UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ERIC E. BEASLEY,

     Plaintiff,

v.

ARAMARK UNIFORM AND CAREER
APPAREL, INC., and JAY HESS, JR.,

     Defendants

Civil Action No. 05-CV-10496-NMG

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Eric E. Beasley, an African-American male, was one of 11 employees fired from

the WearGuard division of Defendant ARAMARK Uniform and Career Apparel, Inc.

("WearGuard")[1] after a two-month investigation implicated them in drug use and drug dealing at

the WearGuard facility.  Despite the fact that numerous witnesses identified Mr. Beasley as a

user and seller of marijuana, and that the majority of the 11 terminated employees were

Caucasian, Mr. Beasley contends that WearGuard actually fired him because of his race, in

violation of Massachusetts General Laws Chapter 151B ("Chapter 151B").  He also contends

that Defendant Jay Hess, Jr., ARAMARK's Manager of Corporate Security, is personally liable

to him under Chapter 151B.

Mr. Beasley's claims fail on the undisputed facts.  He cannot make out even a *prima facie*

case of discrimination, since WearGuard did not replace him, or seek to do so, after he was

terminated.  Even if he could satisfy the elements of a *prima facie* case, there is no evidence

---

[1]     Defendants will continue the parties' convention of referring to Mr. Beasley's employer as "WearGuard," even though ARAMARK Uniform and Career Apparel, Inc. was the actual entity that employed him.  To the extent that it is necessary to distinguish ARAMARK Uniform and Career Apparel, Inc., Defendants will refer to that entity as "ARAMARK."

upon which a reasonable jury could conclude that WearGuard's articulated reason for his termination – violation of the company's drug-free workplace policy – was pretextual, or that WearGuard acted with discriminatory animus.  Mr. Beasley has no evidence that he was treated differently than any similarly situated Caucasian employees.  He has no evidence of any racial bias or discriminatory atmosphere at WearGuard, nor any evidence to dispute that WearGuard believed in good faith that he was involved with illegal drugs.  Mr. Beasley's claims against Mr. Hess fail for the same reasons, and also because his almost non-existent involvement with Mr. Beasley, and his complete lack of involvement in any decisions regarding Mr. Beasley's suspension or termination, falls far short of the standard for imposing personal liability.

## I.     UNDISPUTED FACTS

### A.     Mr. Beasley's Employment at WearGuard.

In 1999, WearGuard hired Mr. Beasley as a Machine Operator in its Custom Embroidery Department.  Mr. Beasley received promotions and pay increases throughout his employment, including a promotion to Digitizer in the Art Department in 2002.  Defendants' Statement of Undisputed Facts ("Defendants' Statement"), ¶¶ 1, 2.

Other than the allegedly discriminatory statements set forth in his Complaint (which Defendants deny), the only racially derogatory statement that Mr. Beasley ever heard at WearGuard (whether directed at him or anyone else) was made in 1999, about six months after he started his employment.  A supervisor named Tim called Mr. Beasley a "stupid N-I-G-A." About 20 minutes later – before Mr. Beasley told anyone at WearGuard what happened – Tim found Mr. Beasley, apologized to him, and admitted that his comment had been "out of line."

Mr. Beasley forgave Tim and considered the matter closed at that point.  Tim resigned shortly

thereafter.  Id. ¶¶ 13-15.[2]

**B.**    **WearGuard's Investigation of Illegal Activities, Including Drugs.**

Throughout Mr. Beasley's employment, WearGuard followed a drug-free workplace

policy, which prohibited "possessing, selling, dispensing, receiving, using, or [being] under the

influence of alcohol or illegal drugs on Company property."  Mr. Beasley was aware of this

policy, and understood that WearGuard could fire employees who violated it.  He also was aware

that WearGuard could fire employees that it *believed* to be using or selling drugs, even if that

belief was mistaken.  Id. ¶¶ 16-18.

In the Spring of 2003, senior management at WearGuard began receiving reports from

department supervisors suggesting widespread drug use among second-shift employees.

Although the supervisors did not have direct proof of drug use, they had observed ongoing

suspicious behavior and had heard rumors that Eric Beasley was the leader of a drug ring –

rumors that Director of Manufacturing Barbara Casagrande also had heard.  Id. ¶¶ 19-23.  As a

result of these reports, Ms. Casagrande and another manager met with the head of security for the

facility, John Cummings, and discussed ways to respond.  Mr. Cummings suggested that he

address the employees at a floor meeting and reiterate WearGuard's zero-tolerance drug policy.

He did so, and for a brief time the suspicious activity (but not the rumors about Mr. Beasley)

ceased.  Id. ¶¶ 24-27.

About a month later, however, the suspicious activities resumed.  Id. ¶ 27.  In August

2003, in response to the continuing rumors of Mr. Beasley's involvement with drugs, Mr.

Cummings obtained a criminal background report on Mr. Beasley.  The report revealed that Mr.

---

[2]    Mr. Beasley has admitted this incident forms no part of his claim against the Defendants.  Defendants'
Statement, ¶ 13 n.6.  It would be time-barred in any event.  See M.G.L. c. 151B, § 9.

Beasley had been charged with possession of marijuana in May 2002, but that the charges had been dismissed on payment of court costs.  WearGuard took no action against Mr. Beasley as a result of this report.  Id. ¶¶ 28-32.

Later that August, Mr. Cummings and Kathy Gillis, a Human Resources Manager, met with Jay Hess, who was in charge of ARAMARK corporate security.  Mr. Hess traveled to Norwell for the meeting from ARAMARK corporate headquarters in Philadelphia.  They discussed various options for addressing the apparent drug problem, ultimately deciding to put an undercover operative in place to observe and report on any suspicious activity.  Mr. Hess recommended an operative named Nechanta Alexander with the firm of Corporate Risk Solutions ("CRS"); Mr. Hess had worked with Ms. Alexander before and found her to be a good observer with careful and accurate reporting skills.  Id. ¶¶ 33-36.

Ms. Alexander began her undercover assignment on September 9, 2003, posing as a member of WearGuard's cleaning crew.  She remained in place until November 5, 2003.  During that time, Ms. Alexander prepared detailed reports of her observations.  CRS forwarded the reports to Mr. Hess, who reviewed them and passed them on to Mr. Cummings.  Mr. Cummings, in turn, regularly apprised Susan Magrini, the Vice President of Human Resources, of the progress of the undercover operation.  Ms. Alexander's reports contained a number of references to an African-American employee named "Eric," who was seen having frequent conversations with Carlos Ortiz, another employee whom Ms. Alexander observed participating in drug activities.  Other employees also referred to "Eric" as a street-smart employee involved with drugs.  In a recap report towards the end of her assignment, Ms. Alexander referred specifically to "Eric Beasley."  Id. ¶¶ 37-45.

The undercover operation revealed evidence of both drug use and theft of company property.  The operation culminated in a "sting" on the evening of November 5, 2003, to attempt to catch employees stealing merchandise.  Several employees were caught stealing and were arrested.  Mr. Beasley was not among them.  He was, however, acting nervous and getting ready to leave while the police were on site.  As a result, Mr. Hess spent about 10 minutes interviewing Mr. Beasley that evening.  Mr. Beasley denied any involvement in illegal activity, but refused to allow police to question him or search the car he had driven to work.  Id. ¶¶ 46-48.  Later that night, Carlos Ortiz – one of the employees arrested in the sting – told Mr. Hess that he had purchased drugs from Mr. Beasley, and gave Mr. Hess a written statement indicating that he had purchased marijuana from "Eric."  Mr. Hess gave Mr. Cummings a copy of the statement and discussed it with him.  Id. ¶¶ 49-52.

That evening and the following morning, Susan Magrini suspended seven employees, including Mr. Beasley, pending further investigation into their possible involvement with illegal activities.  Ms. Magrini based her suspension decisions on the information that the undercover operative had gathered.  *She had no knowledge of the races of the employees she suspended.*  As it turned out, however, three were Caucasian, three were Hispanic, and only one – Mr. Beasley – was African-American.  Id. ¶¶ 53-58.

Mr. Beasley claims that, during their November 5 meeting, Mr. Hess told him, "Come on, I know your kind loves to sell drugs"; that he told Mr. Beasley "to resign before we get you, because we will get you"; and that he told Mr. Beasley there were police dogs sniffing his car in the parking lot, and asked Mr. Beasley if the police could search his car.  Id. ¶¶ 8-9.  As for Ms. Gillis, Mr. Beasley alleges that in their November 6 meeting, when he said he would be embarrassed to return to work after being accused of involvement with drugs, Ms. Gillis replied

that "you don't have to worry; you probably won't be back."  He also alleges that in response to

his denial of involvement with drugs, Ms. Gillis said that she did not believe him, and felt that he

knew more than he was saying.  Id. ¶ 10.  Mr. Beasley admits that Ms. Gillis made no statements

about his race, and that these are the only allegedly discriminatory statements that he attributes to

either Mr. Hess or Ms. Gillis.  Id. ¶¶ 9, 11-12.[3]

Immediately after the sting, WearGuard retained a private investigator, Richard Sjoberg,

to interview WearGuard employees about illegal activities at the Norwell facility.  Mr. Sjoberg

interviewed approximately 15 different employees, including Mr. Beasley.  While Mr. Beasley

(who was the only employee to insist on the presence of an attorney) continued to deny any

involvement with drugs, several other employees told Mr. Sjoberg that Mr. Beasley both used

and sold marijuana.  At least one actually had seen Mr. Beasley with marijuana at work, while

others had heard of his involvement with drugs or had observed Mr. Beasley taking long breaks,

having furtive conversations with other employees, and appearing with blood-shot eyes and

wearing heavy cologne.  Mr. Sjoberg and Mr. Cummings met almost daily with Ms. Magrini and

kept her up-to-date on the information that employees were providing to Mr. Sjoberg.  Id. ¶¶

59-69.  All told, between the undercover operation and Mr. Sjoberg's investigation, WearGuard

spent over $20,000 investigating the illegal activities at its plant.  Id. ¶ 70.

