UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ERIC E. BEASLEY,

       Plaintiff,

v.

ARAMARK UNIFORM AND CAREER
APPAREL, INC., and JAY HESS, JR.,

       Defendants

Civil Action No. 05-CV-10496-NMG

## DEFENDANTS' STATEMENT OF UNDISPUTED FACTS

Defendants ARAMARK Uniform and Career Apparel, Inc. ("ARAMARK") and Jay
Hess, Jr. ("Hess"), by and through their undersigned attorneys, submit this Statement of
Undisputed Facts pursuant to Local Rule 56.1.  To the extent these facts recount Plaintiff's
allegations against Defendants, Defendants present them as undisputed because Defendants will
assume them to be true, but legally insufficient, for the purposes of its Motion for Summary
Judgment.  Defendants do not concede, and in fact dispute, Plaintiff's allegations on the merits.

## A.      PLAINTIFF'S AT-WILL EMPLOYMENT WITH WEARGUARD

1.      In 1999, ARAMARK hired Plaintiff Eric Beasley as a second-shift (3:30 p.m. to
12:30 a.m.) Machine Operator in the Custom Embroidery ("CE") Department of its WearGuard
division in Norwell, Massachusetts.[1]  In 2002, he was promoted to a Digitizer position in the Art
Department, also on the second shift.  [Affidavit of Barbara Casagrande ("Casagrande Aff."), ¶
4.]

---

[1]      To maintain the convention that the parties have used throughout this case, Defendants will refer to Mr.
Beasley's employer as "WearGuard," since he was employed by the WearGuard division of ARAMARK.

2.    Mr. Beasley got a raise when he was promoted to Digitizer.  [Deposition of Eric Beasley ("Beasley Depo."), at 77:5-9.][2]

3.    Mr. Beasley was an at-will employee throughout his employment with WearGuard.  Mr. Beasley understood that he was an at-will employee, and understood that WearGuard had the right to fire him for any reason except illegal discrimination.  [Beasley Depo., at 112:13 to 113:5.]

4.    On November 17, 2003, WearGuard terminated Mr. Beasley's employment. [Beasley Depo., at 138:7-8.]

5.    WearGuard did not replace Mr. Beasley after he was fired, nor did WearGuard seek to fill that position.  First, WearGuard was in the process of outsourcing many of the Art Department functions, so there was no need to maintain a full headcount in the department by replacing Mr. Beasley.  Second, any replacement would require training, and WearGuard was unable to find a trainer who was available to work the second shift (the shift on which Mr. Beasley had worked).  [Casagrande Aff., ¶ 15.]

**B.    THE ABSENCE OF DISCRIMINATORY ANIMUS AT WEARGUARD**

6.    Mr. Beasley's claims of discrimination are based solely on two brief meetings he had on November 5, 2003, and November 6, 2003.  [Complaint, ¶¶ 13-25; Beasley Depo., 114:12 to 115:6; Plaintiff's Amended Answers to Defendants' First Set of Interrogatories ("Plaintiff's Int. Ans."), No. 11.][3]

---

[2]    Referenced portions of the Beasley deposition are attached hereto as Exhibit A.
[3]    A copy of the Complaint is attached hereto as Exhibit B.  A copy of the referenced portions of Plaintiff's Amended Answers to Defendants' First Set of Interrogatories is attached hereto as Exhibit C.

BOS_514226_4/BLAMKIN

7.    Mr. Beasley does not contend that WearGuard discriminated against other African-American employees, nor that similarly situated employees of a different race were treated any differently than he was.  [Plaintiff's Int. Ans., Nos. 12, 13.]

8.    Mr. Beasley alleges that in the November 5, 2003, meeting, Defendant Jay Hess, ARAMARK's Manager of Corporate Security, said, "Come on, I know your kind loves to sell drugs"; that Mr. Hess told Mr. Beasley "to resign before we get you, because we will get you"; and that Mr. Hess told Mr. Beasley there were police dogs sniffing his car in the parking lot, and asked Mr. Beasley if the police could search his car, even though Mr. Beasley claimed that the car was not his.  [Complaint, ¶¶ 16-18; Beasley Depo., at 106:15 to 107:15; 121:21 to 124:17; 127:5-18.][4]

9.    These are the only allegedly discriminatory comments that Mr. Beasley attributes to Mr. Hess.  [Beasley Depo., at 109:5-15.]

10.    In the November 6, 2003, meeting, Mr. Beasley told WearGuard's Director of Human Resources, Kathy Gillis, that he would be embarrassed to return to work after being accused of involvement with drugs.  Mr. Beasley alleges that Ms. Gillis then told him, "you don't have to worry; you probably won't be back."  He also alleges that in response to his denial of involvement with drugs, Ms. Gillis said that she did not believe him, and felt that he knew more than he was saying.  [Beasley Depo, at 106:15-21; 109:16 to 110:11.][5]

---

[4]    Mr. Hess denies making the alleged statements, except for a brief discussion about Mr. Beasley's car. There is, therefore, a dispute of fact as to what was said in the meeting between Mr. Beasley and Mr. Hess.  As Defendants argue in their Memorandum of Law, however, this dispute is not material, since Mr. Beasley's allegations, even if true, are insufficient to support a verdict in his favor.

[5]    Ms. Gillis denies making these statements.  Again, this presents a dispute of fact, but not a material one; even if Ms. Gillis made these statements, they would not suffice to prove discriminatory animus on the part of WearGuard.

BOS_514226_4/BLAMKIN

11.     Mr. Beasley admits that Ms. Gillis made no statements concerning his race. [Beasley Depo., at 110:2-9.]

12.     These are the only allegedly discriminatory statements that Mr. Beasley attributes to Ms. Gillis.  [Beasley Depo., at 110:14-16.]

13.     Mr. Beasley claims that in 1999, about six months after WearGuard hired him, a supervisor named Tim called him a "stupid N-I-G-A."  About 20 minutes later – before Mr. Beasley told anyone at WearGuard what happened – Tim found Mr. Beasley, apologized to him, and admitted that his comment had been "out of line."  Mr. Beasley forgave Tim and considered the matter closed at that point.  Tim resigned shortly thereafter, and made no further racial comments to Mr. Beasley.[6]  [Beasley Depo., at 84:8 to 86:17.]

14.     Other than the single racial epithet by Tim in 1999, and the allegedly discriminatory comments by Mr. Hess and Ms. Gillis (which they deny) on November 5, 2003, and November 6, 2003, no one at WearGuard ever made any racist comment to Mr. Beasley. [Beasley Depo., at 86:18 to 87:9.]

15.     Mr. Beasley never heard anyone at WearGuard direct a racist comment to anyone else.  [Beasley Depo., at 87:1-9.]

**C.     WEARGUARD'S DRUG-FREE POLICY AND PLAINTIFF'S UNDERSTANDING OF IT**

16.     WearGuard has a zero-tolerance policy for using, buying, or selling illegal drugs at work.  That policy is reflected in the Employee Handbook, distributed to all employees, and includes the following statement:  "WearGuard-Crest is committed to maintaining a workplace

---

[6]     Mr. Beasley does not allege that this incident forms any part of his claims against the Defendants.  He has stated unequivocally that the allegations in his Complaint – which are limited to the alleged statements by Mr. Hess and Ms. Gillis – are the only basis for his claims.  [Beasley Depo., at 114:12 to 115:6.]

BOS_514226_4/BLAMKIN

that is free of illegal drugs and alcohol.  As such, the Company will not tolerate any employee possessing, selling, dispensing, receiving, using or under the influence of alcohol or illegal drugs on Company property, or any employee being in the presence of someone engaging in such activity."  Among the partial list of prohibited actions in the Employee Handbook is the following:  "Possessing, using or being under the influence of alcohol or any illegal drugs on Company time or Company property, or being in the presence of someone engaging in such activity."  [Casagrande Aff., ¶ 3; Employee Handbook, at 14, 40.][7]

17.    Mr. Beasley was aware of and understood WearGuard's drug-free workplace policy, and understood that violations of that policy could result in termination of employment. [Beasley Depo., at 15:14 to 17:3; 70:23 to 74:9.]

18.    Mr. Beasley understood that WearGuard had the right to fire him if it believed he was involved with illegal drugs at work, even if that belief was mistaken.  [Beasley Depo., at 113:6 to 114:7.]

D.    **WEARGUARD'S INITIAL SUSPICIONS OF DRUG ACTIVITY**

19.    In the Spring of 2003, senior management in the CE Department and Art Department began to receive information from department supervisors suggesting widespread drug use among second-shift employees.  Brian Caswell, a second-shift CE Department supervisor, approached Director of Manufacturing Barbara Casagrande to discuss concerns about possible drug use.  Mr. Caswell told Ms. Casagrande that several employees had approached him to report extensive drug use by other employees, although they would not disclose any names. Mr. Caswell also reported that he frequently observed groups of employees going out to the

---

[7]    Referenced portions of the Employee Handbook are attached hereto as Exhibit D, and as Exhibit A to the Casagrande Affidavit.

parking lot together and getting in each others' cars, then returning with glassy eyes and smelling like marijuana. He complained that the department was getting out of control, but he felt he could not do anything since he had not actually seen anyone using or dealing drugs. [Casagrande Aff., ¶ 5.]

20.    Mr. Caswell also told Ms. Casagrande about frequent rumors he heard to the effect that Eric Beasley was selling drugs to employees in the CE Department, and that Mr. Beasley was the "ring leader" of a drug ring.  [Casagrande Aff., ¶ 6.][8]

21.    From time to time, Ms. Casagrande herself had heard similar rumors about Mr. Beasley's involvement with drugs.  [Casagrande Aff., ¶ 6.]

22.    Around the same time that Mr. Caswell spoke to Ms. Casagrande, another CE Department supervisor, Mike Lowder, brought similar concerns about drug use to her attention. [Casagrande Aff., ¶ 7.]

23.    Mr. Caswell and Mr. Lowder also brought these issues to the attention of Kathy McNeely, the Manager of the CE Department.  [Casagrande Aff., ¶ 8.]

24.    At that point, Ms. Casagrande and Ms. McNeely felt the situation was serious enough to bring to the attention of John Cummings, who was in charge of security for the Norwell facility.  They met with Mr. Cummings to explore how best to address the apparent drug

---

[8]    Defendants are offering evidence of these rumors not for their truth, but as part of the information available to WearGuard when it made the decision to terminate Mr. Beasley's employment.  WearGuard's belief that Mr. Beasley was using or selling drugs is relevant; whether he actually was doing so is not.  "The employer does not have to persuade the trier of fact that it was correct in its belief."  Tate v. Department of Mental Health, 419 Mass. 356, 362, 645 N.E.2d 1159, 1163 (1995).  See, e.g., Southerland v. Sycamore Community School Dist. Bd. of Ed., 277 F. Supp. 2d 807, 816 (S.D. Ohio 2003) ("[E]vidence that rumors … were disseminated is not hearsay when they are not offered for the truth of the rumors but for the fact that the rumors were spread.") (citation omitted); Equal Employment Opp. Comm'n v. Champion Int'l Corp., 1995 WL 488333, at *6 (N.D. Ill. Aug. 1, 1995) (Rumors "are relevant, if at all, only for what they indicate about [the supervisor's] mental state in acting as the decision-maker who discharged [complainant].").

BOS_514226_4/BLAMKIN

problem.  They discussed the information they had learned from Mr. Caswell and Mr. Lowder, and asked Mr. Cummings for recommendations on how to proceed.  [Casagrande Aff., ¶¶ 8-9.]

25.     Mr. Cummings suggested that he address all of the employees at a floor meeting, tell them that management was aware of possible drug activity, and remind them about ARAMARK's zero-tolerance policy for drugs in the workplace.  [Casagrande Aff., ¶ 9.]

26.     Ms. Casagrande and Ms. McNeely agreed with this approach, and Mr. Cummings made his presentation to the employees shortly thereafter.  [Casagrande Aff., ¶ 9; Beasley Depo., at 116:19 to 117:2.]

27.     Mr. Cummings' speech seemed to have a positive effect for about a month.  The supervisors reported less suspicious activity, and the rumors of rampant drug use died down.  About a month after his speech, however, the rumors and suspicious activities increased again to at least the level they had been before Mr. Cummings' speech.  The rumors about Mr. Beasley's involvement as a drug "ring leader" continued, as well.  [Casagrande Aff., ¶ 10.]

28.     In early August 2003, Ms. Casagrande again met with Mr. Cummings.  She explained to him that the apparent drug problem was ongoing, and that some further action needed to be taken.  She also told Mr. Cummings about the frequent rumors of Mr. Beasley's involvement, and they discussed the possibility of running a criminal background check on Mr. Beasley.  [Casagrande Aff., ¶ 11.]

29.     Shortly thereafter, Mr. Cummings engaged the services of a private investigator, Richard Sjoberg, to check Mr. Beasley's criminal history.  Mr. Sjoberg did so, and forwarded a report containing this information to Mr. Cummings.  [Deposition of John Cummings

("Cummings Depo."), at 21:17-21; 24:1-11;[9] Affidavit of Richard A. Sjoberg ("Sjoberg Aff."), ¶¶ 4-7.]

30.    A true and accurate copy of the report is attached hereto as Exhibit F, and as Exhibit A to the Sjoberg Affidavit (with references to Mr. Beasley's social security number, date of birth, residential street address, and driving record redacted).  [Sjoberg Aff., ¶ 7.]

31.    The report indicated, among other things, that Mr. Beasley had been charged with possession of marijuana in May 2002 after a traffic stop.  According to the court records, the charge was dismissed on payment of $200.00 in court costs.  [Sjoberg Aff., ¶ 6.]

32.    Mr. Cummings took no action against Mr. Beasley as a result of the report. [Cummings Depo., at 24:19 to 25:1.]

## E.    THE UNDERCOVER OPERATION AND THE "STING"

33.    Following his August 2003 meeting with Ms. Casagrande, Mr. Cummings called Jay Hess, the Manager of Corporate Security for ARAMARK, to discuss the apparent drug problem at the Norwell facility.  Mr. Cummings told Mr. Hess he had received reports of extensive illegal drug activity among employees at the facility, and asked for Mr. Hess's advice on options and strategies for investigating the matter further.  [Affidavit of Jay M. Hess, Jr. ("Hess Aff."), ¶ 4.]

34.    On August 21, 2003, Mr. Hess traveled to Norwell and met with Mr. Cummings and Kathy Gillis, a Human Resources Manager.  They discussed the options available for addressing the drug problem, and concluded that the best course of action would be to place an undercover operative on site to observe and report on any suspicious activity.  [Hess Aff., ¶ 5.]

---

[9]        Referenced portions of the Cummings Deposition are attached hereto as Exhibit E.

BOS_514226_4/BLAMKIN

35.     During that meeting, Mr. Cummings told Mr. Hess that there were two names that came up repeatedly in rumors about drugs at WearGuard.  One of those names was Eric Beasley. [Hess Aff., ¶ 6.]

36.     Shortly thereafter, Mr. Hess recommended that WearGuard use an undercover operative named Nechanta Alexander, with the firm of Corporate Risk Solutions ("CRS") in Atlanta, Georgia.  Mr. Hess had worked with Ms. Alexander on other undercover operations, and he considered her to be a careful and accurate reporter of everything she observed on an assignment.  [Hess Aff., ¶ 7.]

37.     Ms. Alexander began her undercover operation on September 9, 2003, posing as a new member of the cleaning crew.  Ms. Alexander continued in this capacity until November 5, 2003, when the undercover operation ended.  [Hess Aff., ¶ 8.]

38.     Throughout her assignment, Ms. Alexander, in conjunction with the CRS office in Atlanta, prepared detailed reports, by date and time, of her observations (the "Undercover Operative Reports").  CRS forwarded the completed reports to Mr. Hess, who reviewed them and forwarded them on to Mr. Cummings.  [Cummings Depo., at 78:18 to 80:3; Hess Aff., ¶ 10.]

39.     In a number of places, the Undercover Operative Reports make reference to an African-American employee named "Eric."  "Eric" is frequently seen having conversations with Carlos Ortiz, another employee whom the operative observed participating in drug activities. True and accurate copies of the entries referring to "Eric" are attached hereto as Exhibit G, and as Exhibit A to the Hess Affidavit.  [Hess Aff., ¶ 11 & Exh. A.]

40.     According to the Undercover Operative Reports, an employee told Ms. Alexander, during a discussion about employees' use of "dope," that "I am not going to say the name [Eric] again, but they will never catch him. I have been here for five years and if nobody

BOS_514226_4/BLAMKIN

else has sense, Eric has some." Another employee, Bill, stated that "what they should have done is bring someone in who does not know Eric and catch him with his hand in the jar." [Undercover Operative Reports, at ARA 0176-77.]

41.     Ms. Alexander also reported that Carlos Ortiz told her, "Eric smokes more weed that you and I put together." [Undercover Operative Reports, at ARA 0221.]

42.     On November 4, 2003 – at the conclusion of the undercover operation – CRS prepared and forwarded to Mr. Hess an "Undercover Operation Recap," summarizing the operative's findings with respect to illegal activity at WearGuard (the "Recap"). A true and accurate copy of the Recap is attached hereto as Exhibit H, and as Exhibit B to the Hess Affidavit. [Hess Aff., ¶ 12 & Exh. B.]

43.     On the first page of the Recap, Eric Beasley is identified, by first and last name, as someone whom the operative observed having substantial interactions with Mr. Ortiz, who was observed participating in drug activity. [Hess Aff., ¶ 12; Recap, at ARA 0629.]

44.     The Recap also states that "John is observed on several occasions driving an Audi registered to Eric Beasley." [Recap, at ARA 0633.]

45.     Mr. Cummings regularly kept Susan Magrini, the Vice President of Human Resources, apprised of the progress of the undercover operation. [Cummings Depo., at 46:14-16.]

46.     During the course of the undercover operation, Ms. Alexander observed evidence of both drug use and theft of company property. As a result of her findings, Mr. Cummings and Mr. Hess, in conjunction with the Norwell Police Department, implemented a "sting" operation in an attempt to catch employees stealing company property. Specifically, on the evening of November 5, 2003, they loaded a Ryder truck (which WearGuard typically uses for deliveries)

with WearGuard merchandise, left it unlocked in the WearGuard parking lot, and set up observation points. Over the course of several hours, three different groups of employees (which did not include Mr. Beasley) came to the truck, removed merchandise, and brought the merchandise either to their cars or back with them into the building. The police arrested these employees later that evening. [Hess Aff., ¶ 13.]

47.     At approximately 9:00 that evening, Mr. Hess interviewed Mr. Beasley after Mr. Cummings informed him that Mr. Beasley was very nervous and was preparing to leave. [Hess Aff., ¶ 14.]

48.     Mr. Hess met with Mr. Beasley that evening for approximately 10 or 15 minutes. He told Mr. Beasley that his name had been associated with drug activity at WearGuard, and asked him whether that was true. Mr. Beasley denied any involvement with drugs. Mr. Hess asked Mr. Beasley whether he would be willing to talk with the police, as they were on site because of the sting operation. Mr. Beasley refused to speak with the police. Mr. Hess then asked Mr. Beasley whether he would allow the police to search his car. Mr. Beasley replied that his car was in the shop. Mr. Hess told him he was referring to whatever car he used to get to work that day, and Mr. Beasley replied that the police could not search anything of his unless they had a warrant. At that point, Mr. Hess gave Mr. Beasley his business card and asked him to call if he had any information about drug activity at WearGuard. The meeting then ended. [Hess Aff., ¶ 15.]

49.     Later that evening, Mr. Hess went to the Norwell police station to meet with the police chief about the sting. One of the officers told him that one of the arrested employees, Carlos Ortiz, had asked to meet with a company representative. Mr. Hess then met with Mr. Ortiz, who indicated that he wanted to cooperate in the investigation. Among other things, Mr.

Ortiz stated that he had purchased marijuana from "Eric" on a number of occasions.  Mr. Hess

asked Mr. Ortiz "Eric's" last name, and Mr. Ortiz replied, "Beasley."  [Hess Aff., ¶ 17.]

50.     Mr. Ortiz prepared a written statement, which he and Mr. Hess both signed (the

"Ortiz Statement").  A true and accurate copy of the Ortiz Statement is attached hereto as Exhibit

I, and as Exhibit C to the Hess Affidavit.  [Hess Aff., ¶ 17 & Exh. C.]

51.     In the Ortiz Statement, Mr. Ortiz wrote: "Two or three weeks ago I met Eric at

my machine & bought 2 bags of weed witch [sic] was dimes.  I bought weed off of him on more

than one accation [sic] always on Wearguard propertie [sic], about a dozen time [sic].  It went

from dimes to 8ths witch [sic] was 45 dollars."  [Exh. I.]

52.     Either later that evening or the following morning, Mr. Hess gave the Ortiz

Statement to Mr. Cummings.  Mr. Cummings and Mr. Hess discussed Mr. Ortiz's statement, as

well as Mr. Hess's meeting with Mr. Beasley.  [Hess Aff., ¶ 18.]

**F.     THE SUSPENSION OF PLAINTIFF AND OTHER EMPLOYEES**

53.     On the evening of November 5, 2003, and the morning of November 6, 2003,

Susan Magrini decided to suspend the employees that had been implicated in the undercover

operation and sting, including Mr. Beasley.  [Deposition of Susan Magrini ("Magrini Depo."), at

22:7-14; 47:21 to 48:9; 54:8-15; 137:21 to 138:4.][10]

54.     Mr. Hess had no involvement in deciding which employees to suspend.  [Hess

Aff., ¶ 19.]

55.     Mr. Hess was not asked for nor did he offer any opinion on the suspensions.

[Hess Aff., ¶ 19.]

---

[10]     Referenced portions of the Magrini Deposition are attached hereto as Exhibit J.

56.    Ms. Magrini based her decision to suspend the employees, including Mr. Beasley, on the information developed during the undercover operation, as relayed to her by Mr. Cummings.  [Magrini Depo., at 22:7 to 23:4; 25:19 to 26:4; 27:23 to 28:14; Cummings Depo., at 46:14-16.]

57.    At the time Ms. Magrini made the decision to suspend the group of employees, she had no information about their respective races, and she did not know that Mr. Beasley was African-American.  [Magrini Depo., at 55:19-22; 57:19-23; 137:21 to 138:14.]

58.    Of the seven individuals suspended, three were Caucasian and three were Hispanic; Mr. Beasley was the only African-American.[11]  [Defendant ARAMARK's Response to Plaintiff's First Set of Interrogatories ("ARAMARK's Ans. to Int."), No. 20.[12]]

## G.    THE SJOBERG INVESTIGATION

59.    Immediately after the sting, WearGuard retained the services of a private investigator, Richard Sjoberg, to interview WearGuard employees in an attempt to gather additional information about illegal activities at the Norwell facility, including drug use and drug dealing.  [Cummings Depo., at 60:15-24; Sjoberg Aff., ¶ 8.]

60.    Between November 10, 2003, and November 17, 2003, Mr. Sjoberg interviewed approximately 15 individuals.  Most of the interviews took place in a conference room at the Norwell facility.  Mr. Cummings attended those on-site interviews, as well as an off-site interview with Carlos Ortiz.  [Sjoberg Aff., ¶ 9.]

---

[11]    The undercover operative, who is African-American, was listed as an additional suspended employee in order to maintain her "cover" after her assignment was concluded.  [Magrini Depo., at 67:8-19.]

[12]    Referenced portions of ARAMARK's answers to interrogatories are attached hereto as Exhibit K. References to employees who were not suspended or terminated as a result of WearGuard's investigation have been redacted.

    BOS_514226_4/BLAMKIN

61.    Ms. Casagrande was among the individuals whom Mr. Sjoberg interviewed.  She repeated to him what she had told Mr. Cummings about Mr. Beasley in August 2003. [Casagrande Aff., ¶¶ 13-14.]

62.    On or about November 17, 2003, Mr. Sjoberg interviewed Mr. Beasley at his attorney's office.  Of the numerous WearGuard employees that Mr. Sjoberg interviewed, Mr. Beasley was the only one who requested the presence of an attorney.  Mr. Sjoberg asked Mr. Beasley whether he had ever possessed or used drugs at WearGuard, or was aware of other employees who had.  He answered "no" to each of those questions.  [Sjoberg Aff., ¶ 11; Beasley Depo., at 142:11 to 143:7.]

63.    On or about November 25, 2003, Mr. Sjoberg prepared a written report detailing his interviews, and provided that report to Mr. Cummings (the "Sjoberg Report").  A true and accurate copy of the Sjoberg Report is attached hereto as Exhibit L, and as Exhibit B to the Sjoberg Affidavit.  [Sjoberg Aff., ¶ 13 & Exh. B.]

64.    The Sjoberg Report fully and accurately sets forth the statements made to Mr. Sjoberg by the individuals he interviewed.  [Sjoberg Aff., ¶ 14.]

65.    Although Mr. Sjoberg did not prepare his written report until November 25, 2003, which was after the date of Mr. Beasley's termination, he and Mr. Cummings met almost daily between November 10 and November 17 with Ms. Magrini and Ms. Gillis.  Mr. Sjoberg informed them of everything the witnesses he interviewed, including Mr. Beasley, had told him. [Sjoberg Aff., ¶ 12; Magrini Depo., at 95:17 to 97:21; 103:5-17.]

66.    Mr. Hess participated by phone on one and possibly two occasions when Mr. Sjoberg updated Mr. Cummings, Ms. Gillis, and Ms. Magrini about his interviews.  Mr. Hess was on these calls because of his role in setting up the sting operation, and to address any

BOS_514226_4/BLAMKIN

questions that might arise about security practices going forward. He was not asked for, nor did he provide, any opinion on which employees should be fired and which should not. [Hess Aff., ¶ 21.]

67.    Numerous witnesses whom Mr. Sjoberg interviewed identified Mr. Beasley as an individual that both used and sold marijuana at WearGuard. Many of these witnesses described Mr. Beasley as someone who originally had worked in the Custom Embroidery Department, but was then promoted to a position in the Art Department. [Sjoberg Aff., ¶ 10.]

68.    A sampling of statements that WearGuard employees made to Mr. Sjoberg concerning Mr. Beasley are as follows:

    a)    "Custom Embroidery Supervisor Brian Caswell reported to Barbara Castagrande [sic] that there are 'Rampant / Blatant rumors going around using Eric's name like crazy. That Eric is the big ring leader who people bought drugs from.'" [Sjoberg Report, at ARA 0240.[13]]

    b)    Brian Caswell, a former supervisor of Mr. Beasley in the Custom Embroidery Department, stated that:

- "[H]e and Eric Beasley started at WearGuard at the same time about 5 years ago [and] went through training and on teams together," and that "he knows for sure that Eric sold drugs at WearGuard at that time." [Sjoberg Report, at ARA 0243.]

- "Eric Beasley kept asking [him] if he was a 'plant' (undercover)" [ARA 0244]

- "Eric told me not to worry about the supervisor's [sic] – they're in my pocket – I supply them with pot." [ARA 0244]

- "About 2 1/2 years ago, Mike Lowder (CE Supervisor) told me that our Lead – Jay Hughes just bought weed from Beasley. … [I] brought Eric Beasley in – he denied it and said it was heresay [sic].

---

[13]    References are to the Bates-numbered pages in the Sjoberg Report.

I told him that Jay Hughes admitted it – He (Eric Beasley) shit. Eric then said, 'I promise it won't happen again.'"  [ARA 0244]

c)   Mike Lowder, a CE Department Lead, stated:

- "A couple of years ago when I was a Lead (CE) I heard Eric Beasley sold drugs here."  [ARA 0245]

d)   Jeff Laubach, an employee in the Art Department, stated:

- "I have worked beside Eric Beasley since he started in the Art Department about 1 year ago …."  [ARA 0247]

- "Eric Beasley does all of the above – drugs and steal."  [ARA 0247]

- "When Eric first started in the Art Department I saw him bring in a big bag of pot in a plastic bag.  He wasn't trying to hide it and was showing it to me.  I asked him either; [sic] 'How much he had' or 'How much was it worth' and I don't remember his answer.  Eric then put the pot into his desk."  [ARA 0247]

- "I have observed Eric Beasley with a daily look of glassy, red eyes."  [ARA 0247]

e)   Paul Keating, an Art Department employee, stated:

- "I trained Eric Beasley.  During training his eyes would be glowing red.  His eyes would be – so red – after breaks – I'm not stupid – you know – and he's now got on heavy cologne."  [ARA 0248]

- "During training when his eyes were read [sic], he had to ask me over & over again questions about what we were covering.  He would even ask the same questions over & over."  [ARA 0248]

- "I usually observe Eric Beasley with red eyes and appearing on drugs 2 to 3 times a week – he's definitely involved in suspicious activity."  [ARA 0249]

f)   Scott Kearns, another Art Department employee, stated:

- "Some nights Eric Beasley is soaked with cologne after break.  I assumed he's masking something because he has blood-shot eyes." [ARA 0250]

BOS_514226_4/BLAMKIN

g)    Joe Lee, a CE Department employee, stated:

- "I heard rumors Eric Beasley is dealing drugs out of his desk. He's shady – I don't deal with him."  [ARA 0255]

- "I know they smoke (Carlos & Eric) and I have smoked with them often."  [ARA 0255]

69.    The Sjoberg Report also contains numerous references to Mr. Beasley having whispered conversations with other employees and leaving the work site for long periods of time.  [Sjoberg Report, at ARA 0241; 0242; 0247; 0248; 0249.]

70.    Between the undercover operation and Mr. Sjoberg's services, WearGuard spent over $20,000 on its investigation of illegal activities at the Norwell facility.  [Hess Aff., ¶ 9; Sjoberg Aff., ¶ 15 & Exh. C.]

## H.    THE "OTHER ERIC"

71.    As of November 2003, an African-American male named Eric O'Connor was employed by WearGuard in the Custom Embroidery Department.  [Cummings Depo., at 22:12 to 23:12; Beasley Depo., at 96:18-20.]

72.    Mr. O'Connor is still employed by WearGuard.  [Cummings Depo., at 23:2-10.]

73.    Neither the Undercover Operative Reports, the Recap, nor the Sjoberg Report refer to any employee named "Eric O'Connor."  The Undercover Operative Reports refer to an African-American employee named "Eric" (and the Recap refers to "Eric Beasley"), while the Sjoberg Report refers to both "Eric" and "Eric Beasley."  [Undercover Operative Reports; Recap; Sjoberg Report.]

74.    At the time of the events in question, neither Mr. Cummings, nor Mr. Hess, nor Ms. Magrini knew that WearGuard employed another African-American male named "Eric,"

besides Mr. Beasley.  [Cummings Depo., at 90:13-19; Deposition of Jay Hess, Jr. ("Hess Depo."), at 87:17 to 88:2;[14] Magrini Depo., at 125:19 to 126:2.]

## I.  THE TERMINATIONS OF PLAINTIFF AND OTHER EMPLOYEES

75.    As a result of the undercover operation, the sting, and the Sjoberg investigation, WearGuard terminated 11 employees, including Mr. Beasley.  [Magrini Depo., 73:18 to 74:2; Cummings Depo., at 123:19 to 124:18.]

76.    A true and accurate copy of a memo listing the terminated employees is attached hereto as Exhibit N.[15]  [Cummings Depo., at 123:19 to 124:18; Exh. N.]

77.    Of the 11 employees that were terminated, only two – Eric Beasley and John Gomes – were African-American.  [ARAMARK's Ans. to Int., No. 14.]

78.    Six of the terminated employees – a majority – were Caucasian, and three were Hispanic.  [ARAMARK's Ans. to Int., No. 14.]

