UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ERIC E. BEASLEY,

    Plaintiff,

v.

ARAMARK UNIFORM AND CAREER
APPAREL, INC., and JAY HESS, JR.,

    Defendants

Civil Action No. 05-CV-10496-NMG

## AFFIDAVIT OF BARBARA CASAGRANDE

I, Barbara Casagrande, on oath depose and state as follows:

1.    I am over 18 years of age, am competent to testify, and have personal knowledge of the facts set forth in this Affidavit.

2.    I have been employed by WearGuard, now a division of ARAMARK Uniform and Career Apparel, Inc., for the last 14 years. I started my employment as a night shift supervisor, and have worked my way up to my present position of Director of Manufacturing, which I have held since approximately 2002. In that position, I am responsible for the entire manufacturing operation at the WearGuard facility in Norwell, Massachusetts, including the Custom Embroidery ("CE") Department and the Art Department. Before becoming Director of Manufacturing, I was Manager of the CE Department.

3.    WearGuard has a zero-tolerance policy for using, buying, or selling illegal drugs at work. That policy is stated in the Employee Handbook that is distributed to all employees. A copy of WearGuard's "Drug and Alcohol Free Workplace" policy is attached hereto as Exhibit A.

4.  In 1999, WearGuard hired Eric Beasley as a second-shift (3:30 p.m. to 12:30 a.m.) Machine Operator in the CE Department. In 2002, Mr. Beasley was promoted to the position of Digitizer in the Art Department, also on the second shift. I knew Mr. Beasley throughout the time he worked at WearGuard, but I did not directly supervise him.

5.  Some time in the Spring of 2003, Brian Caswell, one of the second shift CE Department supervisors, approached me to discuss concerns he had about possible illegal drug use by employees on the second shift. Mr. Caswell told me that several employees had approached him to report extensive drug use by other employees, although they would not disclose any names. Mr. Caswell also told me that he frequently observed groups of employees going out to the parking lot together and getting in each others' cars, then returning with glassy eyes and smelling like marijuana. He complained that the department was getting out of control, but he felt he could not do anything since he had not actually seen anyone using or dealing drugs.

6.  Mr. Caswell also told me about frequent rumors he heard to the effect that Eric Beasley was selling drugs to employees in the CE Department, and that Mr. Beasley was the "ring leader" of a drug ring. I also had heard similar rumors about Mr. Beasley from time to time.

7.  Around this same time, another CE Department supervisor, Mike Lowder, brought similar concerns about a drug problem to our attention.

8.  After receiving this information from Mr. Caswell and Mr. Lowder, I discussed it with Kathy McNeely, the Manager of the CE Department, and learned that Mr. Caswell and Mr. Lowder had discussed these issues with her, as well. At that point, Ms. McNeely and I felt the situation was serious enough to bring it to the attention of John Cummings, who was in charge of security for the Norwell facility.

9. Shortly thereafter, Ms. McNeely and I met with Mr. Cummings to explore how best to address the apparent drug problem. We discussed the information we had learned from Mr. Caswell and Mr. Lowder, and asked Mr. Cummings for recommendations on how to proceed. Mr. Cummings suggested that he address all of the employees at a floor meeting, tell them that management was aware of possible drug activity, and remind them about WearGuard's zero-tolerance policy for drugs in the workplace. We agreed with this approach, and Mr. Cummings made his presentation to the employees a short time later.

10. Mr. Cummings' speech seemed to have a positive effect for a brief period of time. The supervisors reported less suspicious activity, and the rumors of rampant drug use died down. However, after a month or so, these activities and rumors increased again to at least the level they had been before Mr. Cummings' speech. The rumors about Mr. Beasley's involvement as a drug "ring leader" continued, as well.

11. In early August 2003, I met with Mr. Cummings again. I explained to him that the problems we had discussed in our first meeting were still occurring, and that some further action needed to be taken to address the problems. I also told Mr. Cummings about the rumors of Mr. Beasley's involvement. Given these frequent rumors, we discussed the possibility of running a criminal background check on Mr. Beasley. In addition, Mr. Cummings explained various options that the company might pursue to find out which employees were buying, using, or selling drugs, and indicated that corporate security would be handling any further investigation.

12. From that point forward until November 6, 2003, I had no knowledge of any investigation by WearGuard. It was not until November 6, 2003 – the day after the "sting"

operation – that I learned that WearGuard had been conducting an investigation, and actually had placed an undercover operative on site to gather information.