On November 17, 2003, based on the findings of the undercover operation and the

Sjoberg investigation, Ms. Magrini decided to terminate 11 employees, including Mr. Beasley.

Of those employees, only two, including Mr. Beasley, were African-American.  Six of the

employees – a majority – were Caucasian, and three were Hispanic.  *Ms. Magrini still was*

*unaware of Mr. Beasley's race.*  Id. ¶¶ 75-80.

---

[3]    Other than the statements about Mr. Beasley's car, Defendants deny that Mr. Hess or Ms. Gillis made the
alleged statements.  Since these facts are in dispute, however, Defendants will assume them to be true for purposes
of this Motion only.

WearGuard did not replace Mr. Beasley after he was fired, nor did WearGuard seek to fill that position.  WearGuard was in the process of outsourcing many of the Art Department functions, so there was no need to maintain a full headcount in the department by replacing Mr. Beasley.  Additionally, any replacement would require training, and WearGuard was unable to find a trainer who could work the second shift.  Id. ¶ 5.

## II.     ARGUMENT

### A.     Plaintiff's Burden of Proof.

In employment discrimination cases alleging disparate treatment, the Massachusetts Supreme Judicial Court has adopted the familiar three-part burden-shifting analysis set forth by the United States Supreme Court in claims arising under Title VII of the Civil Rights Act of 1964.  See Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 127-28, 686 N.E.2d 1303, 1308 (1997).  Accordingly, a plaintiff bears the initial burden of establishing a *prima facie* case of discrimination based upon his membership in a protected class.  Id. at 128, 686 N.E.2d at 1308.  To do so, he must prove that "[he] is a member of a class protected by G.L. c. 151B; [he] performed [his] job at an acceptable level; [he] was terminated; and [his] employer sought to fill [his] position by hiring another individual with qualifications similar to [his]."  Sullivan v. Liberty Mut. Ins. Co., 444 Mass. 34, 41, 825 N.E.2d 522, 531 (2005).

If a plaintiff is able to establish his *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for his termination and to produce credible evidence to show that the articulated reason was the real reason for the decision.  Id. at 50, 825 N.E.2d at 538.  The defendant's burden is merely one of production, not persuasion.  Id. at 51, 825 N.E.2d at 538.  The defendant need not persuade the finder of fact that its decision was correct.  Matthews, 426 Mass. at 128, 686 N.E.2d at 1309.  Indeed, the defendant has fulfilled its

burden of production even if the reason for the decision may be "unsound or even absurd," or where the employment decision may seem "arbitrary or unwise."  Id.

The burden then returns to the plaintiff to prove that the defendant's stated reason for the adverse employment action is a pretext for unlawful discrimination.  Id.  "If the defendant's reasons are not discriminatory, and if the plaintiff does not prove that they are pretexts, the plaintiff cannot prevail."  Id.  Furthermore, "a challenge to the bases of a defendant's decisions is not sufficient to prove pretext, much less pretext which conceals a discriminatory animus."  Runyon v. Massachusetts Inst. of Tech., 871 F. Supp. 1502, 1510 (D. Mass. 1994).

Summary judgment is appropriate in employment discrimination cases where "the plaintiff is unable to offer admissible evidence of the defendant's discriminatory intent, motive, or state of mind sufficient to carry the plaintiff's burdens and support a judgment in the plaintiff's favor."  Matthews, 426 Mass. at 127, 686 N.E.2d at 1308.  As argued below, that is precisely the case here.

**B.    Plaintiff Cannot Establish a *Prima Facie* Case.**

Mr. Beasley's claims fail for a number of reasons, but initially they stumble on the threshold of his *prima facie* case.  There is no question that Mr. Beasley is in a protected class and suffered an adverse job action.  Similarly, while the Defendants contend Mr. Beasley's drug use and drug dealing mean that he was not performing his job adequately, they concede there is a dispute of fact (although not a material one) as to whether Mr. Beasley was using or dealing drugs since he denies any such activity.

However, it is undisputed that WearGuard did not replace Mr. Beasley, nor did it seek a replacement for him.  WearGuard was in the process of outsourcing many of the Art Department functions, so it was not necessary to bring the department back to a full headcount after Mr.

BOS_525090_4/BLAMKIN

Beasley was terminated.  In addition, WearGuard could not find a trainer to work the second

shift, which would be necessary if Mr. Beasley were replaced.  Defendants' Statement, ¶ 5.

Since it is undisputed that WearGuard did not replace Mr. Beasley, he cannot make out a *prima

facie* case, and his claim fails.  See <u>Worlds v. Thermal Indus., Inc.</u>, 928 F. Supp. 115, 120 (D.

Mass. 1996) (Gorton, J.) (holding that plaintiff's failure to present evidence that he was replaced

was, by itself, sufficient to defeat discrimination claim).

**C.**    **<u>Defendants' Legitimate, Non-Discriminatory Reason for Terminating Mr. Beasley.</u>**

Should the Court determine that Mr. Beasley has stated a *prima facie* case of race

discrimination, the Defendants easily satisfy their burden of production under the second step of

the three-step analysis.  WearGuard's articulated reason for terminating Mr. Beasley's

employment was its conclusion that Mr. Beasley was both using and selling drugs during work

hours and on WearGuard premises.  WearGuard reached this conclusion after spending over

$20,000 on a two-month investigation involving an undercover operative and a private detective,

in which numerous employees identified Mr. Beasley as a user and seller of illegal drugs.  It is

difficult to imagine a more legitimate, less discriminatory reason for terminating an employee.

<u>See, e.g.</u>, <u>Sarullo v. United States Postal Serv.</u>, 352 F.3d 789, 799 (3d Cir. 2003) (violation of

drug policy is legitimate, nondiscriminatory reason for adverse employment action).

**D.**    **<u>Plaintiff Cannot Prove That WearGuard's Articulated Reasons For His
Termination Were a Pretext For Discrimination.</u>**

At the third stage of the burden-shifting analysis, the burden of persuasion is (as it always

remains) on Mr. Beasley to show that WearGuard's actions were a pretext for illegal

discrimination.  Mr. Beasley cannot satisfy this burden.

1.    *Mr. Beasley has no evidence that similarly situated white employees were treated differently.*

In the absence of direct evidence of discrimination (and there is no such evidence here), "[t]he most probative means of establishing that the plaintiff's termination was a pretext for racial discrimination is to demonstrate that similarly situated white employees were treated differently." Matthews, 426 Mass. at 129, 686 N.E.2d at 1309. In this case, however, Mr. Beasley has not identified a single white employee who was in any respect treated differently or more favorably than he was. On the contrary, Mr. Beasley expressly disavowed, under oath, any claim that similarly situated employees of a different race were treated differently than he was. Defendant's Statement, ¶ 7. Indeed, it is difficult to see how Mr. Beasley could have done anything but concede this point, since only two out of the 11 terminated employees were African-American, and the majority were Caucasian. Id. ¶¶ 75-78.

2.    *Mr. Beasley has no evidence that he worked in a discriminatory environment.*

A plaintiff looking for circumstantial evidence of discrimination also might attempt to show a general atmosphere of discrimination at his workplace. Mr. Beasley cannot do so. Other than the alleged racial remarks by Mr. Hess and Ms. Gillis (only one of which – the alleged reference to "your kind" – even remotely could be construed as racial), Mr. Beasley identified only one derogatory mark ("stupid N-I-G-A") directed at him or anyone else. This remark was made by a supervisor *four years* before the events in question in this action. What is more, this supervisor, on his own initiative, apologized to Mr. Beasley 20 minutes after making the remark, made no more derogatory comments, and resigned shortly thereafter. Defendants' Statement, ¶¶ 13-15.

3.  *WearGuard terminated Mr. Beasley and others based on a lengthy and thorough investigation.*

Most fundamentally, Mr. Beasley has no evidence to counter the undisputed fact that he and others were terminated as the result of an extensive investigation implicating them in drug activity (and, for some, theft). As early as the Spring of 2003, WearGuard managers knew of rumors that Mr. Beasley was involved in illegal drugs. Mr. Beasley was aware of WearGuard's drug-free policy, and understood that employees could be fired for violating it, or even if WearGuard simply *believed* they were violating it. WearGuard did not fire Mr. Beasley until it had completed a two-month investigation of numerous employees, involving an undercover operative, a private investigator, and the Norwell police, at a cost of more than $20,000. The undercover operative participated in conversations describing an African-American male named "Eric" as a drug user and dealer; the operative observed numerous interactions between Mr. Beasley and another reported drug user, Carlos Ortiz; and several employees told the private investigator that Mr. Beasley used drugs and brought them to work (along with other incriminating statements).[4] Mr. Beasley was the only African-American employee who was suspended following the undercover operation; he was one of 11 employees terminated following the suspension, the majority of whom were Caucasian; and only one other terminated employee was African-American. *Indeed, it is undisputed that Susan Magrini – the vice president responsible for the suspension and termination decisions – did not even know Mr. Beasley's race*.