79.    It was Susan Magrini's decision to terminate Mr. Beasley's employment. [Magrini Depo., at 22:15-19.]

80.    Ms. Magrini was unaware of Mr. Beasley's race when she made the decision to terminate his employment.  [Magrini Depo., at 139:4-8.]

81.    Mr. Hess had no role in deciding which employees should be fired and which should not.  [Hess Aff., ¶ 22.]

82.    Mr. Hess had no authority to fire any employees, nor did he make any recommendations about terminations in this case.  [Hess Aff., ¶ 22.]

---

[14]    Referenced excerpts from the Hess Deposition are attached hereto as Exhibit M.
[15]    The original memo had photographs of each employee attached to it.  Defendants are submitting only the cover page of the memo, as the photographs are not of sufficient quality to reproduce adequately or to scan for electronic filing (and would make a prohibitively large file).

ARAMARK UNIFORM AND CAREER
APPAREL, INC., and JAY HESS, JR.,
By their attorneys,


/s/ Brian H. Lamkin
Timothy P. Van Dyck (BBO No. 548347)
Brian H. Lamkin (BBO No. 635688)
EDWARDS ANGELL PALMER & DODGE LLP
111 Huntington Avenue
Boston, MA  02199
(617) 239-0100
(617) 227-4420 (fax)


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on March 2, 2006, and that there are no non-registered participants.


/s/ Brian H. Lamkin
Brian H. Lamkin (BBO No. 635688)

BOS_514226_4/BLAMKIN

# EXHIBIT A

1

1    VOLUME I

2    PAGES 1 - 179

3    EXHIBITS 1 - 13

4    UNITED STATES DISTRICT COURT

5    District of Massachusetts

6    ---------------------------

7    ERIC BEASLEY,

8             Plaintiff          Civil Action

9    v.                      No. 05-CV-10496

10

11   ARAMARK UNIFORM AND CAREER

12   APPAREL, INC., and JAY HESS, JR.,

13            Defendants

14   ---------------------------

15

16         DEPOSITION of ERIC BEASLEY

17         Friday, September 30, 2005

18           Edwards & Angell, LLP

19            101 Federal Street

20         Boston, Massachusetts  02110

21              10:00 a.m.

22

23

24   ----------- CAROL A. CARUSO, CSR -----------

2

1    APPEARANCES:

2        KEVIN B. CALLANAN, ESQUIRE

3        17 Accord Park Drive, Suite 101

4        Norwell, Massachusetts  02061

5        781-878-1604    kbcallahan@msn.com

6        Counsel for the Plaintiff.

7

8        EDWARDS & ANGELL, LLP

9        Brian H. Lamkin, Esquire

10       101 Federal Street

11       Boston, Massachusetts  02110

12       617-439-4444

13       Counsel for the Defendant.

14

15

16

17

18

19

20

21

22

23

24

15

1        Q.  Or disciplined in some other way?

2        A.  I knew there would be some type of

3    discipline.

4        Q.  Where did you get that understanding?

5        A.  In the manual book, when I was hired at

6    WearGuard, there is a no drug tolerance company.

7        Q.  When you say the manual book, you are

8    talking about the Employee Handbook?

9        A.  Yes.

10            MR. LAMKIN:  Actually, mark this as

11   Exhibit No. 1 please.

12            (Document was marked Exhibit No. 1 for

13   identification.)

14       Q.  Mr. Beasley, let me show you what we have

15   marked as Exhibit No. 1.  Is that the Employee

16   Handbook that you were referring to?

17       A.  Yes.

18       Q.  And if you turn to page -- some of the

19   numbers seem to be cut off, but it's about five or

20   six pages in on the left-hand side, there is an

21   entry Drug and Alcohol-Free Workplace.  There you

22   go, do you see that?

23       A.  Yes.

24       Q.  Is that the policy you were referring to?

16

1      A.  Yes.

2      Q.  And in your own words, what is your

3   understanding of that policy?

4      A.  WearGuard is a drug-free establishment.

5      Q.  And what does that mean to you?

6      A.  WearGuard does not accept drugs or alcohol

7   on the premises.

8      Q.  And did you understand that to be true for

9   the entire time that you worked at WearGuard?

10     A.  Yes.

11     Q.  And during the time that you worked at

12  WearGuard, did you understand that if someone was

13  using or buying or selling drugs in the workplace,

14  that they could be fired for that?

15     A.  Yes.

16     Q.  And is it your understanding that the

17  company would have been justified in firing somebody

18  for doing that?

19          MR. CALLANAN:  Object to the form.  Go

20  ahead.

21     A.  Repeat the question.

22     Q.  Let me ask it a different way.  In your

23  view, would it have been appropriate for the

24  company, in light of this policy, to fire somebody

Eric Beasley

17

1  who used or bought or sold illegal drugs at work?

2           MR. CALLANAN:  Object to the form.

3       A.  Yes.

4       Q.  Was there -- and by the way, when I say

5  employee at WearGuard, I mean supervisors, fellow

6  employees, anybody who works there; was that your

7  understanding in the earlier questions I was asking

8  you?

9       A.  Yes.

10      Q.  During the time that you worked at

11  WearGuard, did you ever discuss the subject of drug

12  use with any other employee?

13      A.  No.

14      Q.  Did you ever discuss the subject of buying

15  or selling drugs with any other employee?

16      A.  No.

17      Q.  Who was Brian Caswell?

18      A.  My supervisor when I was in the CE

19  department.

20      Q.  And do you remember what years those were?

21      A.  '99, 2000, maybe 2001 also.

22      Q.  How would you describe your relationship

23  with Mr. Caswell?

24      A.  My relationship with Mr. Caswell was just a

Eric Beasley

70

1    you were hired?

2         A.   I don't recall.

3         Q.   How about some kind of training period?

4         A.   Yes.

5         Q.   What were you hired as, by the way, what

6    position?

7         A.   A machine operator.

8         Q.   And do you remember how long your training

9    lasted as a machine operator?

10        A.   I want to say about five weeks.

11        Q.   And you were training with a more senior

12   person at the company, basically?

13        A.   Yes.

14        Q.   And at the time you first started at

15   WearGuard, or close to the time that you first

16   started, is that when you first got an Employee

17   Handbook?

18        A.   Yes.

19             MR. LAMKIN:   And mark this as Exhibit 5,

20   please.

21             (Document was marked Exhibit No. 5 for

22   identification.)

23        Q.   Mr. Beasley, let me show you what's been

24   marked as Exhibit 5, and just so there is no

71

1    confusion, I understand that the copy of the

2    handbook I showed you was dated January of 2001, so

3    I know that that's not the handbook, the exact

4    handbook that this is referring to, but is Exhibit

5    No. 5 your acknowledgment that you received an

6    Employee Handbook?

7        A.    Repeat your question.

8        Q.    Let me ask it this way, what is Exhibit No.

9    5?

10       A.    It looks like there is a letter

11   acknowledging that they handed me an orientation

12   packet.

13       Q.    And is that your signature where it says

14   "Employee Signature"?

15       A.    Yes.

16       Q.    And the "3/22/99" date, is that your

17   handwriting?

18       A.    Yes.

19       Q.    And did you understand when you signed this

20   that you had to abide by WearGuard's policies and

21   procedures?

22       A.    Yes.

23       Q.    And did you understand those included the

24   drug-free workplace procedure?

72

1          A.   Yes.

2          Q.   And you understood at the time that using,

3    buying or selling drugs at the workplace would be

4    grounds for termination potentially?

5          A.   Yes.

6               MR. LAMKIN:   And let me show you --

7    could we mark this Exhibit 6, please.

8               (Document was marked Exhibit No. 6 for

9    identification.)

10         Q.   Mr. Beasley, let me show you what's been

11   marked Exhibit 6.  Can you identify that document

12   for me?

13         A.   Yes, another letter stating that I received

14   a copy of WearGuard Crest Employee Handbook and that

15   I reviewed it in its entirety.

16         Q.   And is that your signature where it says

17   "Employee Signature"?

18         A.   It is.

19         Q.   And the "1/3/01" date, is that your

20   handwriting?

21         A.   Yes.

22         Q.   And does this -- on the bottom it says

23   effective January 1, 2001, is that right?

24         A.   Yes.

Eric Beasley

73

1       Q.   And is this referring to the Employee
2   Handbook that I showed you earlier?
3       A.   Yes, I believe so.
4       Q.   And if you turn to the very last page of
5   that, which is Exhibit No. 1, the date is cut off on
6   the bottom of the page, but does that appear to be
7   the same form that is Exhibit No. 6?
8       A.   Yes.
9       Q.   And you understood when you signed this that
10   WearGuard was still a drug-free workplace?
11       A.   Yes.
12       Q.   And that employees using, buying or selling
13   drugs on the premises or during work hours could be
14   terminated?
15       A.   Yes.
16       Q.   And if you look at page, it's the second to
17   last page from the back of Exhibit No. 1, there are
18   27 listed rules and regulations there, do you see
19   that?
20       A.   Yes.
21       Q.   And at the very beginning it says, "Common
22   sense is usually a reliable guide as to what is
23   unacceptable behavior in a service business.  The
24   following is a partial list of prohibited actions."

Eric Beasley

74

1    Do you see that?

2        A.  Yes.

3        Q.  And number 10 says, "Possessing, using or

4    being under the influence of alcohol or any illegal

5    drugs on company time or company property or being

6    in the presence of someone engaging in such

7    activity."  Did you understand that to be one of the

8    rules at WearGuard?

9        A.  Yes.

10        Q.  Were you ever in the presence of someone

11    using, buying or selling drugs at WearGuard to your

12    knowledge?

13        A.  No.

14        Q.  And rule No. 3 says, "Failure to report

15    illegal actions."  You understood that that was also

16    prohibited at WearGuard, that if you saw any illegal

17    action, you were required to report it?

18        A.  Yes.

19        Q.  And did you understand that WearGuard

20    expected its employees to be honest in their

21    dealings with the company?

22        A.  Yes.

23        Q.  And that employees were not supposed to lie

24    to the company, is that right?

Eric Beasley

77

1  as a machine operator?

2      A.  Yes.

3      Q.  But there wasn't any increased pay?

4      A.  No.

5      Q.  How about when you went from trainer to

6  digitizer, was there any increase in pay there?

7      A.  Yes.

8      Q.  Did you consider that to be a promotion?

9      A.  Yes.

10     Q.  And that's a job that you applied for?

11     A.  Yes.

12     Q.  Was it a posted position?

13     A.  I don't recall.

14     Q.  Do you remember how you found out that there

15  was an opening for a digitizer?

16     A.  I don't.

17     Q.  Did you know that there was an opening for a

18  digitizer when you applied for it?

19     A.  Yes.

20     Q.  And who, if you know, was responsible for

21  deciding who would get that digitizer position?

22     A.  I believe it would be Marcia Hogan as well

23  as Barbara Casagrande.

24     Q.  What were their positions?

Eric Beasley

78

1    A.   Marcia was the supervisor of the art

2  department, manager, supervisor, and Barbara was the

3  director of all operations, I believe, I'm not sure

4  of her title.

5    Q.   And as far as you know, did both of those

6  women have to approve you as getting a digitizer

7  promotion?

8    A.   Yes.

9    Q.   Do you know whether anybody in human

10  resources had to approve that?

11    A.   I don't know.

12    Q.   Do you know whether there were other people

13  who applied for the digitizer position at the same

14  time you did?

15    A.   I don't know.

16    Q.   And I'm sorry, the person who approached you

17  about machine operator, her name was what again?

18    A.   Sandy Fisher.

19    Q.   What was her position?

20    A.   She was a supervisor.

21    Q.   In your department?

22    A.   Yes.

23    Q.   Did you ever apply for any positions at

24  WearGuard that you didn't get?

Eric Beasley

79

1        A.   Yes.

2        Q.   What, what were those?

3        A.   Computer room, I believe that's the only one

4    that I can remember.

5        Q.   What was the computer room job?

6        A.   I don't know, I didn't get all the, I never

7    got interviewed for the position, so I didn't find

8    out all the details of it.

9        Q.   Would that have been a promotion?

10        A.   Yes.

11        Q.   And more money?

12        A.   Yes.

13        Q.   Do you feel there is anything discriminatory

14    in your not getting that position?

15        A.   Yes, I was a little curious why I didn't get

16    interviewed.

17        Q.   And do you think your race had anything to

18    do with that?

19        A.   Yes.

20        Q.   What makes you think that?

21        A.   I applied for the position three times, my

22    resume never made it to the HR department to even

23    get considered as a candidate.

24        Q.   How do you know that?

80

1       A.   I spoke to my supervisor about it, and on

2    several occasions he gave me excuses why it didn't

3    make it to HR.

4       Q.   Do you remember when these three times were

5    that you applied?

6       A.   I do not.

7       Q.   Do you remember a year?

8       A.   I do not.

9       Q.   How close in time were the three

10   applications to each other?

11      A.   I would say they were within a nine month

12   period.

13      Q.   Do you know who else applied for the job at

14   any of the times that you did?

15      A.   I do not.

16      Q.   Do you know who got the jobs?

17      A.   I do not.

18      Q.   What were the qualifications for the

19   position as you understood it?

20      A.   For the computer room?

21      Q.   Yes.

22      A.   Knowledge of a computer, knowing how to

23   network your way through a computer.

24      Q.   What were the responsibilities of that

Eric Beasley

81

1  position as far as you understood them?

2      A.  I never got a chance to interview for the

3  position.  Talking to an employee that once worked

4  at that position, he told me it was a lot of print

5  copying, copying and filing.

6      Q.  So your knowledge of the responsibilities of

7  that position were limited to what another employee

8  told you about it?

9      A.  Yes.

10      Q.  Did you ever ask a supervisor in the

11  computer room what the responsibilities of the

12  position were?

13      A.  No.

14      Q.  Did any supervisor -- the employee who told

15  you about this, was he a supervisor, or she?

16      A.  No.

17      Q.  Who was that employee?

18      A.  Joe.

19      Q.  Do you remember Joe's last name?

20      A.  Joe Comoko.

21      Q.  And he worked in the computer room?

22      A.  Yes.

23      Q.  Do you know what his position in the

24  computer room was?

Eric Beasley

82

1      A.  I do not.

2      Q.  How did you come to be talking to Joe about

3  this position?

4      A.  I knew Joe, I knew he worked in the

5  department, and I asked him to tell me a little bit

6  about it.

7      Q.  At the time that you asked him to tell you

8  about the position, did you know that there was an

9  opening?

10     A.  Yes.

11     Q.  Was it posted?

12     A.  I'm not sure.

13     Q.  How did you know there was an opening?

14     A.  I'm not sure.

15     Q.  Did you feel that you were qualified for the

16  position based upon your knowledge of it?

17     A.  Yes.

18     Q.  And your knowledge was limited to what Joe

19  Comoko had told you?

20     A.  Yes.

21     Q.  And I take it since you don't know who else

22  applied for the position, you don't know if those

23  people -- you don't know if there were any people,

24  and if there were, you don't know whether they were

Eric Beasley

83

1    white, black, Asian, Hispanic, anything like that,

2    right?

3         A.    Correct.

4         Q.    And the same is true for whoever got that

5    job, if anybody?

6         A.    Correct.

7         Q.    What was Joe Comoko's race?

8         A.    African American.

9         Q.    Do you know if he had the same kind of job

10   in the computer room that you were applying for?

11        A.    I believe so.

12        Q.    Putting aside the drug investigation and

13   your termination from the company and this computer

14   room job that we just talked about, is there

15   anything else that happened at WearGuard that you

16   feel happened to you at WearGuard that you feel was

17   discriminatory?

18        A.    Not that I can remember.

19        Q.    And prior to the incidents that you

20   described in your Complaint relating to the drug

21   investigation, did anybody at WearGuard make any

22   comments to you that you perceived to be racist?

23        A.    Repeat your question.

24        Q.    Sure.   I understand that one of your

Eric Beasley

84

1    allegations in this case is that when you got called

2    in for interviews about this drug investigation that

3    certain individuals made racist comments to you,

4    that's one of your claims, right?

5        A.  Yes.

6        Q.  And that was in November of 2003?

7        A.  Yes.

8        Q.  Before November of 2003, had anybody at

9    WearGuard made any racist comments to you?

10       A.  Yes.

11       Q.  Who?

12       A.  The supervisor Tim, a gentleman I

13   interviewed with.

14       Q.  What did Tim say?

15       A.  He called me a stupid N-I-G-A.

16       Q.  How many times did he do that?

17       A.  Once.

18       Q.  When was that?

19       A.  I don't recall, it was some time in '99 when

20   I was first hired.

21       Q.  Shortly after you were hired?

22       A.  I would say about six months after I was

23   hired.

24       Q.  What did you do when he called you that?

Eric Beasley

85

1    A.   Walked off the floor.

2    Q.   Did you tell anybody at WearGuard what he

3  had said?

4    A.   I didn't.

5    Q.   How come?

6    A.   He came to me and apologized for it.

7    Q.   How soon after he made the comment did he

8  apologize for it?

9    A.   About 20 minutes.

10   Q.   Do you remember more specifically what he

11  said?

12   A.   Yes.  I was on my way back in to the CE

13  department, he pulled me to the side, took me to the

14  conference room and said, you know, I just want to

15  apologize for what I said, when I saw you on the

16  phone, I lost it, I couldn't believe you was using

17  the phone on the floor, and I got a little out of

18  line, and I apologize.  He put his hand out to shake

19  it and said, Can you please forgive me?

20   Q.   And did you accept his apology?

21   A.   I didn't shake his hand, but I told him I'll

22  forgive him for what he said.

23   Q.   Did he say anything like that to you again?

24   A.   No.  He shortly resigned.

Eric Beasley

86

1    Q.  And he had come to you on his own, I mean as

2  far as you know, you didn't ask him for an apology?

3    A.  No, I did not ask him.

4    Q.  Did you say anything to him at all when he

5  made the comment initially?

6    A.  No.

7    Q.  You just walked off the floor and 20 minutes

8  later he apologized?

9    A.  When I walked off the floor, he knew I was

10 upset when I came back in, and he pulled me at that

11 point.

12   Q.  And after he apologized, did you consider

13 the issue closed with him?

14   A.  Yes.

15   Q.  And so you never reported that to anybody at

16 the company?

17   A.  No.

18   Q.  Other than -- Tim, was it?

19   A.  Yes.

20   Q.  Other than Tim and the allegations in this

21 Complaint, which we'll talk about in a little bit,

22 did anybody at WearGuard ever make any racist

23 comments to you?

24   A.  Not that I can remember.

87

1      Q.  Did you ever hear anybody at WearGuard

2   making racist comments to other people?

3      A.  Not that I can remember.

4      Q.  So as far as you can remember, the only

5   racist comments that were ever directed to you or

6   that you heard while you were at WearGuard were the

7   one that Tim made and what you talk about in your

8   Complaint in this lawsuit?

9      A.  Yes.

10     Q.  Between March and May of 2002, did you have

11  a leave of absence from WearGuard?

12     A.  I don't recall.

13          MR. LAMKIN:  Mark this as Exhibit 7.

14          (Document was marked Exhibit No. 7 for

15  identification.)

16     Q.  Mr. Beasley, let me show you what we've

17  marked as Exhibit No. 7, which is a Status Change

18  Form from your personnel file at WearGuard.  If you

19  look under section 4, Leave of Absence, it says,

20  Effective date of leave March 18, '02, Anticipated

21  return date May 6, '02, Actual return date May 6,

22  '02; does that refresh your recollection about a

23  leave of absence?

24     A.  I do not.

Eric Beasley

96

1    A.   No.

2    Q.   Did you ever take any trips anywhere with

3  Mr. Ortiz?

4    A.   No.

5    Q.   Did you go on any kind of vacations out of

6  the state while you worked at WearGuard?

7    A.   Yes.

8    Q.   Where did you go?

9    A.   I went to South Carolina.

10    Q.   Did you go to South Carolina with Mr. Ortiz?

11    A.   No.

12    Q.   Did you go to South Carolina with anybody

13  from WearGuard?

14    A.   Yes.

15    Q.   Who did you go with?

16    A.   I went with Eric O'Connor and a gentleman by

17  the name of Trey, I'm not sure of Trey's last name.

18    Q.   Eric O'Connor and Trey somebody, and what

19  departments were they in?

20    A.   CE, custom embroidery department.

21    Q.   Were either of them supervisors?

22    A.   No.

23    Q.   Just friends of yours?

24    A.   Coworkers of mine.

Eric Beasley

106

1      A.   Yes, Kathy Gillis stating to me that -- I
2  was a little concerned about being humiliated when
3  they called me to the conference room and told me I
4  was being suspended without pay, and I mentioned to
5  her that I was embarrassed, humiliated, and I told
6  her that I am going to be embarrassed to come back
7  to this place once you guys finish your
8  investigation and realize I have done nothing wrong,
9  she mentioned to me that I don't have to worry about
10  that because I probably wouldn't have been back, I
11  am probably not coming back.
12      Q.   Anything else?
13      A.   No, those are the two things that stick out
14  in my head right now.
15      Q.   So sitting here today, you think that the
16  ways that WearGuard and Mr. Hess discriminated
17  against you are by Mr. Hess saying, Come on, I know
18  your kind likes to do this, and Kathy Gillis saying
19  you don't have to worry because you probably won't
20  be back?
21      A.   Correct.
22      Q.   And were there any other comments that
23  anybody made to you at any time, other than the Tim
24  thing that we talked about that you felt were

Eric Beasley

107

1    discriminatory?

2        A.   Yes, Jay Hess mentioned that the police dog

3    was outside barking around my car, if he could

4    search it, and I indicated to him that if he wanted

5    to search my car he would have to go to the body

6    shop because my car was in the shop.

7        Q.   Okay.

8        A.   He said, Come on, I know your car is out

9    there, there is a Navy -- a dark color car.  I

10   indicated to him, What color car?  He said a Navy

11   blue car, a Corsica, he actually mentioned a

12   Corsica.  I told him I don't own a Corsica, I never

13   owned a Corsica.

14       Q.   What kind of car did you have at the time?

15       A.   I had a Ford Explorer, a truck.

16       Q.   And you say it was in the shop?

17       A.   Yes.

18       Q.   What shop?

19       A.   Factory Collision.

20       Q.   Where is that?

21       A.   That's in Weymouth.

22       Q.   Do you know the street address?

23       A.   I don't.

24       Q.   What was it doing in the shop?

Eric Beasley

109

1  most recent personal injury lawsuit that you talked

2  about before?

3      A.  I don't recall, I'm not sure if it's the

4  same accident.

5      Q.  And the comments that Mr. Hess made to you

6  about the dog sniffing in the car, that was the same

7  night as the comment about, Oh, I know your kind

8  likes to do drugs?

9      A.  Correct.

10     Q.  Anything else that Mr. Hess said that you

11 felt was discriminatory?

12     A.  Yes, he mentioned to me that I should resign

13 before they get me, because they will get me.

14     Q.  Anything else?

15     A.  That's all I can remember at the time.

16     Q.  And other than the probably won't be back

17 comment, was there anything that Kathy Gillis said

18 that you felt was discriminatory?

19     A.  Yeah, I just felt from the very beginning

20 she indicated that she didn't trust, believe or

21 trust what I was saying.

22     Q.  What's your best recollection of the words

23 that she used when she expressed that belief to you?

24     A.  I don't believe you, I feel that you do know

Eric Beasley

110

1   more than what you're saying.

2       Q.  Did she say anything about your kind or

3   anything like that?

4       A.  No.

5       Q.  She didn't say, for example, I don't believe

6   black people, or something like that?

7       A.  No.

8       Q.  She said, I don't believe you?

9       A.  Correct.

10      Q.  Did she tell you why she didn't believe you?

11      A.  No.

12      Q.  Did you ask?

13      A.  No.

14      Q.  Anything else that Kathy Gillis said that

15  was discriminatory?

16      A.  Not that I can remember at this time.

17      Q.  Anything else that anybody said at all,

18  other than the ones we have already talked about?

19      A.  Not that I can remember.

20      Q.  And is there anybody other than -- put aside

21  Tim, is there anybody other than Kathy Gillis and

22  Jay Hess that you feel did anything discriminatory

23  towards you?

24      A.  Brian Caswell, I remember there was an

Eric Beasley

112

1    can think of that you haven't already told me?

2        A.   Not that I can remember, that's it.

3        Q.   And do you feel that WearGuard discriminated

4    against you when it fired you?

5        A.   When they fired me, yes.

6        Q.   Why do you feel that that was

7    discriminatory?

8        A.   Because I felt I was fired for no

9    justifiable reason.

10       Q.   What makes you feel that?

11       A.   I've done nothing wrong, I violated no

12   rules.

13       Q.   Do you understand what at-will employment

14   is?

15       A.   Yes.

16       Q.   What's your understanding of at-will

17   employment?

18       A.   That they can let you go at their will.

19       Q.   And did you understand that you were an

20   at-will employee?

21       A.   Yes.

22       Q.   You weren't in a union, right?

23       A.   Correct.

24       Q.   There is no union there.  So assuming that

Eric Beasley

113

1    they are not illegally discriminating against you,

2    it was your understanding that WearGuard could

3    terminate anybody for whatever reason they wanted,

4    good or bad?

5        A.   Correct.

6        Q.   And was it your understanding that if

7    WearGuard believed that you were doing drugs,

8    regardless of whether that was true, that they could

9    fire you because of that?

10               MR. CALLANAN:   Object to the form.

11       A.   Yes.

12       Q.   And is it your belief that WearGuard did not

13   actually think you were doing drugs?

14       A.   Repeat your question.

15       Q.   Do you feel that WearGuard said they were

16   firing you for drugs, but they didn't actually

17   believe you were doing drugs?

18               MR. CALLANAN:   Object to the form.

19       A.   I don't know.

20       Q.   Did anybody at WearGuard ever say to you, We

21   don't really think you were doing drugs?

22       A.   No.

23       Q.   And did you ever tell anybody at WearGuard

24   that I don't think they really believe I was doing

Eric Beasley

114

1    drugs?

2        A.  No.

3        Q.  And you would agree with me that if

4    WearGuard really did think you were doing drugs,

5    that they had a right to fire you?

6                MR. CALLANAN:  Object to the form.

7        A.  Yes.

8                MR. LAMKIN:  Let's mark this Exhibit 9,

9    please.

10               (Document was marked Exhibit No. 9 for

11   identification.)

12       Q.  Mr. Beasley, the court reporter has handed

13   you what we have marked as Exhibit No. 9.  Do you

14   recognize that document?

15       A.  Yes.

16       Q.  And what is Exhibit 9?

17       A.  Complaint and Jury Demand.

18       Q.  And this is your lawsuit, basically, as far

19   as you understand?

20       A.  Yes.

21       Q.  And did you review this document before it

22   was filed in court?

23       A.  Yes.

24       Q.  And is it your understanding that this

Eric Beasley

115

1    document contains all of your allegations of
2    discrimination?
3        A.   Yes.
4        Q.   Add in fact, you said that in your
5    interrogatory answers, right?
6        A.   Yes.
7        Q.   Before the meetings in November of 2003
8    about the drug investigation, had you ever met Jay
9    Hess?
10       A.   No.
11       Q.   Have you ever heard of him?
12       A.   No.
13       Q.   How about Kathy Gillis?
14       A.   Yes.
15       Q.   And what context did you know her from?
16       A.   She used to walk by my department every
17   night, say hi, I'd say, Good night, and that was it.
18       Q.   And what was your understanding, if any, of
19   her position with the company?
20       A.   I didn't really know her position, I just
21   know she was in HR.
22       Q.   So other than, you know, have a good night,
23   you didn't have any dealings with her before the
24   drug investigation?

Eric Beasley

116

1    A.   No, none.

2    Q.   How about John Cummings?

3    A.   None.

4    Q.   Did you know who he was before the drug

5    investigation?

6    A.   I did.

7    Q.   What was his position to your understanding?

8    A.   He was head of security for the complex, the

9    location.

10   Q.   Had you ever spoken to him before November

11   of 2003?

12   A.   Yes.

13   Q.   In what context?

14   A.   Good morning, good afternoon, good night.

15   Q.   Just pleasantries?

16   A.   Just passing.

17   Q.   Nothing more than that?

18   A.   Nothing.

19   Q.   Do you recall any time around May of 2003

20   when Mr. Cummings came on to the floor and made an

21   announcement that there was suspicion of drug use

22   and that it wasn't going to be tolerated?

23   A.   Yes.

24   Q.   Did I pretty much accurately summarize what

Eric Beasley

117

1   he said?

2       A.   Yes.

3       Q.   Did you have any discussions with anybody at

4   WearMark about his announcement, any other coworkers

5   or anything like that?

6       A.   Yes.

7       Q.   What discussions did you have and with whom?

8       A.   It was just a buzz that what's going on.

9       Q.   And what was the general buzz?

10      A.   That someone must be doing drugs in order

11  for him to come to the department, give the speech,

12  who could it be, yada, yada, yada, stuff like that.

13      Q.   Did anybody you talked to offer opinions on

14  who was using drugs?

15      A.   No.

16      Q.   Did you have any opinions about that?

17      A.   No.

18      Q.   How long did this buzz last?

19      A.   It lasted for about three or four days.

20      Q.   And then things pretty much died down until

21  the investigation came to light?

22      A.   Yes.

23              MR. LAMKIN:   This is Exhibit 10, please.

24              (Document was marked Exhibit No. 10 for

Eric Beasley

121

1    A.  Correct.

2    Q.  Did he introduce himself?

3    A.  Yes.

4    Q.  What did he introduce himself as?

5    A.  Jay Hess from Philadelphia, head of all

6    Aramark security.

7    Q.  And Cummings, you knew who he was?

8    A.  Yes.

9    Q.  And did he say anything?

10   A.  No.

11   Q.  So you walk in the room, there are these

12   three guys, are they talking to each other when you

13   come in?

14   A.  I believe they are having some dialogue.

15   Q.  And do they continue that dialogue after you

16   enter the room?

17   A.  They do not.

18   Q.  So the two guys left, and it's just you and

19   Hess?

20   A.  Yes.

21   Q.  Tell me as best you can remember everything

22   the two of you said to each other?

23   A.  Hess asked me to come into the room.  I do

24   so.  He said, Have a seat.  I then do so.  He sits

Eric Beasley

122

1    across from me, he then indicates if I knew anything

2    that was going on, I said, No.  He then said, Well,

3    I'm here because there was a theft, and that during

4    an investigation of the theft, drugs was discovered

5    being sold here, your name was brought up, what can

6    you tell me, I say, I can't tell you anything, I

7    don't know anything.  He said, Oh, come on, your

8    kind loves to sell drugs.  I then proceeded to tell

9    him I didn't know what he was talking about.  He

10   then said that if he could search my car.  I told

11   him, If you want to search my car, he would have to

12   do that at the body shop because it's at the body

13   shop.  He was like, No, your car is outside, we have

14   the dogs out, there they are barking, the police

15   have your car surrounded.  Would you like to talk to

16   the police officers?  I said, No.  He then passed me

17   a business card and told me if there is anything

18   that I want to talk to him about, give him a call.

19        Q.   And that was it?

20        A.   That pretty much was it.

21        Q.   And then you left the room?

22        A.   He told me to go back to work.

23        Q.   And is that what you did?

24        A.   And that's what I did.

Eric Beasley

123

1     Q.  How long did the meeting last?

2     A.  About 15 minutes.

3     Q.  And what was his reaction when you told him

4  that your car was in the shop?

5     A.  He told me, No, it was outside.  Then he

6  proceeded to tell me what kind of car I owned, then

7  he also told me that they followed me back and forth

8  from Rockland.

9     Q.  They who?

10    A.  Meaning, I assume, the police.

11    Q.  And was it at that point that he asked you

12  if you wanted to talk to the police?