13. Shortly thereafter, I was interviewed by Richard Sjoberg, whom I understood to be a private investigator that WearGuard had hired as part of its drug investigation. I gave Mr. Sjoberg substantially the same information that I had given to Mr. Cummings, as I have described above.

14. I have reviewed the section of Mr. Sjoberg's report summarizing his interview with me [ARA 0239 to ARA 0241]. Mr. Sjoberg's report accurately summarizes the information that I provided to him.

15. WearGuard did not replace Mr. Beasley after he was fired, nor did WearGuard seek to fill that position. First, WearGuard was in the process of outsourcing many of the Art Department functions, so there was no need to maintain a full headcount in the department by replacing Mr. Beasley. Second, any replacement would require training, and we were unable to find a trainer who was available to work the second shift.

**I DECLARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT. EXECUTED ON MARCH 1, 2006.**

/s/ Barbara Casagrande
Barbara Casagrande

## CERTIFICATE OF SERVICE

     I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on March 2, 2006, and that there are no non-registered participants.

                                       /s/ Brian H. Lamkin
                                       Brian H. Lamkin (BBO No. 635688)

# EXHIBIT A



# The BEST People Work Here
## WearGuard™-CREST®

Your Guide to the Policies, Procedures, Benefits and Services of WearGuard-Crest

A DIVISION OF ARAMARK UNIFORM & CAREER APPAREL, INC.

ARA 0073

## drug and alcohol free workplace

WearGuard-Crest is committed to maintaining a workplace that is free of illegal drugs and alcohol. As such, the Company will not tolerate any employee possessing selling, dispensing, receiving, using or under the influence of alcohol or illegal drugs on Company property, or any employee being in the presence of somone engaging in such activity.

For the purposes of this policy, illegal drugs shall include those substances controlled under Federal or state law that are not authorized for sale, possession or use, as well as any legal drugs that are obtained or distributed illegally.

## violence in the workplace

It is against Company policy to verbally or physically threaten another employee. In an effort to provide a safe and comfortable workplace, violence and threats of violence, either verbal or physical, will not be tolerated in the workplace.

All acts or threats of violence committed by an employee in the workplace will be investigated. Upon completion of the investigation, WearGuard-Crest will take such response and disciplinary actions that it deems necessary and appropriate.

The reporting of acts or threats of violence is the proper course of action. Employees are expected to cooperate and fully disclose information pertaining to an investigation. Any behavior that impedes an investigation may result in disciplinary action. No employee will be subject to any form of retaliation or discipline for reporting a violent act or threat or for cooperating in any investigation.

To report violence or a threat of violence of any kind, employees should immediately contact one of the following persons:

| | |
|---|---|
| Your Supervisor | x____ |
| Security | x4000 |
| Vice President of Human Resources | x4388 |
| Director of Human Resources | x4385 |
| Manager of Human Resources | x4378 |







ARA 0086

# Rules & Regulations

Common sense is usually a reliable guide as to what is unacceptable behavior in a service business. The following is a partial list of prohibited actions.

1. Conduct endangering the life, safety or health of any employee.
2. Failure to comply with all Federal and state laws.
3. Failure to report illegal actions.
4. Participating in company theft or having knowledge of company theft without making it known to Management.
5. Insubordination or refusal to follow instructions of Supervisors or Managers.
6. Malicious or willful damage or destruction of Company property, or damaging or destroying through negligence or carelessness Company property or that of coworkers, visitors or customers.
7. Falsifying or misrepresenting personal or Company records.
8. Falsifying or misrepresenting employment records.
9. Disclosing confidential Company information and/or misrepresenting Company information.
10. Possessing, using or being under the influence of alcohol or any illegal drugs on Company time or Company property, or being in the presence of someone engaging in such activity.
11. Possessing dangerous or deadly weapons on company time or on Company property.
12. Fighting with, assaulting, harassing or threatening harm to another employee or any person on Company premises or Company time.
13. Smoking in unauthorized areas as designated by the Company.
14. Inefficient, unsatisfactory, negligent or careless performance of duties.
15. Utilizing another employee's identification badge or allowing someone else to use your badge.
16. Intimidating, coercing or using obscene or abusive language toward another employee, visitor or customer.
17. Parking in unauthorized areas as designated by the Company.
18. Failure to abide by the Company policies.
19. Malicious gossip or a derogatory attack on a fellow employee.
20. Gambling or soliciting on Company property.
21. Working on personal projects on Company property, machines or time, unless given written permission by a Supervisor.
22. Failure to observe prescribed safety rules and procedures.