---

[4]    If offered for their truth, many of these statements likely would be considered hearsay. Defendants do not, however, offer them for that purpose, but to show WearGuard's "state of mind" and the information available to it when it made the decision to terminate Mr. Beasley's employment. The relevant question is not whether Mr. Beasley actually violated WearGuard's drug policy, but whether WearGuard fired him on the belief (reasonable or not) that he did. <u>Cf.</u> Fed. R. Evid. 404(b) (evidence of prior bad acts admissible for purposes other than showing conduct in conformity therewith).

BOS_525090_4/BLAMKIN

Far from showing discriminatory animus, these facts demonstrate that WearGuard acted deliberately and thoroughly before deciding how to proceed. If WearGuard had wanted to fire Mr. Beasley because of his race, it would have made no sense to go through the substantial time and expense of an investigation when it had continuous rumors of Mr. Beasley's involvement with drugs going back to the Spring of 2003, coupled with evidence that Mr. Beasley had been arrested for possession of marijuana. It makes even less sense that Mr. Beasley was the only African-American suspended, and one of only two out of 11 who were terminated.

4.    *The allegedly discriminatory statements by Mr. Hess and Ms. Gillis are wholly insufficient to show pretext.*

Against this overwhelming evidence, Mr. Beasley principally sets the alleged racial statements by Mr. Hess and Ms. Gillis. Even if those statements were made (which Defendants deny, but assume to be true for purposes of this Motion only), they are wholly insufficient to support a claim of pretext. These statements allegedly were made in the course of two meetings that together lasted no more than 15 or 20 minutes. None of the statements mentions Mr. Beasley's race. The only one that even comes close is Mr. Hess's alleged statement referring to "your kind"; the others are simply expressions of skepticism at Mr. Beasley's protestations of innocence, with no express or even implied connection to his race. There is no evidence that Mr. Beasley had any prior interactions with Mr. Hess, or any of substance with Ms. Gillis, nor is there evidence that either of those individuals did or said anything discriminatory to any other employee. It is undisputed that neither Mr. Hess nor Ms. Gillis made the decision either to suspend or to terminate Mr. Beasley.

Mr. Beasley cannot support his claims by such a gossamer thread. Worlds v. Thermal Industries, Inc., 928 F. Supp. 115, 120 (D. Mass. 1996) (Gorton, J.), is particularly instructive. In Worlds, this Court considered claims by a *pro se* plaintiff that he was terminated because of

racial bias.  In support of his claim, the plaintiff offered evidence of racially charged remarks that were far more egregious than anything Mr. Beasley has offered.  Mr. Worlds alleged that a coworker said that "she would not let her daughter marry a nigger" and "that on her last job she had to work with nigger welfare women … and did not like working with Black's [sic]."  Id. at 118.  Mr. Worlds also described other employees telling jokes about Jews, Chinese, Blacks, and Irish, both in the plaintiff's presence and in the presence of his supervisor.  Id. at 118-19.  Finally, Mr. Worlds alleged that his supervisor complained that his brother could not get a job with the Haverhill fire department "because 3 Black's [sic] and 2 Hispanic's [sic] would always come along."  Id. at 119.

The Court found these remarks insufficient to establish a discriminatory motive on the part of the employer, stating that "Plaintiff has failed … to submit credible evidence that would sufficiently connect those occasional and isolated instances with an alleged invidious motive on the part of the company or his supervisor … to terminate his employment on the basis of his race."  Id. at 121.  Mr. Beasley's evidence is similarly lacking.  He has alleged only one remark that even conceivably could be taken as racially motivated, and has offered no evidence connecting that remark to the termination of his employment.  Such tenuous evidence cannot support a claim under Chapter 151B.  See also Gonzalez v. El Dia, Inc., 304 F.3d 63, 69 (1st Cir. 2002) ("'[S]tray workplace remarks,' as well as statements made either by nondecisionmakers or by decisionmakers not involved in the decisional process, normally are insufficient, standing alone, to establish either pretext or the requisite discriminatory animus.").

    5.    *Mr. Beasley's attack on the results of the investigation is both irrelevant and unavailing.*

Mr. Beasley also attacks the character of the information upon which WearGuard based its decision to suspend and then terminate him.  Such attacks are doomed from the start, since a

finder of fact is not permitted to judge the wisdom or correctness of an employer's decision.  See Mesnick v. General Elec. Co., 950 F.2d 816, 825 (1st Cir. 1991) ("Courts may not sit as super personnel departments, assessing the merits – or even the rationality – of employers' nondiscriminatory business decisions."); Tate v. Department of Mental Health, 419 Mass. 356, 362, 645 N.E.2d 1159, 1163 (1995) ("The employer does not have to persuade the trier of fact that it was correct in its belief.").  Even if such attacks did have relevance, they are fruitless here.

        (a)        **The "Two Erics."**

First, Mr. Beasley has suggested that WearGuard fired the wrong "Eric," and that the "Eric" referred to throughout the investigation was Eric O'Connor, another African-American male of similar size and build.  There is, indeed, a male African-American employee at WearGuard named Eric O'Connor.  Id. ¶¶ 71-72.  It is also true that the reports of the undercover operative refer to employees by first name only, id. ¶ 73, and that the "Eric" in those reports was described as wearing an eye ring – which Eric O'Connor does and which Eric Beasley claims he does not.

As titillating as the suggestion of mistaken identity might be, it ignores the fact that numerous witnesses talked to the private investigator about Mr. Beasley *using his first and last names*.  Id. ¶¶ 67-68.  A former supervisor, for example, told Mr. Sjoberg that "he and Eric *Beasley* started at WearGuard at the same time … [and] he knows for sure that Eric sold drugs at WearGuard at that time," and that "Eric told me not to worry about the supervisor's [sic] … I supply them with pot."  Id. ¶ 68(b) (emphasis added).  Another employee stated, "I heard Eric *Beasley* sold drugs here," id. ¶ 68(c) (emphasis added), while another said, "Eric *Beasley* does all of the above – drugs and steal," and went on to say, "When Eric first started in the Art Department I saw him bring in a big bag of pot in a plastic bag."  Id. ¶ 68(d) (emphasis added).

Others referred to "Eric Beasley" as having blood-shot eyes and being "soaked with cologne." Id. ¶¶ 68(e), (f).  Another coworker stated that, "I heard rumors Eric *Beasley* is dealing drugs out of his desk."  Id. ¶ 68(g) (emphasis added).[5]

Finally, the fact that both "Erics" are African-American defeats any claim of racial bias. If Eric O'Connor had been Caucasian, then perhaps Mr. Beasley could have argued that WearGuard, on the basis of racial stereotypes, automatically assumed that the African-American "Eric" must have been the drug dealer.  Here, no such inference is possible.  The worst that a jury even conceivably could conclude is that WearGuard confused two employees and made an innocent mistake.  While that would be regrettable if it were true, it would not be discriminatory and would not be a violation of Chapter 151B.

### (b)    The Ortiz Statement.

Mr. Beasley also has attacked the statement by Carlos Ortiz that he bought drugs from Mr. Beasley, id. ¶¶ 49-51, relying on the fact that Mr. Ortiz later retracted that statement.  See Sjoberg Report, at ARA 0251-52.  So long as it was not acting with discriminatory motive – and it was not – WearGuard was free to draw whatever conclusions it wished from the evidence before it.  It was well within its rights to credit Mr. Ortiz's original statement rather than his later retraction, and its decision to do so was an exercise of judgment that is not within the province of a fact-finder to second guess.

### (c)    Mr. Beasley's Denials.

Finally, Mr. Beasley has implied that WearGuard disregarded his statements that he had no involvement with drugs and that doing so was somehow wrongful.  To begin with, it is

---

[5]    Additionally, Eric O'Connor worked in the Custom Embroidery Department, while many of the employees who were interviewed described "Eric" as someone who originally had worked in that department but had been promoted to the Art Department – a description that accurately fits Mr. Beasley, and neither Mr. Cummings, Mr. Hess, nor Ms. Magrini knew there was any other African-American "Eric" at the time of the events in question.  Id. ¶¶ 66, 73.

BOS_525090_4/BLAMKIN

undisputed that WearGuard did know about Mr. Beasley's denials, both in his interviews with Mr. Hess and Ms. Gillis and in the statements he made to Mr. Sjoberg. Defendants' Statement, ¶¶ 10, 48, 62, 65. WearGuard was under no obligation to believe Mr. Beasley (and had ample grounds to doubt him, given the numerous other employees who implicated him as a drug dealer). Furthermore, even if WearGuard had not been aware of Mr. Beasley's denials, and had terminated him based on incomplete information (which was not the case), that might, at worst, call into question the reasonableness of WearGuard's actions. The law, however, does not protect employees against unreasonable acts by an employer; it protects only against discrimination, of which there is no evidence here.

(d) **The *Delphi Automotive* Cases.**

A pair of cases from the Western District of New York is particularly instructive. Anderson v. Delphi Automotive Systems Corp., 297 F. Supp. 2d 625 (W.D.N.Y. 2004), and Knighton v. Delphi Automotive Systems Corp., 2004 WL 2415084 (W.D.N.Y. Oct. 28, 2004),[6] involved claims by African-American plaintiffs who were fired after a two-year, internal, undercover investigation into drug trafficking. As a result of the investigation, Delphi fired 14 employees, including the plaintiffs. Of these 14 employees, 10 were Caucasian and four were African-American.