13    A.  Yes.

14    Q.  And you said no?

15    A.  Right.

16    Q.  Why did you say no?

17    A.  Talk to them for what?

18    Q.  I'm just asking why you said no?

19    A.  I didn't feel I had a reason to talk to

20  them.

21    Q.  Well, if, according to Mr. Hess, the police

22  thought they had your car surrounded, and that the

23  drug dogs were going crazy around your car, wouldn't

24  you have wanted to talk to the police and say, Hey,

Eric Beasley

124

1    that's not my car?

2           MR. CALLANAN:  Object to form.

3      A.  No.

4      Q.  Why not?

5      A.  Because I knew it wasn't my car.

6      Q.  And if Mr. Hess said that the police had

7    been following you, you wouldn't want to talk to

8    them about that?

9      A.  No.

10     Q.  Were you worried you would get arrested?

11     A.  No.

12     Q.  You just didn't want to talk to them?

13     A.  Right.

14     Q.  And have you now told me everything that

15   there is to tell me that happened in this first

16   meeting with Mr. Hess?

17     A.  Yes.

18           MR. CALLANAN:  Can we take a short

19   break?

20           MR. LAMKIN:  Sure.

21           (Off the record.)

22     Q.  Mr. Beasley, you can answer this yes or no,

23   during the break did you speak with your attorney?

24     A.  Yes.

Eric Beasley

127

1    A.  No.

2    Q.  Anything --

3    A.  Oh, yes, one other fact, one other fact.

4    Q.  Yes.

5    A.  In the conference room, Jay Hess also

6  mentioned that I should resign before they get me

7  because they will get me.

8    Q.  That was your first meeting with him or the

9  second one?

10    A.  The first one.

11    Q.  So that was on November 5 of 2003?

12    A.  Correct.

13    Q.  Anything else?

14    A.  That's it.

15    Q.  So have you now exhausted your memory about

16  who said what to whom during your November 5th

17  meeting?

18    A.  Yes.

19    Q.  And have you told me all of the facts of

20  your case that you and your attorney talked about

21  during the break?

22    A.  Yes.

23    Q.  After the November -- after you got out of

24  that meeting, did you go back to work?

Eric Beasley

138

1    anybody that day about what happened at

2    WearGuard -- on that day I mean?

3         A.   That day, not that I can remember.

4         Q.   And did you ever go back to the WearGuard

5    facility after November 6th?

6         A.   No.

7         Q.   And what day was it that you were fired?

8         A.   November 17th.

9         Q.   And what were you doing during those 11

10   days?

11        A.   Being home, trying to figure out what just

12   happened.

13        Q.   And other than your wife or an attorney,

14   during that 11-day period did you discuss what had

15   happened with anybody?

16        A.   Not that I remember.

17        Q.   And during that 11-day period, did you

18   discuss what had happened with your wife at any time

19   when anyone other than the two of you was present?

20        A.   Repeat your question.

21        Q.   Sure.  If you had conversations, just you

22   and your wife, with nobody else around about what

23   happened at WearGuard, I don't want to know about

24   those -- well, I want to know about them, but I

Eric Beasley

142

1      Q.   And was that the extent of the call?

2      A.   Yes.

3      Q.   And I take it some time after that Attorney

4   Benner called and said he needed to come into the

5   office to talk to the investigator?

6      A.   Correct.

7      Q.   And how soon after you talked to the

8   investigator on the phone did you go into Attorney

9   Benner's office?

10     A.   Days later.

11     Q.   And why don't you tell me as best you can

12  recall everything that everybody said, and I don't

13  want to know anything that you and Attorney Benner

14  talked about if nobody else was in the room, but

15  while the three of you were in the room, tell me

16  everything that was said?

17     A.   I arrived first, and me and Thomas Benner

18  went to the conference room, shortly later, I am

19  talking maybe two or three minutes later, the

20  investigator showed up, he arrived, come to the

21  conference room, he indicates that he has three

22  quick questions he would like to ask me.  One of the

23  questions -- I don't even recall all three of the

24  questions, I think one of the questions were, Have I

143

1  sold drugs at WearGuard?  I responded, No.  The

2  second one was was I aware of anyone selling drugs

3  at WearGuard?  I responded, No.  And I'm not sure of

4  the third question, but the answer to it was no, and

5  he said, That's it, and he got up and left.

6       Q.  So pretty short meeting?

7       A.  Very short.

8       Q.  Was anyone there other than the three of

9  you?

10      A.  No.

11      Q.  As far as you can tell, was the investigator

12  recording this on a tape-recorder?

13      A.  Not that I could tell.

14      Q.  Was he taking notes?

15      A.  No.

16      Q.  Were you taking notes?

17      A.  No.

18      Q.  Did you take any notes during the November

19  5th meeting?

20      A.  No.

21      Q.  Did you make any notes to yourself about

22  that meeting after the fact?

23      A.  No.

24      Q.  Did you take any notes during the November

# EXHIBIT B

## COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH, SS,                                    SUPERIOR COURT
                                                Civil Action No. 05-0225

_____

ERIC E. BEASLEY,
                    Plaintiff,

v.

WEARGUARD CORPORATION, INC.,
ARAMARK UNIFORM AND CAREER
APPAREL, INC. and JAY HESS, JR.
                    Defendants
_____/

### COMPLAINT AND JURY DEMAND

#### Preliminary Statement

1.  This is an employment discrimination action under General Laws,

Chapter 151B seeking compensatory and punitive damages against the

defendants for race discrimination.

#### Jurisdiction

2.  This action is brought under Massachusetts General Laws, Chapter

151B, Section 9.

3.  Plaintiff filed a timely complaint against the defendants with the

Massachusetts Commission Against Discrimination (MCAD Docket No. 04-BEM-

00202) and has met all administrative prerequisites for bringing this action.

#### Venue

4.  This action properly lies in this Court because the claims arose in

1

Plymouth County, where the plaintiff was employed by the defendants.

Parties

5.   Plaintiff, Eric E. Beasley ("Beasley"), is a Black adult male, who resides at 14 Roland Road, Weymouth, Plymouth County, Massachusetts.

6.   Defendant, WearGuard Corporation ("WearGuard"), is a foreign corporation authorized to do business in Massachusetts with offices at Longwater Drive, Norwell, Plymouth County, Massachusetts.

7.   Defendant, Aramark Uniform and Career Apparel, Inc. ("Aramark"), is a foreign corporation authorized to do business in Massachusetts with offices at Longwater Drive, Norwell, Plymouth County, Massachusetts.

8.   Defendant, Jay Hess, Jr., ("Hess") was the Manager of Corporate Security for the defendant Aramark at all times relevant to this action.

Facts

9.   WearGuard and Aramark operated a business employing 25 or more employees at Longwater Drive, Norwell, Massachusetts at all times relevant to this action.

10.   Beasley was employed by WearGuard and Aramark as a machine operator and a digitizer in Norwell from March 22, 1999 until November 17, 2003.

11.   Beasley was paid an hourly wage of $13.75 by WearGuard and Aramark.

12.   During his employment with WearGuard and Aramark, Beasley's work performance was satisfactory at all times.

13.   On or about November 5, 2003, while working on the 2 p.m. to

2

midnight shift, Beasley was called into a conference room at about 9:00 p.m. to meet Hess.

14.  Hess told Beasley he was conducting an investigation.

15.  During the meeting, Hess accused Beasley of selling drugs at work.

16.  When Beasley denied the accusation, Hess said: "Oh, come on, I know your kind loves to sell drugs."

17.  The words "your kind" used by Hess and directed to Beasley, a Black man, was an unmistakable racial slur.

18.  Hess also advised Beasley "to resign before we get you, because we will get you."

19.  At the conclusion of the meeting, Beasley returned to work.

20.  On or about November 6, 2003, when Beasley reported to work at about 2 p.m., he was called to a meeting with John Cummings ("Cummings"), Director of Security, and Kathy Gillis ("Gillis"), Director of Human Resources, in a conference room.

21.  Cummings and Gillis asked Beasley what he knew about an investigation of drug use and theft at work.

22.  When Beasley denied knowledge or involvement in drug use or theft at work, Gillis said she did not believe him.

23.  Gillis then told Beasley he was suspended indefinitely without pay and directed him to leave the premises immediately

24.  Beasley then told Cummings and Gillis he was offended by the accusations and would be humiliated to return to work after such false charges.

3

25.   Gillis then replied: "You don't have to worry; you probably won't be back."

26.   On or about November 17, 2003, at about 5 p.m., Beasley received a telephone call at home from Gail O'Connor ("O'Connor"), a WearGuard employee.

27.   O'Connor told Beasley that Gillis had asked her to call to tell Beasley he was terminated from employment effective from the day of his suspension.

28.   When Beasley asked O'Connor the reason for his termination, O'Connor replied it was for failure to abide by Company policy.

29.   When Beasley asked O'Connor what policy he failed to abide by, O'Connor said she could not tell him.

## COUNT I

### (Violation of Chapter 151B, Sec. 4(1) against WearGuard)

30.   Beasley hereby incorporates, as if re-alleged, paragraphs 1 through 29 above.

31.   By and through the conduct of its agents Hess, Cumming, Gillis and O'Connor, WearGuard engaged in race discrimination in violation of Chapter 151B, Section 4 (1).

## COUNT II

### (Violation of Chapter 151B, Sec. 4(1) against Aramark)

32.   Beasley hereby incorporates, as if re-alleged, paragraphs 1 through 31 above.

33.   By and through the conduct of its agents, Hess, Cummings, Gillis

4

and O'Connor, Aramark engaged in race discrimination in violation of Chapter 151B, Section 4 (1).

## COUNT III

### (Violation of Chapter 151B, Section 4 (4A) against Hess)

34.  Beasley hereby incorporates, as if re-alleged, paragraphs 1 through 33 above.

35.  By his conduct toward Beasley, Hess coerced and intimidated Beasley in the exercise or enjoyment of his rights under Chapter 151B and thereby Hess violated Section 4 (4A) thereof.

## COUNT IV

### (Violation of Chapter 151B, Section 4 (5) against Hess)

36.  Beasley hereby incorporates, as if re-alleged, paragraphs 1 through 34 above.

37.  By his conduct toward Beasley, Hess aided and abetted WearGuard and Aramark in violating Chapter 151B and thereby Hess violated Section 4 (5) thereof.

## Prayer For Relief

38.  Wherefore, Beasley, prays that this Court:

(a)  declare the conduct of WearGuard, Aramark and Hess to be in violation of the Beasley's rights under Chapter 151B;

(b)  award Beasley the following damages:

(i)  lost wages and employee benefits

(ii)  damages for emotional distress;

5

(iii)     punitive damages

(iv)     award Beasley his costs and attorney's fees; and

(v)     grant such other relief as the Court may deem just.

<u>Jury Demand</u>

39.  Beasley demands a jury to try all claims triable by a jury.


Respectfully submitted,

ERIC E. BEASLEY

By his attorney,


Kevin  B. Callanan, BBO #070620
Law Office of Kevin B. Callanan
17 Accord Park Drive, Suite 101
Norwell, Massachusetts 02061
781-878-1604

Dated:   February 24, 2005

# EXHIBIT C

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---

ERIC E. BEASLEY,
     Plaintiff

v.

ARAMARK UNIFORM AND
CAREER APPAREL, INC.,
and JAY HESS, JR.
     Defendants

_____/

Civil Action No. 05-10496-NMG

## PLAINTIFF'S ANSWERS TO DEFENDANT'S
## FIRST SET OF INTERROGATORIES

### INTERROGATORY NO. 1

If you have ever been convicted of a crime (other than a minor traffic violation), for each such conviction identify the crime for which you were convicted; the date of your conviction; the court that convicted you; the sentence imposed; and the docket number of the proceedings.

### RESPONSE NO. 1

See Attached PCF Adult Record Information as of 05-21-02 (2 pages)

### INTERROGATORY NO. 2

If you have ever been a plaintiff in any civil action, or a complainant in any administrative proceeding, that you have brought against any of your employers other than ARAMARK, state the title and docket number of the action or proceeding, identify the court or agency in which the action or proceeding was brought, describe the nature of the action or proceeding, and state the outcome of the action or proceeding.

### RESPONSE NO. 2

None other than a workers' compensation claim against Auto Palace, Weymouth, MA in approximately 1998. Claim was settled.

1

## RESPONSE NO. 8

None.

## INTERROGATORY NO. 9

Identify each person who has personal knowledge of facts relevant to the claims you are asserting against the Defendants in the above-captioned action, and as to each such person, describe the substance of the knowledge that each such person possesses.

## RESPONSE NO. 9

See Initial Disclosure, Section (A).

## INTERROGATORY NO. 10

Identify each person you intend to call as an expert witness at trial, and as to each person identified, state the qualifications of the expert and the subject matter on which the expert is expected to testify, state the substance of the facts and opinions to which the expert is expected to testify, and provide a summary of the grounds for each opinion.

## RESPONSE NO. 10

I have not yet decided whether to call an expert witness at trial.

## INTERROGATORY NO. 11

State the basis for your contention that the Defendants discriminated against you on the basis of your race and/or color.

## RESPONSE NO. 11

See my Complaint and Jury Demand and my MCAD Charge of Discrimination.

## INTERROGATORY NO. 12

If you contend that ARAMARK has discriminated against other employees on the basis of race and/or color, identify each such person and, as to each such person, state the basis for your contention.

4

## RESPONSE NO. 12

Not applicable.

## INTERROGATORY NO. 13

If you contend that any employees of ARAMARK, of a different race or color were similarly situated as you but were treated differently by the Defendants, identify each such employee and state all facts upon which you base your contention that each such employee was similarly situated as you but treated differently.

## RESPONSE NO. 13

Not applicable.


Signed under the penalties of perjury on this 28TH day of September, 2005

Eric E. Beasley

Respectfully submitted,

ERIC E. BEASLEY
By his attorney,

Kevin B. Callanan BBO #070620
Law Office of Kevin B. Callanan
17 Accord Park Drive, Suite 101
Norwell, Massachusetts 02061
781-878-1604

Dated: September 28, 2005

### Certificate of Service

I certify that a true copy of the foregoing document has been served on Timothy P. Van Dyck and Brian H. Lamkin, Edwards & Angell, LLP, counsel for the defendants, 101 Federal Street, Boston, Massachusetts by mail on September 28, 2005.

Kevin B. Callanan

5

# EXHIBIT D



# The BEST People Work Here

## WearGuard™-CREST®

Your Guide to the Policies, Procedures, Benefits and Services of WearGuard-Crest

A DIVISION OF ARAMARK UNIFORM & CAREER APPAREL, INC.

ARA 0073

## drug and alcohol free workplace

WearGuard-Crest is committed to maintaining a workplace that is free of illegal drugs and alcohol. As such, the Company will not tolerate any employee possessing selling, dispensing, receiving, using or under the influence of alcohol or illegal drug on Company property, or any employee being in the presence of somone engaging in such activity.

For the purposes of this policy, illegal drugs shall include those substances controlle under Federal or state law that are not authorized for sale, possession or use, as well as any legal drugs that are obtained or distributed illegally.

## violence in the workplace

It is against Company policy to verbally or physically threaten another employee. In a effort to provide a safe and comfortable workplace, violence and threats of violence, either verbal or physical, will not be tolerated in the workplace.

All acts or threats of violence committed by an employee in the workplace will be investigated. Upon completion of the investigation, WearGuard-Crest will take such response and disciplinary actions that it deems necessary and appropriate.

The reporting of acts or threats of violence is the proper course of action. Employees are expected to cooperate and fully disclose information pertaining to an investigation Any behavior that impedes an investigation may result in disciplinary action. No employee will be subject to any form of retaliation or discipline for reporting a violent act or threat or for cooperating in any investigation.

To report violence or a threat of violence of any kind, employees should immediately contact one of the following persons:

| | |
|---|---|
| Your Supervisor | x ____ |
| Security | x4000 |
| Vice President of Human Resources | x4388 |
| Director of Human Resources | x4385 |
| Manager of Human Resources | x4378 |







ARA 0086

# Rules & Regulations

Common sense is usually a reliable guide as to what is unacceptable behavior in a service business. The following is a partial list of prohibited actions.

1. Conduct endangering the life, safety or health of any employee.
2. Failure to comply with all Federal and state laws.
3. Failure to report illegal actions.
4. Participating in company theft or having knowledge of company theft without making it known to Management.
5. Insubordination or refusal to follow instructions of Supervisors or Managers.
6. Malicious or willful damage or destruction of Company property, or damaging or destroying through negligence or carelessness Company property or that of coworkers, visitors or customers.
7. Falsifying or misrepresenting personal or Company records.
8. Falsifying or misrepresenting employment records.
9. Disclosing confidential Company information and/or misrepresenting Company information.
10. Possessing, using or being under the influence of alcohol or any illegal drugs on Company time or Company property, or being in the presence of someone engaging in such activity.
11. Possessing dangerous or deadly weapons on company time or on Company property.
12. Fighting with, assaulting, harassing or threatening harm to another employee or any person on Company premises or Company time.
13. Smoking in unauthorized areas as designated by the Company.
14. Inefficient, unsatisfactory, negligent or careless performance of duties.
15. Utilizing another employee's identification badge or allowing someone else to use your badge.
16. Intimidating, coercing or using obscene or abusive language toward another employee, visitor or customer.
17. Parking in unauthorized areas as designated by the Company.
18. Failure to abide by the Company policies.
19. Malicious gossip or a derogatory attack on a fellow employee.
20. Gambling or soliciting on Company property.
21. Working on personal projects on Company property, machines or time, unless given written permission by a Supervisor.
22. Failure to observe prescribed safety rules and procedures.

Effective January 1, 2001

ARA 0112

# EXHIBIT E

VOLUME:     I
PAGES:      1 to 163
EXHIBITS:   See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  | x |
|---|---|
| ERIC BEASLEY, | x |
|  | x |
| Plaintiff | x |
|  | x |
| vs. | x |
|  | x |
| ARAMARK UNIFORM AND CAREER | x |
| APPAREL, INC. and JAY HESS, JR., | x |
| Defendants | x |
|  | x |

*DEPOSITION of JOHN J. CUMMINGS,* taken
pursuant to the applicable provisions of the
Federal Rules of Civil Procedure, before Jill
Kourafas, Certified Shorthand Reporter and
Notary Public in and for the Commonwealth of
Massachusetts held at the Law Offices of
Kevin B. Callanan, 17 Accord Park Drive,
Norwell, Massachusetts, on Tuesday,
December 13, 2005, commencing at 10:00 a.m.

*REPORTERS, INC.*
*GENERAL & TECHNICAL COURT REPORTING*
*23 MERRYMOUNT ROAD, QUINCY, MA 02169*
*617.786.7783/FACSIMILE 617.786.7723*

*APPEARANCES OF COUNSEL:*

*For the Plaintiff:*
**EDWARDS, ANGELL, PALMER & DODGE**
**(BY:  BRIAN H. LAMKIN, ESQ.)**
101 Federal Street
Boston, Massachusetts 02110

*For the Defendants:*
**LAW OFFICES OF KEVIN B. CALLANAN**
**(BY:  KEVIN B. CALLANAN, ESQ.)**
17 Accord Park Drive, Suite 101
Norwell, Massachusetts 02061

```
 1              closely with the local police and authorities
 2              in regards to things like this.
 3     Q.       Was anybody else's name mentioned at this
 4              stage other than Eric Beasley?
 5     A.       I can't remember.
 6     Q.       Is it fair to say that Eric Beasley was a
 7              suspect from the very beginning, a suspect in
 8              terms of use or distribution of drugs on the
 9              company property?
10     A.       A suspect of mine?
11     Q.       In your mind.
12     A.       No.
13     Q.       But you can't think of anyone else's name who
14              was brought up at that early stage in the
15              investigation?
16     A.       No.
17     Q.       Did you take any steps -- I'm talking now
18              about August of '03, in that time frame -- to
19              investigate Eric Beasley?
20     A.       I think we had a background check done on
21              him.
22     Q.       And whose idea was that?
23     A.       I would say that would be Barbara Casagrande
24              or Kathy McNeeley or Kathy Gillis, one of
```

```
 1               those three.
 2   Q.    Did you have a background check done at that
 3         time on anyone else?
 4   A.    Not that I recall.
 5   Q.    You had known Eric Beasley prior to this
 6         particular point in time, had you not,
 7         August of '03?  Did you know him as an
 8         employee?
 9   A.    No, not really, no.
10   Q.    You didn't?
11   A.    No.
12   Q.    Do you know whether at that time in August of
13         '03 there were any other employees at
14         WearGuard named Eric?
15   A.    At that time, no.
16   Q.    Does the name Eric O'Connor mean anything to
17         you?
18   A.    It does now, yes.
19   Q.    He's presently employed at WearGuard, is he
20         not?
21   A.    Yes.
22   Q.    He's a black male, is he not?
23   A.    Yes.
24   Q.    Eric Beasley is a black male, correct?
```

```
 1    A.    Yes.
 2    Q.    Do you have any knowledge as to whether Eric
 3          O'Connor was employed at the Norwell facility
 4          in August of 2003?
 5    A.    I believe he was.
 6    Q.    And works in the Custom Embroidery
 7          Department, does he not?
 8    A.    Now?
 9    Q.    Let's start with now, yes.
10    A.    He works there now, yes.
11    Q.    Did he work there in 2003?
12    A.    I really don't know, no.
13    Q.    I show you some documents, Mr. Cummings.
14                MR. CALLANAN:  I'd like to have this
15          marked as Exhibit No. 1, please.
16                     (Exhibit No. 1, Letter to John
17                     Cummings from Richard Sjoberg,
18                     dated 8/5/03, bates-stamped ARA
19                     0285 through ARA 0287, marked.)
20    Q.    I'd ask you to look at what's been marked as
21          Exhibit No. 1, and ask you if you recognize
22          this document?
23    A.    (Witness reviews document.)
24                Yes.
```

```
 1    Q.    Is this the background investigation report
 2          that you just testified about?
 3    A.    Yes.
 4    Q.    This was addressed to you, correct?
 5    A.    Yes.
 6    Q.    This particular letter?
 7    A.    Yes.
 8    Q.    It's a letter dated August 5 addressed to you
 9          from Richard Sjoberg who is an investigator
10          with a group called NSA, Inc., is that
11          correct?
12    A.    Yes.
13    Q.    And it's your testimony that at this time in
14          August of '03, this was the only employee
15          who you requested a background investigation
16          on?
17    A.    The only one that I can recall at this time,
18          yes.
19    Q.    And what, if anything, did you do when you
20          received this report?
21    A.    I read it and can't tell you exactly what I
22          did with it.
23    Q.    Did it cause you to take any action with
24          respect to Eric Beasley?
```

| | | |
|---|---|---|
| 1 | A. | No. |
| 2 | Q. | Did you at some point make Jay Hess aware of |
| 3 | | this report? |
| 4 | A. | The answer is I don't know. |
| 5 | Q. | Do you know recall who, if anyone, you shared |
| 6 | | this report with at WearGuard? |
| 7 | A. | I can't recall. |
| 8 | Q. | At the time in 2003, what position did |
| 9 | | Susan Magrini have? |
| 10 | A. | She was vice president of HR. |
| 11 | Q. | And Kathy Gillis had what position? |
| 12 | A. | Director of HR. |
| 13 | Q. | Did you make them aware of this report? |
| 14 | A. | I believe so.  I don't know which one. |
| 15 | Q. | One or the other? |
| 16 | A. | One or the other. |
| 17 | Q. | And Gillis worked with Magrini? |
| 18 | A. | Yes. |
| 19 | Q. | Did you make Barbara Casagrande aware of this |
| 20 | | report? |
| 21 | A. | I can't really say.  I don't know. |
| 22 | Q. | Had you worked with Mr. Sjoberg before August |
| 23 | | of '05 *(sic)*?  By "you," I mean WearGuard. |
| 24 | A. | Yes. |

```
 1    Q.    It would appear that he had violated the
 2          business practice policy, or the drug policy
 3          at WearGuard as a result of what you just
 4          learned here on October 22nd, right?
 5    A.    Yes.
 6    Q.    Who was actually in overall control of this
 7          investigation?
 8    A.    I think this would be Susan Magrini.
 9    Q.    What's the basis for you making that
10          statement?
11    A.    Well, she was the most senior person that was
12          aware of the undercover work.  Jay was more
13          of a consultant.
14    Q.    Did you keep Susan Magrini informed of the
15          process of the investigation?
16    A.    I believe I did.
17    Q.    During this conference call, which is
18          reflected in Exhibit No. 6, you don't know
19          who made the statement that you wrote down
20          that reads:  "Eric is probably supplying
21          Carlos"?
22    A.    No, I don't.
23    Q.    And I take it that you don't know what the
24          basis of that statement is either?
```

```
 1   Q.   And it says "I'm planning on having a
 2        conference call with Jay this afternoon
 3        to discuss moving forward with the next round
 4        of investigations using Rich Sjoberg's
 5        services.  Please join me in the HR
 6        conference room."
 7             Did I read that correctly?
 8   A.   Yes.
 9   Q.   You sent it to Kathy Gillis and Susan Magrini
10        as well as Jay Hess?
11   A.   Yes.
12   Q.   And this was a day after the employees were
13        suspended who we just talked about, right?
14   A.   Yes.
15   Q.   And what was the purpose of having
16        Mr. Sjoberg's services for further
17        investigation?
18   A.   He was gonna follow up on the other people
19        that were mentioned during the undercover
20        investigation, or we had knowledge that they
21        may be suspected of other things, so I think
22        it was Jay's, to move forward with the next
23        round of the investigations using Rich
24        Sjoberg's services.
```

1    Q.    Did you and Kathy Gillis meet with any other

2          individuals that day for purposes of

3          informing them of their suspension?

4    A.    That day, I can't remember, no.

5    Q.    You said you've worked for WearGuard, did you

6          say 19 years?

7    A.    I started in 1986, yes.

8    Q.    And do you remember a case brought against

9          Aramark by someone named James Blue?

10   A.    No, I don't.

11   Q.    Bear with me for a second here.

12   A.    Sure.

13   Q.    *(Pause.)*

14                Do you know who a Mr. Eighmey is,

15         E-I-G-H-M-E-Y, identified as a floor

16         supervisor?

17   A.    No, I don't.

18   Q.    Now, I want to show you this.

19                    *(Exhibit No. 10, Multi-page*

20                    *Undercover Operative Report dated*

21                    *9/14/03, bates-stamped ARA 0549*

22                    *through ARA 0650, marked.)*

23   Q.    I show you what has been marked as Exhibit

24         No. 10.  It is a lengthy document beginning

1               with -- I'll use the ARA documentation
2               numbers that are in the lower right-hand
3               bottom corner -- ARA 0549 through ARA 0650;
4               is that the way yours is put together, your
5               Exhibit No. 10?
6     A.     Yes.
7     Q.     Would you agree these are a series of reports
8               from Computer Risk Solutions addressed to Jay
9               Hess providing reports of information from
10              the undercover operative who was working at
11              WearGuard at the time?
12    A.     Yes.
13                    MR. LAMKIN:  Corporate Risk
14              Solutions?
15                    MR. CALLANAN:  Yes.
16                    MR. LAMKIN:  I think you said
17              "Computer."
18                    MR. CALLANAN:  Thank you.  Corporate
19              Risk Solutions.
20    Q.     These reports were addressed to Mr. Hess, at
21              least the first one, dated September 14th; is
22              that correct?
23    A.     Yes.
24    Q.     And did you see these reports at any time



| 1  |    | during the period September to November of |
|----|----|--------------------------------------------|
| 2  |    | '03?                                       |
| 3  | A. | Yes.  Jay would forward them to me.        |
| 4  | Q. | On the first page of Exhibit No. 10, there's |
| 5  |    | handwriting, is that your handwriting?     |
| 6  | A. | Yes.                                       |
| 7  | Q. | Would you read that to us?                 |
| 8  | A. | "Gave copies of field reports to Rich Sjoberg |
| 9  |    | - NSA, Kathy Gillis HR, Susan Magrini HR" -- |
| 10 |    | crossed those out -- "11/11/03."           |
| 11 | Q. | The word "field reports," is that what you |
| 12 |    | said?                                      |
| 13 | A. | Yes.                                       |
| 14 | Q. | What do you mean by "field reports"?  Do you |
| 15 |    | mean this document?                        |
| 16 | A. | Yes.                                       |
| 17 | Q. | This entire document?                      |
| 18 | A. | The entire undercover, yes.                |
| 19 | Q. | Did you give a copy to Kathy Gillis?       |
| 20 | A. | I don't believe I did.  I don't know why I |
| 21 |    | would cross it out if I did.               |
| 22 | Q. | What about Susan Magrini?                  |
| 23 | A. | I don't think I gave them to her either at |
| 24 |    | this time.                                 |

```
 1   A.    Not really, no.

 2   Q.    Do you know at the time this is a report

 3         dated -- let's see which one this is.

 4               (Pause.)

 5               This looks like the report of

 6         August 1 on Page 583.  Is that the beginning

 7         of it?

 8               MR. LAMKIN:  October 1.

 9               MR. CALLANAN:  I'm sorry.

10         October 1, 2003.

11   Q.    Agreed?

12   A.    Yep.  Yes.

13   Q.    This is the last page of Kendra Webb's report

14         to Jay Hess, which is based on information

15         from the undercover operative.

16               At the time did you know that Eric

17         O'Connor, a black male, was employed at

18         WearGuard and wore an eye piece?

19   A.    No.

20   Q.    Did you know at the time whether or not Eric

21         Beasley wore an eye piece?

22   A.    No.

23   Q.    When you received this report from Jay Hess,

24         what did you do with it?  Did you share it
```

```
 1              time at Norwell?

 2    A.        There would be three full-time guards and

 3              probably four or five part-time guards.

 4    Q.        You said Bill Garrison was a guard who was

 5              terminated later?

 6    A.        Yes.

 7    Q.        For something unrelated to this sting or this

 8              investigation?

 9    A.        I think he was terminated for not showing up

10              at work a number of shifts.  He had been

11              given a written warning and finally

12              terminated.

13    Q.        How was November 17th determined as the

14              effective date for Mr. Torres's termination?

15    A.        I can't remember why, why the date.

16                        (Exhibit No. 17, Memo dated

17                         11/17/03 without bates stamps,

18                         marked.)

19    Q.        Mr. Cummings, take a look at Exhibit 17 and

20              tell us what it is.

21    A.        I believe these are the employees that were

22              terminated 11/17/03.  "They are not allowed

23              on any WearGuard property.  If they are seen

24              on the property, notify Kathy Gillis or John
```

1          Cummings immediately."

2    Q.    First of all, this is a document that you

3          issued, correct?

4    A.    Yes.

5    Q.    From you to Security it says?

6    A.    Yes.

7    Q.    On November 17, 2003, right?

8    A.    Yes.

9    Q.    What is the handwritten note up here?

10    A.    "Gave Security and HR copies 11/17/03."

11    Q.    Now, what prompted you to prepare this

12          document?

13    A.    I think basically to let them know who was

14          terminated and they should not be on company

15          property.

16    Q.    How did you determine what names to put on

17          this Exhibit 17?

18    A.    Just people who were terminated.

19    Q.    You just confirmed that in Exhibit 16 you

20          sent a letter to Jason Torres whose name is

21          on this list terminating him because he was

22          your employee?