The court granted the defendant's motion for summary judgment in both cases. In the Anderson decision, the court stated:

> At the time the Company made the decision to terminate Anderson and the others, the Company had investigative reports, several of them, indicating illegal activities. The decision to terminate must be judged at that time, not in hindsight. Ultimately, of course, the question is not whether the employer's decision was a wise one, but whether it was motivated by some impermissible, discriminatory purpose. There is no evidence here, save for plaintiff's speculation, that the basis for termination, use of drugs, was pretextual.

---

[6]    A copy of this unreported decision is attached hereto as Exhibit A for the Court's convenience.

BOS_525090_4/BLAMKIN

Anderson, 297 F. Supp. 2d at 628.  The Knighton decision reflected a similar sentiment:

> [E]ven assuming that plaintiff did not sell drugs at his worksite, it is undisputed that defendant *believed* that plaintiff had sold drugs on company property.  Even if the defendant was mistaken with respect to its belief that plaintiff sold drugs at work, absent evidence that the defendant acted against the plaintiff based on a discriminatory animus, the mistaken belief would not give rise to the inference of discrimination.

Knighton, 2004 WL 2415084, at *4 (citations omitted; emphasis added).  The court held that "there is no evidence that Knighton's employment was terminated because he was black.  Rather, the evidence indicates that Knighton was fired along with 13 other employees (10 of whom were white) following a two-year undercover investigation into illegal drug activity at the defendant's worksite."  Id.  See also Rice v. Comtek Mfg. of Ore., 766 F. Supp. 1544, 1548 (D. Ore. 1990) ("[P]laintiff attempted to show the unreasonableness of defendants' belief that he was dealing drugs.  Even if plaintiff had shown defendants' belief was unreasonable, such a showing would have been immaterial because defendants had the right to fire plaintiff any time for any reason or no reason at all.") (citation omitted).

These cases are precisely on point.  Neither this Court nor a jury may pass judgment on the wisdom of WearGuard's actions.  The only relevant question is whether WearGuard fired Mr. Beasley because of his race – and the undisputed facts prove that it did not.

**E.     The Evidence Is Insufficient To Hold Mr. Hess Personally Liable.**

In addition to his claim against ARAMARK, Mr. Beasley seeks to impose personal liability on Jay Hess.  Mr. Beasley relies on two provisions of Chapter 151B:  Section 4(4A), which makes it unlawful "[f]or any person to coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right granted or protected by this chapter"; and Section 4(5), which makes it unlawful "[f]or any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden

BOS_525090_4/BLAMKIN

under this chapter or to attempt to do so."  Mr. Beasley's claims against Mr. Hess fail not only for all the reasons discussed above, but also because Mr. Hess's conduct falls far short of that needed to establish personal liability under either of the theories that Mr. Beasley alleges.

Massachusetts courts have recognized the potential for individual liability under Chapter 151B.  See Beaupre v. Cliff Smith & Assocs., 50 Mass. App. Ct. 480, 738 N.E.2d 753 (2000).  However, it has been largely left to the MCAD to explain the parameters of such liability.  In Woodason v. Town of Norton School Committee, 25 MDLR 62 (2003),[7] the Commission laid out three circumstances under which an interference claim under § 4(4A) might be appropriate.  The first concerns harassment-based claims, which Mr. Beasley is not asserting; the second applies where – unlike here – there is direct evidence of discrimination.  Id. at 64.  The third applies "[w]here there is only circumstantial evidence of discrimination":

> [E]mployees may be named if: (a) They had the authority or the duty to act on behalf of the employer; (b) Their action or failure to act implicated rights under the statute; and (c) There is evidence articulated by the complainant that the action or failure to act was in deliberate disregard of the complainant's rights allowing the inference to be drawn that there was intent to discriminate or interfere with complainant's exercise of rights.

Id.

Mr. Beasley is unable to prove these elements.  It is undisputed that Mr. Hess had no authority to fire any employees.  Defendants' Statement, ¶ 82.  He made no recommendations about suspensions or terminations, nor did he participate in any way in those decisions.  Id. ¶¶ 54, 66, 82.  He was not asked for, nor did he offer, any opinions about which employees should be suspended or terminated.  Id. ¶¶ 55, 66.  Mr. Hess's undisputed role in this entire series of events was to arrange for and provide high-level oversight of the investigation, and to make suggestions and recommendations regarding general aspects of corporate security.  There is nothing about this role that implicated Mr. Beasley's rights under Chapter 151B, and Mr. Hess

---

[7]     A copy of Woodason is attached as Exhibit B for the Court's convenience.

hardly can be said to have acted in "deliberate disregard" of Mr. Beasley's rights when it is undisputed that he did nothing whatsoever to impact those rights.

In fact, Mr. Hess's entire interaction with Mr. Beasley took place during one ten-minute interview that was arranged at the last minute on the night of the sing operation. According to Mr. Beasley, Mr. Hess made one ambiguous remark about "your kind," advised Mr. Beasley to "resign before we get you, because we will get you," and had a discussion with Mr. Beasley about having the police search his car. Id. ¶ 8. Even assuming Mr. Hess made these statements — which he denies, except for the discussion about Mr. Beasley's car — they hardly suffice to prove the kind of intent to discriminate that is required for individual liability.

Mr. Beasley's "aiding and abetting" claim under Section 4(5) fares no better. To begin with, that claim is entirely derivative of the claim against ARAMARK; if the claim against ARAMARK falls (as it does), the claim against Mr. Hess falls with it. See Abramian v. President & Fellows of Harvard College, 432 Mass. 107, 122, 731 N.E.2d 1075, 1088 (2000). In addition, a plaintiff asserting an aiding and abetting claim must prove that "a wholly individual and distinct wrong was committed by [the individual defendant] … [and that] the aider or abetter shared an intent to discriminate not unlike that of the alleged principal offender, and that the aider or abetter knew of his or her supporting role in an enterprise designed to deprive an individual of a right guaranteed to him or her under G.L. c.151B." Harmon v. Malden Hospital, 19 MDLR 157 (1997).[8]

Mr. Beasley has not alleged a "wholly individual and distinct wrong" by Mr. Hess; if anything, he has claimed that Mr. Hess was part and parcel of WearGuard's supposed discrimination. Furthermore, there is no evidence (even if Mr. Hess had made the statements that Mr. Beasley attributes to him) that Mr. Hess had any discriminatory intent, nor is there

---

[8]    A copy of Harmon is attached as Exhibit C for the Court's convenience.

evidence from which a reasonable jury could conclude that WearGuard was engaged in "an enterprise designed to deprive [Mr. Beasley] of a right guaranteed to him or her under G.L. c.151B." On the contrary, the undisputed facts show that WearGuard engaged in a lengthy, expensive, and thorough investigation to ensure that its employees – even those selling drugs and stealing merchandise – were treated fairly. Since there was no discriminatory enterprise, there was no way Mr. Hess could have aided or abetted it. Furthermore, even if WearGuard had set out to discriminate against Mr. Beasley (which it did not), there is no evidence from which a jury could conclude that Mr. Hess knew about that goal or tried to help bring it about.

### III.    CONCLUSION

For the foregoing reasons, there are no genuine issues of material fact, and the Defendants are entitled to judgment in their favor as a matter of law.

ARAMARK UNIFORM AND CAREER
APPAREL, INC., and JAY HESS, JR.,
By their attorneys,


/s/ Brian H. Lamkin
_____
Timothy P. Van Dyck (BBO No. 548347)
Brian H. Lamkin (BBO No. 635688)
EDWARDS ANGELL PALMER & DODGE LLP
111 Huntington Avenue
Boston, MA  02199
(617) 239-0100
(617) 227-4420 (fax)

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on March 2, 2006, and that there are no non-registered participants.


/s/ Brian H. Lamkin
_____
Brian H. Lamkin (BBO No. 635688)

BOS_525090_4/BLAMKIN

# EXHIBIT A

Westlaw.

Not Reported in F.Supp.2d                                                      Page 1
Not Reported in F.Supp.2d, 2004 WL 2415084 (W.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,W.D. New York.
Gregory KNIGHTON, Plaintiff,
v.
DELPHI AUTOMOTIVE SYSTEMS, Defendant.
**No. 03-CV-6270T.**

Oct. 28, 2004.

George S. Mehallow, Syracuse, NY, for Plaintiff.
James C. Holahan, Ward, Norris, Heller & Reidy, LLP,
Rochester, NY, for Defendant.

DECISION and ORDER

TELESCA, J.

### INTRODUCTION

*1 Plaintiff Gregory Knighton, ("Knighton"), brings this
action pursuant to 42 U.S.C. § 1981, and the New York
State Executive Law claiming that he was discriminated
against by his employer defendant Delphi Automotive
Systems, ("Delphi"), on the basis of his race, and status as a
convicted felon. Specifically, plaintiff, who has
subsequently been rehired by the defendant, contends that
he was unlawfully terminated from his position as a
machine operator because he is an African-American, and
because he was convicted of a felony drug possession crime
in 1990.