23    A.    Yes.

24    Q.    Where did you obtain the other names to be

# EXHIBIT F



# Needham, Sjoberg & Associates

### INVESTIGATIVE CONSULTANTS

*Corporate Fraud*
*Pre-Employment Profiles*

*Attorney Services*
*Video Surveillance*

August 5, 2003

**PERSONAL AND CONFIDENTIAL**

**WearGuard-CREST**
141 Longwater Drive
Norwell, MA 02061

**Attention:**   Mr. John Cummings
Asst. V.P., Facilities, Engineering & Security

**Re:**   **Background Investigation**

**Subject:**   **ERIC E. BEASLEY**
SS#  Redacted

Dear Mr. Cummings,

Pursuant to your request, we have conducted a background investigation on the above-named subject . This report will supplement our verbal update and detail our findings.

## SOCIAL SECURITY VERIFICATION

Through Trans Union Credit Bureau, we surfaced a Social Security Trace Report in the subject's name. The subject's Social Security Number of Redacted , as well as, Date of Birth of Redacted , were confirmed respectively.

## ADDRESS VERIFICATION

The following addresses were confirmed relative to this subject on the following corresponding dates:

| Residential Address | Date Reported |
|---|---|
| REDACTED | 08/94 To Present |
| | 04/96 To 05/98 |
| | 12/94 |

**CONFIDENTIAL**

**ARA 0285**

WearGuard-CREST
Eric Beasley Background Investigation
August 5, 2003
Page 2

## DRIVER RECORD HISTORY

Research determined the applicant possesses an *Active,* Class D, Driver's License which is due to expire on October 11, 2007. The applicant's Driver's License Number of ⟨Redacted⟩ within the Commonwealth Of Massachusetts lists a residential address ⟨Redacted⟩ Weymouth, MA 02189.

A search of the applicant's Driver Record History found an extensive record of violations issued to this license holder. **A copy of the subject's Driver Record History is attached for your review.**

## CRIMINAL HISTORY

### Criminal History Research, Massachusetts

To the extent allowed by state law, criminal records were searched at appropriate jurisdictions with the following criminal record found for this subject:

| Type Of Offense | Date | Court Location |
|---|---|---|
| **Illegal Possession Of Controlled Substance, Class D - Marijuana** (Docket #0256CR003008) | 05-18-02 | Quincy District, MA |

**Disposition:**    Dismissed Upon Payment Of $200.00 Court Costs;

Police Report & Criminal Docket Attached

| | | |
|---|---|---|
| **State Highway By-Law Violation (Civil Motor Vehicle Infraction)** (Docket #0256CR003008) | 05-18-02 | Quincy District, MA |

**CONFIDENTIAL**

**Disposition:**    Found Responsible, $50.00 Fine;

Police Report & Criminal Docket Attached

ARA 0286

**WearGuard-CREST**
**Eric Beasley Background Investigation**
**August 5, 2003**
**Page 3**

| Type Of Offense | Date | Court Location |
| --- | --- | --- |
| **Operate Motor Vehicle With**<br>**Suspended License**<br>(Docket #9306CR6479) | 08-25-93 | West Roxbury District, MA |

**Disposition:**    Dismissed On $150.00 Court Costs, $50.00 Victim / Witness Fees;

Defaulted On Payments - Various Warrants Issued / Recalled

## SUMMARY

We have completed our investigation on this subject and have provided you with a verbal update of our findings. Should you have any questions or comments, please feel free to contact our office at any time.

Sincerely,

*Richard A. Sjoberg*

Richard A. Sjoberg
President

CONFIDENTIAL

ARA 0287

# Milton Police Department
### 40 Highland Street
### Milton,Ma 02186
### 617-696-5068
### Custody Report
### MIT

Booking Number: 2002000000201
File Number:

| | | | |
|---|---|---|---|
| Booking Code: | Arrest | Custody Type: | Taken into Custody |
| Cell Number: | 3/LO | Court: | N/A |
| Master Name: | BEASLEY, ERIC E | DOB: | 10/11/70 |
| Master Card No: | 2002000001656 | OBTN: | TMIT02000201 |
| Location of Custody: | ADAMS STREET / RANDOLPH AVENUE, MILTON MA, 02186 | | |
| Booking Name: | BEASLEY, ERIC E | | |
| Address: | Redacted | | |
| Booking Number: | 2002000000201 | File No: | |
| Booking Date: | 5/18/02  2:27:00AM | Custody Date: | 5/18/02  2:27:00AM |

5/18/02  2:44:56AM    5/18/02  2:45:24AM

CR Number:
RA Number:

## Personal Infomation

| | | | | | |
|---|---|---|---|---|---|
| Sex: | Male | Height: | 6' 3" | Occupation: | COPUTERIZED DIGITI |
| Race: | Black | Weight: | 255 | Employer/School: | WEAR GUARD |
| DOB: | Redacted | Age: 31 | Build: | Large | Emp/School Address: | NORWELL, MA |
| Place of Birth: | Redacted | Eye Color: | Brown | Social Security No: | Redacted |
| Mother's Name: | N/A | Hair Color: | Black | Opr's. License # & St: | Redacted | MA |
| Father's Name: | N/A | Skin Tone: | Dark | Marital Status: | Single |
| Legal Spouse: | N/A | Ethnicity: | Not Hispanic | Maiden Name: | N/A |
| Mother: | MARY BEASLEY | | | Home Telephone: | Redacted |
| Father: | N/A | | | | |
| Spouse: | N/A | | | | |
| Scars / Marks / Tattoos: | N/A | | | | |

## Associated Incidents

| Incident Number | Incident File Number | Incident Date | Description |
|---|---|---|---|
| 2002000004188 | | 5/18/02  1:55:00AM | Warrant Service |

## Booking Process

| | | | | | |
|---|---|---|---|---|---|
| Was Phone Used: | N/A | Examined at Hospital: | N/A | Breathalizer Administered: | No |
| Tel. No. Called: | N/A | | | | |
| Personal Property: | MARIJUANA, WALLET, WATCH, 2 RINGS, CHAIN, EARING, HAT | | | | |
| Refused Fingerprints: | No | Refused Photograph: | No | Refused Breath Test: | N/A | Refused Blood Test: | N/A |

**CONFIDENTIAL**

**A R A   0 2 9 3**

# Milton Police Department
## 40 Highland Street
## Milton, Ma 02186
## 617-696-5068
## Custody Report
## MIT

| | |
|---|---|
| **Master Name:** | BEASLEY, ERIC E |
| **Master Card No:** | 2002000001656 |
| **Booking Number:** | 2002000000201 |

**(Continued)**

### Associated Officers

| | | | |
|---|---|---|---|
| **Custody Officer:** | BURNS, TIMOTH | **Searched By:** | BURNS, TIMOTH |
| **Booking Officer:** | WEST, WILLIAM | **Placed in Cell By:** | BURNS, TIMOTH |
| **Informed of Rights by:** | WEST, WILLIAM | | |

| | |
|---|---|
| **Custody Partner ID:** | |
| **Unit No:** | |
| **Transporting Unit No:** | |

### Comments and Observations

| **Cautions:** | **Booking Comments:** | **Visible Injuries:** |
|---|---|---|
| | N/A | N/A |

### Juvenile Information

| | |
|---|---|
| **Juvenile:** No | |
| **Person Notified:** | **Relationship:** | **Phone No:** |
| **Address:** | | **Juvenile Probation Officer:** |
| **Notified By:** | | **Notification Date & Time:** |

### Charge Information

| **Statute:** | | **Law Description:** | | **Counts:** | |
|---|---|---|---|---|---|
| 85/2A | | DPW REGULATIONS MOVEMENT ON HI | | 1 | |
| 94C/34/826 | | Possession Class D Substance | | 1 | |

### Records Information

| | | | |
|---|---|---|---|
| **Bail Set By:** | N/A | **BOP Check:** | |
| **Bailed By:** | N/A | **Suicide Check:** | |
| | | **BOP Warrant:** | |
| **Bail Amount:** | N/A | **BOP Court:** | |

### Breath Test Information

| **Administered:** | N/A | **Breathalyzer Type:** | N/A | **Serial Number:** | N/A |
|---|---|---|---|---|---|
| **Administered by:** | | | | | |

| **Test 1:** | 0.000 | **Simulated Test 1:** | 0.000 | **Test 2:** | 0.000 | **Simulated Test 2:** | 0.000 |
|---|---|---|---|---|---|---|---|

**CONFIDENTIAL**

**ARA 0294**

# Milton Police Department
### 40 Highland Street
### Milton, Ma 02186
### 617-696-5068
### Custody Report
### MIT

| | |
|---|---|
| **Master Name:** | BEASLEY, ERIC E |
| **Master Card No:** | 2002000001656 |
| **Booking Number:** | 2002000000201 |

**(Continued)**

## Detoxification Information

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Notified by:** | | | **Bed Available:** | | | | |
| **Detox Notified:** | N/A | **Taken to Detox:** | N/A | **Taken Home:** | N/A | **Taken to Hospital:** | N/A |
| **Transported by:** | | **Date/Time:** | | **Name of Hospital:** | | | |
| **Remarks:** | | | | | | | |

## Alias Information

| Alias Name(Last, First, MI) | SSN | Date of Birth | License Number | License State |
|---|---|---|---|---|
| No Aliases for Master Card #: 2002000001656 | | | | |

## Warrant Information (System)

| Warrant ID | Warrant Type | Warrant Description | Date Issued | Charges |
|---|---|---|---|---|
| No Warrants for Master Card #: 2002000001656 | | | | |

## Warrant Information (Manual)

| Warrant / Docket ID | Date Created | Counts | Charges | Notes |
|---|---|---|---|---|
| 9306CR6479 | 05/18/2002 | 1 | SUSPENDED LICENSE | |

## Warrant Related Checks

| BOP Records | BOP Warrants | BOP Court |
|---|---|---|
| No Checks Info for Master Card #: 2002000001656 | | |

## ID Numbers

| State Number | FBI Number | INS Number | Misc. Number | Misc. Number Description |
|---|---|---|---|---|
| | | | | |

## Associated Persons Arrested

| Type | Name(Last, First, MI) | Date of Birth | Sex | Home Phone # | Work Phone # |
|---|---|---|---|---|---|
| No Associated Persons Arrested for Incident #: 2002000004188 | | | | | |

## Vehicle Info

| Vehicle No. | Make | Model | Year | VIN | Primary Color | Secondary Color | Plate | State |
|---|---|---|---|---|---|---|---|---|
| 2002000000610 | Ford | Explorer | 1995 | 1FMDU34X3SUB51856 | Black | Brown | BB1170 | MA |

**CONFIDENTIAL**

ARA 0295

# Milton Police Department

**40 Highland Street**
**Milton, Ma 02186**
**617-696-5068**
**Custody Report**
**MIT**

| | |
|---|---|
| Master Name: | BEASLEY, ERIC E |
| Master Card No: | 2002000001656 |
| Booking Number: | 2002000000201 |

(Continued)

**Evidence**

| Property Number | Property Description | | Status | Serial Number | Orig. Est. Value |
|---|---|---|---|---|---|
| 2002000000254 | 1 GLASINE BAG GREEN LEAFY SUBSTA | | Open | N/A | $0.00 |

| Weapon Type | | Vehicle Ref. | Drug Type | Container | | Loss Desc. | Category Desc. |
|---|---|---|---|---|---|---|---|
| N/A | | N/A | Marijuana | N/A | | N/A | Evidence |

| Year | Make | Model | Width | Length | Height | Weight | Caliber | Qty | Unit of Measure | Color |
|---|---|---|---|---|---|---|---|---|---|---|
| N/A | N/A | N/A | 0 | 0 | 0 | 0 | 0 | 0.00 | N/A | N/A |

**CONFIDENTIAL**

**ARA 0296**

_Signature of Prisoner_                    _Signature of Booking Officer_

# Milton Police Department

**40 Highland Street**
**Milton,Ma 02186**
**617-696-5068**
**Incident Report**
**MIT**

Incident Number: 2002000004188
Alternative Reference Number:  N/A
Dispatch Incident Number: 2002000001534

## Incident Information

| Occurred On/From | Day of Week | Date | Time | Occurred To | Day of Week | Date | Time | Reported On | Date | Time |
|---|---|---|---|---|---|---|---|---|---|---|
| | Sat | 05/18/2002 | 1:55:00AM | | Sat | 05/18/2002 | 1:55:00AM | | 5/18/02 | 2:18:37AM |

| Reported As | Incident Type - Primary | Arresting Officer |
|---|---|---|
| Warrant Service [76] | Warrant Service | TIMOTHY BURNS |

| Incident Address | Reporting Officer |
|---|---|
| RANDOLPH/ADAMS, MILTON, MA 02186 | |

| Business Name | Sector |
|---|---|
| N/A | |

## Associated Persons Summary

| Type | Name(Last, First, MI) | Date of Birth | Sex | Home Phone # | Work Phone # |
|---|---|---|---|---|---|
| OWNER | BEASLEY, ERIC E | Redacted | M | Redacted | N/A |
| Address | Redacted | | | | |

## Associated Businesses Summary

| Type | Name | Primary Phone # | Secondary Phone # |
|---|---|---|---|
| VICTIM | MILTON POLICE DEPARTMENT | N/A | N/A |
| Address | 40 HIGHLAND STREET, MILTON, MA 02186 | | |

## IBR/UCR Offenses

| Offense Number | IBR Type | Chapter | Section | IBR Type Description | Counts |
|---|---|---|---|---|---|
| 0 | | N/A | N/A | | |
| No Incident Offenses Recorded for Incident #: 2002000004188 | | | | | |

## Arrest Offenses

| Seq # | Chapter | Section | Name(Last, First, MI) | Description of Offense | Counts |
|---|---|---|---|---|---|
| 1 | 85 | 2 | BEASLEY,ERIC, E | DPW REGULATIONS MOVEMENT ON H | 1 |
| 2 | 94C | 34 | BEASLEY,ERIC, E | Possession Class D Substance | 1 |

## Arrestee Seq. #: 1

| Suspect Type | Suspect Name | Alias/Nickname | Occupation | SSN |
|---|---|---|---|---|
| No Arrest Data Available for Incident #: 2002000004188 | | | | |

## Suspect Seq. #: 1

| Suspect Type | Suspect Name | Alias/Nickname | Occupation | SSN |
|---|---|---|---|---|
| No Suspect Data Available for Incident #: 2002000004188 | | | | |

## Victims

| Victim Name | Victim Type | Sex | Race | Ethnic Origin | Hospital Destination | Transport Description |
|---|---|---|---|---|---|---|

## Vehicle Info

| Vehicle No. | Vehicle Make | Vehicle Model | Vehicle Year | VIN | Primary Color | Secondary Color | Plate No. | State |
|---|---|---|---|---|---|---|---|---|
| 2002000000610 | Ford | Explorer | 1995 | 1FMDU34X3SUB51856 | Black | Brown | BB1170 | MA |

**CONFIDENTIAL**

A R A  0 2 9 7

**Milton Police Department**
40 Highland Street
Milton, Ma 02186
617-696-5068
**Incident Report**
**MIT**

Incident Number: 2002000004188
Alternative Reference Number:  N/A
Dispatch Incident Number: 2002000001534

**Property**

| Property Number | Property Description | Status | Serial Number | Orig. Est. Value |
|---|---|---|---|---|
| 2002000000255 | Marijuana | Open | N/A | $0.00 |

| Weapon Type | Vehicle Ref | Drug Type | Container | Loss Desc. | Category Desc. |
|---|---|---|---|---|---|
| N/A | N/A | Marijuana | N/A | N/A | Arrest |

| Year | Make | Model | Width | Length | Height | Weight | Caliber | Qty | Unit of Measure | Color |
|---|---|---|---|---|---|---|---|---|---|---|
| N/A | N/A | N/A | 0 | 0 | 0 | 0 | 0 | 0.00 | N/A | N/A |

**Narratives:**

Narrative by: TIMOTHY BURNS

| Seq No: | Date & Time |
|---|---|
| 1 | 5/18/02  4:13:00AM |

At approximately 0200 hours on 05/18/02, I observed a 1995 Black Ford Explorer, Ma reg BB1170, drive on Adams Street before Eliot Street the wrong way (Note: Due to construction that portion of Adams Street has been closed off to all southbound traffic.  The wrong way is clearly blocked off by several barricades as well as several signs indicating that it is a one way.)  I pulled the vehicle over on Adams Street by Randolph Avenue.

A registry query of the operator, Eric Beasley [Redacted] revealed that he had a warrant out of West Roxbury Court (#9306-CR-6479).  Mr. Beasley was then placed under arrest for the outstanding warrant.  As I was conducting an inventory search of the vehicle I located a plastic bag in the center console.  This bag was filled with a green leafy substance.  Through my training and experience I believed this substance to be marijuana.  A subsequent charge of illegal possession narcotics (Class D) was then added.

Mr. Beasley was then transported to the station and charged with the following:
1) WMS # 9306-CR-6479
2) 94C-34  Possession of Class D
3) 85-2a  Violation DPW Signs

Narcotics were placed in evidence locker #1.

Respectfully Submitted,
Ptlm. Timothy P. Burns
M3854

**Incident Notes:**

Create User ID

| Seq No: | Date & Time |
|---|---|

No Incident Notes Listed

**CONFIDENTIAL**

ARA 0298

**Milton Police Department**
40 Highland Street
Milton, Ma 02186
617-696-5068
Incident Report
MIT

Incident Number: 2002000004188
Alternative Reference Number: N/A
Dispatch Incident Number: 2002000001534

**Incident Dispatcher Remarks:**

Create User ID: system

Seq No:          Date & Time
                 05/18/2002 02:18:38

OFC REPORTS MV STOP MA REG BB1170. LEAPS SHOWS OPERATOR WITH WMS WARRANT. OFC REPORTS OPERATOR ARRESTED FOR WMS WARRANT AND POSSESSION OF CLASS B SUBSTANCE. SEE PERSON SCREEN FOR PARTY.

**CONFIDENTIAL**

**ARA 0299**

# CRIMINAL DOCKET

**0256CR003008**

| COURT DIVISION | ☐ INTERPRETER REQUIRED | | DATE and JUDGE | DOCKET ENTRY |
|---|---|---|---|---|

COURT DIVISION: Quincy

NAME, ADDRESS AND ZIP CODE OF DEFENDANT:
BEASLEY, ERIC E
Redacted

DATE and JUDGE: 5-20-02 [signature]

DOCKET ENTRY:
☐ Attorney appointed (SJC R. 3:10)
☐ Atty denied and Deft Advised per 211D §2A
☐ Waiver of counsel found after colloquy

Terms of release as:
☒ PR ☐ Bail:
☐ Held (276 §58A)
☐ See back for special conditions

Arraigned and advised:
☐ Potential of bail revocation (276 §58)
☐ Right to bail review (276 §58)
☐ Right to drug exam (111E §10)

DEFT. DOB AND SEX: Redacted M

DATE OF OFFENSE(S): 05/18/2002

PLACE OF OFFENSE(S): MILTON

COMPLAINANT: JUDGE, LEO

POLICE DEPARTMENT (if applicable): MILTON PD

DATE OF COMPLAINT: 05/20/2002

RETURN DATE AND TIME: 05/20/2002 00:00:00

Advised of right to jury trial:
☐ Does not waive
☐ Waiver of jury trial found after colloquy

Advised of right as pro se (Supp. R. 4)
Advised of right of appeal to Appeals Ct (R. 28)

| COUNT/OFFENSE | FINE | SURFINE | COSTS | RESTITUTION | V/W ASSESSMENT |
|---|---|---|---|---|---|
| 1. 85/23  STATE HWAY--GUBERNATORIAL BY-LAW VIOL * c85 | 50 00 | | | | ☐ WAIVED |

DISPOSITION DATE and JUDGE: 5/20/02 Buckley

DISPOSITION METHOD:
☐ Guilty Plea or Admission to Sufficient Facts accepted after colloquy and 278 §29D warning
☐ Bench Trial
☐ Jury Trial
☐ None of the Above

FINDING:
☐ Not Guilty
☐ Guilty
☐ Not Responsible
☒ Responsible
☐ No Probable Cause
☐ Probable Cause

SENTENCE OR OTHER DISPOSITION:
☐ Sufficient facts found but continued without guilty finding until:
☐ Probation   ☐ Pretrial Probation (276 §87) - until:
☐ To be dismissed upon payment of court costs/restitution
☐ Dismissed upon: ☐ Request of Comm. ☐ Request of Victim
☐ Request of Deft ☐ Failure to prosecute ☐ Other:
☐ Filed with Deft's consent ☐ Nolle Prosequi ☐ Decriminalized (277 §70C)

R - $50 00
4863C000006/11/02 MILTON FINE  50.00

FINAL DISPOSITION:
☐ Dismissed on recommendation of Probation Dept.
☐ Probation terminated: defendant discharged

JUDGE: [signature]   DATE: 6/3/02

| COUNT/OFFENSE | FINE | SURFINE | COSTS | RESTITUTION | V/W ASSESSMENT |
|---|---|---|---|---|---|
| 2. 94C/34/G  DRUG, POSSESS CLASS D c94C §34 | | | 200 00 | | ☐ WAIVED |

DISPOSITION DATE and JUDGE: 5/20/02 Buckley

DISPOSITION METHOD:
☐ Guilty Plea or Admission to Sufficient Facts accepted after colloquy and 278 §29D warning
☐ Bench Trial
☐ Jury Trial
☐ None of the Above

FINDING:
☐ Not Guilty
☐ Guilty
☐ Not Responsible
☐ Responsible
☐ No Probable Cause
☐ Probable Cause

SENTENCE OR OTHER DISPOSITION:
☐ Sufficient facts found but continued without guilty finding until:
☐ Probation   ☐ Pretrial Probation (276 §87) - until:
☐ To be dismissed upon payment of court costs/restitution
☒ Dismissed upon: ☐ Request of Comm. ☐ Request of Victim
☐ Request of Deft ☐ Failure to prosecute ☐ Other:
☐ Filed with Deft's consent ☐ Nolle Prosequi ☐ Decriminalized (277 §70C)

Dism - $200 cc
4863C000006/11/02 COURT COST  200.00

FINAL DISPOSITION:
☒ Dismissed on recommendation of Probation Dept.
☐ Probation terminated: defendant discharged

JUDGE: [signature]   DATE: 6/3/02

| COUNT/OFFENSE | FINE | SURFINE | COSTS | RESTITUTION | V/W ASSESSMENT |
|---|---|---|---|---|---|
| | | | | | ☐ WAIVED |

DISPOSITION DATE and JUDGE:

DISPOSITION METHOD:
☐ Guilty Plea or Admission to Sufficient Facts accepted after colloquy and 278 §29D warning
☐ Bench Trial
☐ Jury Trial
☐ None of the Above

FINDING:
☐ Not Guilty
☐ Guilty
☐ Not Responsible
☐ Responsible
☐ No Probable Cause
☐ Probable Cause

SENTENCE OR OTHER DISPOSITION:
☐ Sufficient facts found but continued without guilty finding until:
☐ Probation   ☐ Pretrial Probation (276 §87) - until:
☐ To be dismissed upon payment of court costs/restitution
☐ Dismissed upon: ☐ Request of Comm. ☐ Request of Victim
☐ Request of Deft ☐ Failure to prosecute ☐ Other:
☐ Filed with Deft's consent ☐ Nolle Prosequi ☐ Decriminalized (277 §70C)

**CONFIDENTIAL**

FINAL DISPOSITION:
☐ Dismissed on recommendation of Probation Dept.
☐ Probation terminated: defendant discharged

JUDGE:   DATE:

| COUNT/OFFENSE | FINE | SURFINE | COSTS | RESTITUTION | V/W ASSESSMENT |
|---|---|---|---|---|---|
| | | | | | ☐ WAIVED |

DISPOSITION DATE and JUDGE:

DISPOSITION METHOD:
☐ Guilty Plea or Admission to Sufficient Facts accepted after colloquy and 278 §29D warning
☐ Bench Trial
☐ Jury Trial
☐ None of the Above

FINDING:
☐ Not Guilty
☐ Guilty
☐ Not Responsible
☐ Responsible
☐ No Probable Cause
☐ Probable Cause

SENTENCE OR OTHER DISPOSITION:
☐ Sufficient facts found but continued without guilty finding until:
☐ Probation   ☐ Pretrial Probation (276 §87) - until:
☐ To be dismissed upon payment of court costs/restitution
☐ Dismissed upon: ☐ Request of Comm. ☐ Request of Victim
☐ Request of Deft ☐ Failure to prosecute ☐ Other:
☐ Filed with Deft's consent ☐ Nolle Prosequi ☐ Decriminalized (277 §70C)

**ARA 0300**

FINAL DISPOSITION:
☐ Dismissed on recommendation of Probation Dept.
☐ Probation terminated: defendant discharged

JUDGE:   DATE:

☐ ADDITIONAL COUNTS ATTACHED

TRUE COPY ATTEST:   X

CLERK-MAGISTRATE/ASST. CLERK

ON (DATE):

COURT ADDRESS:
Quincy District Court
1 Dennis Ryan Parkway
Quincy, MA 02169

93 VO CR 0479

COURT DIVISION    NAME, ADDRESS AND ZIP CODE OF DEFENDANT

Am WEST ROXBURY

Eric E Beasley

Redacted

**District Court Department**

TO ANY JUSTICE OR CLERK-MAGISTRATE
OF THE DISTRICT COURT DEPARTMENT:

The within named and undersigned complainant, on behalf of the Commonwealth, on oath complains that on the date and at the location stated herein the defendant did commit the offense(s) listed below.

| DEF. DOB AND SEX | OFFENSE CODE(S) |
| Redacted | 116,140 |

| DATE OF OFFENSE | PLACE OF OFFENSE |
| 8/25/93 | 95 Cornell St |

| COMPLAINANT | POLICE DEPARTMENT (if applicable) |
| Kilduf/A.Murphy | Area E₅ |

| DATE OF COMPLAINT | RETURN DATE AND TIME June 22,1994 @9:00 AM AM |
| December 15,1993 December 15,1993 | |

COUNT-OFFENSE

A.OP. AFTER LIC. OR RT. TO OP. SUSP. c90 s23

did operate a motor vehicle after his or her license, or right to operate a motor vehicle without a license, had been suspended and after notice of such suspension had been issued by the registrar and received by said person, or by his or her agent or employer, and prior to the restoration of such license or right to operate or to the issuance to him or her of a new license to operate, in violation of G.L. c.90, s.23.

COUNT-OFFENSE

B.SPEEDING c90 s17

**NOTE: THIS IS A CIVIL MV INFRACTION, SET FORTH HERE FOR PROCEDURAL PURPOSES ONLY.**
did operate a motor vehicle on a way, as defined in G.L. c.90, s.1, at a rate of speed greater than reasonable and proper, having regard to traffic and the use of the way and safety of the public, in violation of G.L. c.90, s.17.

COUNT-OFFENSE

COUNT-OFFENSE

**CONFIDENTIAL**

**ARA 0301**

| COMPLAINANT | SWORN TO BEFORE CLERK-MAGISTRATE/ASST. CLERK | ON (DATE) | ADDITIONAL COUNTS ATTACHED |
| X | X | 3-24-94 | |
| FIRST JUSTICE PAUL MURPHY | | COURT ADDRESS 445 ARBORWAY | |
| A TRUE COPY | CLERK-MAGISTRATE/ASST. CLERK    ON (DATE) | JAMAICA PLAIN, MA 02130 | |

COURT DIVISION

Am WEST ROXBURY    NAME, ADDRESS AND ZIP CODE OF DEFENDANT

Eric E Beasley

Redacted

| | TERMS OF RELEASE | Assigned *Wm. Kelsay* | |
| --- | --- | --- | --- |
| | | | .ROR |

| DATE | PROCEEDING |
| --- | --- |
| 11-15-94 | ☒ Arraigned before J. *Trueman* |
| | ☒ Advised of right to counsel |
| | ☐ Advised of right to drug exam |
| | ☐ Advised of right to bail review |
| | ☐ Advised of right to F.I. Jury Trial |
| | ☐ Waives   ☐ Requests F.I. Jury Trial |
| | ☐ Advised of alien rights |
| 6-22-94 | ☒ Warrant issued  ☐ Default warrant issued |
| 11-15-94 | ☒ Default removed  ☒ Warrant recalled |
| 6-20-95 | ☒ Warrant issued  ☐ Default warrant issued |
| 5-21-02 | ☒ Default removed  ☐ Warrant recalled |

DEF. DOB AND SEX   Redacted

DATE OF OFFENSE   OFFENSE CODE(S)   116,140

8/25/93   PLACE OF OFFENSE   95 Cornell St

COMPLAINANT   Kilduf/A.Murphy   POLICE DEPARTMENT (if applicable)   Area Ey

DATE OF COMPLAINT   December 15, 1993   RETURN DATE AND TIME   June 22, 1994 @9:0

| COUNT-OFFENSE | FINE | SURFINE 50 w/v | COSTS | TOTAL DUE # 150.00 |
| --- | --- | --- | --- | --- |

| DATE 1994 | PLEA | IMPRISONMENT AND OTHER DISPOSITION |
| --- | --- | --- |
| | ☒ Not Guilty  ☐ Guilty  ☐ Nolo | |
| | ☐ New Plea:  ☐ Admits suff. facts | |
| 5-21-02 | FINDING *dism.*   JUDGE | |
| | ☐ Cont. w/o finding until: 6-20-95 | FINAL DISPOSITION   DATE |
| | ☐ Appeal of find. & disp.  ☐ Appeal of disp. | ☐ Discharged from probation  ☐ Dismissed at request of probation |

| COUNT-OFFENSE | FINE | SURFINE | COSTS | TOTAL DUE |
| --- | --- | --- | --- | --- |

| DATE | PLEA | IMPRISONMENT AND OTHER DISPOSITION |
| --- | --- | --- |
| | ☐ Not Guilty  ☐ Guilty  ☐ Nolo | |
| | ☐ New Plea:  ☐ Admits suff. facts | 2816E000009/11/02VWAP    50. |
| | FINDING   JUDGE | 2816E000009/11/02COURT COST  150. |
| | ☐ Cont. w/o finding until: | FINAL DISPOSITION   DATE |
| | ☐ Appeal of find. & disp.  ☐ Appeal of disp. | ☐ Discharged from probation  ☐ Dismissed at request of probation |

| COUNT-OFFENSE | FINE | SURFINE | COSTS | TOTAL DUE |
| --- | --- | --- | --- | --- |

| DATE | PLEA | IMPRISONMENT AND OTHER DISPOSITION |
| --- | --- | --- |
| | ☐ Not Guilty  ☐ Guilty  ☐ Nolo | |
| | ☐ New Plea:  ☐ Admits suff. facts | **CONFIDENTIAL** |
| | FINDING   JUDGE | |
| | ☐ Cont. w/o finding until: | FINAL DISPOSITION   DATE |
| | ☐ Appeal of find. & disp.  ☐ Appeal of disp. | ☐ Discharged from probation  ☐ Dismissed at request of probation |

| COUNT-OFFENSE | FINE | SURFINE | COSTS | TOTAL DUE |
| --- | --- | --- | --- | --- |

| DATE | PLEA | IMPRISONMENT AND OTHER DISPOSITION |
| --- | --- | --- |
| | ☐ Not Guilty  ☐ Guilty  ☐ Nolo | |
| | ☐ New Plea:  ☐ Admits suff. facts | **ARA 0302** |
| | FINDING   JUDGE | |
| | ☐ Cont. w/o finding until: | FINAL DISPOSITION   DATE |
| | ☐ Appeal of find. & disp.  ☐ Appeal of disp. | ☐ Discharged from probation  ☐ Dismissed at request of probation |

| CONT. TO | PURPOSE | CONT. TO | PURPOSE | | DATE | TAPE NO. | START | STOP |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 6-22-94 | | | | | | | | |
| 12-13-94 | Trial | | | | | | | |
| 6-20-95 | disp | | | | | | | |
| 6-21-02 | SRP | | | | | | | |

# EXHIBIT G

4:55 PM    The Operative observes an unidentified black male employee wandering around the first floor. The Operative pretends to be lost and approaches the employee. The employee informs the Operative that his name is Eric and he points her toward the stairs. Before she can begin a conversation with Eric, she is interrupted by Mike who has several other jobs for her to complete. Mike assigns the Operative several tasks to complete during the remainder of the shift and then states that he is leaving for the day.