Defendant denies plaintiff's allegations, and moves for
summary judgment dismissing plaintiff's complaint.
Specifically, defendant contends that Knighton was
terminated along with several other employees after a
two-year internal investigation revealed that plaintiff had
sold drugs at work in violation of local shop rules.
Defendant contends that plaintiff has failed to state a prima
facie case of discrimination because he has not presented
any evidence demonstrating that he was denied any right,
privilege, or benefit with respect to the contract governing
his employment, or that Delphi intentionally discriminated
against him on the basis of his race. In the alternative,
defendant contends that even if plaintiff has stated a prima

facie case of race discrimination, he has failed to rebut the
defendant's legitimate non-discriminatory reason for
terminating his employment: specifically that an internal
investigation revealed that plaintiff had sold drugs on
company property in violation of company rules and the
plaintiff's contract of employment. With respect to plaintiff's
claim that he was discriminated against on the basis of his
felony status, defendant denies those claims and contends
that plaintiff has failed to present any evidence of a
discriminatory animus based on his criminal status.

For the reasons set forth below, I grant defendant's motion
for summary judgment, and dismiss plaintiff's complaint
with prejudice.

### BACKGROUND

Plaintiff Gregory Knighton began working for defendant
Delphi Automotive Systems (formerly General Motors
Corporation) as a machine operator in September 1978. In
1990, he was convicted of the felony offense of unlawful
possession of a controlled substance. In 1998, Delphi
commenced a two-year undercover investigation into
unlawful drug trafficking at its Lexington Avenue plant,
where plaintiff was employed. As a result of the
investigation, Delphi fired 14 employees, including the
plaintiff, for engaging in illegal drug trafficking. Of the 14
employees terminated, 10 were white, and 4 were black.

Following his termination on September 26, 2000, plaintiff
filed a grievance through his union, which was initially
denied. Plaintiff also sought unemployment insurance
benefits. After an initial denial of his claim for
unemployment benefits, the New York State
Unemployment Insurance Appeal Board held that there was
no credible evidence that Knighton had sold marijuana on
company property, and therefore the Appeal Board awarded
plaintiff unemployment benefits.

*2 On June 4, 2003, Knighton filed the instant action.
Thereafter, on September 26, 2003, the parties settled the
plaintiff's grievance, and Knighton was reinstated to his
position under a "last chance" agreement under which he
agreed to waive certain rights and protections afforded
employees under the general collective bargaining

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2
Not Reported in F.Supp.2d, 2004 WL 2415084 (W.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

agreement. Pursuant to that agreement, which expressly provides that the settlement "does not set any precedent nor prejudice either parties' position in future cases" Knighton agreed that Delphi "acted justly and properly" in initially terminating Knighton's employment.

### DISCUSSION

#### I. Defendant's Motion for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." When considering a motion for summary judgment, all inferences and ambiguities must be resolved in favor of the party against whom summary judgment is sought. *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54 (2nd Cir.1997). If, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party, a grant of summary judgment is appropriate. *Annis v. County of Westchester,* 136 F.3d 239, 247 (2nd Cir.1998).

#### II. Plaintiff's *Section 1981* Claims

42 U.S.C. § 1981 provides in relevant part that: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens...." 42 U.S.C.A. § 1981 (1994). To state a claim under § 1981, "a plaintiff must allege facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant, and (3) the discrimination concerned one or more of the activities enumerated in the statute ..." *Mian v. Donaldson, Lufkin & Jenrette Securities,* 7 F.3d 1085 (2nd Cir.1993) (citation omitted).

"Essential to an action under section 1981 are allegations that the defendants' acts were purposefully discriminatory and racially motivated." *Albert v. Caravano,* 851 F.2d 561, 571 (2nd Cir.1988) (citations omitted). Discrimination

claims brought under Title VII and 42 U.S.C. § 1981 are both governed by the familiar three-part analytical framework set forth in *McDonnell Douglas, supra. See Haywood v. Heritage Christian Home, Inc.,* 977 F.Supp. 611, 613 (W.D.N.Y.1997) (Larimer, C.J.) (Noting that both claims are governed by *McDonnell Douglas* standard.); *Choudhury v. Polytechnic Institute of New York,* 735 F.2d 38, 43 (2nd Cir.1984) (Same elements constitute a claim for employment discrimination under § 1981 as under Title VII.).

**\*3** Pursuant to *McDonnell Douglas,* as refined in *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) and *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), the plaintiff in an employment discrimination case bears the initial burden proving a *prima facie* case of discrimination. If the plaintiff succeeds in stating a *prima facie* case, the burden of production then shifts to the defendant to state a legitimate, non-discriminatory reason for the employment action. Should the defendant establish a legitimate, non-discriminatory reason for taking an adverse employment action against the plaintiff, the burden of production then shifts back to the plaintiff to show that the reasons proffered by the employer were not the true reasons, were a pretext for discrimination, and that discrimination was the real reason for the adverse employment action. *See Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252-53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *St. Mary's Honor Center v. Hicks,* 509 U.S. 502-06, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

In order to establish a *prima facie* case of employment discrimination, a plaintiff must show (1) that he belonged to a protected class; (2) that he was qualified for the position; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *See Shumway v. United Parcel Service, Inc.,* 118 F.3d 60, 63 (2nd Cir.1997). *See Wong v. Kings County District Attorney's Office,* 2004 WL 692165, \*3 (E.D.N.Y. March 31, 2004) ("The substantive standards applicable to a claim of disparate treatment, i.e. intentional discrimination, under section 1981 are the same as those under Title VII.")

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2004 WL 2415084 (W.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

(citations omitted).

In the instant case, plaintiff has failed to state a prima facie case of racial discrimination. While it is uncontested that he is a member of a protected class, that he was qualified for his position, and that he suffered an adverse employment action, there is no evidence suggesting that the termination of his employment or failure to be rehired for three years after his employment initially ended occurred under circumstances giving rise to an inference of discrimination. Plaintiff has come forward with no evidence that his termination was racially motivated. He has failed to submit evidence that he was treated differently than white employees, and has failed to submit evidence of a any discrimination or hostility directed towards any protected class.

Instead, plaintiff claims that he must have been discriminated against because the stated reason for his termination (that he sold drugs on company property) was false, and therefore pretextual. In support of this position, plaintiff alleges that he never sold drugs on company property, and further relies upon the determination of the New York State Unemployment Insurance Appeal Board, which found that there was insufficient evidence in the record before that body to determine that plaintiff had actually sold drugs on company property. Plaintiff contends that this determination collaterally estops the defendant from arguing that plaintiff was terminated because of his alleged sale of drugs to an undercover investigator.

*4 However, pursuant to New York State Law, the decision of the Unemployment Insurance Appeal Board is not binding on this court. New York Labor Law § 623(2). Moreover, even assuming that plaintiff did not sell drugs at his worksite, it is undisputed that the defendant believed that plaintiff had sold drugs on company property. Even if the defendant was mistaken with respect to its belief that plaintiff sold drugs at work, absent evidence that the defendant acted against the plaintiff based on a discriminatory animus, the mistaken belief would not give rise to an inference of discrimination. See Byrnie v. Board of Education, 243 F.3d 93, 103 (2nd Cir.2001) (court's role in discrimination case is to prevent unlawful employment practices, "not to act as a superpersonnel department that

second guesses employers' business judgments."); Mesnick v. General Electric Co., 950 F.2d 816, 825 (1st Cir.1991), cert. denied, 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992) (Courts do not sit as "super-personnel departments, assessing the merits-or even the rationality-of employers' nondiscriminatory business decisions."). Federal courts "are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir.2002) (internal quotation marks omitted).

In this case, there is no evidence that Knighton's employment was terminated because he was black. Rather, the evidence indicates that Knighton was fired along with 13 other employees (10 of whom were white) following a two-year undercover investigation into illegal drug activity at the defendant's worksite. There is no evidence that plaintiff was targeted because of his race, and the fact that 10 of the 14 employees who were fired were white demonstrates that plaintiff was not treated more harshly than similarly situated white employees.

Plaintiff contends in establishing a prima facie case, he may rely on the alleged falsity of the defendant's explanation for terminating his employment to raise an inference of discrimination. See Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment at p. 2. In support of this argument, plaintiff cites the United States Supreme Court case of Reeves v. Sanderson, 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) for the proposition that "[i]t is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment at p. 2. Clearly, however, under the burden-shifting analysis of McDonnell Douglas, the veracity or lack thereof of the employer's explanation for terminating the employment of an employee may not be taken into consideration unless the plaintiff has established a prima facie case of discrimination. Only after the plaintiff has established a prima facie case may the employer's explanation for terminating the plaintiff be considered. Accordingly, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2415084 (W.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 4

employer's explanation may not be considered in determining whether or not the plaintiff has established a prima facie case.

**\*5** A close reading of the *Reeves* case confirms that the alleged falsity of employer's explanation may not, standing alone, establish a prima facie case of discrimination. As the Court stated in *Reeves,* " '[T]he factfinder's disbelief of the reasons put forward by the defendant ... may, *together with the elements of the prima facie case,* suffice to show intentional discrimination." ' *Reeves,* 530 U.S. at 147 (emphasis added) (citing *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

Finally, plaintiff contends that he was discriminated against because three white employees were rehired prior to plaintiff being rehired, and because he did not receive pay or benefits for the time he was not employed with Delphi. Plaintiff, however, has failed to establish that he was treated differently than white employees with respect to his being rehired. There is no evidence that any white employee received back pay or benefits upon being rehired, that white employees received more favorable terms than the plaintiff, or that white employees were disproportionately favored with respect to rehiring.

I note that my determination comports with the recent Decision and Order issued by Judge Larimer of this District dismissing the discrimination complaint filed by Russell Anderson, an African-American employee of the defendant who worked at the same location as the plaintiff in this case and who was also terminated as a result of the defendant's two-year undercover investigation. *See Anderson v. Delphi Corporation,* 297 F.Supp.2d 625 (W.D.N.Y.2004).