8:02 PM    Carlos approaches the Operative and asks to "...join me and my boys for lunch." During the lunch break, the Operative is sitting with Carlos when an unidentified white male approaches them. Carlos asks the white male "...you got my cigar?" The white males responds, "Yeah...you have something to put it in?" Carlos then looks at the Operative and asks "...You blaze (a slang term for smoking marijuana)?" The Operative does not answer Carlos, but makes a facial expression to let him know that she is interested. Carlos states "...that's ok...you can take the 5TH...we won't tell anybody on you." The Operative then walks through the parking lot with Carlos to a vehicle (Audi – MA Tag# 885 770). At this time, an black male approaches the vehicle and is introduced by Carlos as "John." John invites the Operative to a party at his residence this weekend. Carlos tells John, "I have some fire...want some?" "Fire" is a slang term for marijuana. The Operative and Carlos walk over to another vehicle, a white Chevrolet Corsica (MA Tag# 87F 957) with the unidentified white male, and John. John and Carlos begin to smoke a cigar that appears to be marijuana. Carlos offers the cigar to the Operative. The Operative declines stating "...I have not had my drug test yet." Carlos tells the Operative that when she is ready to let him know. Carlos continues a conversation with the Operative stating, "On Thursdays I make mad money...whatever amount you want I have it ready to sell. I can sell a pound for $1500." The Operative attempts to make small talk with Carlos and mentions Eric stating, "...I met him earlier today." Carlos tells the Operative "...Yeah, Eric is real cool. He is a supervisor. He has a really nice bike." As they are returning from their lunch break Carlos asks the Operative for her phone number.

8:35 PM    The Operative returns to the warehouse to resume the assigned cleaning tasks. She has a brief conversation with Jason, a Security Department employee. Jason tells the Operative that he was not required to go through a background check because of his Army clearance. Jason informs the Operative that he just started working in the warehouse two days ago.

9:00 PM    The shift ends and the Operative departs the warehouse for the evening. The assignment is concluded for the day.

**CONFIDENTIAL**

**ARA 0151**

FRIDAY
SEPTEMBER 12, 2003  (Conducted by Operative 1543)

2:45 PM    The Operative reports to the warehouse to begin the shift. She signs in at the Security desk and checks out key set #8. Mike approaches the Operative and informs her that one of the cleaners has called in sick and she will be cleaning the entire downstairs area alone today.

2:55 PM    The Operative begins her assigned cleaning tasks of changing trash liners, mopping the floors, cleaning windows and dusting.

3:30 PM    The Operative does not observe Carlos working in his usual area of the warehouse. Mike tells the Operative that some employees are not working today, however will be working tomorrow.

5:00 PM    The Operative takes a short break and sits near Jason at the Security desk. Jason tells the Operative that he looks forward to them becoming friends. Jason then comments, "...You look tired. If you 'hang' with me I can make your job a lot easier." Victor approaches her and tells her that on Fridays all cleaning employees should leave by 11:00pm.

5:15 PM    The Operative resumes her assigned cleaning tasks.

8:00 PM    The Operative takes a 30 minute lunch break. During this time the Operative observes Eric and approaches him to begin a conversation. The Operative notices that Eric appears to be in a hurry and does not seem very interested in speaking with her.

10:45 PM    The Operative takes a short break near Jason at the Security desk. Jason asks "...will you cover the desk for me for a few minutes?" The Operative notes that Jason is gone for approximately five minutes.

11:15 PM    The Operative returns to the Security desk to have a conversation with Jason. The Operative observes Eric exit the warehouse, walking past the Security desk with a large, full bag. The Operative jokes with Jason by commenting, "...don't you check any bags?" Jason responds by telling the Operative that "...Bill told me it's ok for them to leave with bags. Bill also told me that several 'Sting' operations are going on right now to catch some of the employees doing drugs. I, myself, have caught several employees having sex in the locker room by watching them on camera." Jason continues to tell the Operative "...this place has to stay clean because it is the president's favorite building." The Operative notes that she believes Jason is "showing off" with no basis for this information being that he is a very new employee.

**CONFIDENTIAL**

ARA 0153

MONDAY
SEPTEMBER 15, 2003  (Conducted by Operative 1543)

2:30 PM      The Operative arrives at the warehouse and meets with the shift
             supervisor, Mike to review a list of tasks, which must be completed during
             the shift. The majority of the duties assigned are in the downstairs area.

2:40 PM      The Operative begins to empty trash liners, clean windows and dust.

4:07 PM      Carlos asks the Operative, "…What happened to you this weekend? Why
             didn't you come to the party at John's place?" The Operative responds
             "…I didn't see you at work on Friday and I was not sure if the party was
             still on or if the plans had changed." Carlos then asks the Operative
             "…What's up with what we talked about the other day?" The Operative
             notes that Carlos is referring to a drug purchase of marijuana. The
             Operative tells him that she is not ready to make a purchase yet. Carlos
             seems frustrated by this and begins to complain that he is suspicious of
             everyone right now. He asks the Operative, "Why do you drive that
             van…you got surveillance equipment in there?" The Operative responds
             by laughing and telling Carlos that he can look in the van if he wants to.
             Carlos says that everyone knows that vans are "Five-0." The Operative
             then returns to performing the cleaning tasks assigned to her.

4:15 PM      Mike approaches the Operative and states, "…Stay clear of the
             employees…if the don't meet their numbers you will get blamed for it."

7:05 PM      The Operative observes Eric and Carlos having a conversation in the
             parking area.

7:17 PM      Carlos requests that the Operative come to his work area to have a
             conversation. He states, "You understand I am just paranoid right now,
             right? A lot of shit has been going on around here and I don't want any
             problems."   The Operative responds affirmatively but seemingly
             uninterested.

8:00 PM      The Operative continues cleaning the downstairs areas of the warehouse
             over the next several hours and purposely stays away from the Art
             Department where Carlos and Eric work.

11:40 PM     The shift ends and the Operative departs the warehouse for the evening.
             The assignment is concluded for the evening.

**CONFIDENTIAL**

ARA 0156

TUESDAY
SEPTEMBER 16, 2003   (Conducted by Operative 1543)

| | |
|---|---|
| 2:40 PM | The Operative arrives at the warehouse and receives a list of duties from Mike. Mike informs the Operative that one of the cleaners has called out sick today. |
| 2:50 PM | The Operative begins to empty trash liners, clean windows and dust. |
| 3:45 PM | She passes by the Custom Embroidery area and observes Carlos. The Operative does not approach him, however, notices that he is observing her work. |
| 6:00 PM | The Operative takes a meal break and walks to her van approximately three minutes before Carlos and Eric exit the warehouse. The Operative observes them have a brief conversation. The Operative believes that Carlos and Eric have a relationship that exists outside of work. Carlos then begins to walk around the parking area to several vehicles. The Operative observes that Carlos is exchanging items with several of the occupants in the vehicles; however, the Operative cannot determine the contents. |
| 6:25 PM | Carlos re-enters the warehouse. The Operative exits the van and also re-enters the warehouse to resume the assigned cleaning duties. |
| 6:40 PM | The Operative notices that the area where Carlos works is segmented in sections which are assigned numbers. The employee named John, who the Operative interacted with the previous week, works in section T22. The unidentified young male who the Operative observed smoking what appeared to be marijuana with Carlos last week, works in section BAR16. |
| 7:15 PM | The Operative notices that Eric is watching her from a distance as she is cleaning. Eric then waves to her and states "Don't work too hard." |
| 7:35 PM | Eric and Carlos have a conversation in the parking area. |
| 8:00 PM | Several white males approach Carlos in his work area. The Operative then observes Carlos walk outside to the parking area with them. Carlos remains outside for approximately three minutes then returns to his area. Carlos took a meal break at 7:00pm and the white male employees that approached him are just beginning their meal break at 8:00pm. |
| 10:00 PM | The Operative takes a break and goes to her vehicle. The Operative lights a cigar in hopes that Carlos and other employees will notice. The Operative reports that Carlos, John and several other employees exit the warehouse for break and observe the Operative smoking in her vehicle. |

**CONFIDENTIAL**                    **ARA 0157**

10:15 PM    Carlos and John re-enter the warehouse. The Operative remains outside and observes Eric exit the warehouse within two minutes. Eric walks to the back of the building to his vehicle.

10:35 PM    Eric re-enters the warehouse and resumes working.

10:40 PM    The Operative returns to the warehouse and dry mops the floors for the remainder of the shift.

11:30 PM    The shift ends and the Operative departs the warehouse. As she exits the building, the Operative has an opportunity to meet Bill at the Security desk. The Operative notes that Bill appears very organized in the closing procedures for the warehouse. The assignment is concluded for the evening.


WEDNESDAY
SEPTEMBER 17, 2003   (Conducted by Operative 1543)

2:50 PM     The Operative reports to the warehouse and begins to dry mop, empty trash liners and dust.

4:35 PM     Jason, the Security Officer, approaches the Operative and states, "Mike has been looking for you for about an hour." The Operative notes that Jason is trying to be intimidating. Jason then states, "…you need to stay close to Mike and do what he tells you if you want to keep your job." Jason then tells the Operative, "I was asked to log your break times." Jason refuses to tell the Operative who requested that he record her breaks. Before the Operative walks away, Jason states, "…I'm watching you."

4:45 PM     The Operative has a conversation with Jerry (Housekeeping Manager). Jerry tells the Operative that Mike has gone home for the day and instructs her to continue cleaning the downstairs area. Jerry then asks the Operative, "Is everything going ok with the job? Do you like it?" The Operative responds affirmatively."

6:00 PM     The Operative takes a break and goes to her vehicle. Within a few minutes Carlos walks by her vehicle and waves. Carlos then asks the Operative for "a light" and comments "…you look tired." Carlos then inquires "Why you not talking to me as much anymore?" The Operative responds that she has been very busy during the last few shifts. The Operative believes that putting some distance between herself and Carlos will make him less suspicious of her.

6:15 PM     They re-enter the warehouse and resume working.

**CONFIDENTIAL**

ARA 0158

| | |
|---|---|
| 7:55 PM | The Operative exits the back door of the warehouse and walks to her vehicle. She observes a male and a female kissing on the side of the warehouse building. The Operative cannot determine at this time if both are employees. The Operative then observes Carlos exit the building and approach an unidentified white male employee. The Operative observes them exchange items from hand to hand. The Operative cannot determine what is exchanged. Carlos then approaches the Operative's vehicle and asks for a cigar. Carlos comments to the Operative, "...I want to see if you are on the payroll, let me see your pay stub." The Operative responds "What?!" Carlos then smiles and walks away. The Operative observes Carlos get into a white Acura (MA Tag 26V 604) with John and drive off the property. The Operative notes that John is driving the vehicle. |
| 8:20 PM | The Operative observes a white male employee exit a black SUV with a beer bottle in his hand. The employee places the beer bottle in a brown paper bag and puts it inside the vehicle. |
| 8:35 PM | The Operative observes Carlos and John return to the warehouse. Carlos has a brief conversation with Eric before re-entering the building. |
| 8:45 PM | The Operative returns to the warehouse and is approached by Jason who asks, "What time did you leave the building?" The Operative ignores Jason and resumes working. The Operative notes that several female employees are standing near Jason and the Operative suspects that he is trying to boast. |
| 10:00 PM | The Operative takes a break and exits through the rear door attempting to avoid Jason. Carlos is outside smoking a cigarette. |
| 10:20 PM | The unidentified white male employee, who has been observed several times on break with Carlos, approaches the Operative. They converse for approximately ten minutes. |
| 11:35 PM | The shift ends and the Operative departs the warehouse. She overhears two female employees discussing Jason as they are exiting the warehouse. One of the females comments, "...Jason likes to show off...all he talks about is sex and female body parts." The assignment is concluded for the evening. |

THURSDAY
SEPTEMBER 18, 2003  (Conducted by Operative 1543)

| | |
|---|---|
| 2:30 PM | The Operative arrives at the warehouse and enters the Uniform store to purchase several shirts. She receives the employee discount. |

**CONFIDENTIAL**

supervisor in that area not to disturb the employees. Mike then states "Well you should have just told them to move." At this time the supervisor for the Taylor area, Thomas, walks over and states "Thomas, she is correct, I asked her to skip over that and not disturb my workers. I told her she may come back today to finish." Mike appears very perturbed and walks the Operative over to another area in the warehouse. Mike tells the Operative that this area does not look like it has been dusted. The Operative reports that the supervisor for this area walks over and comments "I saw her dusting in here yesterday." The Operative notes that Mike is now very angry and he walks away from the Operative.

4:07 PM     The Operative observes Carlos and Eric in a corner of the Art area having a heated discussion. Both Carlos and Eric are yelling at each other. The Operative attempts to listen to the argument; however Mike walks up behind the Operative and yells "What are you doing?!" which brings attention to the both of them. The Operative reports that Carlos and Eric look over at them and then return to working. Mike then tells the Operative he wants her to clean in a different area.

7:30 PM     The Operative walks to the Security desk to obtain a delivery package. Jason states "So...Mike talked to you about your cleaning? He told me to make sure that I keep an eye on you at all times on the camera and to log down any times that I can't see you. He told me that he is not sure if he is going to keep you around or not."
The Operative takes the delivery package and leaves the area.

8:00 PM     The Operative resumes cleaning in the Taylor area. The supervisor, Thomas advises the Operative that she can ask the employees to move over to areas that have been dusted. The Operative notes that several employees begin to complain to Thomas about the dust in the air. Thomas then asks the Operative to return on Wednesday to complete the cleaning.

11:00 PM    The Operative is approached by George who asks "Do you have anything for me?" The Operative responds "Not yet". George instructs the Operative "When you get something, leave it under the stairs on the office side of the building." The Operative notes that if you are facing the Security desk and walk down the hall to the left there is a set of stairs on the first right that George is referring to.

11:30 PM    The shift ends and the Operative departs the warehouse. The assignment is completed for the evening.

**CONFIDENTIAL**

A R A  0 1 6 6

MONDAY
SEPTEMBER 29, 2003  (Conducted by Operative 1543)

2:55 PM    The Operative arrives at the building and walks to the locker area to retrieve her ID badge hidden Friday by George.

3:30 PM    The Operative walks past the Security desk and overhears Jason speaking on the phone in Spanish. The Operative approaches the desk and request a different key from Jason.

5:05 PM    The Operative walks back to the Security desk area near Jason and pretends to be having a conversation on her cell phone. The Operative speaks into her phone for a few minutes; Jason approaches the Operative and asks if she was talking about purchasing "weed" on the phone. The Operative says "Yeah, buy you can't tell anyone." Jason then confides to the Operative that he has a female friend (who is a third grade teacher) who can "get you what you need." The Operative asks "How much?" Jason responds " I will have to get with you later about the price. I will bring it to work with me." The Operative then resumes the assigned cleaning duties.

5:47 PM    The Operative asks Carlos if she can borrow his lighter while she goes on break. The Operative notes that Carlos is in a good mood and speaks nicely to the Operative.

6:00 PM    Carlos approaches her vehicle to retrieve his lighter. Carlos tells the Operative that he only has a few minutes for break because he is very busy.

6:30 PM    The Operative re-enters the building and resumes the assigned cleaning duties.

7:30 PM    The Operative walks past the Security desk and Jason comments, "I don't have a price yet. I should know something by 10:00pm."

9:47 PM    The Operative walks past the Embroidery area and observes Carlos and Eric having a conversation. The Operative is not able to overhear the content of the conversation.

10:15 PM   The Operative walks past the Security desk and Jason asks, " Can you pay upfront?" The Operative responds "Hell no! You bring it in and I want to weigh it." Jason laughs and then responds, "Damn…you know your shit."

11:30 PM   The shift ends and the Operative departs the building. The assignment is concluded for the evening.

TUESDAY
SEPTEMBER 30, 2003  (Conducted by Operative 1543)

| | |
|---|---|
| 2:55 PM | The Operative enters the building to begin the shift and approaches the Security desk to speak with Jason.   The Operative initiates a conversation with Jason regarding the purchasing price of an ounce of marijuana. Jason explains to the Operative that an ounce will cost anywhere from $125 to $300 depending on the quality she is interested in.  Jason further explains that his friend, who is a 3rd grade teacher, delivers marijuana for her brother. The Operative informs Jason that another person is interested in "dealing" to her. The Operative tells Jason that she would like to sample a half-ounce from each person to determine who has the "best weed." Jason becomes perturbed and states, "…they deal in weight only and supply to mostly dealers and not on a personal use level." The Operative tells Jason that she will speak with him again later. |
| 3:00 PM | The Operative begins to clean her assigned areas of the building. |
| 4:55PM | The Operative approaches Carlos and initiates a conversation about making a purchase of marijuana from him. The Operative informs Carlos that she would like to purchase a half ounce instead of an ounce to "compare his stuff" with someone else that wants to "deal" to her.  The Operative reports that Carlos becomes perturbed and states "I don't deal like that Shorty!"   At this time, the Operative notices that Carlos looks past her, where Eric is standing observing them having a conversation. Carlos tells the Operative that he will speak with her again at lunch. Carlos then walks over and has a brief conversation with Eric. The Operative continues to clean the area. |
| 6:00 PM | The Operative takes a break and goes to her vehicle and observes that the Audi, Corsica and Acura mentioned in previous reports are all present in the parking lot. John exits the building and walks into the parking area. The Operative cannot determine if John enters a vehicle at this time. |
| 6:15 PM | The Operative observes Carlos exit the building. Carlos walks over to the Operative's vehicle. The Operative notes that Carlos appears nervous and asks the Operative "…why you buying all over the place?" The Operative responds " I just want the best product for my money." |
| 6:30 PM | The Operative re-enters the building and resumes the assigned cleaning duties. |

**CONFIDENTIAL**

7:55 PM       The Operative takes a meal break and exits the back door of the building to go to her vehicle. The Operative observes John and the young white male employee (mentioned in previous reports) enter a vehicle, which is parked in the middle of the parking lot. The Operative's view is slightly obstructed and the make of the vehicle cannot be determined. In a few minutes the Operative observes the white male exit the vehicle and re-enter the building.

8:30 PM       The Operative re-enters the building just as Carlos is walking out. The Operative does not follow Carlos to avoid suspicion.

8:37 PM       The Operative is approached by George who asks "Can you get me a box of jackets?" The Operative responds that she will talk to him later about it.

9:07 PM       The Operative is cleaning and notices that Eric is staring at her from behind his station. The Operative continues to clean and appear as if she does not notice Eric observing her.

11:00 PM      The Operative passes by the Security desk and listens to a conversation which takes place between Cindy and Bill. Bill is telling Cindy "...Ralph the day guard asked me to pull some tapes from earlier because someone took his exotic plant from his desk. I told him that was not my obligation because it did not happen on my shift." Cindy then states " I've heard that the company will set employees up. I used to work at the post office and they would stuff envelopes with cash to see if the workers would open them and take the money. One time they tried to get me by leaving money on the bathroom floor....I just walked right over it!" Cindy then states " Remember that sting operation a few months ago? Honey...John Cummings walked right into the Custom Embroidery area and yelled 'Those of you that are doing dope...I got you on tape. If you're going to do dope I don't care, but leave the lot when you do it.'" Cindy then asks Bill "Who was that guy that tipped everyone off?" Bill thinks for a moment and then says "...Oh, Horseshoe...that was his name...or we called him George." Cindy then states " He worked with the Whitman Police Department." Bill responds, "I used to get reports that he would meet with someone in a white car everyday...I just passed all of it on to Cummings. You know that Norwell Police sit at other sites and watch the facility." Cindy then asks "Can they do that? That guy Horseshoe tipped Eric off." Cindy looks over at the Operative and then puts her hand over her mouth. Cindy is upset with herself for saying Eric's name out loud in front of the Operative. The Operative pretends as if she is not interested in their conversation. Bill then points to the Operative and tells Cindy "...don't worry about her, she is new and doesn't even know who Eric is." Cindy then states "They will never catch him, he has street sense...I have heard rumors that there are still undercover people watching cars in the

parking lot for people that use." Bill responds " Well...I know that there was something going on a while back and they would not tell me...so I took the tapes home to see if I could review them and find out what was going on. The tapes were all in fast motion and I could not see anything. Something is going on now but they are being all tight lipped about it." Cindy then responds, "...Well I know why they didn't do anything last time...it was because he would have lost all of the 3rd shift and half of the 2nd shift. Hell...you remember when they were drinking on their breaks? Brian (Embroidery Supervisor) was right there with them while they were drinking. It's a number game...they don't care as long as your produce...I am not going to say the name again, but they will never catch him. I have been here for five years and if nobody else has sense, Eric has some. I think that Norwell Police department had something at one time on him, but was not able to make it stick. John has a lot of pull over there you know." The Operative notes at this time she is standing very close to Cindy and Bill and casually enters the conversation. The Operative continues to act as if she does not know whom any of the parties are that are being mentioned in the conversation. Cindy tries to physically describe John Cummings to her. The Operative responds " Oh is he the one whose wife works here also?" Cindy laughs and states "No... if John's wife worked here he would no longer be married." The Operative continues to listen to Cindy and Bill discuss that John will only speak to certain employees in the building. Cindy then comments "Well if they really wanted to catch these guys, all they have to do is make them take a drug test." Bill disagrees with Cindy and states "No...what they should have done is bring someone in who does not know Eric and catch him with his hand in the jar." Cindy tries to physically describe Eric to her by saying quietly "...he is the big black guy with an ear ring in his eye." Cindy then responds to Bill by stating "Well if they continue to go off the lot, they are just causing problems for other companies because more likely they are smoking in someone else's lot...I mean its real obvious when four or five guys get into a car leave the lot...you know...what they are doing...hell the whole company does it, even supervisors." Several other employees approach the desk and the conversation ends. The Operative departs the building. The assignment is concluded for the evening.

WEDNESDAY
OCTOBER 1, 2003   (Conducted by Operative 1543)

2:45 PM    The Operative arrives at the warehouse and has a conversation with Jason at the Security desk. Jason advises the Operative "...I had to have my girl drive to get the weed, but I will still have it to you on time."

3:00 PM    The Operative begins to mop, dust and empty trash cans.    **CONFIDENTIAL**

8:40 PM        The Operative re-enters the warehouse and walks to the Security desk to have a conversation with Jason. Jason tells the Operative "...I'm still waiting on my girl to call." The Operative notes that Jason attempts to persuade her to purchase a whole ounce of marijuana versus a half ounce. The Operative asks Jason "Is there going to be a problem with me buying a half ounce?" Jason replies "...Hell no, I will have your shit like I said."

11:00 PM       The Operative walks to the Security desk to have another conversation with Jason. Jason advises the Operative that she will need to have $300 with her tomorrow to make the marijuana purchase. At this time, Bill approaches the Security desk and informs Jason that he needs to be cautious about having people at the Security desk. The Operative reports that Jason yells to Bill "...quit being a fucking bitch, I mean what the hell you afraid of? Who John Cummings...he's just another white man."

11:30 PM       The shift ends and the Operative departs the warehouse. As the Operative exits the building, Jason informs her that he will have the marijuana for her on Thursday or Friday.
               The assignment is concluded for the evening.


THURSDAY
OCTOBER 2, 2003  (Conducted by Operative 1543)

2:15 PM        The Operative arrives at the warehouse and remains in her vehicle for a few minutes to conduct surveillance. The Operative notes that there is no suspicious activity at this time.

2:40 PM        The Operative enters the warehouse and has a brief conversation with Jason. Jason advises the Operative "...I'm still waiting on a call." The Operative suspects that Jason may be "all talk" at this point.

3:00 PM        The Operative has a conversation with Mike regarding the upstairs bathroom. Mike instructs the Operative "...make sure the trash is done."

5:27 PM        The Operative enters the Embroidery storage area and observes Eric having a conversation on his cell phone. The Operative enters the area and begins to clean and overhears Eric giving directions to someone on how to get to the warehouse. The Operative notes that Eric begins lower his voice and then moves out of the area.

5:55 PM        The Operative exits the warehouse and walks to her vehicle. Within a few minutes, the Operative observes Carlos, John and the unidentified white male (who now works in Carlos previous assigned station) enter the black colored older model four door vehicle and drive out of the parking area.


**CONFIDENTIAL**                                    **ARA 0179**

9:45 PM    The Operative arrives at the TKO bar and observes two white females that are recognized as employees from the Wearguard building. The Operative recognizes that one of the females work at the station adjacent to Carlos and appears to be under the influence of a drug daily. The Operative learns that her name is Kendra (A-16). The other female works in the rear of custom embroidery on the left side, however the Operative is not able to obtain her name. The Operative notes that when the females see her enter the bar they state "Its about time you went out. Are you meeting Carlos?" The Operative affirms and Kendra tells the Operative to "Sit tight…they always get drunk before the come in here."

10:45 PM   The white male who did not want Carlos to speak to Jason approaches her and identifies himself as Paul (A-15). Paul tells the Operative that "Carlos has told me all about you and that you will be hanging out with us tonight. I just spoke with them on the phone and they are in Brockton picking up some weed for us to smoke tonight." The Operative notes that Paul appears as if he is very intoxicated. Paul picks up her drink and asks "What is this?" and takes a sip from the glass. Paul then states "Shit girl…this is a weak drink." Paul then tells the bartender "Bring this lady another drink and double up on the shots." The bartender smiles at the Operative however makes the drink just as the Operative had requested earlier in the evening (with very little alcohol). Paul begins to talk to the Operative about Kendra stating "That girl gets weed from Carlos everyday but she won't smoke with us, she likes to smoke by herself in her own car." Paul then begins to talk about Mike (A-2) stating "He's cool." The Operative believes this to mean that Mike probably smokes weed as well. Paul leans very close to her and whispers "Everybody at this company smokes toot powder. Carlos has the good shit. Carlos also has this weed called blueberry and chocolate. Girl…you will be high all day." Paul then yells at the bartender for another round of drinks. Paul asks the Operative about her divorce and then states "My girl left me after five years when I lived in South Boston." The Operative attempts to bring up Eric (A-6) in the conversation to see if Paul will volunteer any information. Paul states that "Eric is only cool with Carlos…he thinks he is better than the rest of us…fuck him." The Operative asks Paul where the employees smoke marijuana and Paul responds "We just go to the very back and park to smoke." Paul then begins laughing and says "Carlos thought you were 5-0 when you first came to the building. I told him he was full of shit because you would have arrested him right after he admitted to smoking weed." Paul then pulls out his cell phone and calls John. Paul hangs up the phone and tells the Operative that Carlos and John will be there in a few minutes. Paul then leaves his cell phone on the table and goes to the restroom. The Operative notices that the number that Paul dialed to reach John (A-5) is 738-6765.

**CONFIDENTIAL**

**ARA 0190**

11:15 PM      Eric enters the bar and walks over and places his hand on the Operative's shoulder stating "Hey you! What's up? Nice to see you here."    They exchange small talk for just a few minutes and Carlos enters the bar with a large group of unidentified males. The Operative notices a commotion at the front door and observes that a police officer is prohibiting Carlos and the other males from coming into the bar. Carlos points to the Operative and Paul and states "I am meeting my friends over there." The officer walks over and asks the Operative and Paul for identification. The officer walks back and tells Carlos and the other males that they must leave. The Operative listens to the officer speaking with another person who thought that Carlos and the men were part of a gang. Paul tells the Operative to pay her bill and meet him in the parking area. The Operative walks outside and discovers that Carlos and the other men have already left the parking area. Paul is waiting by his vehicle and tells the Operative "Welcome to the crew...we will try this again later at another place that I know about." The Operative departs the parking area at approximately 11:40 PM. The assignment is concluded for the evening.


NOTE:        This report has been reviewed for accuracy and completeness by Operative 1543.


Sincerely,



Kendra Webb
Managing Director


CONFIDENTIAL


ARA 0191

8:15 PM      The Operative observes Carlos having a conversation with Eric. The Operative notes that within a few minutes Carlos approaches her and states "My brother-in-law wants to see the jackets, can we meet back here at 1:30 tonight when I get off?" The Operative responds agrees and Carlos says "My brother is going to drive my car and I will ride with you. Can you pay some money right now to secure the deal?" The Operative tells Carlos that she will meet him at the 10:00pm break to give him some money.

10:00 PM     The Operative meets with Carlos in the parking area and gives him $60.00 in cash. Carlos tells the Operative "Don't be late picking me up."

10:15 PM     The Operative and Carlos re-enter the building and pass by George. Carlos speaks to George in Spanish and then George replies "Ohhh...I want one...where is mine?" The Operative asks Carlos why he is telling George about the thefts and Carlos begins to laugh and tells George "You will have to wait a few days."

11:30 PM     The shift ends and the Operative departs the building.


WEDNESDAY (AM)
OCTOBER 22, 2003   (Conducted by Operative 1543)

1:05 AM      The Operative returns to the building parking area to wait for Carlos. Jason approaches the Operative and states "So...you finally going to get some tonight." The Operative asks Jason what he means and Jason responds, "Some fucking dick...Ho...you've been here a month and I haven't heard you talk about dick." The Operative responds to Jason that he discusses sex enough for everyone. Jason then asks the Operative why she is there and she says that she is waiting to give a friend a ride home. Jason responds "Oh well ain't you nice" and then walks away.

1:11 AM      The Operative observes an unidentified white male employee, wearing a plaid shirt, jeans and glasses exit the building carrying a new stack of flat boxes which still have the tie around them. The Operative notes that employees have been instructed that they can only take old used boxes from the building for personal use. The Operative observes the employee walking toward the parking area, however it not able to identify his vehicle.


**CONFIDENTIAL**

**ARA 0208**

8:45 PM      The Operative re-enters the warehouse and resumes cleaning in the assigned areas.

10:00 PM     The Operative takes a break and meets with Carlos and his brother (who the Operative now learns is named Jesus) at her vehicle. Carlos tells the Operative "You will never believe what happened...We were on lunch near Brockton and drove up to a fucking road block...so I tossed the weed out." The Operative responds "You what?! You threw out my weed?! You can't just throw away two ounces."

Carlos responds "Its not really thrown away...I know where it is. I will bring it to you tomorrow."

The Operative continues the conversation by asking "What are you guys doing for the Holidays?" Carlos replies "Jesus is getting high like Chris Tucker in the movie *Friday.*"

At this time the Operative observes the unidentified Caucasian male (described below in A-11) walk outside. The Operative remarks to Carlos "He is so strange looking with all those tattoos." Carlos replies "We call him "Sketch". The Operative comments "He looks crazy." Carlos laughs and responds "I guess we will find out if they ever fire him."

The Operative then asks Carlos "So are you and your brother Hernandez's or Lopez's?" Carlos laughs and then replies "Our last name is Ortiz...my mother is Italian and my dad is Porte Rican."

The Operative then shifts the conversation to another topic asking Carlos "Where did you work before you came here?" Carlos answers "I used to work at Stella's pizza...but I got fired about 15 times. Remember when I wanted us to meet up at club Giggys? Well they also own Stella's pizza...right in my hood." The Operative asks Carlos "Why did they fire you?" Carlos answers "Well one time I kicked a $2000 air unit....but they still love me though. It's a long story, but this is a mob owned business and my pops worked there to. I worked there since I was 13. They liked my pops so much because he is full blooded Italian."