### III. *Plaintiff's State Law Claims*

Where a district court has dismissed all claims over which it has original jurisdiction, the court may decline to exercise jurisdiction over state law claims. 28 U.S.C. 1367(c)(3). *See also United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (district court, may, in its discretion, dismiss a plaintiff's state law claims where "considerations of judicial economy, convenience, and fairness to the parties" require.) Because plaintiff's federal

claims have been dismissed, I decline to exercise jurisdiction over his remaining state law claims.

### *CONCLUSION*

For the reasons set forth above, I grant defendant's motion for summary judgment and dismiss plaintiff's federal claims with prejudice. Plaintiff has failed to state a prima facie case of employment discrimination as he has failed to set forth any evidence suggesting that the termination of his employment or failure to be rehired occurred under circumstances giving rise to an inference of discrimination. Even if plaintiff could state a prima facie case of discrimination, he has failed to rebut the defendant's legitimate, non-discriminatory reason for terminating his employment. Because plaintiff's federal claims are dismissed with prejudice, I decline to entertain jurisdiction over plaintiff's remaining state law claims. Finally, defendant's motion to amend its answer is denied as moot.

**\*6** ALL OF THE ABOVE IS SO ORDERED.

W.D.N.Y.,2004.
Knighton v. Delphi Automotive Systems
Not Reported in F.Supp.2d, 2004 WL 2415084 (W.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 6:03cv06270 (Docket) (Jun. 04, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

## CITE AS 25 MDLR 62

(2) Pay to Complainant, Jill Mercurio, the sum of $100, 000.00 in damages for emotional distress with interest thereon at the rate of 12 % per annum from the date the Complaint was filed until such time as payment is made or the matter is reduced to a court order and post-judgment interest begins to accrue. Payment shall be made within 60 days of receipt of this decision.

The Complaint against Robert Atamian is hereby dismissed.

The parties shall notify the Clerk of the Commission as soon as the ordered payments have been made. If any Respondents fail to comply with this Order within the time period allotted, please notify the Clerk of the Commission.

This constitutes the final order of the Hearing Officer. Any party aggrieved by this decision may file a Notice of Appeal with the Full Commission within ten (10) days of receipt of this Order and a Petition for Review with the Full Commission within thirty (30) days of receipt of this Order.

So Ordered this 11th day of February, 2003.

* * * * * *

### MARY-ANN WOODASON

v.

### TOWN OF NORTON SCHOOL COMMITTEE, MAURICE SPLAINE and IRENE STANOVICH

Docket No. 98-BEM-0624

*February 19, 2003*
*Cynthia A. Tucker, Commissioner*
*Walter J. Sullivan Jr., Commissioner*

*Full Commission Review–Reasonableness of ·Emotional Distress Damages–Individual Liability*—The Full Commission affirmed a Hearing Officer's refusal to find individual liability in a handicap-discrimination case in noting the absence of the requisite intent to discriminate but affirmed an award of $50,000 in emotional-distress damages as reasonable in light of the Town of Norton's own liability.

### DECISION OF THE FULL COMMISSION

This matter came before us following a decision of Hearing Officer Eugenia Guastaferri in favor of the Complainant [24 MDLR 21]. Following an evidentiary hearing, the Hearing Officer concluded that Respondent, Town of Norton School Committee, discriminated against Complainant due to her disability in violation of M.G.L. c. 151B, § 4(16), when she was terminated from her position as a cafeteria assistant at the Nourse Elementary School. The Hearing Officer found in favor of the Complainant as to the employer Respondent, but dismissed the complaint as to the individual Respondents. Both the Complainant and Respondents then filed timely appeals to the Full Commission.

The responsibilities of the Full Commission are outlined by statute, the Commission's Rules of Procedure (804 CMR 1.00 *et seq.*) and relevant case law. It is the duty of the Full Commission to review the record of proceedings before the hearing commissioner or officer. M.G.L. c. 151B, § 5. The Hearing Officer's findings of fact must be supported by substantial evidence, which is defined as "...such evidence as a reasonable mind might accept as adequate to support a finding..." *Katz* v. *MCAD*, 365 Mass. 357, 365 (1974); M.G.L. c. 30A. It is the responsibility of the hearing officer to evaluate the credibility of witnesses and/or to weigh the evidence when deciding disputed questions of fact, and the Full Commission defers to these determinations. See e.g. *School Committee of Chicopee* v. *MCAD*, 361 Mass. 352 (1972); *Bowen* v. *Colonnade Hotel*, 4 MDLR 1007, 1011 (1982). The role of the Full Commission is to determine whether the decision under appeal was rendered in accordance with the law, or whether the decision was arbitrary or capricious, an abuse of discretion, or was otherwise not in accordance with the law. See 804 CMR 1.16(8)(f).

We have carefully reviewed the petition for appeal and the full record in this matter and have weighed all the objections to the decision in accordance with the standard of review articulated

herein. Respondents assert that the decision of the Hearing Officer finding that Complainant was subjected to unlawful discrimination in employment constitutes an abuse of discretion and is not supported by substantial evidence in the record. In addition, Respondents submit that the remedial orders of the Hearing Officer constitute an abuse of discretion. *See Dartt v. Browning-Ferris Industries, Inc.*, 427 Mass. 1 (1998).

As a result of our review, we find no material errors of fact or law and conclude that there is substantial evidence in the record to support the findings of fact made by the Hearing Officer. We, therefore, deny Respondents' appeal.

Complainant has appealed the Decision of the Hearing Officer on the grounds that: a) it was error of law to not find Respondent Maurice Splaine individually liable for his actions[1]; b) the determination that $50,000.00 was a suitable compensatory award of emotional distress constitutes an abuse of discretion; and c) the failure to award statutory interest constituted an abuse of discretion and clear error of law.[2]

We will address the two remaining grounds.

*1. Emotional Distress Award*

In her decision, the Hearing Officer found that:

"Complainant and her husband testified credibly about the emotional distress and physical maladies Complainant suffered as a result of her termination. Complainant lost a great deal of weight which caused her to suffer hair loss and was very depressed as a result of having lost her job. She stopped socializing and just sat at home. Complainant testified that she became obsessed with the loss of her job and called Gail Scott so many times that Gail asked her to stop calling and she lost a friendship over this. There was also testimony that Complainant was so distraught over having been terminated that she threatened Rivard with the possible loss of her job, if Rivard testified against her. Complainant stated that she had just lost it at that point because she believed a school official had lied in deposition about the events leading up to her termination and this caused her to make such an irrational threat. I am persuaded that Complainant suffered significant emotional distress as a direct result of Respondent's actions and is entitled to an award of $50,000.00."

We have previously held that it is the responsibility of the Hearing Officer to evaluate the credibility of witnesses and/or to weigh the evidence when deciding disputed questions of fact. The Full Commission defers to these determinations. See e.g., *School Committee of Chicopee v. MCAD*, 361 Mass. 352 (1972); *Bowen v. Colonnade Hotel*, 4 MDLR 1007, 1011 (1982). The role of the Full Commission is to determine whether the decision on appeal was rendered in accordance with the law, or whether the decision was arbitrary, capricious, or an abuse of discretion. See, 804 CMR 1.16(8)(f). See e.g., *Said v. Northeast Security*, 23 MDLR 124 (2001 Order of the Full Commission).

As the Commission previously noted in *Baldelli v. Town of Southboro*, 18 MDLR 167, 168 (1996):

A challenge to the damages awarded as against the weight of the evidence generally is a matter within the judge's discretion. As the judge here recognized, '*a judge has no right to set aside a verdict merely because he himself would have assessed the damages in a different amount.*' [Citing *Bartley v. Phillips* 317 Mass. 35, 40 (1944)]. The judge concluded that the jury could have reached, honestly and fairly, the award that they did based on the plaintiff's continuing permanent pain and disability, and the impairment of her earning capacity. For this reason, the judge declined to exercise his discretion and to order a remittitur or a new trial because the award was against the weight of the evidence. We find no abuse of discretion in this ruling. *Maria F. Solimene v. B. Grauel & Co., & Another,* 399 Mass. 790, 802 (1987) (as cited in *Said supra*).

In the instant matter, we find that there was substantial evidence in the record to award emotional distress. We further find there is insufficient basis, based on the applicable scope of review, to disturb the award as issued by the Hearing Officer.

*2. Individual Liability*

In her Decision, the Hearing Officer found:

Complainant named both Splaine and Stanovitch as individuals in her Complaint of discrimination. She seeks to hold Splaine liable as an individual under M.G.L. c. 151B, s. 4(4A) for interfering with her right to work free of unlawful discrimination. Since the individuals named in this complaint are not the employer and thus not covered by M.G.L. c. 151B, s.4 (16), the individuals would have to be found liable under alternative sections of the statute which prohibit individuals from retaliating, aiding and abetting discrimination, or threatening, intimidating, coercing or interfering with an individual's rights. See. *Hudson v. Pembroke/ Hanover Elks Lodge, et al.* 24 MDLR 19 (2002) (Full Commission found individual liable for retaliation.) In order to be held liable under these sections an individual Respondent must have undertaken some act wholly individual and distinct from, or in furtherance of, the employer's discriminatory act. *Harmon v. Malden Hospital,* 19 MDLR 157 (1997). I conclude that such is not the case in this matter.