The Operative notes that Jesus interrupts and comments "What it boils down to is the Italians make more money that us." The Operative notes that Jesus is referring to Hispanic race.

Carlos then continues "I watched my mom cry many nights over my pops owing them money and these people had to be paid back. Once they fronted the money to get me out of jail...it was $700." Jesus adds "The only reason they got you out is because you were caught with their shit." Carlos replies "True." The Operative comments "Come on...that stuff only happens on TV." Carlos replies "No its happening right in Brockton and the cops know it but can't touch them. You want to follow me back to my crib tonight to pick up those two O's?" The Operative responds "Hell no! I don't want to get caught in a road block." Carlos then agrees and tells the Operative that he will bring the marijuana with him to work tomorrow.

**ARA 0220**

**CONFIDENTIAL**

The Operative then attempts to shift the conversation to discuss Eric. Carlos comments "Eric smokes more weed that you and I put together." The Operative asks "What about the other supervisor?" Carlos answers "Yeah him to, but I deal with Eric's ass." The Operative responds "Well everybody got a hook. So Eric is yours?" Carlos laughs and Jesus elbows Carlos in his side. The Operative suspects that Jesus thinks Carlos is talking too much.

The Operative re-enters the building and resumes cleaning in the upstairs areas.

10:25 PM    The Operative walks by the Security desk and Jason states "You know I called Cummings at home." The Operative asks "What the hell for?" Jason answers "Cummings said if there was any problems with you I was to call him at home." The Operative remarks "Oh really...just like you pick up the phone to call Mike on me?" Jason replies "Yep" and the Operative walks away.

The Operative has another conversation with the new female employee from the Distribution area. The Operative asks "What is your name?" and the female employee answers "Yolanda...but don't bother to remember it I am leaving this shit in two weeks."

11:15 PM    Carlos approaches the Operative and states "You sure you don't want to follow me? I know where I hid the dope. Its just a little out of Rockland." The Operative tells Carlos that she would rather wait until tomorrow.

11:30 PM    The shift ends and the Operative departs the warehouse. The assignment is concluded for the evening.

WEDNESDAY
OCTOBER 29, 2003    (Conducted by Operative 1543)

2:45 PM    The Operative enters the warehouse and meets with Jerry for a brief meeting. Jerry instructs the Operative to dust the Cage three area behind Custom Embroidery. Jerry also expresses frustration over Tom instructing her to not dust in his area. Jerry instructs the Operative to remain out of the Taylor area for the day.

3:35 PM    Carlos approaches the Operative and tells her that he will meet her outside later to deliver the two ounces of marijuana.

5:00 PM    The Operative observes Jerry and Tom having a discussion about the cleaning duties in the Taylor area. Jerry then walks over to the Operative and instructs her to check with him daily before cleaning in the Taylor department.

**CONFIDENTIAL**

**ARA 0221**

4:55 PM    The Operative discovers $15 in front of the ladies room. The Operative walks to the Taylor area and gives the money to the supervisor, Mike. (This is not the cleaning supervisor Mike) The Operative observes Mike post a sign regarding the lost money.

5:15 PM    The Operative has a conversation with Jesus. The Operative tells Jesus that she would like to purchase one or two ounces of marijuana from Carlos if he has that amount available. The Operative also informs Jesus that she will have the boots and other merchandise requested by Carlos tomorrow.   The Operative informs Jesus that she may need assistance carrying the merchandise out to her vehicle. Jesus responds "Now that's what I'm talking about! You come find me when you are ready and Carlos and I will help you." The Operative then tells Jesus "Because Carlos wants so much stuff, we may need more help carrying it all out." Jesus responds "No...then we have to give them a cut of our stuff...and we ain't having that." The Operative agrees.

6:30 PM    The Operative takes a short break, however notes that there is no employee activity in the parking area at this time.

6:50 PM    The Operative resumes cleaning in the assigned areas of the warehouse.

9:00 PM    The Operative has a conversation with Jason at the Security desk. The Operative reports that as she approaches the Security desk she overhears a female employee named Johanna (who works in the café) telling Jason that she is frightened of George. Johanna is telling Jason that George keeps offering to take her home every evening and continuously asks for her home phone number.  Jason asks Johanna "You want me to write this up?" Before Johanna can respond, Jason receives a phone call and briefly steps away from the Security desk.  The Operative notes that Johanna turns to her and states "He (referring to Jason) does the same thing...so I don't know if reporting it to him will do any good." Johanna then tells the Operative that she is only 16 years of age. Johanna then states "The other problem I have is with Kendra Cain." The Operative notes that a supervisor walks up, who the Operative does not know by name, but describes as a Caucasian male, slim build, beard and the Operative observes his sitting right next to Eric during all the shifts.
The supervisor pulls Johanna to the side and asks her to give him some more details. Johanna and the supervisor then walk outside together.
The Operative notes that within a few minutes the supervisor returns to the Security desk alone and states "Damn...a lot of stuff going on around here." Jason then returns to the Security desk and states "George is 25 and has a wife...he needs to leave Johanna alone."

9:15 PM    The Operative reports that George approaches the Security desk and tells the Operative in the presence of Jason "Take all the shit you want because

**CONFIDENTIAL**

**ARA 0229**

# EXHIBIT H

 CORPORATE RISK SOLUTIONS

1499 Alpharetta Highway
Suite I
Alpharetta, Georgia 30004
770-664-0911    770-753-0911 fax
blarkin@corporaterisksolutions.com

November 4, 2003

Mr. Jay Hess
Manager - Corporate Security
Aramark Corporation
1101 Market Street
Philadelphia, PA. 19107

## UNDERCOVER OPERATION RECAP - WEARGUARD

**RE**: Operative # 1543

**PERIOD**:   September 9, 2003 to October 31, 2003

The following report outlines the observations of Operative 1543 where employee dishonesty, drug activity, and procedural deficiencies have been noted on a consistent basis at the Wearguard facility located in Norwell, Massachusetts. The outline will assist with identifying issues by employee that are either illegal or in violation of Wearguard policy.

The Operative has been successful in identifying the following employees currently involved in merchandise theft, drug use and drug sales:

The Operative befriends a male employee by the name of ***Carlos Ortiz*** who she learns on her first day of working in the building is selling marijuana to the other employees. During the assignment, the Operative has observed much interaction between Carlos and another employee by the name of Eric Beasley.

**The following dates are documented by the Operative involving observations and conversations of drug use, drug distribution and theft by Carlos.**

CONFIDENTIAL

| | |
|---|---|
| September 10, 2003 | Carlos brags to the Operative that he makes "Mad money" on Thursdays selling marijuana because this is payday for the building employees. Carlos also states that he can provide any amount of marijuana that she is interested in purchasing. |
| September 15, 2003 | Carlos approaches the Operative at 4:07 pm to ask her if she is interested in making a purchase of marijuana. |
| September 16, 2003 | The Operative observes Carlos walking from one vehicle to the other in the parking lot making quick exchanges from hand to hand with the occupants of each vehicle. |
| September 18, 2003 | The Operative observes Carlos walking through the parking area making three different quick hand to hand exchanges with different employees. |
| September 26, 2003 | Carlos approaches the Operative and again attempts to persuade her to make a purchase of marijuana from him. |
| October 6, 2003 | Carlos approaches the Operative and invites her to smoke marijuana with him one evening after work. |
| October 7, 2003 | Carlos and several other employees sit inside of the Operative's van during a break. They are smoking cigars and cigarettes that they state contain marijuana. The smell is consistent with that of marijuana. |
| October 9, 2003 | Carlos approaches the Operative at the meal break and invites her to ride with him off premises to smoke marijuana.<br><br>Carlos tells the Operative to start taking her evening break at 9:30 and he will give her a sample of some marijuana to smoke on the break. |
| October 10, 2003 | Carlos invites the Operative to meet with him and several other employees after work to smoke marijuana. Carlos also asks the Operative if she has any "Blunts" to smoke later that evening. The Operative has a conversation with another employee (Paul) who tells the Operative that Carlos sells flavored marijuana and has many employees who buy from him on a regular basis. Paul also states that Carlos leaves the premises on most of the breaks to smoke marijuana with other employees. |
| October 15, 2003 | The Operative observes Carlos leave for a break and return drinking a beer, which he discards in the back of his trunk. |

CONFIDENTIAL

ARA 0630

Carlos invites the Operative to go out and smoke marijuana with him Friday evening after work.

October 17, 2003    The Operative observes Carlos sell marijuana to Paul in the parking area during one of the breaks. The marijuana is sealed into a small plastic bag.

After the shift ends, Paul gives the Operative a "Blunt" and states that it is a gift from Carlos for her to smoke this evening.

October 20, 2003    The Operative observes Carlos make a quick hand exchange with John (A-5) in the parking area. Carlos walks to the Operative's vehicle and observes that Carlos has a roll of cash still in his hand.

Carlos approaches the Operative and requests that she steal some leather jackets for him from the building in exchange for ¾ ounce of marijuana.

During the evening break the Operative observes Carlos make a quick hand-to-hand exchange with an unidentified white male employee in the parking area.

October 21, 2003    The Operative conceals three jackets and places them in her vehicle. The Operative displays the jackets to Carlos at the evening break and also gives him $60 in cash to secure the deal for ¾ ounce of marijuana. They agree to meet at 1:30 AM to exchange the jackets for the marijuana.

October 22, 2003    The Operative follows Carlos to his residence at 1:30am to collect the marijuana. Once they arrive at the residence, Carlos produces the marijuana, sealed in a plastic sandwich bag and hands it to the Operative. Carlos then collects the three leather jackets and another $140 in cash from the Operative for another ounce of marijuana, which he promises to produce the following day in exchange for three more leather jackets.

CONFIDENTIAL

At 3:37 pm, at the building, Carlos approaches the Operative and requests that she get him a black leather jacket in an extra large size in addition to 10 blue jean jackets. Carlos promises the Operative another ounce of marijuana in exchange for the jackets.

At 6:10pm, the Operative meets with Carlos at her vehicle and produces three more leather jackets to Carlos. Carlos

hands the Operative another bag of marijuana.

At 7:25pm, Carlos approaches the Operative and informs her that he has two more ounces of marijuana that he wants to sell if she is interested. The Operative tells Carlos that she will need to wait for "payday."

October 23, 2003   Carlos approaches the Operative and insists that she produce the ten blue jean jackets by the end of the evening. The Operative attempts to explain to Carlos that it is difficult to move that many jackets at one time. They agree to meet the next evening at 6:00pm in a back parking area to exchange the jackets for another ounce of marijuana. Carlos states that he is not working tomorrow but will come in to meet her.

October 24, 2003   The Operative removes one leather jacket and one blue jean jacket from the building and places them in her vehicle to give to Carlos at 6:00pm. At 5:10pm, Carlos' brother approaches the Operative and she relays to him that she only has two jackets at this time. Carlos does not show up at the scheduled 6:00pm meeting place.

October 27, 2003   The Operative has a conversation with Carlos in the Custom Embroidery area about the purchase of two ounces of marijuana. Carlos makes arrangements with the Operative to follow him to his residence that evening. The Operative gives Carlos $300 in cash. Later, the same evening, Carlos tells the Operative that he has decided to bring the marijuana to her at work the following day. At the evening break, the Operative meets with Carlos to give him the two jackets that she removed from the building the previous week. Carlos pushes the Operative for additional jackets and a pair of Timberland boots.

October 28, 2003   At the evening break, Carlos informs the Operative that he was caught in a roadblock and had to toss the two ounces of marijuana from his vehicle. He agrees to bring the marijuana to the Operative at work the following day. Carlos has a conversation with the Operative about being involved with organized crime in Brockton, Massachusetts. In addition, Carlos tells the Operative, "Eric smokes more marijuana that you and I put together."

October 29, 2003   At 6:25pm, the Operative meets with Carlos at her vehicle and he hands her two ounces of marijuana sealed inside of two sandwich bags. Carlos tells the Operative "I will have some

better shit next week."

The Operative learns that Carlos is very close friends and spends a lot of time with another employee by the name of _**John**_ an African American male, who has long hair pulled into a ponytail. The Operative has determined that John also smokes marijuana with Carlos. The Operative observes that John and Carlos leave the premises several times each day during breaks to presumably smoke marijuana. The Operative also notes that John is observed on several occasions driving an Audi registered to Eric Beasley.

**The following activities are documented by the Operative involving John:**

| | |
|---|---|
| September 10, 2003 | The Operative listens to John ask Carlos "You have any Fire on you?" which the Operative notes is a slang term for marijuana. The Operative then observes Carlos produce a cigar that he tells John has the marijuana inside and they begin to smoke. At this time, John is sitting in the Audi. |
| September 18, 2003 | The Operative observes John and Carlos leave the building together during the meal break. When Carlos and John return their eyes are red and glassy. |
| September 22, 2003 | The Operative again observes John sitting alone inside of the Audi. |
| | At the meal break, the Operative observes John and Carlos exit the parking area driving the Audi. The Operative walks to the vehicle when they return and notes that it smells strongly of marijuana. |
| September 24, 2003 | The Operative observes John and Carlos inside of the Audi. John slides down in the seat as a police vehicle cruises through the parking area. John drives the Audi quickly out of the parking area after the police leave the area. |
| October 9, 2003 | The Operative is approached by Carlos and John who try to persuade her to leave the premises with them to smoke marijuana on one of the breaks. |
| October 10, 2003 | The Operative makes plans to meet after work with Carlos, John and Paul. The Operative learns that Carlos and John drive to Brockton to obtain marijuana before meeting her and Paul at the TKO bar. During the evening, John calls Paul several times on his cell phone to relay their location. |
| October 14, 2003 | During a break, the Operative observes, Carlos and John drinking beer or liquor from a bottle concealed in a brown paper bag. |

CONFIDENTIAL        ARA 0633

October 20, 2003          The Operative observes John retrieving an item from the Audi. John
                          then leaves the property with another employee in a small
                          sports vehicle. When John returns, the Operative observes
                          Carlos hand John a small plastic bag and John then hands
                          Carlos a roll of cash. Carlos then walks over to the
                          Operative and tells her that John and the other employees in
                          the sports vehicle are smoking "a blunt."

October 22, 2003          Again, during a break the Operative observes John and Carlos make
                          a quick hand-to-hand exchange in the parking area. The
                          Operative notes that Carlos hands John a small plastic bag
                          that contain "a blunt" and John hands Carlos a roll of cash.


        The Operative determines that another employee, **_Paul_**, is actively involved with
Carlos in drug usage. The Operative learns that Paul has a lot of knowledge regarding
drug sales by Carlos to other employees in the building. Paul is also able to provide the
Operative with details on the type of drugs and regular buyers that Carlos is involved with.

        **The following dates outline the conversations and drug usage witnessed by
the Operative involving Paul:**

October 10, 2003          The Operative has a conversation with Paul at the TKO bar
                          while they are waiting for Carlos and John to arrive. The
                          Operative learns from Paul that Carlos and John have gone
                          to Brockton to purchase marijuana. Paul gives the
                          Operative details regarding flavors of marijuana that Carlos
                          has for sale. In addition, Paul tells the Operative that Carlos
                          has many "regular customers" at the building and mentions
                          a female employee, **_Kendra_** that makes purchases almost
                          daily from Carlos.




October 15, 2003          The Operative has a conversation with Paul regarding a security
                          employee, Jason. Paul tells the Operative that he suspects
                          Jason is a "snitch." Later the same evening, Paul asks the
                          Operative if she will "go in with him" on purchasing a bag
                          of marijuana.

October 17, 2003          Paul comments to the Operative "We are going to get high as the
                          sky tonight." At 4:00 PM, in the parking area of the
                          building, the Operative observes Carlos hand Paul a plastic
                          bag containing marijuana. Paul then hands Carlos a roll of
                          cash. After work, the Operative agrees to meet Paul again at
                          the TKO bar for dinner and drinks. Paul tells the Operative

CONFIDENTIAL          ARA 0634

that    he purchased marijuana from Carlos earlier during the day. Paul also tells the Operative that Carlos gave him an extra "blunt" for them to smoke together this evening. At the end of the evening Paul gives the "blunt" to the Operative to "take home and smoke."

October 27, 2003        Paul asks the Operative "Hey, you got some fire?" meaning marijuana. Paul then relays that he needs to purchase some marijuana because he does not have any.

The Operative learns that Carlos has a brother who begins working at the building by the name of *Jesus*. The Operative determines that Jesus is actively involved with Carlos in the distribution of drugs in exchange for cash or merchandise.

**The following dates are outlined by the Operative involving Jesus' involvement in illegal activity:**

October 20, 2003        Carlos introduces the Operative to his brother Jesus and then asks the Operative while Jesus is present to "move some leather jackets" from the building in exchange for an ounce of marijuana.

October 22, 2003        The Operative follows Carlos and Jesus to their residence        to exchange three leather jackets and $60 in cash for an ounce of marijuana.

October 24, 2003        Jesus approaches the Operative and asks "Did you get our jackets?" Jesus becomes angry with the Operative after she informs him that she only has two jackets instead of the ten that he and Carlos requested.

October 27, 2003        Jesus and Carlos meet the Operative at her vehicle in the parking area to obtain the two jackets that she removed from the building the previous week.

October 28, 2003        Jesus and Carlos meet with the Operative during a break and relay that they drove to a roadblock and threw out the two ounces of marijuana they were delivering to her.

Jesus and Carlos also relay some family history to the Operative regarding drug sales and being connected to organized crime. During this same conversation, the Operative makes arrangements with Jesus and Carlos to obtain two ounces of marijuana from them.

CONFIDENTIAL

ARA 0635

The Operative identifies another employee in the building, *Matt* who approaches the Operative regarding his interest in purchasing marijuana.

**The following date outlines a conversation that the Operative has with Matt involving drugs in the building:**

October 3, 2003     Matt approaches the Operative and complains of having a toothache and needing "some weed." Matt tells the Operative that he normally purchases his weed from "guys in the building." Matt relays that one employee was caught selling marijuana and now it is difficult to purchase marijuana from anyone at the building.

The Operative ascertains by many observations and direct conversations that another employee by the name of *Jason* violates company policies and procedures. Jason is employed as a Security representative for the company. The Operative notes that Jason has knowledge of information that is of confidential nature and he does not hesitate to share the information with other employees in the building.

**The following dates are outlined by the Operative as having conversations with Jason that exhibit racial discrimination:**

October 1, 2003     The Operative listens to Jason tell Bill "...stop being a fucking bitch....what are you afraid of....John Cummings? He is just another white man."

October 24, 2003    The Operative listens to Jason have a conversation with another employee about John Cummings. Jason continues to talk about John Cummings to the Operative stating "....he is racist...but he is hiring more and more blacks...that is the only reason you were hired...because you're black...that's all black people are good for."

Jason continues "Rich, you're lucky cause your ass is white." Rich then tells Jason that he is Indian and Hungarian decent.

Jason continues the conversation by stating "The white man will only hire a black for cleaning." Jason then tells the Operative "Get down on your hands and knees where you belong."

CONFIDENTIAL

ARA 0636

**The following dates are outlined by the Operative as having conversations and observing behavior from Jason, which exhibit sexual discrimination;**

September 12, 2003    The Operative has a conversation at the Security desk with Jason who tells the Operative that he enjoys having lots of sex and then Jason asks the Operative "Do you like having sex?"

September 17, 2003    The Operative listens to a conversation between two female employees who are complaining about Jason "always talking about women's body part and sex."

September 22, 2003    The Operative listens to a conversation between two employees, Bill and Cindy who complain about Jason talking "sexy" to female employees.

September 25, 2003    The Operative observes a female employee at the Security desk with Jason. The Operative then hears Jason say "...so how big are your tits anyway?"

October 3, 2003    Jason requests that the Operative remain in the building with him overnight. The Operative refuses and Jason comments "...Are you afraid to stay because I might talk you into giving me a piece of that ass."

October 22, 2003    Jason approaches the Operative and states "So...you finally going to get some tonight." The Operative asks Jason what he means and Jason responds, "Some fucking dick...Ho...you've been here a month and I haven't heard you talk about dick."

October 30, 2003    Jason says "Cummings made a big mistake by hiring that lady guard because he is just wasting the company's time and money. Where the fuck did they get her from? The only thing they probably looked at was she was in the military and she probably ain't good at that." The Operative comments that he is angry because she is a female. Jason flips up his middle finger at the Operative and replies "Fuck you."

**The following dates are outlined by the Operative as observations, which involve Jason violating company policies and procedures;**

September 12, 2003    Jason attempts to persuade the Operative to "hang out" with him at the Security desk instead of working in her assigned area.

At 10:45pm, Jason asks the Operative to "cover" the Security desk for him while he takes a break.    CONFIDENTIAL

ARA 0637

The Operative observes that Jason does not inspect any
bags, which are being carried out by the employees.

September 18, 2003    The Operative observes an employee exit the building carrying two
large duffle bags. The Operative notes that Jason does not
challenge the employee nor does he appear to even be
monitoring the cameras. Jason is engaged in conversation
with another employee.

September 19, 2003    The Operative observes Jason has a female guest behind the
Security desk with him. The female has a large duffle bag
and sits with Jason as the employees are leaving for the
evening. The Operative also listens to a conversation that
Jason has with another employee, George. The Operative
suspects that George reveals to Jason his plans to steal
merchandise from the building. At the end of the
conversation Jason gives George a thumbs up sign and
states "Oh, we cool."

September 22, 2003    The Operative listens to a conversation between two other
employees that are complaining about Jason moving
cameras.

September 23, 2003    Jason curses at the Operative after she approaches the Security
desk to obtain the cleaning keys.

Jason tells the Operative that Mike has requested for him to
watch her on camera and log her activity and break times.

September 25, 2003    The Operative observes that Rich, who is the chef, is manning the
Security desk while Jason takes a break.

September 26, 2003    Jason calls the Operative to the Security desk to show her photos
of criminal trespass suspects.

October 2, 2003    The Operative listens to Jason telling another employee
"...Cummings got a $17,000 raise...he makes over
$200,000 to do shit."

October 3, 2003    Jason tells the Operative that he printed over 1000 pages from the
Internet. In addition, Jason confides to the Operative that he
is going to sleep after all the employees have exited the
building.

October 7, 2003    Jason confides to the Operative that he was an hour late for
work.

CONFIDENTIAL

ARA 0638

Jason asks the Operative to remain at the Security desk while he "takes a piss."

| | |
|---|---|
| October 14, 2003 | Jason confirms to the Operative that his girlfriend stayed in the building with him overnight. |
| October 16, 2003 | Jason confides to the Operative that while he works this evening he plans on "surfing the net, working out, and going to sleep." |
| October 31, 2003 | The Operative listens to Jason tell Rich that he is going to sleep in the Nurses station after the other employees have departed the building. |

**The following dates are outlined by the Operative as conversations with Jason involving drug use:**

| | |
|---|---|
| September 29, 2003 | Jason confides to the Operative that he has a female friend that can supply marijuana through her brother. Jason tells the Operative that he can supply her with marijuana if she is interested in making a purchase. |
| September 30, 2003 | Jason approaches the Operative and informs her that he can supply her with marijuana for $125 to $300 depending on the quality of marijuana she is interested in purchasing. |
| October 1, 2003 | The Operative negotiates a sale of marijuana with Jason. Jason tells the Operative that his "Girl" must drive to get the marijuana and that he will bring it to the Operative at work. Jason approaches the Operative and attempts to persuade her to purchase an ounce of marijuana versus the ½ ounce that the Operative requested. After the Operative refuses, Jason instructs the Operative to bring $300 in cash to work the following day and he will have the marijuana. |
| October 2, 2003 | Jason tells the Operative that he will not be able to deliver the marijuana to her until the following day. |
| October 3, 2003 | Jason informs the Operative "I didn't feel like driving to pick up the stuff" referring to the marijuana. The Operative suspects that Jason is unable to produce the marijuana. |

CONFIDENTIAL

The Operative discovers that a cleaner, *George,* is taking merchandise from the building. George persuades the Operative on several occasions to assist him with the theft of merchandise. George offers to fraudulently clock the Operative in/out allowing her to

gain wages for hours that she actually does not work.

**The Operative outlines the following dates, which involve George and the Operative removing merchandise from the building in exchange for fraudulent clocking;**

September 19, 2003    George approaches the Operative and requests that she place merchandise into a trash bag for him to remove from the building.  George offers to allow the Operative to leave early and he will clock her out when he departs the building several hours later.

September 23, 2003    George again attempts to persuade the Operative to place some merchandise into a trash bag. George asks the Operative to place the bag under the stairs for him.

September 24, 2003    At 9:40pm, the Operative removes a red jacket from a small gray bin located in the rear left side of the Embroidery area.  The jacket has a SKU #1438RB2XL. The Operative places the jacket in a trash bag containing dry paper.

At 11:30pm, the Operative catches a quick glimpse of George exiting the building with what appears to be the trash bag containing the red jacket.

September 25, 2003    George confirms to the Operative that he removed the red jacket from the building the previous evening. George requests that the Operative place more merchandise under the stairs for him. The Operative tells George that she wants to leave at 10:30 pm however wants to be clocked out at 11:30pm. George tells the Operative to find him before she leaves to give him her badge.

The Operative removes a green and blue jacket and paperwork from inside of a box located in the Embroidery area. The sku numbers on the paperwork are 1308 bl-m, 130810 fx1, and 1308 bl-l. The color is listed as 2335 for all the jackets in the box. The names on the paperwork are Momeganna, Tigigiluk, and Aviuk. Each jacket is priced at $139.99. Again, the Operative conceals the jacket inside of a trash bag and places it under the stairs.

The Operative departs the building at 10:30 pm and George clocks her out at 11:30pm.

CONFIDENTIAL

September 26, 2003    George asks the Operative to "Get some more jackets." The Operative removes two navy blue jackets (sku number

414NC M) both size medium. The Operative places them in the same place under the stairs for George.

The Operative meets with George by the trash compactor and George asks her what she was able to conceal for him. The Operative hands George the trash bag that contains the jackets and George removes them from the bag. The Operative notes that George seems unaware that a camera is in place above the trash compactor.

The Operative departs the building at 10:30 pm and George clocks her out at 11:30pm.

September 30, 2003     George approaches the Operative and requests that she remove an entire box of jackets from the embroidery area. The Operative tells George that she will think about it and let him know.

This concludes the Operative's findings to the current date.

**CONFIDENTIAL**

# EXHIBIT I

I'm willing to testify to these

(one of the bags was for shemp) statments

Two or three weeks ago I met
Erric at my machine & bought 2
bags of weed witch was dimes.
I bought weed off of hime on
more than one accation. always on
wear guard propertie. about a dozen time.
it went from dimes to 8ths with
was 45 dollers.

John Shemp also selse weed &
usey has it on wed or thurs.
& also the bag the Police officer
found on me came from John shemp

I Also Know somebody else that
selse weed at wearguard & he
works on the team that is
located on the same side of the
floor as the UCE. He is short
with a gold "T" & chubby.
I also bout wed from the Kid on
the first time & twice.

gold T on his
chin long light
brown hair &
carries a book
back.

**CONFIDENTIAL**

**ARA 0071**

I smoked with sketch on
many accations on wearguard
property.

[signature] 11/4/03     [signature] Carlos Ortiz

# EXHIBIT J

VOLUME:   I
PAGES:    1-150
EXHIBITS: See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CIVIL ACTION NO. 05-10496-NMG

| | |
|---|---|
| | x |
| ERIC BEASLEY | x |
| Plaintiff | x |
| | x |
| vs. | x |
| | x |
| ARAMARK UNIFORM and CAREER APPAREL, | x |
| INC. AND JAY HESS, JR., | x |
| Defendants | x |
| | x |

*DEPOSITION of SUSAN MAGRINI*, taken
pursuant to the applicable provisions of the
Federal Rules of Civil Procedure, before
Jill Kourafas, Certified Shorthand Reporter
and Notary Public in and for the Commonwealth
of Massachusetts held at the Law Office of
Kevin B. Callanan, 17 Accord Park Drive,
Norwell, Massachusetts, on Thursday,
January 12, 2006, commencing at 10:00 a.m.

*REPORTERS, INC.*
*GENERAL & TECHNICAL COURT REPORTING*
*23 MERRYMOUNT ROAD, QUINCY, MA 02169*
*617.786.7783/FACSIMILE 617.786.7723*

*APPEARANCES OF COUNSEL:*

*For the Plaintiff:*
LAW OFFICE OF KEVIN B. CALLANAN
(BY:   KEVIN B. CALLANAN, ESQ.)
17 Accord Park Drive, Suite 101
Norwell, Massachusetts 02061

*For the Defendants:*
EDWARDS, ANGELL, PALMER & DODGE
(BY:   TIMOTHY P. VAN DYCK, ESQ.)
101 Federal Street
Boston, Massachusetts 02110

```
 1    A.    (Witness nods.)
 2                MR. VAN DYCK:  You have to answer
 3          verbally.
 4    A.    No.
 5                MR. VAN DYCK:  Nods of the head
 6          don't get recorded.
 7    Q.    Did you have any role in the decision to
 8          suspend Eric Beasley?
 9    A.    Yes.
10    Q.    What was that role?
11    A.    As the Vice President of Human Resources,
12          decisions like that were brought to my
13          attention, or I was involved in the
14          decision-making at that level.
15    Q.    And what about the decision to terminate
16          Eric Beasley --
17    A.    Yes.
18    Q.    -- was that your decision also?
19    A.    Yes.
20    Q.    What is your present recollection of the
21          reason that you decided to suspend Eric
22          Beasley from employment?
23    A.    It was based on a sting operation that took
24          place within the Norwell location for which
```

```
 1              be left open, unlocked, and that another

 2              employee was offering up the opportunity to

 3              go on the trucks and see if there was some

 4              merchandise on the truck, and to see if --

 5              the undercover operative was offering people

 6              to get on the truck, but other than that, I

 7              can't really speak to it because I wasn't

 8              observing any of that.

 9    Q.        And the merchandise was WearGuard

10              merchandise?

11    A.        Yes, best of my knowledge.

12    Q.        This operation was done in cooperation with

13              the Norwell Police station?

14    A.        Yes.

15    Q.        Now, earlier you mentioned that Mr. Beasley

16              was suspended based on information from the

17              sting?

18    A.        Uh-huh.

19    Q.        Do you have any knowledge of what that

20              information was that brought you to decide

21              that he would be suspended?

22    A.        There was many.  I think the discussions

23              around the interviews that were done by the

24              undercover operative, the information that
```

1              was shared with the undercover operative,

2              and then there was a little bit tied to that,

3              and the actual sting itself, for the sting

4              piece.

5                        And then afterwards, it was the

6              actual investigation which took place where

7              we hired a third-party person to come in and

8              interview everyone, Sjostead -- I can't

9              remember --

10    Q.    Sjoberg?

11    A.    Sjoberg.

12    Q.    S-J-O-B-E-R-G, Richard Sjoberg?

13    A.    Yes.

14                       -- to do the investigative

15             interviews post-sting, to validate, to make

16             sure that the information, in fact,

17             substantiated our decisions around the sting.

18                       We made a huge investment in trying

19             to find out what was going on in the

20             building.

21    Q.    And the undercover operative was a woman

22             named Nechanta Alexander; is that correct?

23    A.    I don't know the name.  It never meant

24             anything to me, so I didn't know.  I never

| 1 | | I was in executive leadership school, which |

1                    I was in executive leadership school, which

2                    is an intensive week-long school when all

3                    this surfaced, and they brought the director

4                    of Human Resources in, in my absence.  The

5                    view was, the less people to know, the

6                    better.  That was the view.

7                         So, when David Gold brought me into

8                    the loop, he told me what was going on and so

9                    did -- he also didn't want me to feel bad

10                   after something came out of it that I wasn't

11                   aware of it.  So, I was fine with it.