While the cases relied on by the Hearing Officer address individual liability, this Commission has recently addressed this question with different results. In *Bendell v. Lemax Inc. et al.*, 22 MDLR 259, 262 (2000), Commissioner Schwarz stated:

Complainant seeks to hold Respondent Lee liable as an individual under G.L. c. 151B, s.4, par. 4A for interfering with her right to

---

1. Complainant did not appeal the Hearing Officer's dismissal of the complaint filed against Irene Stanovitch.

2. Complainant's objection to the failure of the Hearing Officer to award interest requires no discussion, as the law in Massachusetts has been set forth in *City of Salem v. MCAD* , 44 Mass. App. Ct. 627 (1998):

Finally, the city challenges the imposition of interest on the damages award. Interest on MCAD awards does not lie against the Commonwealth *or its instru-*

*mentalities* (as here) in the absence of express statutory authority. See *Boston v. Massachusetts Comm'n. Against Discrimination*, 39 Mass. App. Ct. 234, 245-246 (1995), and cases cited. The principle of that decision presents an application of the doctrine of sovereign immunity, as explained in *Onofrio v. Department of Mental Health*, 411 Mass. 657, 659 (1992), a doctrine which, despite different historical bases, is normally treated as applying to the Commonwealth and to municipalities without important distinction. See *Morash & Sons, Inc.* v. *Commonwealth*, 363 Mass. 612, 616-618 (1973).

work at Lemax free of unlawful discrimination. Respondent argues that section 4, paragraph 4A is not intended to proscribe "direct" denials of rights. Respondent cites cases construing G.L. c. 12, s.11H and 111 (the Massachusetts Civil Rights Act) in support of its assertion. E.g., *Longval* v. *Commissioner of Correction*, 404 Mass. 325, 333 (1989).

Respondent states that the language of G.L. c. 151B, s. 4, par. 4A is "identical" to G.L. c. 12, s. 11H and 111, and therefore the word "interfere" should be construed identically. In fact, the word "interfere" appears differently in the two statutes. In G.L. c. 12, s. 11H, "interfere" is modified by "threats, intimidation or coercion," which are the three ways a person is forbidden from interfering with the exercise or enjoyment of a protected right. *In G. L. c. 151B, s. 4, par. 4A, "interfere" stands on its own, unmodified, as an impermissible action, with no requirement of threats, intimidation or coercion.* (emphasis added)

Respondent's argument raises the question of whether the legislature intended individual liability to be imposed in the large number of circumstances implicated by the plain language of G.L. c. 151B, s. 4, par. 4A. But to interpret the statute to exempt from coverage "direct" denials of protected rights would read into the statute words it does not contain. In view of the legislative mandate that the statute be "construed liberally for the accomplishment of the purposes thereof," G.L. c. 151B, s. 9; *Bournewood Hospital* v. *MCAD*, 371 Mass. 303 (1976), such a reading would be unduly restrictive. In line with the broader reading of G.L. c. 151B, trial courts have concluded that the statute applies to "any person who interferes with another's right to work free of unlawful discrimination." *Ruffino* v. *State Street Bank and Trust Co.*, 908 F.Supp. 1019,1048 (D. Mass. 1995); *Morehouse* v. *Berkshire Gas Co.*, 989 F.Supp 54, 60 (D. Mass. 1997), regardless of whether the interference is "direct."

We would modify and amplify the analysis articulated by Commissioner Schwarz, above. In our view his construction of the language "interfere with the rights protected under this statute," because it gives no consideration of the context in which the phrase appears, requires amplification. While we agree that the word "interfere" does not necessarily require coercion, intimidation or threats, the concept of interference with one's rights must be construed with some regard for the context of the statutory language within which it appears. In construing the word "interfere" to give no import to the strong language surrounding it would be misguided. Thus, we conclude that in order for an individual to be held liable for a violation of M.GL. c. 151B he must have, at the very least, "interfered" with another's rights in a manner that was in deliberate disregard of those rights.

Starting from this premise we hold that complaints alleging violations of M.GL. c. 151B, § 4(4A) *may* appropriately name individual employees as respondents in the following circumstances:

1. Where the individuals are alleged perpetrators of unlawful harassment (sexual and otherwise), they may be named as individual respondents, without regard to whether they are supervisors or co-workers. Such individuals may be charged with "*interfering with*

*one's exercise or enjoyment of the right to a non-discriminatory, harassment free, workplace.*"

2. Where there is direct evidence of discrimination and the alleged perpetrator of discrimination was in a supervisory position in which he or she had direct control over complainant's employment, the individual may be named as acting in deliberate disregard of complainant's rights.

3. Where there is only circumstantial evidence of discrimination, employees may be named if:

a. They had the authority or the duty to act on behalf of the employer;

b. Their action or failure to act implicated rights under the statute; and

c. There is evidence articulated by the complainant that the action or failure to act was in deliberate disregard of the complainant's rights allowing the inference to be drawn that there was intent to discriminate or interfere with complainant's exercise of rights.

The evidence in this record does not establish the requisite "*intent to discriminate*" required in order to find Maurice Splaine individually liable for unlawful discrimination.[3] Therefore, we affirm the Decision of the Hearing Officer dismissing the complaint against Maurice Splaine.

Having affirmed the decision of the Hearing Commissioner, in favor of the Complainant, we conclude that the Complainant has prevailed in this matter and is therefore entitled to an award of reasonable attorneys' fees and costs.

The determination of what is a reasonable fee is one that the Commission approaches utilizing its discretion and its understanding of the litigation of a claim of discrimination in the administrative forum of the Commission Against Discrimination. In rendering a determination of what is a reasonable fee, the Commission has adopted the lodestar method for fee computation. *Fontaine* v. *EBTEC Corp*, 415 Mass. 309, 613 N.E.2d 881, 891 (1993); *Baker* v. *Winchester School Committee*, 14 MDLR 1079 (1992); *Brown* v. *City of Salem*, 14 MDLR 1365 (1992). This method requires the Commission to undertake a two-step analysis. First, the Commission will calculate the number of hours reasonably expended to litigate the claim and then multiply that number by an hourly rate considered to be reasonable. Second, the Commission will then examine the resulting figure, known as the "lodestar", and adjust it either upward or downward or not at all depending on various factors.

A calculation of the hours reasonably expended involves separating out work done in relation to the individual doing the work (e.g., senior partner, junior associates, and paralegal). Time beyond that consistent with a standard of reasonable efficiency and productivity is eliminated. Hours that appear to be duplicative,

---

3. While there are circumstances where the mere "*failure to act*" may, in and of itself, constitute a sufficient basis to establish an *intent* to interfere, that is not the case here. M.G.L. c. 151B, § 4(16) has been construed to require an employer to engage in some pro-active conduct with a "*qualified handicapped person, capa-*

*ble of performing the essential functions of the position involved with reasonable accommodation.*" However, based on the facts in the instant matter, we agree with the Hearing Officer's finding that Mr. Splaine did not act with deliberate disregard of Ms. Woodason's rights pursuant to M.G.L.c. 151B.

unproductive, excessive, or otherwise unnecessary to prosecution of the claim are subtracted, as are hours insufficiently documented. *Grendel's Den* v. *Larkin*, 749 F.2d 945 (1st Cir. 1984); *Miles* v. *Samson*, 675 F.2d 5 (1st Cir.1982); *Furtado* v. *Bishop*, 635 F.2d 915 (1st Cir. 1980); *Baird* v. *Belloti*, 616 F.Supp. 6 (D.Mass 1984); *Brown* v. *City of Salem*, 14 MDLR 1365 (1992).

The Commission's efforts to determine the number of hours reasonably expended will involve more than simply adding all hours expended by all personnel. The Commission carefully reviews the Complainant's submission and will not simply accept the proffered number of hours as "reasonable". *See e.g.*, *Baird* v. *Belloti*, *supra*.

In the instant matter, counsel for the Complainant has submitted extensive affidavits and attachments thereto detailing the hours expended during the course of this matter before the Commission. We have examined the facts of this case, the affidavits submitted by complainant and the billing specification of time and services. Based upon this and similar matters before the Commission, we conclude that these listed hours are reasonable. Despite Respondent's assertion to the contrary, we see no evidence to warrant a conclusion that these hours were excessive.

Furthermore, we find that the hourly rates requested by Complainant's counsel are reasonable and are within the range of rates common to the marketplace within which Complainant obtained counsel and litigated her claim *See, e.g. Baker* v. *Winchester School Committee*, 14 MDLR 1097 (1992).

Thus, the lodestar figure here of $74,760.80 for attorneys' fees and costs is hereby allowed. We decline to adjust this figure upward since it is in our view a reasonable award under the circumstances presented.

ORDER

For the reasons set forth above, we hereby affirm the findings of fact, conclusions of law and the Order of the Hearing Officer and issue the following ORDER of the Full Commission:

1. Within sixty (60) days of receipt of this Order, Respondent, Town of Norton School Committee, shall pay to Complainant the amount of $50,000 in damages for emotional distress.

2. Within sixty (60) days of receipt of this Order, Respondent, Town of Norton School Committee, shall pay to Complainant the amount of $4,595.40 in damages for lost wages in the form of back pay.

3. Within sixty (60) days of receipt of this Order, Respondent, Town of Norton School Committee, shall pay to Complainant the amount of $28,970.02 in damages for lost pension retirement benefits.