12    Q.    Were you involved in any way in the decision

13          to engage Corporate Risk Solutions to come to

14          Norwell and help with this suspected drug

15          problem?

16    A.    No.

17    Q.    Again, that was the company that provided the

18          undercover operative, that's your

19          understanding?

20    A.    Yes.

21    Q.    Was there anyone else at WearGuard-Norwell or

22          Aramark-Norwell who made decisions about

23          suspensions or terminations other than you

24          while you were Vice President of Human

1          Resources?

2     A.    Final decision on seasonal employees was

3           Kathy Gillis, the director of Human

4           Resources, but other than that, they would

5           bring them to me.

6     Q.    And you were the decision-maker for, as we've

7           said, the suspensions and discharges related

8           to the sting operation?

9     A.    Yes.  And if I was --

10    Q.    Did you interview any employees before you

11          made those decisions?

12    A.    I did not.

13                MR. VAN DYCK:  Again, is your

14          question just referring to the people who

15          were suspended and later terminated as a

16          result of the sting?

17                MR. CALLANAN:  Yes.

18                MR. VAN DYCK:  Or any employees?

19                MR. CALLANAN:  No, just the group

20          who were suspended and then later a number

21          were terminated.

22    Q.    Let's start with Kathy Gillis.  Do you know

23          whether Kathy Gillis ever interviewed

24          Mr. Beasley before he was suspended?

```
 1    A.    Yes.

 2    Q.    And the interrogatory asks, just to summarize

 3          it, to identify each employee who was

 4          suspended from employment following the sting

 5          operation at WearGuard-Norwell in November of

 6          2003.

 7    A.    Uh-huh.

 8    Q.    And drawing your attention to the answer,

 9          which appears below it, the last sentence of

10          the answer reads:  "The suspension decisions

11          were made by Susan Magrini."

12                Do you see that?

13    A.    Yes.

14    Q.    Do you degree with that statement?

15    A.    Yes.

16    Q.    And prior to that particular sentence, it

17          indicates that the suspensions were effective

18          November 6, 2003 without pay.

19                Do you agree with that statement?

20    A.    Yes.

21    Q.    And my question to you is:  When, in terms of

22          time, did you make the decision to suspend

23          these individuals?

24    A.    Between the day after the sting and I believe
```

```
 1              the sting was -- yes.
 2     Q.    Was the sting on the night of November 5
 3              and 6?
 4     A.    Yes.
 5     Q.    Were these decisions made in one session or
 6              one meeting by you?
 7     A.    I don't recall.
 8     Q.    Now, the same answer at the bottom of Page 18
 9              identifies the Plaintiff, Eric Beasley, as
10              well as a number of other employees who were
11              suspended at that time.
12                   Would you agree?
13     A.    Yes.
14     Q.    And it identifies them by race.  Can you see
15              that as part of this answer?
16     A.    Yes.
17     Q.    This is a claim, among other things, of race
18              discrimination.
19                   At the time you made the decision
20              with respect to Mr. Beasley, did you know
21              that he was black?
22     A.    No.
23     Q.    Looking at these names, the other names are
24              Paul George, Richard Marsters, Carlos Ortiz,
```

```
 1              officers.
 2    Q.    You already said Renaissance, you mean the
 3          Radisson Hotel?
 4    A.    Radisson.  Thank you.
 5    Q.    I think it changed names again since the time
 6          of this matter, but I think it was the --
 7          well, you're saying Radisson?
 8    A.    Yes.
 9    Q.    Here in Rockland?
10    A.    Yes.  Next to Dunkin' Donuts.
11    Q.    What's the time frame between that meeting at
12          that hotel and the night of the sting?  Are
13          we talking weeks or days between those two
14          events?
15                  I'm just going for your memory of
16          that now.
17    A.    I think it's either the same day or close to
18          it.  I can't remember specifically.
19    Q.    And when you made the decisions to suspend
20          this group of employees, did you have any
21          information with respect to their race or
22          ethnicity available to you?
23    A.    No.
24    Q.    Is it your testimony that you made this
```

| | | |
|---|---|---|
| 1 | | No. 3, they appear to be the same, except for |
| 2 | | the first name on Exhibit No. 3. |
| 3 | | Do you see the point I'm making? |
| 4 | A. | Let me just -- |
| 5 | Q. | Take your time. |
| 6 | A. | *(Witness compares documents.)* |
| 7 | | Yes. |
| 8 | Q. | So, the new name that appears, if you will, |
| 9 | | on Exhibit No. 3 is Nechanta Alexander, would |
| 10 | | you agree? |
| 11 | A. | Yes. |
| 12 | Q. | And who is she? |
| 13 | A. | The undercover operative. |
| 14 | Q. | And isn't it fair to say she wasn't really |
| 15 | | suspended in this particular transaction? |
| 16 | A. | If I remember now, my memory tells me that in |
| 17 | | order to protect her undercover identity that |
| 18 | | she was identified as a terminated or a |
| 19 | | suspended employee from the other employees. |
| 20 | Q. | But, in fact, she was on her way back to |
| 21 | | Atlanta, Georgia when this document was |
| 22 | | prepared; is that true? |
| 23 | A. | That, I don't know. |
| 24 | Q. | Did you ever see her again after the sting? |

| | | |
|---|---|---|
| 1 | A. | *(Witness reviews document.)* |
| 2 | | Yes, I remember seeing the memo, but |
| 3 | | not the pictures. |
| 4 | Q. | There's a handwritten notation in the top |
| 5 | | right-hand corner, can you read that? |
| 6 | A. | *(Witness complies.)* |
| 7 | | Something "security" and something |
| 8 | | "copies, 11/17/03." |
| 9 | Q. | Would you agree that it says "Gave Security |
| 10 | | and HR copies"? |
| 11 | A. | Yes. |
| 12 | Q. | You don't recognize the handwriting, do you? |
| 13 | A. | No. |
| 14 | Q. | Is that perhaps Mr. Cummings' handwriting? |
| 15 | | MR. VAN DYCK:  Don't speculate. |
| 16 | Q. | You don't recognize the handwriting? |
| 17 | A. | I don't know. |
| 18 | Q. | Now, that is list of 11 individuals, and |
| 19 | | according to the memo, they have been |
| 20 | | terminated effective November 17, 2003, |
| 21 | | correct? |
| 22 | A. | Yes. |
| 23 | Q. | And based on your previous testimony, you |
| 24 | | made the decision to terminate these |

1          11 individuals; is that correct?

2   A.   Yes.

3   Q.   Do you have any understanding of the purpose

4          of this document as prepared by apparently

5          Mr. Cummings?

6   A.   Yes.

7   Q.   What is your understanding?

8   A.   To make sure that certain -- when people are

9          terminated, they are not to be allowed back

10         into the building and to communicate that

11         information to security.

12   Q.   Now, these individuals, according to Exhibit

13         No. 4, were terminated effective November 17,

14         2003; did you make the decisions all at one

15         time or did you make the decisions at

16         different times for different individuals

17         listed on Exhibit No. 4?

18   A.   You know, I don't remember.

19   Q.   All right.

20   A.   We needed to wait for the interviews.  We

21         wanted to wait for the investigative hearing,

22         the interviews.

23   Q.   The interviews by Mr. Sjoberg?

24   A.   By Mr. Sjoberg, yes.

```
 1   A.   I did not.

 2             Thank you.

 3   Q.   I would like to call your attention to

 4        Page 14 of Exhibit No. 8, please.

 5             On Page 14, Mr. Sjoberg, who signs

 6        this letter, is referring to a meeting with

 7        Carlos Ortiz, the paragraph entitled

 8        "Interview with Carlos Ortiz," do you see

 9        that?

10   A.   Yes.

11   Q.   "On Monday, November 10, 2003 at 11:45 a.m.;

12        at a park along Route 37 in Holbrook, Mass.,"

13        and then he enumerates the statements that he

14        attributes to Mr. Ortiz.  Do you see that

15        part of the page?

16   A.   Yes.

17   Q.   Did you know that Mr. -- I assume it's

18        Mr. Sjoberg -- had met with Mr. Ortiz, and

19        apparently Mr. Cummings was also present.

20             Do you see at the top line it says

21        "On Monday, November 10, 2003, the

22        investigator and Mr. Cummings also spoke with

23        the following" -- it's not clear whether he

24        was there or not, but the question is:  Were
```

| | | |
|---|---|---|
| 1 | | was also a black male? |
| 2 | A. | I did not. |
| 3 | Q. | So you didn't take that into account in |
| 4 | | making your decision with regard to Eric |
| 5 | | Beasley? |
| 6 | A. | No. |
| 7 | Q. | Going back to Exhibit No. 6 -- and I'm not |
| 8 | | trying to repeat myself here -- if I |
| 9 | | suggested to you that this signature -- |
| 10 | | there's two at the bottom of the page -- |
| 11 | | the one to the left above the date, if I |
| 12 | | suggest to you that was Jay Hess's signature, |
| 13 | | would you agree or disagree or would you not |
| 14 | | know? |
| 15 | | MR. VAN DYCK:  Don't guess. |
| 16 | A. | I don't know. |
| 17 | Q. | Did you receive any sort of a preliminary |
| 18 | | report, verbal or otherwise, from |
| 19 | | Mr. Sjoberg's office regarding the |
| 20 | | 11 individuals that you discharged on |
| 21 | | November 17 before you made those decisions? |
| 22 | | MR. VAN DYCK:  May I ask a point of |
| 23 | | clarification? |
| 24 | | When you say "report," you mean a |

1   verbal report?

2                   MR. CALLANAN:  Sure.

3   A.  Verbal, yes.

4   Q.  Did you receive any sort of information from

5       Mr. Sjoberg's office before you decided to

6       discharge the 11 individuals on

7       November 17?

8   A.  Yes.

9   Q.  Tell me about that.

10  A.  He conducted interviews on our behalf, and

11      based on those interviews, shared information

12      with us that supported our decisions.

13  Q.  Did he speak to you?

14  A.  Yes.

15  Q.  What did he tell you?

16  A.  He summarized the interviews that he was

17      having with each individual.

18  Q.  Was this done in person or by telephone?

19  A.  Could've been both.

20                  Speculation, sorry.

21  Q.  Just your memory.  Just your memory.  I

22      realize this is a couple of years ago.

23                  Do you have any memory whether you

24      were receiving this information from

1          Mr. Sjoberg alone or whether other people

2          were present?

3    A.    I believe Kathy Gillis or John Cummings was

4          present at some point or all.

5    Q.    It could've been perhaps by phone or in

6          person?

7    A.    Either or.  He would come into the building

8          occasionally, or he would call in depending

9          on what was going on in the investigation.

10   Q.    Do you remember anything that he reported

11         to you at that time with respect to

12         Mr. Beasley?

13   A.    I remember on the day that we talked about

14         Mr. Beasley that we concluded our interview.

15         I think he was the final interview in the

16         process of all the people, as I remember, and

17         that that interview substantiated the other

18         things that the undercover agent had

19         indicated.

20                So, based on that, we made a

21         decision to terminate him.

22   Q.    And what did that interview substantiate?

23   A.    The fact that he had been identified as

24         someone who violated our policy in terms of

| | | |
|---|---|---|
| 1 | | respect to suspension, a conference call in |
| 2 | | which Mr. Freidman participated? |
| 3 | A. | I can't remember the -- I don't remember the |
| 4 | | sequence. |
| 5 | Q. | Do you recall having any conference calls |
| 6 | | with Mr. Freidman at any time before you |
| 7 | | decided to terminate the 11 employees, |
| 8 | | including the plaintiff? |
| 9 | A. | Yes. |
| 10 | Q. | And when would those conference calls have |
| 11 | | taken place? We're talking presumably |
| 12 | | November of 2003. |
| 13 | A. | I can't specifically remember when, but they |
| 14 | | would've occurred -- |
| 15 | Q. | Before you made the decision to terminate |
| 16 | | these 11 individuals? |
| 17 | A. | Yes. |
| 18 | Q. | So, again, you were aware that Mr. Beasley |
| 19 | | had denied involvement in the drug |
| 20 | | activity -- |
| 21 | A. | Yes. |
| 22 | Q. | -- before you discharged him? |
| 23 | A. | That part, I don't remember. |
| 24 | Q. | I'm trying to go back to your testimony about |

1              is after Eric?

2    A.    Aloud or to myself?

3    Q.    Aloud.

4    A.    "African American male approximately 30 years

5          of age, six-foot tall, 200 pounds, eye

6          pierced."

7    Q.    And I suggest to you that throughout this

8          document, there are other pages which are

9          similar that there is a reference to Eric

10         with the eye pierced.

11             Were you aware there was an Eric

12         with the eye piercing in this report before

13         you made your decision to terminate

14         Mr. Beasley?

15   A.    Not that I remember.

16                 *(Exhibit No. 10, One-page copy of a*

17                 *photograph with bates-number.*

18                 *ARA 0759, marked.)*

19   Q.    I show you what has been marked as

20         Exhibit No. 10, and I have only one copy of a

21         better representation of it.

22             I'd just ask you if that is a

23         photograph with the name "Eric O'Connor"

24         under it, do you have any knowledge of who

126

1        Eric O'Connor is or was?

2    A.    No.

3    Q.    Would you agree with me that that photograph

4          does indicate an eye piercing or eye jewelry?

5    A.    Yes.

6    Q.    Okay.  So, going back to Exhibit No. 9, if we

7          could, Page 4, the reference here in this

8          paragraph to "Eric" followed by "Beasley" in

9          parentheses, do you recall at the time that

10         you signed this document as being a truthful

11         document having any knowledge of anyone else

12         named Eric in this context?

13   A.    I don't recall.

14   Q.    Now, just dropping down to Paragraph D1 on

15         the same page.

16   A.    Yes.

17   Q.    D1 is a paragraph that relates to Exhibit B,

18         which is attached.  If you'd take a look at

19         Exhibit B, which is attached to

20         Exhibit No. 9, that's a document we've

21         already have seen.  I think it's already been

22         marked.  That's the statement signed by in

23         Ortiz?

24   A.    That's correct.

1      A.    I don't recall.

2                  MR. CALLANAN:   I think that's it.

3            No further questions.

4                  MR. VAN DYCK:   I have four minutes

5            of questions for clarification, please.

6

7            *EXAMINATION BY MR. VAN DYCK:*

8      Q.    Good afternoon, Ms. Magrini.

9      A.    Good afternoon.

10     Q.    I believe you testified that you're no longer

11           employed by Aramark; is that correct?

12     A.    That's correct.

13     Q.    Would you briefly explain whether your

14           separation from the company was voluntary or

15           involuntary?

16     A.    It was involuntary.

17     Q.    And when were you terminated from the

18           company?

19     A.    September -- at the end of September, October

20           2003 -- 2004.

21     Q.    Now, I believe you testified earlier that you

22           were the one responsible for making the

23           decision to suspend Mr. Beasley along with

24           others, correct?

138

1   A.   Yes.

2   Q.   And that decision was made on or about

3        November 6th?

4   A.   Correct.

5   Q.   And did you have any knowledge of

6        Mr. Beasley's race at the time that you made

7        that decision to suspend him?

8   A.   No.

9   Q.   Up to the time that you had made the decision

10       to suspend Mr. Beasley, had the subject of

11       Mr. Beasley's race come up in any way of your

12       communications with any other Aramark

13       employee?

14  A.   No.

15  Q.   All right.  Now, I believe you testified

16       earlier that you were also the one who was

17       responsible for terminating Mr. Beasley; is

18       that correct?

19  A.   That's correct.

20  Q.   And that termination occurred on or about

21       November 17?

22  A.   That's correct.

23  Q.   Am I correct that the decision to terminate

24       Mr. Beasley was based, at least in part, upon

139

| | | |
|---|---|---|
| 1 | | communications that you and others were |
| 2 | | having with Mr. Sjoberg? |
| 3 | A. | That's correct. |
| 4 | Q. | All right.  On November 17, when the decision |
| 5 | | was made to terminate Mr. Beasley, did you |
| 6 | | have any understanding as to what his race |
| 7 | | was? |
| 8 | A. | No. |
| 9 | Q. | Did Mr. Beasley's race play any role |
| 10 | | whatsoever in the company's decision to |
| 11 | | either suspend or terminate Mr. Beasley? |
| 12 | A. | Not at all. |
| 13 | Q. | Now, Mr. Beasley's counsel has indicated that |
| 14 | | in the undercover reports that you've never |
| 15 | | seen up until today, the name "Eric" appears |
| 16 | | but not "Beasley"? |
| 17 | A. | Yes. |
| 18 | Q. | Do you recall being shown that? |
| 19 | A. | Yes. |
| 20 | Q. | I would like to draw your attention to what's |
| 21 | | been previously marked as Exhibit No. 8, |
| 22 | | which are Richard Sjoberg's reports, correct? |
| 23 | A. | Correct. |
| 24 | Q. | And if I recall your testimony earlier today, |

# EXHIBIT K

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ERIC E. BEASLEY,

     Plaintiff,

v.

ARAMARK UNIFORM AND CAREER
APPAREL, INC., and JAY HESS, JR.,

     Defendants

Civil Action No. 05-cv-10496-NMG

## DEFENDANT ARMARK'S RESPONSE TO PLAINTIFF'S
## FIRST SET OF INTERROGATORIES

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendant ARAMARK
Uniform and Career Apparel, Inc. ("ARAMARK"), by and through his undersigned attorneys,
objects and responds as follows to Plaintiff Eric E. Beasley's ("Beasley") First Set of
Interrogatories.

### GENERAL OBJECTIONS

Defendant, through its attorneys, makes the following General Objections to Plaintiff's
interrogatories. These General Objections are incorporated by reference into Defendant's
response to each and every individual interrogatory, to the extent applicable, whether or not
specifically stated in any individual response. Responses to Plaintiff's interrogatories are
qualified by the objections, whether general or specific, asserted herein. Answers to
interrogatories do not waive any objections asserted.

1.    Defendant, through its attorneys, objects generally to any instruction or
interrogatory to the extent that it seeks to impose discovery obligations that exceed those set
forth in the Federal Rules of Civil Procedure.

2.    Defendant, through its attorneys, objects generally to any interrogatory to the
extent that it seeks discovery of privileged information, including, but not limited to, attorney-
client privileged information, or non-discoverable work product which is privileged pursuant to
Fed. R. Civ. P. 26(b)(3) or (b)(4).

3.    Defendant objects generally to any and all interrogatories to the extent they seek
information concerning the substance of each and every communication concerning general
subject matters, dates of such communications and/or the names of all participants to such
communications, on grounds such interrogatories are overly broad and unduly burdensome



**INTERROGATORY NO. 12:**

State the date when Aramark or WearGuard first suspected that the plaintiff was involved in illegal drug activity or theft of company property and identify in your answer the source of such information and how such information was obtained.

**RESPONSE: Some time in the Spring of 2003, Barbara Casagrande and Kathy McNeely approached John Cummings and expressed concerns about possible drug use and dealing at the Norwell facility by a number of employees, including but not limited to Plaintiff.**

**INTERROGATORY NO. 13:**

Identify by name, race, job title, last known residential address, date of resignation and reason for resignation, all persons who resigned from employment with Aramark or WearGuard at the WearGuard facility in Norwell, MA in November 2003.

**RESPONSE: Defendant objects to Interrogatory No. 13 as neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, and as unduly invasive of the privacy rights of individuals who are not parties to this action.**

**INTERROGATORY NO. 14:**

Identify by name, race, job title, last known residential address, date of discharge and reason for discharge, all persons who were discharged from employment with Aramark or WearGuard at the WearGuard facility in Norwell, MA in November 2003.

**RESPONSE: *THIS RESPONSE IS CONFIDENTIAL PURSUANT TO THE PARTIES' CONFIDENTIALITY AGREEMENT.***

**Defendant objects to Interrogatory No. 14 as neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, and as unduly invasive of the privacy rights of individuals who are not parties to this action. Without waiving the foregoing general and specific objections, and subject to them, Defendant answers as follows:**

**1.    Eric Beasley**
      **Black**
      **November 17, 2003**
      **Violation of Company Rules**

BOS_BOS_507996_3/BLAMKIN

**CONFIDENTIAL**

2.

[REDACTED]

3.   **Richard Marsters**
     **White**
     **November 17, 2003**
     **Violation of Company Rules**

4.   **Joseph Lee**
     **White**
     **November 17, 2003**
     **Violation of Company Rules**

5.

[REDACTED]

6.   **John Qualter**
     **White**
     **November 17, 2003**
     **Violation of Company Rules**

7.

[REDACTED]

8.

[REDACTED]

BOS_BOS_507996_3/BLAMKIN

**CONFIDENTIAL**

9.

REDACTED

10.

REDACTED

11.

REDACTED

12.

REDACTED

13.   **Jesus Ortiz**
      **Hispanic**
      **November 17, 2003**
      **Violation of Company Rules**

14.

REDACTED

BOS_BOS_507996_3/BLAMKIN

CONFIDENTIAL

**15.**

REDACTED

**16.**

REDACTED

**17.**

REDACTED

**18.**

REDACTED

**19.**

REDACTED

**20.**

REDACTED

BOS_BOS_507996_3/BLAMKIN

CONFIDENTIAL

21.  REDACTED

22.  REDACTED

23.  REDACTED

24.  **Carlos Ortiz**
     **Hispanic**
     **November 17, 2003**
     **Violation of Company Rules**

25.  **John Gomes**
     **Black**
     **November 17, 2003**
     **Violation of Company Rules**

26.  **Paul George**
     **White**
     **November 17, 2003**
     **Violation of Company Rules**

27.  REDACTED

BOS_BOS_507996_3/BLAMKIN

**CONFIDENTIAL**

28.    **Jonathan Schempp**
       **White**
       **November 17, 2003**
       **Violation of Company Rules**

29.    **Anthony Souza**
       **White**
       **November 17, 2003**
       **Violation of Company Rules**

30.    REDACTED

REDACTED

BOS_BOS_507996_3/BLAMKIN



REDACTED

**INTERROGATORY NO. 20:**

Identify by name, race, job title and last known residential address each employee who was suspended from employment following the "sting" operation at the WearGuard facility in Norwell, MA in November 2003, including the dates of each suspension, whether each suspension was with or without pay, and the name and position of the person or persons who made each suspension decision.

**RESPONSE:** *THIS RESPONSE IS CONFIDENTIAL PURSUANT TO THE PARTIES' CONFIDENTIALITY AGREEMENT.*

**Eric Beasley, Digitizer (Black); Paul George, CE Operator (White); Richard Marsters, CE Operator (White); Carlos Ortiz, CE Operator (Hispanic); Jesus Ortiz, General Associate (Hispanic); Jon Schempp, CE Operator (White); Jason Torres, Security Guard (Hispanic). The suspensions were effective November 6, 2003, without pay. The suspension decisions were made by Susan Magrini.**

BOS_BOS_507996_3/BLAMKIN

**I DECLARE UNDER THE PAINS AND PENALTIES OF PERJURY THAT THE FOREGOING ANSWERS TO INTERROGATORIES ARE BASED UPON INFORMATION REASONABLY AVAILABLE TO ARAMARK UNIFORM AND CAREER APPAREL, INC., AND ARE NOT NECESSARILY BASED UPON THE PERSONAL KNOWLEDGE OF THE UNDERSIGNED, THIS 22 DAY OF NOVEMBER, 2005.**

Jason Callaway

**AS TO OBJECTIONS:**

Timothy P. Van Dyck (BBO No. 548347)
Brian H. Lamkin (BBO No. 635688)
EDWARDS ANGELL PALMER & DODGE LLP
101 Federal Street
Boston, MA  02110
(617) 439-4444
(617) 439-4170 (fax)

**CERTIFICATE OF SERVICE**

I hereby certify that on this day a true copy of the above document was served upon the attorney of record for each party by mail/by hand.

Date:  11/28/05

- 19 -

BOS_BOS_507996_3/BLAMKIN

# EXHIBIT L



# $\mathcal{NSA}$, Inc.

## Needham, Sjoberg & Associates

### INVESTIGATIVE CONSULTANTS

*Corporate Fraud*
*Pre-Employment Profiles*

*Attorney Services*
*Video Surveillance*

November 25, 2003

**PERSONAL AND CONFIDENTIAL**

**WearGuard-CREST**
**An Aramark Company**
141 Longwater Drive
Norwell, MA 02061

**Attention:**   **Mr. John Cummings**
**Director Of Security**

**Subject:**   **Employee Drug / Theft Investigation**
**RE:**   **Investigative Follow-Up Interviews**

Dear Mr. Cummings,

On Friday, November 7, 2003, you contacted this office to brief the investigator in regard to a recently completed internal investigation initiated through the Aramark Corporate Security Department. This investigation apparently resulted in the arrest of several WearGuard employees for various offenses involving drug possession and theft of company property.

Upon your request, this office initiated employee interviews of those employees arrested, as well as, additional employees placed on suspension as part of the completed investigation. The investigator was provided with details of the on-going investigation, as discussed with Mr. Jay Hess, Aramark Security Director.

The investigator initiated interview attempts to speak with the various employees related to this ongoing investigation. Enclosed are the results of those various interviews. The investigator notes after several attempts to speak with Rick Marsters & Jason Torres - both failed to respond to his best efforts.

**The following information was gathered through a series of interviews, as follows:**

**CONFIDENTIAL**    ARA 0238

*101 Federal Street • Suite 1900 • Boston, Massachusetts 02110 • Telephone (617) 342-3616 • Facsimile (781) 337-3935*

**WearGuard-CREST**
**Subject: Employee Drug / Theft Investigation**
**RE: Investigative Follow-Up Interviews**
**Page 2**

Upon review of the provided materials, on **Monday, November 10, 2003**, the investigator and Mr. Cummings initiated a series of related employee interviews to corroborate information provided to date. On this date, the investigator spoke with the following supervisory personnel:

> **Barbara Castagrande, Manager, Custom Embroidery Department**
> **Marcia Hogan, Assistant Manager, Art Department**
> **Sharon Phillips, Assistant Manager, Art Department**
> **Brian Caswell, 2ND Shift Custom Embroidery Supervisor**
> **Mike Lowder, 2ND Shift Custom Embroidery Supervisor**

**The investigators spoke with Barbara Castagrande, CE Manager regarding her knowledge of the Custom Embroidery Department Employees and on-going issues:**

- Several months ago, CE Supervisor, Kathy McNeely came to Barbara and stated; "The floor is out of control. Things are getting pretty bad out there. Everyone is bringing in friends of friends. It's not easy to get something on somebody."

- Simultaneously, 2ND Shift CE Supervisor, Brian Caswell also came to Barbara and stated that he felt employees were smoking pot and doing coke while on their breaks. Brian noted employees were going out in groups and would return from break with glassy eyes and the smell of marijuana.

- Barbara Castagrande stated; "Brian Caswell told me he didn't feel comfortable dealing with it and that he felt his hands were tied unless he actually witnessed something."

- Barbara Castagrande stated; after reporting her suspicions to Mr. Cummings; a floor meeting was held in May, 2003. Mr. Cummings announced to the floor that drug use or possession would not be tolerated. And things settled down for a few weeks.

- Barbara Castagrande stated that she and Kathy McNeely came forward with their concerns because they did not want to go into the Fall busy season with Custom Embroidery "out of control."

- Barbara Castagrande stated CE Supervisor Mike Lowder is a problem, because he is young and came up from the floor. Mike still has relationships with a lot of the employees he is now supervising.

**CONFIDENTIAL**    **ARA 0239**

**WearGuard-CREST**
**Subject:  Employee Drug / Theft Investigation**
**RE:  Investigative Follow-Up Interviews**
**Page 3**

- Barbara Castagrande stated Brian Caswell told me one time he observed a residue in the mens room and thought it was cocaine.

- Barbara Castagrande stated Brian Caswell reported to her that there are "Rampant / Blatant rumors going around using Eric's name like crazy.  That Eric is the big ring leader who people bought drugs from."

- Barbara Castagrande stated she told her supervisors to come forward if drug use seemed to continue.

**Barbara Castagrande made the following statements regarding Eric Beasley:**

- Eric Beasley began employment at WearGuard approximately 5 years ago as a 2nd shift Custom Embroidery Machine Operator, then was promoted / transferred to the Art Department as a Digitizer on October 21, 2002.

- Upon starting - Eric Beasley was not a great employee, but not the worst.

- There were performance issues with product quality, attendance, etc.

- Whenever Eric is approached regarding an issue - he always has an answer - the problem is never his fault - always forwards blame to team.

- A Digitizer position opened in the Art Department - and he got it.

- Eric Beasley's direct co-workers are Jeff Laubach & Paul Keating.

- The 2nd Shift Art Department has no direct management - are lightly supervised by CE to make sure they are working & present at their desks - but no responsibility for their numbers, etc.

CONFIDENTIAL

ARA 0240

**WearGuard-CREST**
**Subject:  Employee Drug / Theft Investigation**
**RE:  Investigative Follow-Up Interviews**
**Page 4**

- Art Department was recently warned about horseplay for throwing around a paper football.

- While in Customer Embroidery, Eric Beasley was observed at Marcia Hogan's desk going through draws and file cabinet.  Barbara Castagrande approached Eric about it. Eric stated he was only using the phone to order dinner for the team.

- Barbara Castagrande stated Eric Beasley is the type of person who doesn't flinch when confronted.  Eric just immediately comes out with an answer to pass off the issue.

**The investigators spoke with Marcia Hogan, Assistant Manager, Art Department regarding her knowledge of employee and on-going issues:**

- Marcia Hogan stated that a Jeff Laubach, Paul Keating & Eric Beasley work the unsupervised second shift in the Art Department.

- Marcia Hogan stated that Eric Beasley was involved in a harassment with a person in CE last Spring.

- Marcia Hogan stated she has observed various unknown employees stopping by Eric's desk.

- Management is aware of possible issues with how he uses the time clock.  It has been reported by his co-workers that he disappears for periods of time only to return after midnight and punch out around 12:45AM.

CONFIDENTIAL

ARA 0241

**WearGuard-CREST**
**Subject:  Employee Drug / Theft Investigation**
**RE:  Investigative Follow-Up Interviews**
**Page 5**


**The investigators spoke with Sharon Phillips, Assistant Manager, Art Department regarding her knowledge of employee and on-going issues:**

- In May, 2003 - Art Department employee, Jeff Laubach complained to me that Eric was not working and getting paid.  That he would leave the building and come back hours later.

- Jeff complained again stating, "You guys don't know what goes on here at night." Sharon Phillips stated he was reluctant to elaborate to say who or what things were happening.

- Sharon Phillips stated she has spoken to Eric about having people at his desk - "He's been told to break it up."

- Sharon Phillips stated she has seen a black male, with short hair, a round face, about 5'10", with a normal build - at Eric's desk a lot.

- Sharon Phillips stated she has heard from employees that Eric spends too much time hanging out in Custom Embroidery.

- Sharon Phillips stated that she thought Brian Caswell (CE Supervisor) and Eric Beasley were friendly and thought he may let Eric get away with things.


**CONFIDENTIAL**


**ARA 0242**

**WearGuard-CREST**
**Subject:  Employee Drug / Theft Investigation**
**RE:  Investigative Follow-Up Interviews**
**Page 6**

**The investigators spoke with Brian Caswell, Custom Embroidery Supervisor regarding his knowledge of employee and on-going issues:**

- Brian Caswell stated that he has had suspicions for a long time of drug use among employees in Custom Embroidery.  Mike Lowder hears a lot from the floor.

- Brian Caswell stated Mike Lowder (CE Supervisor) is friendly with a lot of the employees. "The night of the arrests, Mike told me he knew of at least three people with dope in their cars.  The were:  John Conant - Trainer; John Qualtor - sells drugs; Rick Marsters - sells drugs and Joe Lee - a drug user."