4. Respondent, Town of Norton School Committee, shall conduct a training session for all of its cafeteria managers and supervisors, and those school officials, including the Superintendent, who make determinations regarding medical leaves of absence, use of sick time, accommodations to disabled employees and termination. This training shall be conducted within 3 months of the issuance of this Order and on an annual basis thereafter if there is over 50% turnover in the above positions resulting in new employees. The training shall be at least one-half day and shall include a review of the employer's obli-

gations under M.G.L. c. 151B, § 4 (16). The trainer shall be an approved trainer from the MCAD trainer referral list and the MCAD shall be provided with advance notice of the training date and the training agenda for approval. The Respondent shall provide the MCAD with notice of compliance with this training session, including the date it was held and the names and titles of those in attendance.

5. The complaint against Respondents Maurice Splaine and Irene Stanovitch is hereby dismissed.

6. Within sixty (60) days of receipt of this Order, Respondent, Town of Norton School Committee, shall pay $74,760.80 for attorneys' fees and costs to the Complainant.

This ORDER represents the final action of the Commission for purposes of M.G.L. c.30A. Failure to comply with this Order will result in the Commission's initiation of enforcement proceedings, pursuant to 804 CMR 1.25, which may subject the non-complying party to both civil and criminal penalties as provided in M.G.L. c.151B, s.8.

Any party aggrieved by this final determination may contest the Commission's decision by filing a complaint in superior court seeking judicial review, together with a copy of the transcript of proceedings. Such action must be filed within 30 days of receipt of this decision and must be filed in accordance with M.G.L. c.30A, c.151B, §6, and the 1996 Superior Court Standing Order on Judicial Review of Agency Actions. The filing of a petition pursuant to M.G.L. c.30A does not automatically stay enforcement of this Order. Failure to file a petition in court within 30 days of receipt of this Order will constitute a waiver of the aggrieved party's right to appeal pursuant to M.G.L. c.151B, s.6.

SO ORDERED this 19th day of February, 2003.

\* \* \* \* \* \*

# EXHIBIT C

Docket #  **96-BEM-1146**
Parties:  **REVELLA HARMON  V.  MALDEN HOSPITAL**
Appearing:
Date:  **January 31, 1997**
ORDER

Charles E. Walker, Jr., Investigating Commissioner

    This matter came before me on: Respondent's motion for a protective order; and Complainant's August 1996 motion, not yet acted upon, to amend her charge to add a claim against Joseph Gravel MD and to add a claim of discrimination based upon disability.

1.    Protective Order

    After review of the investigative needs of the Commission in this matter, and the legitimate business interests of the Respondent in maintaining confidentiality of the materials, I direct that a protective order, issue making such materials confidential as to the general public. The materials include all filings of the Respondent which identify third parties by name. Respondent should note however, that this order is subject to renewal if this matter proceeds to a public hearing. Therefore, during the pendancy of this matter before me as investigating commissioner, materials submitted by Respondent in its position statement are subject to this order of confidentiality. Since the materials pertain directly to alleged comparators, it is in the interest of the Commission to allow the Complainant to view such data. Therefore, Complainant may review such materials but may not disclose them to third parties excepting her attorney. Violations of this order may subject the offending party to appropriate sanctions, including dismissal of the claim altogether.

2.    Motion to Amend

    As to paragraphs 1 and 2 of the motions to amend, the individual named by the Complainant in her motion to amend is not alleged to be her employer and so it is only under the provisions of G.L. c. 151B, s.4 (4), (4A) and (5) that claims may proceed against individuals. These provisions read in part as follows:

[it is an unlawful practice]:

    4(4)  For any person, employer, labor organization or employment
           agency to discharge, expel or otherwise discriminate
           against any person because he has opposed any
           practices forbidden under this chapter or because he
           has filed a complaint, testified or assisted in any
           proceeding under section five.

    4(4)  For any person to coerce, intimidate, threaten, or interfere
           with another person in the exercise or enjoyment of
           any right granted or protected by this chapter, or to
           coerce, intimidate, threaten or interfere with such
           other person for having sided or encouraged any other
           person in the exercise or enjoyment of any such right
           granted or protected by

                         -    2    -

    4(5).  For any person, whether an employer or an employee or not,
           to aid, abet, incite, compel or coerce the doing of
           any of the acts forbidden under this chapter or
           attempt to do so.

(emphasis added)

    To the extent that Complainant argues that the amendment is proper since "persons" as opposed to "employers" may be found liable in their individual capacity, Complainant has properly stated a rule of liability drawn from these sections of G.L. c.151B. The application of such rule is, however, not subject to easy articulation. The Supreme Judicial Court has not yet spoken to the issue of personal liability under G.L. c.151B in any manner which clearly delineates the evidentiary standards necessary to demonstrate liability. While the MCAD has in the past spoken to the question in somewhat oblique terms, there is some discusion in Massachusetts decisional law which is helpful.[1]

    A claim that an individual is liable under the chapter is a claim which on its face seeks to establish accessory liability. That is, while as here the individual is not alleged to be the "employer" the allegation which is necessary to hold the individual liable is that he/she: retaliated (see sec. 4(4): coerced, intimidated, threatened or interfered (see sec. 4(4)): or, aided, abetted, incited, compelled or coerced (sec. 4(5)) in the doing of certain acts specified in those provisions.

    Accessory liability, while more familiarly a concept in the criminal las, also has a footing where the alleged wrong is a civil wrong. Planned Parenthood League of Mass v. Blake, 471 Mass 467, 481 (1994). In Planned Parenthood, the SJC was confronted with an issue not too unlike the issue which might be presented at the MCAD in an "aiding and abetting" case. There, acting under the Massachusetts Civil Rights Act (MCRA), G.L. c.12 s.s. 11H, 11L, a superior court judge issued an injunction which included a clause barring the defendants from "aiding and abetting" directly or indirectly any persons who engaged in any of the acts made unlawful under this injunction. The Court noted that:

> Because intentional conduct is the measure of a violation of the
>         MCRA...proof of a violation of the aiding or abetting
>         prohibition of [the injunction] will require a
>         showing of a defendant's intention to assist
>         intentional conduct violative of [other provisions of
>         the injunction]...

Planned Parenthood v. Blake, supra at 481

    The Court also noted that aiding and abetting requires proof that the defendant knew of its substantial supporting role in an unlawful enterprise, and that any violator of the prohibition against aiding or abetting in the injunction must share the mental state of the principal violator. See also Kyte v. Phillip Morris Inc, 408 Mass 162, 168-169 (1990), Deas v. Dempsey, 403 Mass. 468, 471 (1998), Commonwealth v. Sylvester, 400 Mass 334, 339, n.6 (1987), Redgrave v. Boston Symphony Orchestra, Inc., 399 Mass 93, 99 (1987), and Commonwealth v. Richards, 363 Mass. 299, 307-308 (1973). While these principles have not been discussed within the context of G.L. c.151B, I believe that the concepts are easily transferable to fact patterns involving employment discrimination claims. The principles appear equitable, have rational public policy underpinnings, and I adopt them.

                        -  3  -

    Thus, in order to prevail on a claim of personal liability under G.L. c.151B, s.s. (4), 4(4A) or 4(5) a complainant must demonstrate that a wholly individual and distinct wrong was committed by the proposed or named individual respondent(s). This wrong must be separate and distinct from the claim to main. See e.g., Davis v. City of Chelsea, 3 MDLR 1335, 1377 (1981). Further, the complainant must provide credible evidence that the aider or abetter shared an intent to discriminate not unlike that of the alleged principal offender, and that the aider or abetter knew of his or her supporting role in an enterprise designed to deprive an individual of a right guaranteed him or her under G.L. c.151B. Negligent acts or omissions such as a negligent failure to investigate a claim while possibly rendering the employer liable under various theories, do not in and of themselves operate to render the (e.g.) human resources manager personally liable. There must exist direct evidence to permit a reasonable fact finder to conclude that the

aider/abettor possessed the requisite intent and knowledge of the unlawful enterprise to render himself or herself liable under an accessory liability theory.

In this case, the Complainant states that she was treated more harshly by the individual, but does not provide evidence that the individual was motivated by an intent to retaliate against her, or to aid or abet the primary respondent, the hospital, in promoting a scheme which was premised upon unlawful and prohibited motivations. This being the case, the Complainant cannot at this pint in time amend her claim since she cannot articulate a prima facie case of individual liability. Complainant has 14 days from the

- 4 -

date of receipt of this order to refile her request to amend with a more specific statement of facts which she believes demonstrates that the individual who is proposed to be brought into this matter and who is proposed to be personally and individually liable to her, in fact was motivated by unlawful considerations. I will revisit the issue upon receipt of such information.

As to paragraph 3 of the motion to amend, Complainant seeks to add a count of disability discrimination. Her claim is that she was subject to disability discrimination but she provides no specifics. Since her motion to amend was filed within 6 months of the alleged wrong, I allow it as a technical amendment, with the provision however that she forthwith submit a more specific statement indicating: the nature of the disability; the nature of the alleged act of discrimination (whether it be failure to accommodate or unlawful termination etc.); the specifics if she did seek accommodation; and, the evidence which she believes demonstrates that the Respondent hospital acted with unlawful consideration of her disability.

I reserve judgment on the motion to amend pending receipt of such further information. Such information should be submitted directly to: George Napolitano, General Counsel, MCAD, Rm 601, 1 Ashburton Place, Boston, MA 02108, within 14 days of receipt of this order. Copies of all such information shall be submitted to opposing counsel as well

SO ORDERED this 31st day of January 1997
*******************

*Commissioner:*
-------------------

[1] In this regard I would also note that federal law is not useful in this area since Title VII, Title VIII, the ADEA and the ADA contain no analogous provision

End Of Decision