- Brian Caswell stated; "Mike Lowder said that Rick Marsters had either 200 tabs or $1200 dollars worth of ecstasy in his car.  It was at least over $1000.00.  And Rick carpools with Matt LeBrun from CE."

- Brian Caswell stated; "Mike Lowder told me that on Thursday night - after the arrests - when Rick Marsters was suspended - Matt LeBrun came to me to report he hurt his knee and wanted to go home.  Matt seemed like he had cold feet to me.  I told him he had to fill out an accident report - he refused and said he would be back in on Friday.  On Friday - Matt called in sick - and was told to see the nurse before he returned."

- Brian Caswell stated; "I have heard that a lot of people come to work at WearGuard for the atmosphere - that it's an easy place to sell and get drugs at."

**Brian Caswell made the following statements regarding Eric Beasley:**

- Brian Caswell stated that he and Eric Beasley started at WearGuard at the same time about 5 years ago.  We went through training and on teams together.

- Brain Caswell stated he knows for sure that Eric sold drugs at WearGuard at that time.

**CONFIDENTIAL**        **ARA 0243**

**WearGuard-CREST**
**Subject: Employee Drug / Theft Investigation**
**RE: Investigative Follow-Up Interviews**
**Page 7**

- Eric Beasley kept asking Brian Caswell if he was a "plant" (undercover)

- Brian Caswell stated, "Eric told me not to worry about the supervisor's - they're in my pocket - I supply them with pot."

- Brian Caswell was also aware that Eric Beasley drank on the job.

- Brian Caswell, upon promotion to supervisor, stated he warned those he worked with that he was aware of their "issues" and to keep their illegal activity outside of work.

- About 21/2 years ago, Mike Lowder (CE Supervisor) told me that our Lead - Jay Hughes just bought weed from Beasley. Brian Caswell told Mike Lowder that he was going to have to address it - and "Mike shit."

- Brian Caswell stated he brought Jay Hughes in - who denied it - and was warned if it happened again in the future he would report it to HR.

- Brian Caswell then brought Eric Beasley in - he denied it and said it was heresay. I told him that Jay Hughes admitted it - He (Eric Beasley) shit. Eric then said, "I promise it won't happen again. Brian warned him there is a "Zero Tolerance" policy with him when it comes to drugs at work.

**CONFIDENTIAL**

ARA 0244

WearGuard-CREST
Subject: Employee Drug / Theft Investigation
RE: Investigative Follow-Up Interviews
Page 8

**The investigators spoke with Mike Lowder, Custom Embroidery Supervisor regarding his knowledge of employee and on-going issues:**

- Mike Lowder stated; "Employees come to me with a lot of "word of mouth" discussions going on because I was a CE Operator for a long time. I brought these concerns to Barbara Castagrande & Kathy McNeely."

- Mike Lowder stated; "I had suspicions. How do I deal with it.?"

- Mike Lowder stated; "A couple of years ago when I was a Lead (CE) I heard Eric Beasley sold drugs here."

- Mike Lowder stated; "Rick Marsters looks like junk after break. He goes out in groups with Joe Lee, John Qualtor & Brice - a tech., Matt LeBrun & Bill Beasley. I know Matt, Rick & Bill used to live together."

- Mike Lowder stated; "I would ask employees when I thought they used drugs - they would deny it. Then what - I got nothing. And is HR going to save me when my throat gets sliced for pressing these people."

- Mike Lowder stated; "None of the people using drugs surprised me. After eight years here, nothing surprises me."

- Mike Lowder stated; "Paul George did surprise me. I didn't pick up on the theft thing."

- Mike Lowder stated; "Jon Schemp is a dumb redneck who don't know what the hell he is doing. We have on-going attendance and performance issues with him."

- Mike Lowder stated; "The night of the arrests, Jon Schemp was nervous because he was driving to work in and unregistered / uninsured car and has a suspended driver's license. Jon told me he put the plate from his old pick up truck on his car now."

**CONFIDENTIAL**

ARA 0245

**WearGuard-CREST**
**Subject:  Employee Drug / Theft Investigation**
**RE:  Investigative Follow-Up Interviews**
**Page 9**

- Mike Lowder stated; "Jon Schemp was mad Carlos Ortiz accused him.  He was begging for a second chance."

- Mike Lowder stated; "Morale is down in CE."

- Mike Lowder stated; "The night of the arrests Rick Marsters & Joe Lee had some drugs on them.  The got real nervous when they heard there was a drug dog around."

- Mike Lowder stated; "John Qualtor literally ran outside when he heard.  I said to him you look a little nervous - he just ran past me."

- Mike Lowder stated; "I think employees knew I knew about drug use - but didn't care."

- Mike Lowder stated; "I've gone to parties outside of work and seen employees using marijuana.  At a house party I saw Rick Marsters, Joe Lee & Jen Martin smoking.  At another party - a bonfire - I saw John Conant, Pat Conant (previous employee) and John Qualtor using drugs."

CONFIDENTIAL

ARA 0246

**WearGuard-CREST**
**Subject:  Employee Drug / Theft Investigation**
**RE:  Investigative Follow-Up Interviews**
**Page 10**

On Monday, November 10, 2003, the investigator and Mr. Cummings spoke with the remaining Art Department personnel:

> **Jeff Laubach, 2ND Shift Art Department Digitizer**
> **Paul Keating, 2ND Shift Art Department Digitizer**
> **Scott Kearns, 2ND Shift Art Department Systems Administrator**

Jeff Laubach, 12 Year Art Department Employee relayed the following information regarding issues within his department:

- Jeff Laubach stated;"I have worked beside Eric Beasley since he started in the Art Department about 1 year ago (Beasley Art Dept. start date 10/21/02)."

- Jeff Laubach stated;"Eric Beasley does all of the above - drugs and steal."

- Jeff Laubach stated; "When Eric first started in the Art Department I saw him bring in a big bag of pot in a plastic bag.  He wasn't trying to hide it and was showing it to me. I asked him either; 'How much he had' or 'How much was it worth' and I don't remember his answer.  Eric then put the pot into his desk."

- Jeff Laubach stated;"I have seen many people come and go from his desk area at night. There is usually a short woman in her 40's with black hair at his desk a lot."

- Jeff Laubach stated;"I know Eric Beasley sells used cars on the side at a dealership."

- Jeff Laubach stated; "Eric told me about this vacation he went on with Carlos Ortiz and a guy named Trey (former CE Employee) together last May (2003) to Virginia."

- Jeff Laubach stated; "Eric Beasley leaves work to watch Patriots games at the Ground Round.  Then he comes back around midnight.  It's not right."

ARA 0247

CONFIDENTIAL

**WearGuard-CREST**
**Subject:  Employee Drug / Theft Investigation**
**RE:  Investigative Follow-Up Interviews**
**Page 11**

- Jeff Laubach stated; "I have observed Eric Beasley with a daily look of glassy, red eyes."

- Jeff Laubach stated; "I'm not an inside person with him, I just see all the comings and goings."

- Jeff Laubach stated; "I was shocked when he got promoted into the Art Department because I knew of his reputation.  Then he comes in and goofs off - why is no one surprised."

**Paul Keating, Digitizer, Art Department relayed the following information regarding issues within his department:**

- Paul Keating stated; "I'm not surprised by all the arrests - there's been a lot of shadiness going on."

- Paul Keating stated; "The Art Department used to be a quiet place to work until Eric Beasley started."

- Paul Keating stated; "There is now a stream of different people coming into the department.  Eric gets up and whispers with people - it's obviously shady.  This is constant with mostly CE people."

- Paul Keating stated; "People will come over to him, then Eric jumps up and goes away with them for a minute while whispering.  It's both men and women."

- Paul Keating stated; "I trained Eric Beasley.  During training his eyes would be glowing red.  His eyes would be - so red - after breaks - I'm not stupid - you know - and he's now got on heavy cologne."

- Paul Keating stated; "During training when his eyes were red, he had to ask me over & over again questions about what we were covering.  He would even ask the same questions over & over."

CONFIDENTIAL          ARA 0248

**WearGuard-CREST**
**Subject:  Employee Drug / Theft Investigation**
**RE:  Investigative Follow-Up Interviews**
**Page 12**

- Paul Keating stated; "I usually observe Eric Beasley with red eyes and appearing on drugs 2 to 3 times a week - he's definitely involved in suspicious activity."

- Paul Keating stated; "I like him as a Trainer, he's funny; but there's definitely something there with him."

- Paul Keating stated; "Eric told me about a vacation he went on over the Summer with a guy named Trey and others from CE.  He said they drove down and rented a house in Virginia or South Carolina.  Eric told me the lady they rented the house from was pissed because they trashed the house.  Eric said he was mad because the lady charged them extra."

- Paul Keating stated; "The Art Department went from a quiet place to work to a lot of traffic when Eric Beasley came in."

- Paul Keating stated; "Jeff and I work until about 11:30, but Eric Beasley will be gone for hours during the night and show back up and stay until 1AM."

- Paul Keating stated; "The night of the arrests; someone said there were detectives in the building.  Eric was definitely / immediately spooked and upset.  Eric kept saying, 'I just want to go home' over & over."

- Paul Keating stated; "After Eric was questioned; he said to me, 'Why are they doing this to me - I don't know any of these people."

CONFIDENTIAL

ARA 0249

WearGuard-CREST
Subject: Employee Drug / Theft Investigation
RE: Investigative Follow-Up Interviews
Page 13

**Scot Kearns, Systems Administrator, Art Department Employee relayed the following information regarding issues within his department:**

- Scott Kearns stated; "I have seen people come up to Eric Beasley and walk off for a minute."

- Scott Kearns stated; "About a year ago I witnessed, a heavy set black male, 6" tall, come up to Eric Beasley - they walked off - a minute later they came back and this guy said 'Thanks' to Eric.

- Scott Kearns stated; "Some nights Eric Beasley is soaked with cologne after break. I assumed he's masking something because he has blood-shot eyes."

CONFIDENTIAL

ARA 0250

WearGuard-CREST
Subject: Employee Drug / Theft Investigation
RE: Investigative Follow-Up Interviews
Page 14

On **Monday, November 10, 2003,** the investigator and Mr. Cummings also spoke with the following employees noted within the scope of the on-going investigation:

> **Carlos Ortiz, 2ND Shift Custom Embroidery Operator**
> **Jon Schemp, 2ND Shift Custom Embroidery Operator**
> **Joe Lee, , 2ND Shift Custom Embroidery Operator**
> **John Qualtor, 2ND Shift Custom Embroidery Operator**
> **John Gomes, 2ND Shift Custom Embroidery Operator**
> **Anthony "Sketchy" Sousa, 2ND Shift Custom Embroidery Operator**

*Interview With Carlos Ortiz*
**The investigators met with Carlos Ortiz, who also brought his five year old son, on Monday, November 10, 2003 at 11:45AM; at a park along Route 37 in Holbrook, MA. Carlos Ortiz made the following statements:**

- Carlos Ortiz stated; "I smoke weed everyday before and during work. I have too."

- Carlos Ortiz stated; "I can't go a day without smoking weed."

- Carlos Ortiz stated; "I have one son - 5, two girls - 5 and a seven month pregnant girlfriend."

- Carlos Ortiz stated; "I look rough now cause I was up all night arguing my girl. She won't give up sex to me. That's what we are fighting about. A mans got his needs."

- Carlos Ortiz stated; "I told that fat black girl (UC) I wanted some black leather jackets. I told her what sizes and style."

- Carlos Ortiz stated; "She gave them to the drug dealer I brought her to in Brockton."

- Carlos Ortiz stated; "I don't even have the jackets. The drug dealer then gave one of the jackets to my mother and the other to my sister."

- Carlos Ortiz stated; "I only wrote down at the police station about Eric (Beasley) so I could get bailed. It's not true."

CONFIDENTIAL        ARA 0251

**WearGuard-CREST**
**Subject: Employee Drug / Theft Investigation**
**RE: Investigative Follow-Up Interviews**
**Page 15**

- Carlos Ortiz stated; "I don't even know Eric (Beasley) except to say Hi. I didn't even know he (Eric Beasley) sold or smoked weed."

- Carlos Ortiz stated; "I've only sold a few blunts (marijuana) to people while at work."

- Carlos Ortiz stated; "There about 40 other people how smoke weed at WearGuard."

- Carlos Ortiz stated; "I've smoked weed with John Trainer - he smokes every day."

- Carlos Ortiz stated; "I've smoked weed with the Cape Verdean (John Gomes). He's in the area next to mine."

- Carlos Ortiz stated; "Jon Schemp buys a 50 bag and sells dimes. When I bought a dime from him one hour before I got arrested - he had 3 or 4 more dimes on him."

- Carlos Ortiz stated; "I can't believe I didn't wait until the end of the night to buy off him (Jon Schemp). That was stupid. I didn't even need it until after work."

- Carlos Ortiz stated; "There's a guy in the 1st unit (Rich Marsters) with a goatee, earrings and a backpack who sells a lot of weed. He's got the good stuff - Hydro. 3.5 is $50 - that's expensive shit."

- **Carlos Ortiz subsequently contacted the investigator via telephone and asked if he could meet with WearGuard and his attorney to talk about him getting his job back. His contact telephone number is (781) 986-8033 - listed to a Robert Sullivan, 135 Chestnut Street, Randolph, MA 02368.**

- **The investigator asked Carlos about the reported vacation he took with Eric Beasley to Virginia. Carlos stated,"You just looking for information. You crazy. Man I never left Massachusetts in my life. I must have been so high that I slept walked through it." Carlos then abruptly hung up on the investigator.**

**CONFIDENTIAL**

**WearGuard-CREST**
**Subject:  Employee Drug / Theft Investigation**
**RE:  Investigative Follow-Up Interviews**
**Page 16**

*Interview With Jon Schemp*

The investigator noted Jon Schemp had not reported to work since the night of the CE Employee arrests. Therefore, on Monday, November 10, 2003, as Jon Schemp arrived for his 2nd Shift in Custom Embroidery, he was asked to speak with the investigator.

- Jon Schempp stated; "I feel I was illegally search be the police.  I deny any involvement with drugs."

- Jon Schempp stated; "I was arrested for DUI (drunk driving) in July in Middleboro or Rochester, MA. I lost my license, but I'm getting around that with my South Dakota license."

- Jon Schempp stated; "I used to have a drinking problem, but I've stopped drinking since my DUI arrest."

- Jon Schempp stated; "I used to have a business on a farm in South Dakota with my grandfather.  We had a wall that was lined - double thick - with empty liquor bottles - Yeah, I had a problem.  I came here to get a new start."

- Jon Schempp stated; "I have a side business here at the Mall - but just got let go from Clear Channel Communications.  We sell ATT phones at the Mall through a sub-contract business.  There are 3 of us - we get the $250 activation fee for each phone we sell; pay the $4000.00 Mall rent and split the rest between the 3 of us."

- Jon Schempp stated; "We just lost our spot in the Mall, but I'm first in line for the new Boston location."

- Jon Schempp stated; "I was nervous the night of the arrests, first cause I got dragged in and patted own; but also because I was driving my new car with the South Dakota plates on it from my old pick up truck."

**CONFIDENTIAL**

- Jon Schempp stated; "I think Carlos (Ortiz) fingered me to help himself."

ARA 0253

**WearGuard-CREST**
**Subject:  Employee Drug / Theft Investigation**
**RE:  Investigative Follow-Up Interviews**
**Page 17**

- Jon Schempp stated; "I do not socialize with others at work.  I go to Burger King."

- Upon questioning, Jon Schempp was not responsive to answering any questions regarding any other employees he was aware may be involved in drug activity.

- **Jon Schemp was placed on suspension pending the out come of this on-going investigation.**

**CONFIDENTIAL**

**A R A  0 2 5 4**

**WearGuard-CREST**
**Subject:  Employee Drug / Theft Investigation**
**RE:  Investigative Follow-Up Interviews**
**Page 18**

*Interview With Joe Lee*

On Monday, November 10, 2003, the investigators spoke with a 3 year, 2nd Shift Custom Embroidery Operator Joe Lee, noting his repeated drug activity mentioned throughout the initial investigation, he was questioned regarding his drug involvement while at work:

- Joe Lee stated; "I want to start off just by letting you guys know I'm a racist."

- Joe Lee stated; "The last time I smoked on break was last Monday.  I drove off the property with Rich Marsters."

- Joe Lee stated; "I've known Rich Marsters for 5 or 6 years."

- Joe Lee stated; "I smoke weed at work about once a week."

- Joe Lee stated; "I've smoked weed with Carlos (Ortiz), Sketchy (Anthony Sousa) and Jon Schemp."

- Joe Lee stated; "Sometimes it's my stuff, sometimes it's there stuff."

- Joe Lee stated; "I've heard rumors about Carlos (Ortiz) selling weed - but he has a bit of an attitude."

- Joe Lee stated; "I know Jon (Schemp) smokes weed - but don't know about selling."

- Joe Lee stated; "I heard rumors Eric Beasley is dealing drugs out of his desk.  He's shady - I don't deal with him."

- Joe Lee stated; "Eric (Beasley) is a stereotypical black person.  He's lazy and tries to get other people to do his work."

- Joe Lee stated; "I have seen Carlos (Ortiz) and Jon (Schemp) talking at work a lot."

- Joe Lee stated; "I know they smoke (Carlos & Eric) and I have smoked with them often."

- **At the request of the investigator, Joe Lee was willing to provide a written statement regarding his drug use during work hours at WearGuard.  A copy of Joe Lee's written statement is attached for your review.**

**WearGuard-CREST**
**Subject: Employee Drug / Theft Investigation**
**RE: Investigative Follow-Up Interviews**
**Page 19**

*Interview With John Qualtor*

On Monday, November 10, 2003, the investigators spoke with a 2 year, 2nd Shift Custom Embroidery Operator Joe Lee, noting his repeated drug activity mentioned throughout the initial investigation, he was questioned regarding his drug involvement while at work:

- John Qualtor stated; "I smoke pot one or two times a week at work."

- John Qualtor stated; "I usually go to break by myself and smoke pot by myself."

- John Qualtor stated; "No one ever asked me to buy drugs from them at work."

- John Qualtor stated; "I don't sell drugs. I get my pot outside of work."

- John Qualtor stated; "If I have pot with me while I'm working - I leave it in the car."

- John Qualtor stated; "I talk a lot with a Tech. - Brice. I think he smokes pot outside of work. I haven't seen him smoke pot at work."

- John Qualtor stated; "It's been about two weeks - on a Friday night - since I smoked pot at work."

- John Qualtor stated; "Is this gonna get me in trouble. I'm on probation through the end of the month on a possession charge out of Brockton Court."

- **At the request of the investigator, John Qualtor was willing to provide a written statement regarding his drug use during work hours at WearGuard. A copy of John Qualtor's written statement is attached for your review.**

CONFIDENTIAL

ARA 0256

**WearGuard-CREST**
**Subject:  Employee Drug / Theft Investigation**
**RE:  Investigative Follow-Up Interviews**
**Page 20**

*Interview With John Gomes*

On Monday, November 10, 2003, the investigators spoke with a 6 month, 2nd Shift Custom Embroidery
Operator John Gomes, noting his repeated drug activity mentioned throughout the initial investigation
(as the Cape Verdean male), he was questioned regarding his drug involvement while at work:

- John Gomes stated; "I smoke pot twice a week at work and leave the property."

- John Gomes stated; "I won't mention anyone's name I know smokes pot at work."

- John Gomes stated; "The last time I smoked pot was last Tuesday night - the night
  before all the arrests.  I smoked pot on my lunch breaks."

- John Gomes stated; "I know Carlos (Ortiz).  I've known him since working here."

- John Gomes stated; "I've smoked pot with Carlos (Ortiz) and Jon Schemp."

- John Gomes stated; "I give Carlos (Ortiz) a ride home sometimes."

- John Gomes stated; "No one asked me to buy drugs at work."

- John Gomes stated; "I would get some pot from Carlos (Ortiz) out of work and off
  property,"

- **At the request of the investigator, John Gomes was willing to provide a written
  statement regarding his drug use during work hours at WearGuard.  A copy
  of John Gomes's written statement is attached for your review.**

CONFIDENTIAL

ARA 0257

**WearGuard-CREST**
**Subject:  Employee Drug / Theft Investigation**
**RE:  Investigative Follow-Up Interviews**
**Page 21**

*Interview With Anthony "Sketchy" Sousa*

On Monday, November 10, 2003, the investigators spoke with 2nd Shift Custom Embroidery Operator
Anthony Sousa, noting his repeated drug activity mentioned throughout the initial investigation, he was
questioned regarding his drug involvement while at work:

- Anthony Sousa stated; "I smoke pot three times a week at work on rough days."

- Anthony Sousa stated; "I smoke when everything goes wrong. When the machine eats orders - that's a bad day."

- Anthony Sousa stated; "I would smoke pot with Carlos, but I stopped because he was too stupid - by selling pot on the property."

- Anthony Sousa stated; "I've bought 'BLUNTS' from Carlos."

- Anthony Sousa stated; "I've smoked pot with Jon Schemp."

- Anthony Sousa stated; "Carlos's brother - Jesus - is usually there - he don't smoke pot."

CONFIDENTIAL

**WearGuard-CREST**
**Subject: Employee Drug / Theft Investigation**
**RE: Investigative Follow-Up Interviews**
**Page 22**

*Interview With Paul George*

On Wednesday, November 12, 2003, the investigator spoke with a 5 month, 2nd Shift Custom Embroidery Operator Paul George at his new residence of [REDACTED] Hull, MA. Noting his repeated drug activity mentioned throughout the initial investigation. as well as, theft of company product, Paul George was questioned regarding his theft & drug involvement while at work:

- Paul George stated; "The night I got arrested I was sitting in my car on lunch break just eating and relaxing. Then the black girl (UC) comes up to me while I'm on the phone."

- Paul George stated; "She's (UC) like - Do you need a jacket? I only had a T-shirt on. I thought she was going to lend me or let me borrow a personal jacket of hers."

- Paul George stated; "I followed her in her van - in my car - to the rear parking lot and she parked next to a Ryder van."

- Paul George stated; "She (UC) told me they were throw aways - grab a jacket. It's cool."

- Paul George stated; "She (UC) opened the door to the van - the back door. I saw boxes - WearGuard boxes - full of sweatshirts and jackets. That's all I saw."

- Paul George stated; "She (UC) said grab what ever you want. I grab one jacket - a Carhart hooded jacket - that was lying on the floor of the van."

- Paul George stated; "There were two boxes with 3 or 4 pieces in each box."

- Paul George stated; "I was being an idiot - not thinking - I have no criminal record."

- Paul George stated; "I was sitting in my car minding my own business."

- Paul George stated; "I don't smoke weed what so ever. I'll take a drug test. I don't drink on break."

**CONFIDENTIAL**

ARA 0259

**WearGuard-CREST**
**Subject:  Employee Drug / Theft Investigation**
**RE:  Investigative Follow-Up Interviews**
**Page 23**

- Paul George stated; "I don't know about Eric Beasley selling drugs - he only comes around to check orders.  I don't know if he smokes pot and don't see him with Carlos."

- Paul George stated; "The she (UC) says, I got a pair of boots if you need them.  I said Nay - I'm all set."

- Paul George stated; "She (UC) says they're a size 11 - give them to your father.  I told her I don't need them.  Again, I think they are hers - because the boots were in her van."

- Paul George stated; "So I ended up taking them - being an idiot.  She (UC) took them out of her car - showed them to me - So I took them.  I put them in my car and drove back to where I was originally sitting, shut off my car and went inside."

- Paul George stated; "Went she (UC) first started at WearGuard - a Friday night about 9:30PM - an early night - I went to TKO Shea's bar and she was there.  We started talking.  She starts bringing up shit about Carlos (Ortiz) - that she knows him and other people - small talk over a couple of drinks while I was waiting for my cousin.  After that she kept saying Hi to me at work."

CONFIDENTIAL

ARA 0260

**WearGuard-CREST**
**Subject: Employee Drug / Theft Investigation**
**RE: Investigative Follow-Up Interviews**
**Page 24**

*Interview With Eric Beasley & Attorney Tom Brenner*

Subsequently, the investigator set a meeting on **Monday, November 17, 2003**, with 2ND Shift Art Department Digitizer, Eric Beasley. At Mr. Beasley's request, this interview was only to take place in the presence of his attorney. Therefore, the investigator proceeded to the Law Office of Attorney Tom Brenner at Two Battery March Park, Building #2, Quincy, MA at 3:00PM.

During this meeting, the investigator asked Eric Beasley three questions:

1.     **Eric, have you ever possessed drugs of any kind while at work at WearGuard?**
          Response Of Eric Beasley: "No"

2.     **Eric, have you ever used drugs of any kind while at work?**
          Response Of Eric Beasley: "No"

3.     **Eric, are you aware of any other co-worker or employee - during your 6 or 7 year period of employment in possession of or using drugs of any kind while at work.**
          Response Of Eric Beasley: "No, I'm a family man. I keep to myself."

*Investigative Conclusion*

As requested, the investigator's collected each individual piece of information gathered throughout this extensive investigation. The investigators updated and provided vivid details of each interview with WearGuard Human Resource Department Vice President, Sue Magrini & Director, Kathy Gillis; as well as, Aramark Corporate Security Department and Aramark Attorney Steve Freidman.

The investigator provides this investigative report for your review and determination for employment proceedings for each subject engrossed in this investigation. Should you have any questions, please feel free to call our office at any time.

Respectfully Submitted,

Richard A. Sjoberg
President

**CONFIDENTIAL**

ARA 0261

11/18/2003  16:46    6177251929    RS:NSAINC    PAGE  01

NSA, Inc.

I Joseph Lee have Smoked pot with
John Sheap/ Skrebsky Lick narkessNO a few occasions.
I have never done it on the property & have never
purchased from anyone working here I am sorry for doing
such things while working & wont let it happen again.

I Smoked w/ these people Ground Once a week.

Regards given to sypeter
the - for - files.

**CONFIDENTIAL**

ARA 0262



11/18/2003  16:46    6177251929    RS:NSAINC    PAGE  02

I Anthony Souza I have smoke weed but stopped I week ago had Dismissed to shop. I have done it in my car off the property with John Sharp + Carlos, + it won't happen any more

[signature]
Anthony Souza

11/10/03

witness.
[signature]
11/10/03.

[signature]
Paradise USA, INc
11-10-03
7:50 pm

CONFIDENTIAL

ARA 0263

11/18/2003  16:46    6177251929    RS:NAINC    PAGE  03

My name is John Gunther. I've been employed in CE for 2 yrs. I have worked out in my breaks. I eat at 2 times a week on average. I haven't for breaks. I'm sorry, and it will never happen again.

John Gunther
11/10

Witness
11/10/23

11-30-03

CONFIDENTIAL

ARA 0264

11/18/2003  16:46  6177251929    RS:NSAINC    PAGE  04

My name is John Combs. I've been involved in WEATHERGUARD for about 6 or 7 month. I go out to smoke on breaks about 1 or 2 times A week. I want to say that I am sorry for what I've been doing & promise right now that it won't happen again.

John Combs 11/18/03

Witness:

11/18/03.

Richard B. Sperley
President, NSAINC.
11-18-03 7:30pm

CONFIDENTIAL

ARA 0265

# EXHIBIT M

1

2

                                                    Volume: I
                                                    Pages: 150
                                                    Exhibits: 5

3                       UNITED STATES DISTRICT COURT

4                        DISTRICT OF MASSACHUSETTS

5            _____

6

7       ERIC BEASLEY,
                                Plaintiff
                                                    Docket No.
8                       vs.                         05-10496-NMG

9       ARAMARK UNIFORM and CAREER
        APPAREL, INC., and JAY HESS, JR.,
10                              Defendants

11           _____

12

13                      DEPOSITION of JAY M. HESS, JR., a
        witness called by and on behalf of the Plaintiff, taken
14      pursuant to the Federal Rules of Civil Procedure,
        before Cynthia F. Stutz, Certified Shorthand Reporter
15      and Notary Public in and for the Commonwealth of
        Massachusetts, at the offices of Edwards, Angell,
16      Palmer & Dodge, 101 Federal Street, Boston,
        Massachusetts, on Friday, December 2, 2005, commencing
17      at 10:20 a.m.

18

19

20

21

22

23

24

```
 1 │   APPEARANCES:

 2 │         KEVIN B. CALLANAN, ESQ.
   │         Law Office of Kevin B. Callanan
 3 │         17 Accord Park Drive, Suite 101
   │         Norwell, Massachusetts 02061
 4 │               on behalf of the Plaintiff

 5 │         BRIAN H. LAMKIN, ESQ.
   │         Edwards, Angell, Palmer & Dodge
 6 │         101 Federal Street
   │         Boston, Massachusetts 02110
 7 │               on behalf of the Defendants

 8 │

 9 │

10 │

11 │

12 │

13 │

14 │

15 │

16 │

17 │

18 │

19 │

20 │

21 │

22 │

23 │

24 │
```

```
 1        A.   Yes.

 2        Q.   And it describes his height and weight in the

 3   center of that first page, do you see that?

 4        A.   Yes.

 5        Q.   What does that reflect?

 6        A.   Six-three, 255 pounds.

 7        Q.   And while the photograph is not portrait

 8   quality, can you see any eye piercing in this rather

 9   small photograph of Eric Beasley?

10        A.   No, I do not.

11        Q.   And as we've said, this was taken not in 2003

12   when you met him, but more than a year earlier.  Having

13   seen this information, do you have any refreshed memory

14   as to the height and weight of Mr. Beasley on the day

15   that you met him?

16        A.   No.

17        Q.   Do you know who Eric O'Connor is?

18        A.   Not that I recall, no.

19        Q.   If I told you that Eric O'Connor was a black

20   employee who worked at WearGuard at the time of these

21   events, would that refresh your memory?

22        A.   No.

23        Q.   If I suggested to you that Mr. Eric O'Connor

24   worked in the customer embroidery department, would
```

```
 1    that ring any bells?
 2         A.   I have no knowledge.
 3                   MR. CALLANAN:  Let me just have this as
 4    Exhibit 3.
 5                        (Hess Exhibit No. 3 marked for
 6                        identification.)
 7         Q.   Mr. Hess, please look at what's been marked as
 8    Exhibit 3.
 9                   (Document handed to the witness.)
10         Q.   I'll suggest to you that these are the
11    responses to the plaintiff's request for production of
12    documents which were directed to you, three pages.
13    Have you seen this document before?
14         A.   Yes, I have.
15         Q.   It's signed on your behalf by your attorney,
16    Mr. Lamkin.  And I just wanted to ask you a couple
17    questions regarding this.
18                        (Brief recess.)
19         Q.   Mr. Hess, Exhibit 3 which you have had a
20    chance to look at asks you about documents connected
21    with your interview of Eric Beasley on November 5,
22    2003.  I just briefly want to go through them.  The
23    answers indicate that you do not have in your
24    possession, custody or control most of the documents I
```

# EXHIBIT N

To: Security

From: John Cummings

Date: 11/17/03

*Give Security a copy*
*Any copies*
*11/17/03.*

**The attached individuals have been terminated effective 11/17/03. They are not allowed on any Wearguard property. If they are seen on the property notify Kathy Gillis or John Cummings immediately.**

**Joseph Lee**

**Anthony Souza**

**John Qualter**

**John Gomes**

**Jason Torres**

**Paul George**

**Carlos Ortiz**

**Jesus Ortiz**

**Eric Beasley**

**Richard Marsters**

**Jon Schempp**

**The above information is strictly confidential.**

**CONFIDENTIAL**

**ARA 0303**