**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**
_____

ERIC BEASLEY,
                    Plaintiff,

v.                                                    Civil Action No. 05-10496-NMG

ARAMARK UNIFORM AND CAREER
APPAREL, INC., and JAY HESS, JR.,
                    Defendants.
_____/

## OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff, Eric Beasley ("Beasley"), pursuant to Rule 56 and Local Rule

56.1, hereby opposes the Motion for Summary Judgment of the defendants,

Aramark Uniform And Career Apparel, Inc. ("Aramark") and its WearGuard

division and Jay Hess, Jr. ("Hess") on the following grounds:

### I. Introduction

This is an action under Massachusetts General Laws, Chapter 151B

("Chapter 151B") in which Beasley claims race discrimination against his former

employer, the WearGuard division ("WearGuard") of Aramark. (Counts I and II),

and against Hess, Aramark's Manager of Corporate Security (Counts III and IV).

The defendants seek summary judgment on all counts.

### II. Summary of Plaintiff's Position

Beasley, an African American employee of WearGuard, was suspended

and discharged in November 2003 following a lengthy investigation of suspected

1

drug use and dealing by employees of the WearGuard division of Aramark in Norwell, Massachusetts.  The investigation included a police "sting" operation and the use of an undercover operative in the workforce under the personal direction of Hess. The reason eventually given for Beasley's discharge was "violation of company drug policy."

Although the investigation focused on many employees, the *only* employee interviewed by Hess at the WearGuard facility was Beasley.  During the November 5, 2003 interview, Beasley denied any drug use or dealing.  Hess replied: "Oh, come on, I know your kind loves to sell drugs."  Hess then threatened Beasley by advising him "to resign before we get you, because we will get you".

On the day following Hess' unmistakable racial slur, Beasley was suspended without pay and escorted from the WearGuard premises.   Eleven days later, on November 17, 2003, a WearGuard human resources employee, Gail O'Connell, phoned Beasley at home to inform him he was terminated immediately.   When Beasley asked for a reason, O'Connell said she could not tell him.

The record shows there was no real evidence, only rumors, of Beasley's involvement in drug activity at WearGuard.   For example, the undercover operative ---an African American woman posing as a cleaning employee --- reported observing drug activity by an employee named "Eric", who she identified as a black male who wore an "eye piece".   It is undisputed that Beasley did *not* wear an eye piece, but another African American employee, Eric O'Connor, did.

2

Despite this fact, Beasley was suspended and discharged. O'Connor continues to be employed by WearGuard.

WearGuard also relied on a hand-written statement of employee, Carlos Ortiz, dated November 6, 2003 and witnessed by Hess at the Norwell police station. The statement implicated "Eric" in drug dealing at work. WearGuard relied on this statement in deciding to suspend and discharge Beasley despite the fact that Carlos Ortiz disavowed his statement four days later on November 10, 2003. He did so during an interview with Richard Sjoberg, a private investigator retained by WearGuard, who worked closely with Hess.

Under these circumstances, it is clear that Hess' racial slur poisoned WearGuard's investigation of Beasley and was a contributing factor in its decision to suspend and discharge him. This conclusion is reinforced by the fact that WearGuard ignored reports of undercover operative indicating that suspected drug activity, attributed to Beasley, was actually the activity of Eric O'Conner, another African American employee. In addition, WearGuard knew the statement of Carlos Ortiz implicating Beasley in drug activity had been disavowed by its author a week *before* Beasley was discharged.

Hess was involved from the outset of the investigation in August 2003. He personally directed the undercover operation at WearGuard from September to November and was in daily contact with John Cummings, WearGuard's Director of Facilities and Security. Hess participated in meetings with WearGuard management including Susan Magrini, Vice President of Human Resources, the individual identified as making the decisions to suspend and discharge Beasley.

Indeed, Magrini testified that; "We decided to suspend him (Beasley) that morning".  Magrini explained that "we" meant Hess and Cummings.  [See par. No. 54 & 55 below]  To suggest that Hess ---who demonstrated racial bias toward Beasley--- had no role in WearGuard's decision to suspend and terminate Beasley's employment is to ignore the facts and circumstances of this case, as well as the reality of corporate decision-making.

In short, race was a factor in the decision to suspend and discharge Beasley.

III.    <u>Beasley's Statement of Material Facts Pursuant To Local Rule 56.1</u>
        <u>As To Which There Exists A Genuine Issue To Be Tried</u>

The following numbered paragraphs (corresponding to the numbered paragraphs of Defendants' Statement Of Undisputed Facts) are controverted by Beasley:

<u>Beasley's Employment With WearGuard</u>

1.    Beasley was employed by WearGuard from March 22, 1999 until November 17, 2003.  He first worked in the customer embroidery department and was later promoted to a position in the art department.  [Beasley Affidavit par. 2 attached]  Barbara Casagrande ("Casagrande") supervised both departments which were located side-by-side on the first floor of the Norwell facility.  [Beasley Aff. par 3]

2.    Beasley was earning $13.75 per hour, or about $28,000 per year, when he was discharged.  [Beasley Dep. 166][1]

4.    On November 17, 2003, Gail O'Connell ("O'Connell) phoned Beasley

---

[1] Referenced portions of the Beasley deposition are attached hereto as Exhibit A.

at home to say that Kathy Gillis ("Gillis") , WearGuard Director of Human
Resources, asked her to notify Beasley that he was terminated immediately.
When Beasley asked for the reason, O'Connell indicated she could not tell him.
[Beasley Dep. 139]

<u>WearGuard's Discriminatory Animus Toward Beasley</u>

6.    Beasley's claims of race discrimination are based on several incidents
including:  Hess' racial slur that "your kind loves to sell drugs" followed by his
threat to "get you", both uttered during his November 5, 2003 interview of
Beasley [Beasley Dep. 122, 127];  Kathy Gillis' November 6, 2003 statement to
Beasley "that you probably won't be back" when she suspended him without pay
[Beasley Dep. 134-135]; and an incident in 1999 when a WearGuard supervisor
named Tim called Beasley "a stupid N-I-G-A", a racial epithet for which he later
apologized. [Beasley 84-85]

8.    On November 5, 2003 at about 9 p.m., while a "sting" operation was
being conducted at WearGuard by the Norwell Police, Beasley was called to the
custom embroidery conference room to meet with Hess.  John Cummings
("Cummings") and another unidentified man left the room when Beasley arrived.
Hess said he was here from Philadelphia for a theft investigation and gave
Beasley his business card.  Hess said Beasley's name had come up on several
occasions regarding drug deals.  When Beasley denied selling drugs, Hess
replied: "Oh, come on, I know your kind loves to sell drugs."   Hess then told
Beasley that the police had his car surrounded by dogs in the parking lot and he
assumed there were drugs in his car.  Hess asked if the police could search his

car.  Beasley replied that his car was in the body shop in Weymouth for repairs.

Hess then told Beasley that he had been followed everyday going to work from

Brockton and "we know you are the go to guy" for drugs.  Beasley replied that he

lives in Weymouth, not Brockton.  Hess asked if Beasley wanted to talk with the

police who were on the premises conducting a "sting".  Beasley declined stating

there was no reason to talk with the police.  Hess also advised Beasley "to resign

before we get you, because we will get you."  Beasley then returned to work.

[Beasley Aff. par. 5,6; Beasley Dep. 106-107; 120-125, 127.]  After finishing the

interview, Hess spoke to Cummings and Gillis or Susan Magrini ("Magrini"),

Wearguard's Vice President of Human Resources, telling them that nothing

relevant came out of the interview and indicating that Beasley denied any

wrongdoing.  [Hess Dep. 133-135][2]

     10.  On November 6, 2003, when Beasley reported to work at 2 p.m., he

was called to a meeting with Cummings and Gillis who asked what he knew

about drug use and theft at work. [Beasley Aff. par. 7; Beasley Dep. 134]

When Beasley denied knowledge or involvement in drug use or theft, Gillis said

she did not believe him.  Gillis told Beasley he was suspended indefinitely

without pay and directed him to leave the premises immediately.  When Beasley

said he would be embarrassed or humiliated to return to work after the

investigation, Gillis replied: "You don't have to worry about that because you

probably won't be back."  [Beasley Aff. par 7; Beasley Dep. 106; 134-135]

     13.  In 1999 when Tim, a WearGuard supervisor, called Beasley a "stupid

N-I-G-A", Beasley "walked off the floor".  About 20 minutes later, Tim apologized

---

[2] Referenced portions of Hess' deposition are attached hereto as Exhibit B.

to Beasley and offered to shake hands.  Beasley did not shake his hand, but told

Tim he would forgive him for what he said.  [Beasley Dep. 84-85]

<u>Beasley's Understanding Of WearGuard's Drug-Free Policy</u>

18.  Beasley's "understanding" that WearGuard had the right to fire him if

it believed he was involved with illegal drugs at work, even if that belief was

mistaken, was acknowledged in response to a question to which his counsel

posed an objection.  [Beasley Dep. 113]

<u>Rumors Of Drug Activity At WearGuard</u>

20.  In the Spring of 2003, Brain Caswell, a second shift supervisor, told

Casagrande about "frequent rumors" that Beasley was selling drugs to

employees and was the "ring leader" of a drug ring.[Casagrande Aff. par 5,6] [3]

28.  It was not until early August 2003 that Casagrande told Cummings,

(who was in charge of security at Norwell) about the rumors of Beasley's

involvement.  [Casagrande Aff. par 8, 11]

31.  The report of Richard Sjoberg ("Sjoberg") dated August 5, 2003

includes a Milton Police Department Custody Report dated May 18, 2002 with a

photograph of Beasley describing him as 6' 3" in height, weighing 255 with a date

of birth of "10/11/70".  Both the police report and Sjoberg's letter show Beasley's

residential address in Weymouth.  [Sjoberg's Report, Exh. C attached] [4]

<u>The Undercover Operation and The "Sting"</u>

34.  Hess traveled to Norwell for the first time on August 21, 2003 and

met with Cummings, Gillis and Magrini [Hess Dep. 25]

---

[3] Casagrande's Affidavit is attached.
[4] Referenced portions of Sjoberg's Report are attached hereto as Exhibit C.

35.    Both Magrini and Cummings mentioned Beasley's name to Hess "as a person dealing drugs". [Hess Dep. 27-28]

36.    The undercover operative, Nechanta "Shawna" Alexander, was a 32 year old African American women from Atlanta, Georgia and who had previously worked with Hess for Aramark. [Hess Dep. 42-44]

39.    The Undercover Operative Reports refer to WearGuard employees by first-name only, with designations such as: "A-1" or "A-2". [_See_ Exhibit G attached to Defendants' Statement of Undisputed Facts, pages ARA 151-229; [See ARA 190 for "A-6" designation of "Eric"] The pages containing references to "Eric" do not include the corresponding pages entitled "List Of Employees" containing a description of each employees. These pages (Bates-stamped by Aramark: ARA 192-193; 202-203; 214-215; 225-226; and 234-235) are attached hereto as Exhibit D.   In each of the five Lists of Employees, "Eric" (designated "A-6") is described as follows: "African American male, approximately 30 years of age, 6'0" tall, 200 lbs, _eye pierced_." (_Emphasis added_)

The Undercover Operative Reports also include the following entries: "Eric is real cool. He is a supervisor." [ARA 151]; "Eric…is the big black guy with an ear ring in his eye." [ARA 177]; "The Operative attempts to bring up Eric (A-6) in conversation…" [ARA 190].

40.  The reference to "Eric" at ARA 176-177 mentions no last name and the corresponding List of Employees [ARA 192] describes "Eric" as an African American male… with "eye pierced".

41.  The reference to "Eric" at ARA 221 mentions no last name and the corresponding List Of Employees [ARA 225] describes "Eric" as an African American male… with "eye pierced".

43. & 44.  The 13 page Operations Report Recap[5] prepared for Hess and dated November 4, 2003 contains only two references to Eric Beasley: (1) that he had interaction with an employee named Carlos Ortiz ("Ortiz") [ARA 629]; and (2) that an employee named "John" was observed "on several occasions driving an Audi registered to Eric Beasley". [ARA 633]

48.  Beasley was the only WearGuard employee interviewed by Hess at the WearGuard facility.  [Hess Dep. 91]  Hess did not tell Hess that the police could not search anything of his unless they had a warrant.  [See No. 8 above]

51.  The statement signed by Ortiz at the Norwell police station on the night of November 5-6, 2005 states that Ortiz bought "bags of weed" from "Eric" several times at WearGuard.  Ortiz's statement is attached hereto as Exhibit F. No last name appears after "Eric".  On November 10, 2003, Ortiz disavowed his statements about "Eric" in an interview with Sjoberg and Cummings on a park bench in Holbrook.  [Cummings Dep. 136-139]  According to Sjoberg's November 25, 2003 report to Cummings regarding follow-up interviews, Ortiz stated: "I only wrote down at the police station about Eric (Beasley) so I could get bailed. It's not true." [ARA 251]  Ortiz also stated: "I don't even know Eric (Beasley) except to say Hi.  I didn't even know he (Eric Beasley) sold or smoked weed." [ARA 252]  Copies of ARA 238, 251, 252 and 261 of

---

[5] The Operations Report Recap is attached hereto as Exhibit E.

Sjoberg's report are attached hereto as Exhibit G.  Hess acknowledged that Ortiz's verbal statement to Sjoberg and Cummings on November 10, 2003 "contradicts" his written statement that Hess witnessed.  [Hess Dep. 139]

### The Decision To Suspend Beasley And Other Employees

54. & 55.  Magrini testified: "We decided to suspend him (Beasley) that morning" (November 6, 2003). [Magrini Dep. 33-34][6] When asked about "we", Magrini stated: "Myself probably, John Cummings and Jay Hess".  [Magrini Dep. 34]   Magrini met with Hess and Cummings with regard to the suspension decisions.  [Magrini Dep. 35-36]   Cummings and Gillis were "probably" present with Magrini when the decision was made to suspend certain employees.  [Magrini Dep. 65-66]  Hess stated he participated in one or two meetings with Magrini, Cummings and Gillis by conference call between November 6, 2003 (when Beasley was suspended) and November 17, 2003 (when Beasley was terminated).  [Hess Aff. par 21]   Hess states the conference calls were to discuss "what they were doing with multiple individuals", including Beasley, in terms of their employment. [Hess Dep. 130-131]

57.  The decision to suspend employees was not made by Magrini alone, but rather by Magrini, Hess, and Cummings.  [Magrini Dep. 33-36]

### The Interviews Of Employees By Richard Sjoberg

59.  In August 2003, at the request of Cummings, Sjoberg, a private investigator, conducted a criminal background check on Beasley. [See Sjoberg Aff. par 4-7] [7]

---

[6] Referenced portions of Magrini's deposition are attached hereto as Exhibit H.
[7] Sjoberg's Affidavit (without exhibits) is attached.

60.   Two employees terminated following the drug investigation, Rick Marsters and Jason Torres, were not interviewed by Sjoberg.  [See Exhibit G, ARA 238]

62.   Beasley was on suspension when he was interviewed by Sjoberg on November 17, 2003 and he was informed of his termination later the same day.  [Beasley Dep. 134, 139]

65.   Since Sjoberg and Cummings met daily with Magrini and Gillis between November 10 and 17, 2003, Magrini was aware ---a week *before* the decision to terminate Beasley--- that Ortiz had disavowed his written statement implicating "Eric" in drug dealing.  [Sjoberg Aff. par 12; See No. 51 above]

66.  See facts in No. 54 & 55 above.

67. & 68.  Witnesses interviewed by Sjoberg (immediately after the police "sting" at the Wearguard facility) reported rumors and hearsay information about Beasley.  No one provided direct evidence of Beasley's involvement with drug activity.  Beasley was already suspended from WearGuard on November 6, 2003 when Sjoberg began to interview employees.  [Beasley Dep. 134]  Hess, Cummings and Gillis had rejected Beasley's denials and decided ---based on rumor and hearsay information--- that he was involved in drug activity.  [Hess Dep. 127; Beasley Dep 134-135]   The lengthy undercover operation and the November 5 "sting" yielded no real evidence against Beasley.

<u>The Other "Eric"</u>

71.   The reports of the undercover operative repeatedly identify "Eric" (designated "A-6") as an "African American male, approximately 30 years of age, 6'0" tall, 200 lbs, eye-pierced".  [See No. 39 above]   Eric O'Connor ("O'Connor"), an African American male, currently employed by WearGuard, wears an eye-piece and was employed in 2003.  [Cummings Dep. 22-23, 153][8]   O'Connor worked with Beasley at WearGuard in 2003. [Beasley Dep. 96, 102]  O'Connor wore an eye piece.  [Beasley Aff. par. 9] WearGuard employees receive a photo ID when hired.  [Magrini Dep. 70; Cummings Dep. 154]  A photograph of O'Connor [ARA 769], used for his employee ID badge, shows an eye piece in his right eye brow. [See Exhibit J attached; Magrini Dep. 125-126]   Beasley has never worn an eye piece.  (Beasley Aff. par 10]  Hess did not recall seeing any facial jewelry when he interviewed Beasley on November 5, 2003.  [Hess Dep. 79-80]

73.   The Undercover Operative Reports refer to an "Eric" described as an African American male who wears an "eye piece".  [See facts in No. 39 & 79 above]

77.   Beasley believes he was the only African American Employee terminated by WearGuard following the drug investigation in November 2003.  [Beasley Aff. par 11] Magrini was unable to identify John Gomes' race from his photograph.  [Magrini Dep. 79]

---

[8] Referenced portions of Cummings deposition are attached hereto as Exhibit I.

79.   Magrini did not act alone in deciding to suspend and terminate Beasley.  [See facts in No. 54 & 55 above]  During the undercover operation detailed reports of the observations of the undercover operative went to Hess who forwarded them to Cummings.  [Cummings Dep. 78-80; Hess Aff. par 10]  Cummings, in turn, regularly kept Magrini apprised of the progress of the undercover operation.  [Cummings Dep. 46]   Information about the undercover operation came to Magrini "through talking with Jay Hess and John Cummings" and the Norwell police.  [Magrini Dep. 56]

81.  See facts in No. 54, 55 & 79 above.


<u>IV. Summary Judgment Standard</u>

Pursuant to Rule 56(c), summary judgment may enter only when no genuine issue of material fact exists and the moving party is entitled to a judgment as a matter of law.  In making the determination whether a genuine issue of material fact exists, the Court must draw inferences from the underlying facts in the light most favorable to the party opposing the motion.  *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986)   Also, the Court must resolve against the moving party all doubt concerning the existence of a material fact.

## V.  Argument

### (1)  A Genuine Issue Of Material Fact Exists As To Whether Hess Uttered A Racial Slur During His Interrogation Of Eric Beasley.

It is undisputed that Hess interrogated Beasley in a conference room at WearGuard on the night of November 5, 2003 for about 15 minutes.  No one else was present.  What was said by Hess and Beasley is contested.  Beasley, an African American, states that Hess, manger of corporate security, uttered a racial slur when he said: "Oh, come on, I know your kind loves to sell drugs." Hess's statement, according to Beasley, came after Beasley denied any knowledge or involvement in drug activity at WearGuard which Hess was investigating.   Beasley claims Hess also said he knew Beasley was "the go to guy" for drugs and advised Beasley "to resign before we get you, because we will get you."   Hess denies making any statements referring to Beasley's race.

The disputed racial slur by Hess on November 5, 2003 is a material fact in this case because on the following day, when Beasley reported for work, he was suspended without pay and told to leave immediately.  When Beasley said it would be humiliating to return to work after being suspended, he was told by Cathy Gillis, manager of human resources, not to worry because "you probably won't be back".  Eleven days later, Beasley was notified by phone that he was discharged for violation of company policy.  He asked what policy he violated, but the caller said she could not tell him.  He later learned that the reason given by WearGuard for his termination was "violation of company drug policy".

The defendants argue that because Hess was not Beasley's supervisor and had no authority to suspend or discharge him, the racial slur had nothing to

14

do with WearGuard's decision to discipline Beasley.  They point out the decision to suspend and discharge was made by Susan Magrini, vice president of human resources at the Norwell facility.

This contention overlooks the central role Hess played in the drug investigation of WearGuard employees beginning in August 2003 and ending in November 2003.   Hess was directly involved from the outset.  In particular, he personally supervised the undercover operation culminating in a "sting" by the Norwell police at the WearGuard facility on the evening of November 5, 2003. Hess worked closely with John Cummings, head of security at Norwell and with Susan Magrini and Cathy Gillis of the human resources department.

For example, facts summarized in paragraphs 54, 55 and 56 above demonstrate the direct influence Hess had in decision-making effecting WearGuard employees,  including Beasley.  The purported decision-maker, Susan Magrini, acknowledged that the decision to suspend Beasley and other employees was not made alone, but rather was made with John Cummings and Jay Hess.   Since Beasley was suspended less than 24 hours after Hess' racial slur, it is unrealistic to suggest that Hess' demonstrated bias toward Beasley was not a factor in the suspension decision.

Accordingly, Hess's disputed racial slur can be seen as direct evidence of racial animus on the part of WearGuard through its manager of corporate security who participates in the decision to suspend the plaintiff less than 24 hours later.  Such statements by a decision-maker can support an inference of discrimination and rise to the level of direct evidence.  See *Dominguez Cruz v.*

*Suttle Caribe, Inc.*, 202 F.3d 424, 433-434 (1st Cir. 2000).  Thus, whether or not Hess uttered a racial slur in this case is a material fact as to which there exists a genuine issue to be tried.

> **(2)  A Genuine Issue Of Material Fact Exists As To Whether WearGuard Intentionally Attributed The Reported Conduct Of Eric O'Connor To The Plaintiff, Eric Beasley, In Deciding To Suspend And Terminate Beasley's Employment.**

Although Beasley's name was mentioned to Hess during his first visit to Norwell in August 2003, no real evidence of Beasley's involvement in drug activity was produced during the lengthy investigation.   Indeed, the undercover operative's reports, which Hess reviewed on a daily basis, consistently describe "Eric" as an African American employee who wore an "eye piece" at work.  Although there was another African American employee named "Eric" at  WearGuard during the drug investigation, namely Eric O'Connor, no one other than the undercover operative (and Beasley) seemed to know this.

In fact, Eric O'Connor wore an eye piece as described by the undercover operative in her reports which Hess reviewed daily.  Nevertheless, even Hess disclaims any knowledge that there was "another Eric".  As a result, the reports of drug related activity by Eric O'Conner were attributed---erroneously or deliberately--- to Eric Beasley, who was subsequently suspended and discharged for violating the company drug policy.  The single person who should have recognized this situation was Hess, who personally supervised the undercover operation.

It is undisputed that Beasley did not wear an eye piece or any facial jewelry.  In fact, Hess himself observed that Beasley wore no facial jewelry when he interrogated him on November 5, 2003.

For these reasons, a genuine issue of material fact exists as to whether WearGuard, through the conduct and bias of Hess, its manager of corporate security, deliberately attributed the reported drug activity of Eric O'Connor to Eric Beasley in deciding to suspend and terminate Beasley's employment.

VI.  Conclusion

For the foregoing reasons, there are genuine issues of material fact to be tried in this case and the defendants' motion for summary judgment should be denied.

> ERIC BEASLEY
>
> By his attorney,
>
>
> /s/ Kevin B. Callanan____
> Kevin B. Callanan, BBO#070620
> Law Office of Kevin B. Callanan
> 17 Accord Park Drive – Suite 101
> Norwell, MA  02061
> 781-878-1604

Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic (NEF) on March 15, 2006, and that there are non-registered participants.

> /s/ Kevin B. Callanan____
> Kevin B. Callanan

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

ERIC BEASLEY,
              Plaintiff

     v.                                Civil Action No. 05-10496-NMG

ARAMARK UNIFORM AND CAREER
APPAREL, INC., and JAY HESS, JR.,
              Defendants
_____/

## <u>AFFIDAVIT OF ERIC BEASLEY</u>

I, Eric Beasley, on oath depose and state as follows:

1.     I am over 18 years of age, am competent to testify, and have personal knowledge of the facts set forth in this Affidavit.

2.     I was employed by WearGuard, a division of Aramark in Norwell, MA from March 22, 1999 until November 17, 2003.

3.     I worked as a machine operator in the custom embroidery department and later was promoted to the position of digitizer in the art department.  These departments were adjacent to each other on the first floor of the Norwell facility.  Barbara Casagrande had supervisory responsibility for both departments.

4.      During my employment with WearGuard, I was never a supervisor.

5.      On November 5, 2003 at about 9:00pm while at work, I was called to the custom embroidery conference room to meet Jay Hess, Jr.  John Cummings and another man I did not know left the room when I arrived.  Hess gave me his business card indicating that he was manager of corporate security for Aramark.  He told me he was conducting a theft investigation and that my name had come up regarding drug activity at WearGuard.   When I denied any knowledge or involvement in drug activity, Hess said: "Oh, come on, I know your kind loves to sell drugs".  Hess said my car was surrounded by dogs in the parking lot and he assumed there were drugs in the car.  He asked if the police could search the car.  The police were conducting a "sting" operation at WearGuard at the time.

6.      I told Hess my car was in the body shop in Weymouth for repairs. Hess told me that I had been followed going to work each day from Brockton and he knew I was "the go to guy" for drugs.  I replied that I lived in Weymouth, not Brockton.  Hess asked if I wanted to talk to the police.  I said there was no reason for me to do so.  Hess told me "to resign before we get you, because we will get you."  I returned to work after the meeting which lasted about fifteen minutes.

7.      On November 6, 2003 I reported to work at 2:00pm.  I was called to a meeting with John Cummings, director of security and Cathy Gillis, director of human resources.  Gillis asked me what I knew about drug use and theft at work. When I denied any knowledge or involvement in such activity, Gillis said she did not believe me.  Gillis then told me I was suspended without pay and told me to leave the premises immediately.  I told Gillis I would be embarrassed and humiliated to return to work after being suspended.  Gillis said: "You don't have to worry about that because you probably won't be back."

8.      On November 17, 2003, Gail O'Connell, a WearGuard human resource employee, phoned me at home to tell me I was terminated immediately for violation of company policy.  I asked what policy I violated and she replied that she could not tell me.

9.      I have never used or sold drugs at WearGuard.  I have never provided drugs to any WearGuard employee.

10.     When I worked at WearGuard, I knew an employee named Eric O'Connor in the custom embroidery department.  Eric O'Connor is an African American male about 30 years old who wore an eye piece at work.

11.     I have never worn an eye piece or any other facial jewelry.  When I worked at WearGuard I was 6'3" tall and weighed about 255 pounds.

12.     I believe I was the only African American employee terminated by WearGuard following the drug investigation in November 2003.


I declare under the penalty of perjury that the foregoing is true and correct. Executed on March 15, 2006.


 /s/ Eric Beasley
Eric Beasley

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ERIC E BEASLEY,

      Plaintiff,

v.

ARAMARK UNIFORM AND CAREER
APPAREL, INC, and JAY HESS, JR.,

      Defendants

Civil Action No. 05-CV-10496-NMG

## AFFIDAVIT OF BARBARA CASAGRANDE

I, Barbara Casagrande, on oath depose and state as follows:

1.    I am over 18 years of age, am competent to testify, and have personal knowledge of the facts set forth in this Affidavit

2.    I have been employed by WearGuard, now a division of ARAMARK Uniform and Career Apparel, Inc, for the last 14 years. I started my employment as a night shift supervisor, and have worked my way up to my present position of Director of Manufacturing, which I have held since approximately 2002. In that position, I am responsible for the entire manufacturing operation at the WearGuard facility in Norwell, Massachusetts, including the Custom Embroidery ("CE") Department and the Art Department. Before becoming Director of Manufacturing, I was Manager of the CE Department.

3.    WearGuard has a zero-tolerance policy for using, buying, or selling illegal drugs at work. That policy is stated in the Employee Handbook that is distributed to all employees. A copy of WearGuard's "Drug and Alcohol Free Workplace" policy is attached hereto as Exhibit A.

4       In 1999, WearGuard hired Eric Beasley as a second-shift (3:30 p.m. to 12:30 a.m.) Machine Operator in the CE Department. In 2002, Mr. Beasley was promoted to the position of Digitizer in the Art Department, also on the second shift. I knew Mr. Beasley throughout the time he worked at WearGuard, but I did not directly supervise him.

5.      Some time in the Spring of 2003, Brian Caswell, one of the second shift CE Department supervisors, approached me to discuss concerns he had about possible illegal drug use by employees on the second shift. Mr. Caswell told me that several employees had approached him to report extensive drug use by other employees, although they would not disclose any names. Mr. Caswell also told me that he frequently observed groups of employees going out to the parking lot together and getting in each others' cars, then returning with glassy eyes and smelling like marijuana. He complained that the department was getting out of control, but he felt he could not do anything since he had not actually seen anyone using or dealing drugs.

6.      Mr. Caswell also told me about frequent rumors he heard to the effect that Eric Beasley was selling drugs to employees in the CE Department, and that Mr. Beasley was the "ring leader" of a drug ring. I also had heard similar rumors about Mr. Beasley from time to time.

7       Around this same time, another CE Department supervisor, Mike Lowder, brought similar concerns about a drug problem to our attention.

8.      After receiving this information from Mr. Caswell and Mr. Lowder, I discussed it with Kathy McNeely, the Manager of the CE Department, and learned that Mr. Caswell and Mr. Lowder had discussed these issues with her, as well. At that point, Ms. McNeely and I felt the situation was serious enough to bring it to the attention of John Cummings, who was in charge of security for the Norwell facility.

-2-

9.     Shortly thereafter, Ms. McNeely and I met with Mr. Cummings to explore how best to address the apparent drug problem. We discussed the information we had learned from Mr. Caswell and Mr. Lowder, and asked Mr. Cummings for recommendations on how to proceed. Mr. Cummings suggested that he address all of the employees at a floor meeting, tell them that management was aware of possible drug activity, and remind them about WearGuard's zero-tolerance policy for drugs in the workplace. We agreed with this approach, and Mr. Cummings made his presentation to the employees a short time later.

10.    Mr. Cummings' speech seemed to have a positive effect for a brief period of time. The supervisors reported less suspicious activity, and the rumors of rampant drug use died down. However, after a month or so, these activities and rumors increased again to at least the level they had been before Mr. Cummings' speech. The rumors about Mr. Beasley's involvement as a drug "ring leader" continued, as well.

11.    In early August 2003, I met with Mr. Cummings again. I explained to him that the problems we had discussed in our first meeting were still occurring, and that some further action needed to be taken to address the problems. I also told Mr. Cummings about the rumors of Mr. Beasley's involvement. Given these frequent rumors, we discussed the possibility of running a criminal background check on Mr. Beasley. In addition, Mr. Cummings explained various options that the company might pursue to find out which employees were buying, using, or selling drugs, and indicated that corporate security would be handling any further investigation.

12.    From that point forward until November 6, 2003, I had no knowledge of any investigation by WearGuard. It was not until November 6, 2003 – the day after the "sting"

- 3 -

operation – that I learned that WearGuard had been conducting an investigation, and actually had placed an undercover operative on site to gather information.

13.     Shortly thereafter, I was interviewed by Richard Sjoberg, whom I understood to be a private investigator that WearGuard had hired as part of its drug investigation. I gave Mr. Sjoberg substantially the same information that I had given to Mr. Cummings, as I have described above.

14.     I have reviewed the section of Mr. Sjoberg's report summarizing his interview with me [ARA 0239 to ARA 0241]. Mr. Sjoberg's report accurately summarizes the information that I provided to him.

15.     WearGuard did not replace Mr. Beasley after he was fired, nor did WearGuard seek to fill that position. First, WearGuard was in the process of outsourcing many of the Art Department functions, so there was no need to maintain a full headcount in the department by replacing Mr. Beasley. Second, any replacement would require training, and we were unable to find a trainer who was available to work the second shift.

**I DECLARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT. EXECUTED ON MARCH 1, 2006.**

/s/ Barbara Casagrande
Barbara Casagrande

- 4 -

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on March 2, 2006, and that there are no non-registered participants.

/s/ Brian H. Lamkin
Brian H. Lamkin (BBO No. 635688)

BOS_514404_2/BLAMKIN

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ERIC E. BEASLEY,

     Plaintiff,

v.

ARAMARK UNIFORM AND CAREER
APPAREL, INC., and JAY HESS, JR.,

     Defendants

Civil Action No. 05-CV-10496-NMG

## AFFIDAVIT OF RICHARD A. SJOBERG

I, Richard A. Sjoberg, on oath depose and state as follows:

1    I am over 18 years of age, am competent to testify, and have personal knowledge of the facts set forth in this Affidavit.

2    I am the President of Needham, Sjoberg & Associates, Inc. ("NSA"), a licensed private detective agency specializing in corporate investigations, surveillance, and employment screening. I have held that position for approximately the last 10 years.

3    Before founding NSA, I worked for more than 10 years in various investigative and corporate security roles, including several years as a Weymouth, Massachusetts police officer.

4    Around August 1, 2003, I received a call from John Cummings, the General Manager of Facilities and Security for WearGuard in Norwell, Massachusetts. Mr. Cummings asked me to run a criminal background check on a WearGuard employee named Eric E. Beasley.

5    I conducted the background check some time during the next few days  I verified Mr Beasley's Social Security Number, address, and date of birth  I also checked Mr. Beasley's driving record and his publicly available criminal record.

6.    Among other things, my investigation revealed that Mr Beasley had been charged with possession of marijuana in May 2002 after a traffic stop  According to the court records, the charge was dismissed on payment of $200.00 in court costs.

7    I prepared a report of my findings, and sent a copy to Mr Cummings on August 5, 2003  A true and accurate copy of my report is attached hereto as Exhibit A.

8.    Mr. Cummings called me on November 7, 2003. He told me that a number of WearGuard employees had been arrested for theft following an undercover "sting" operation, and that the undercover operative had discovered evidence of drug use and drug dealing (as well as theft of company property) at the Norwell facility  In an effort to find out more about this apparent drug problem, Mr Cummings asked me to interview a number of WearGuard employees, including the employees who had been arrested and those who had been suspended.

9.    Between November 10, 2003, and November 17, 2003, I interviewed approximately 15 individuals. Most of the interviews took place in a conference room at the Norwell facility. Mr Cummings attended those on-site interviews, as well as an off-site interview with Carlos Ortiz.

10    A number of the witnesses I interviewed identified Eric Beasley as an individual who both used and sold marijuana at WearGuard  Many of these witnesses described Mr. Beasley as someone who originally had worked in the Custom Embroidery Department, but was then promoted to a position in the Art Department

- 2 -

11.    On or about November 17, 2003, I interviewed Mr. Beasley at his attorney's office. Of the numerous WearGuard employees I interviewed, Mr. Beasley was the only one who requested the presence of an attorney. I asked Mr. Beasley whether he had ever possessed or used drugs at WearGuard, or was aware of other employees who had. He answered "no" to each of those questions.

12    During the period that I was conducting my interviews, Mr. Cummings and I met almost daily with Susan Magrini, the Vice President of Human Resources, and Kathy Gillis, a Director of Human Resources. I informed them of everything the witnesses I interviewed had told me.

13.    On or about November 25, 2003, I prepared a written report detailing my interviews, and provided that report to Mr. Cummings. A true and accurate copy of that report is attached hereto as Exhibit B.

14.    My written report fully and accurately sets forth the statements made to me by the individuals I interviewed

15.    All told, I spent 84.25 hours on the WearGuard investigation, for which I billed WearGuard $7,161.25. A true and accurate copy of the invoice I sent to WearGuard is attached hereto as Exhibit C.

**I DECLARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT. EXECUTED ON FEBRUARY 27, 2006.**

/s/ Richard A. Sjoberg
Richard A. Sjoberg

BOS_515092_3/BLAMKIN

# EXHIBIT G



# NSA, Inc.

## Needham, Sjoberg & Associates

### INVESTIGATIVE CONSULTANTS

*Corporate Fraud*
*Pre-Employment Profiles*

*Attorney Services*
*Video Surveillance*

November 25, 2003

**PERSONAL AND CONFIDENTIAL**

**WearGuard-CREST**
**An Aramark Company**
141 Longwater Drive
Norwell, MA 02061

**Attention:**   **Mr. John Cummings**
                **Director Of Security**

**Subject:**   **Employee Drug / Theft Investigation**
**RE:**        **Investigative Follow-Up Interviews**

Dear Mr. Cummings,

On Friday, November 7, 2003, you contacted this office to brief the investigator in regard to a recently completed internal investigation initiated through the Aramark Corporate Security Department. This investigation apparently resulted in the arrest of several WearGuard employees for various offenses involving drug possession and theft of company property.

Upon your request, this office initiated employee interviews of those employees arrested, as well as, additional employees placed on suspension as part of the completed investigation. The investigator was provided with details of the on-going investigation, as discussed with Mr. Jay Hess, Aramark Security Director.

The investigator initiated interview attempts to speak with the various employees related to this ongoing investigation. Enclosed are the results of those various interviews. The investigator notes after several attempts to speak with Rick Marsters & Jason Torres - both failed to respond to his best efforts.

**The following information was gathered through a series of interviews, as follows:**

CONFIDENTIAL       ARA 0238

*101 Federal Street • Suite 1900 • Boston, Massachusetts 02110 • Telephone (617) 342-3616 • Facsimile (781) 337-3935*

WearGuard-CREST
Subject: Employee Drug / Theft Investigation
RE: Investigative Follow-Up Interviews
Page 14

On **Monday, November 10, 2003,** the investigator and Mr. Cummings also spoke with the following employees noted within the scope of the on-going investigation:

> **Carlos Ortiz, 2ND Shift Custom Embroidery Operator**
> **Jon Schemp, 2ND Shift Custom Embroidery Operator**
> **Joe Lee, , 2ND Shift Custom Embroidery Operator**
> **John Qualtor, 2ND Shift Custom Embroidery Operator**
> **John Gomes, 2ND Shift Custom Embroidery Operator**
> **Anthony "Sketchy" Sousa, 2ND Shift Custom Embroidery Operator**

*Interview With Carlos Ortiz*
**The investigators met with Carlos Ortiz, who also brought his five year old son, on Monday, November 10, 2003 at 11:45AM; at a park along Route 37 in Holbrook, MA. Carlos Ortiz made the following statements:**

- Carlos Ortiz stated; "I smoke weed everyday before and during work. I have too."

- Carlos Ortiz stated; "I can't go a day without smoking weed."

- Carlos Ortiz stated; "I have one son - 5, two girls - 5 and a seven month pregnant girlfriend."

- Carlos Ortiz stated; "I look rough now cause I was up all night arguing my girl. She won't give up sex to me. That's what we are fighting about. A mans got his needs."

- Carlos Ortiz stated; "I told that fat black girl (UC) I wanted some black leather jackets. I told her what sizes and style."

- Carlos Ortiz stated; "She gave them to the drug dealer I brought her to in Brockton."

- Carlos Ortiz stated; "I don't even have the jackets. The drug dealer then gave one of the jackets to my mother and the other to my sister."

- Carlos Ortiz stated; "I only wrote down at the police station about Eric (Beasley) so I could get bailed. It's not true."

CONFIDENTIAL                ARA 0251

WearGuard-CREST
Subject: Employee Drug / Theft Investigation
RE: Investigative Follow-Up Interviews
Page 15

- Carlos Ortiz stated; "I don't even know Eric (Beasley) except to say Hi. I didn't even know he (Eric Beasley) sold or smoked weed."

- Carlos Ortiz stated; "I've only sold a few blunts (marijuana) to people while at work."

- Carlos Ortiz stated; "There about 40 other people how smoke weed at WearGuard."

- Carlos Ortiz stated; "I've smoked weed with John Trainer - he smokes every day."

- Carlos Ortiz stated; "I've smoked weed with the Cape Verdean (John Gomes). He's in the area next to mine."

- Carlos Ortiz stated; "Jon Schemp buys a 50 bag and sells dimes. When I bought a dime from him one hour before I got arrested - he had 3 or 4 more dimes on him."

- Carlos Ortiz stated; "I can't believe I didn't wait until the end of the night to buy off him (Jon Schemp). That was stupid. I didn't even need it until after work."

- Carlos Ortiz stated; "There's a guy in the 1st unit (Rich Marsters) with a goatee, earrings and a backpack who sells a lot of weed. He's got the good stuff - Hydro. 3.5 is $50 - that's expensive shit."

- **Carlos Ortiz subsequently contacted the investigator via telephone and asked if he could meet with WearGuard and his attorney to talk about him getting his job back. His contact telephone number is (781) 986-8033 - listed to a Robert Sullivan, 135 Chestnut Street, Randolph, MA 02368.**

- **The investigator asked Carlos about the reported vacation he took with Eric Beasley to Virginia. Carlos stated,"You just looking for information. You crazy. Man I never left Massachusetts in my life. I must have been so high that I slept walked through it." Carlos then abruptly hung up on the investigator.**

CONFIDENTIAL

ARA 0252

WearGuard-CREST
Subject: Employee Drug / Theft Investigation
RE: Investigative Follow-Up Interviews
Page 24

### Interview With Eric Beasley & Attorney Tom Brenner

Subsequently, the investigator set a meeting on **Monday, November 17, 2003**, with 2ND Shift Art
Department Digitizer, Eric Beasley. At Mr. Beasley's request, this interview was only to take place in
the presence of his attorney. Therefore, the investigator proceeded to the Law Office of Attorney Tom
Brenner at Two Battery March Park, Building #2, Quincy, MA at 3:00PM.

During this meeting, the investigator asked Eric Beasley three questions:

1.  **Eric, have you ever possessed drugs of any kind while at work at WearGuard?**
    Response Of Eric Beasley:  "No"

2.  **Eric, have you ever used drugs of any kind while at work?**
    Response Of Eric Beasley:  "No"

3.  **Eric, are you aware of any other co-worker or employee - during your 6 or 7
    year period of employment in possession of or using drugs of any kind while
    at work.**
    Response Of Eric Beasley:  "No, I'm a family man.  I keep to myself."

### Investigative Conclusion

As requested, the investigator's collected each individual piece of information gathered throughout this
extensive investigation. The investigators updated and provided vivid details of each interview with
WearGuard Human Resource Department Vice President, Sue Magrini & Director, Kathy Gillis;
as well as, Aramark Corporate Security Department and Aramark Attorney Steve Freidman.

The investigator provides this investigative report for your review and determination for employment
proceedings for each subject engrossed in this investigation. Should you have any questions, please
feel free to call our office at any time.

Respectfully Submitted,

Richard A. Sjoberg
President

CONFIDENTIAL

ARA 0261

# EXHIBIT A

Eric Beasley

Page 1

```
 1                                      VOLUME  I

 2                                      PAGES 1 - 179

 3                                      EXHIBITS  1 - 13

 4              UNITED STATES DISTRICT COURT

 5                 District of Massachusetts

 6       ---------------------------

 7    ERIC BEASLEY,

 8                     Plaintiff        Civil Action

 9    v.                               No. 05-CV-10496

10

11    ARAMARK UNIFORM AND CAREER

12    APPAREL, INC., and JAY HESS, JR.,

13                 Defendants

14       ---------------------------

15

16              DEPOSITION of ERIC BEASLEY

17            Friday, September 30, 2005

18              Edwards & Angell, LLP

19               101 Federal Street

20           Boston, Massachusetts  02110

21                 10:00 a.m.

22

23

24       ----------- CAROL A. CARUSO, CSR -----------
```

Eric Beasley

Page 82

1   A. I do not.
2   Q. How did you come to be talking to Joe about
3   this position?
4   A. I knew Joe, I knew he worked in the
5   department, and I asked him to tell me a little bit
6   about it.
7   Q. At the time that you asked him to tell you
8   about the position, did you know that there was an
9   opening?
10  A. Yes.
11  Q. Was it posted?
12  A. I'm not sure.
13  Q. How did you know there was an opening?
14  A. I'm not sure.
15  Q. Did you feel that you were qualified for the
16  position based upon your knowledge of it?
17  A. Yes.
18  Q. And your knowledge was limited to what Joe
19  Comoko had told you?
20  A. Yes.
21  Q. And I take it since you don't know who else
22  applied for the position, you don't know if those
23  people -- you don't know if there were any people,
24  and if there were, you don't know whether they were

Page 83

1   white, black, Asian, Hispanic, anything like that,
2   right?
3   A. Correct.
4   Q. And the same is true for whoever got that
5   job, if anybody?
6   A. Correct.
7   Q. What was Joe Comoko's race?
8   A. African American.
9   Q. Do you know if he had the same kind of job
10  in the computer room that you were applying for?
11  A. I believe so.
12  Q. Putting aside the drug investigation and
13  your termination from the company and this computer
14  room job that we just talked about, is there
15  anything else that happened at WearGuard that you
16  feel happened to you at WearGuard that you feel was
17  discriminatory?
18  A. Not that I can remember.
19  Q. And prior to the incidents that you
20  described in your Complaint relating to the drug
21  investigation, did anybody at WearGuard make any
22  comments to you that you perceived to be racist?
23  A. Repeat your question.
24  Q. Sure. I understand that one of your

Page 84

1   allegations in this case is that when you got called
2   in for interviews about this drug investigation that
3   certain individuals made racist comments to you,
4   that's one of your claims, right?
5   A. Yes.
6   Q. And that was in November of 2003?
7   A. Yes.
8   Q. Before November of 2003, had anybody at
9   WearGuard made any racist comments to you?
10  A. Yes.
11  Q. Who?
12  A. The supervisor Tim, a gentleman I
13  interviewed with.
14  Q. What did Tim say?
15  A. He called me a stupid N-I-G-A.
16  Q. How many times did he do that?
17  A. Once.
18  Q. When was that?
19  A. I don't recall, it was some time in '99 when
20  I was first hired.
21  Q. Shortly after you were hired?
22  A. I would say about six months after I was
23  hired.
24  Q. What did you do when he called you that?

Page 85

1   A. Walked off the floor.
2   Q. Did you tell anybody at WearGuard what he
3   had said?
4   A. I didn't.
5   Q. How come?
6   A. He came to me and apologized for it.
7   Q. How soon after he made the comment did he
8   apologize for it?
9   A. About 20 minutes.
10  Q. Do you remember more specifically what he
11  said?
12  A. Yes. I was on my way back in to the CE
13  department, he pulled me to the side, took me to the
14  conference room and said, you know, I just want to
15  apologize for what I said, when I saw you on the
16  phone, I lost it, I couldn't believe you was using
17  the phone on the floor, and I got a little out of
18  line, and I apologize. He put his hand out to shake
19  it and said, Can you please forgive me?
20  Q. And did you accept his apology?
21  A. I didn't shake his hand, but I told him I'll
22  forgive him for what he said.
23  Q. Did he say anything like that to you again?
24  A. No. He shortly resigned.

22 (Pages 82 to 85)

Eric Beasley

Page 94

1    A. I knew of him because in the wintertime he
2   used to walk around with a tank top on, and
3   individuals used to laugh at him and point him out,
4   like look at this guy who walks around like he has
5   muscles or something, and that's how he was
6   originally brought to my attention.
7    Q. What department was he, if you know?
8    A. He was hired for the CE department.
9    Q. Do you know when he was hired?
10   A. I do not.
11   Q. Do you know if he was working at WearGuard
12  before you started there?
13   A. He was not.
14   Q. So he was hired after you?
15   A. Yes.
16   Q. Were you in the CE department when he was
17  hired?
18   A. I don't think so.
19   Q. You were in -- was it the graphics
20  department?
21   A. Art.
22   Q. You were in the art department by then?
23   A. Yes.
24   Q. Did you ever speak with Mr. Ortiz?

Page 95

1    A. No.
2    Q. Were there any other employees named Ortiz
3   at WearGuard that you knew?
4    A. Not that I'm aware of.
5    Q. So you saw this guy around in a tank top,
6   and he was sort of a running joke around the
7   company, but you never spoke to him?
8    A. Correct.
9    Q. Did you ever see him using drugs?
10   A. No.
11   Q. How about buying or selling them?
12   A. No.
13   Q. Did you ever hear from anybody, any rumors
14  that he was buying or selling drugs?
15   A. No.
16   Q. Or using them?
17   A. No.
18   Q. Did you ever take a trip down to Virginia
19  with Mr. Ortiz?
20   A. No.
21   Q. Were you ever -- did you ever take a trip to
22  Virginia while you worked at WearGuard?
23   A. No.
24   Q. Have you ever been to Virginia?

Page 96

1    A. No.
2    Q. Did you ever take any trips anywhere with
3   Mr. Ortiz?
4    A. No.
5    Q. Did you go on any kind of vacations out of
6   the state while you worked at WearGuard?
7    A. Yes.
8    Q. Where did you go?
9    A. I went to South Carolina.
10   Q. Did you go to South Carolina with Mr. Ortiz?
11   A. No.
12   Q. Did you go to South Carolina with anybody
13  from WearGuard?
14   A. Yes.
15   Q. Who did you go with?
16   A. I went with Eric O'Connor and a gentleman by
17  the name of Trey, I'm not sure of Trey's last name.
18   Q. Eric O'Connor and Trey somebody, and what
19  departments were they in?
20   A. CE, custom embroidery department.
21   Q. Were either of them supervisors?
22   A. No.
23   Q. Just friends of yours?
24   A. Coworkers of mine.

Page 97

1    Q. When was this trip?
2    A. It was bike week, I believe it was in May.
3    Q. Bike week?
4    A. Just like Laconia have a bike week, same
5   thing in South Carolina, it was a bike week, all the
6   bikers go down there for a weekend.
7    Q. Are you a biker?
8    A. Now I am.
9    Q. Were you at the time?
10   A. No.
11   Q. Were Eric and Trey?
12   A. Eric was, Trey had a bike, didn't bring it.
13   Q. How did it end up that you went down to
14  North Carolina with these guys -- excuse me, South
15  Carolina?
16   A. Eric went a few years prior, always came
17  back, showed me pictures, told me what a great time
18  he was having, and I told him one of these years I'm
19  going to go with you. Prior to May actually coming,
20  he was, like, I'm booking my trip, do you want to
21  go? I was, like, Sure. Gave me a brochure of some
22  of the local homes and hotels down there, I called,
23  booked a room, I went.
24   Q. Did you physically travel down there with

25 (Pages 94 to 97)

Eric Beasley

Page 102

1    A. No.
2    Q. Did you ever hear Mr. Ortiz talking about
3    drugs?
4    A. No.
5    Q. You never bought or sold any drugs from him?
6    A. No.
7    Q. Are you aware that Mr. Ortiz gave WearGuard
8    a written statement saying that you sold drugs?
9    A. Yes.
10   Q. Have you seen that before?
11   A. Yes.
12       MR. LAMKIN: This is Exhibit 8, please.
13       (Document was marked Exhibit No. 8 for
14   identification.)
15   Q. By the way, before I ask you about that, do
16   you know -- or did you know, I should say, at the
17   time of any employee at WearGuard besides yourself
18   who are named Eric?
19   A. Yes.
20   Q. And how many others?
21   A. There was myself and one other that I was
22   aware of.
23   Q. Who was the other?
24   A. Eric O'Connor.

Page 103

1    Q. Right, the one you went down to South
2    Carolina with. And if you take a look at Exhibit
3    No. 8, is that the Carlos Ortiz statement that you
4    have seen?
5    A. Yes.
6    Q. And at the very beginning of the statement
7    he writes, "Two or three weeks ago I met Eric at my
8    machine and bought two bags of weed, which was
9    dimes. I bought weed off him on more than one
10   occasion, always on WearGuard's properties, about a
11   dozen times. It went from dimes to eighths, which
12   was $45." Is it your understanding that he was
13   referring to you?
14       MR. CALLANAN: Object to the form. I
15   was distracted by you said, "He writes the
16   statements," I don't know whether he wrote it or
17   not.
18   Q. You mean Ortiz. All right, fine, but I
19   asked him if this was the statement that he saw that
20   he thought was Ortiz's statement. I understand you
21   weren't there when he wrote this -- or were you?
22   A. I was not.
23   Q. Do you have an understanding one way or
24   another whether the Eric referred to in this

Page 104

1    statement is meant to be you?
2    A. I do not know.
3    Q. And did you ever sell bags of marijuana to
4    Carlos Ortiz?
5    A. No.
6    Q. You never saw anybody selling him bags of
7    marijuana?
8    A. No.
9    Q. Did you ever talk to Mr. Ortiz about this
10   statement?
11   A. No.
12   Q. When is the last time you saw him?
13   A. I would say September of, the end of
14   September of '03.
15   Q. So you haven't seen him since you were fired
16   from WearGuard?
17   A. I haven't seen him since.
18   Q. When did you first see this statement?
19   A. When my attorney brought it to my attention.
20   Q. So that was after you had been fired?
21   A. Yes.
22   Q. And you've never discussed this with
23   Mr. Ortiz?
24   A. No.

Page 105

1    Q. Other than your attorney, have you discussed
2    this statement with anybody?
3    A. No.
4    Q. And during the time that you were at
5    WearGuard, did you ever have any disagreements with
6    Mr. Ortiz?
7    A. No.
8    Q. Did you ever have any fights with him?
9    A. No.
10   Q. I take it you understand that this lawsuit
11   is about your allegations that WearGuard and Jay
12   Hess discriminated against you on the basis of your
13   race, is that right?
14   A. Yes.
15   Q. Tell me in your own words what it is you
16   think that WearGuard and Mr. Hess did that was
17   discriminatory, how do you feel they discriminated
18   against you?
19   A. Well, I feel that they discriminated against
20   me because of the comment he made to me, "Oh, come
21   on, I know your kind loves to sell drugs."
22   Q. So it's that comment  Is there anything
23   else that you feel was discrimination against you
24   either by the company or Mr. Hess?

27 (Pages 102 to 105)

Eric Beasley

Page 106

1    A. Yes, Kathy Gillis stating to me that -- I
2  was a little concerned about being humiliated when
3  they called me to the conference room and told me I
4  was being suspended without pay, and I mentioned to
5  her that I was embarrassed, humiliated, and I told
6  her that I am going to be embarrassed to come back
7  to this place once you guys finish your
8  investigation and realize I have done nothing wrong,
9  she mentioned to me that I don't have to worry about
10 that because I probably wouldn't have been back, I
11 am probably not coming back.
12    Q. Anything else?
13    A. No, those are the two things that stick out
14 in my head right now.
15    Q. So sitting here today, you think that the
16 ways that WearGuard and Mr. Hess discriminated
17 against you are by Mr. Hess saying, Come on, I know
18 your kind likes to do this, and Kathy Gillis saying
19 you don't have to worry because you probably won't
20 be back?
21    A. Correct.
22    Q. And were there any other comments that
23 anybody made to you at any time, other than the Tim
24 thing that we talked about that you felt were

Page 107

1  discriminatory?
2    A. Yes, Jay Hess mentioned that the police dog
3  was outside barking around my car, if he could
4  search it, and I indicated to him that if he wanted
5  to search my car he would have to go to the body
6  shop because my car was in the shop.
7    Q. Okay.
8    A. He said, Come on, I know your car is out
9  there, there is a Navy -- a dark color car. I
10 indicated to him, What color car? He said a Navy
11 blue car, a Corsica, he actually mentioned a
12 Corsica. I told him I don't own a Corsica, I never
13 owned a Corsica.
14    Q. What kind of car did you have at the time?
15    A. I had a Ford Explorer, a truck.
16    Q. And you say it was in the shop?
17    A. Yes.
18    Q. What shop?
19    A. Factory Collision.
20    Q. Where is that?
21    A. That's in Weymouth.
22    Q. Do you know the street address?
23    A. I don't.
24    Q. What was it doing in the shop?

Page 108

1    A. I was in an accident.
2    Q. When was the accident?
3    A. Excuse me?
4    Q. When was the accident?
5    A. I don't recall when the accident took place,
6  but I remember I had a rent-a-car at the time, and
7  my car was in the shop.
8    Q. What kind of rental car was it?
9    A. It was a tan little Spectrum, I want to say,
10 Optimum.
11    Q. A Kia, a Kia Spectra?
12    A. I believe it was like a Kia Spectra, a
13 small, little four-door car.
14    Q. Do you remember where you rented it from?
15    A. It either was Hertz -- I'm sorry, Enterprise
16 or Hertz, those are the two rent-a-cars in my
17 neighborhood that I use to go to, so either one of
18 the two.
19    Q. And those would have been in Weymouth?
20    A. Yes.
21       MR. CALLANAN: Excuse me, did you say
22 Hertz or Verk?
23    A. Hertz or Enterprise.
24    Q. Was that the car accident that led to the

Page 109

1  most recent personal injury lawsuit that you talked
2  about before?
3    A. I don't recall, I'm not sure if it's the
4  same accident.
5    Q. And the comments that Mr. Hess made to you
6  about the dog sniffing in the car, that was the same
7  night as the comment about, Oh, I know your kind
8  likes to do drugs?
9    A. Correct.
10    Q. Anything else that Mr. Hess said that you
11 felt was discriminatory?
12    A. Yes, he mentioned to me that I should resign
13 before they get me, because they will get me.
14    Q. Anything else?
15    A. That's all I can remember at the time.
16    Q. And other than the probably won't be back
17 comment, was there anything that Kathy Gillis said
18 that you felt was discriminatory?
19    A. Yeah, I just felt from the very beginning
20 she indicated that she didn't trust, believe or
21 trust what I was saying.
22    Q. What's your best recollection of the words
23 that she used when she expressed that belief to you?
24    A. I don't believe you, I feel that you do know

28 (Pages 106 to 109)

Eric Beasley

Page 110

1   more than what you're saying.
2       Q. Did she say anything about your kind or
3   anything like that?
4       A. No.
5       Q. She didn't say, for example, I don't believe
6   black people, or something like that?
7       A. No.
8       Q. She said, I don't believe you?
9       A. Correct.
10      Q. Did she tell you why she didn't believe you?
11      A. No.
12      Q. Did you ask?
13      A. No.
14      Q. Anything else that Kathy Gillis said that
15  was discriminatory?
16      A. Not that I can remember at this time.
17      Q. Anything else that anybody said at all,
18  other than the ones we have already talked about?
19      A. Not that I can remember.
20      Q. And is there anybody other than -- put aside
21  Tim, is there anybody other than Kathy Gillis and
22  Jay Hess that you feel did anything discriminatory
23  towards you?
24      A. Brian Caswell, I remember there was an

Page 111

1   incident where we was sitting at the front desk days
2   after I saw him kiss Irene, you know, thinking, you
3   know, just joking around with him, I -- we had an
4   Auto Mart book laying out on the desk, and he was,
5   like, All I need is one of those and a 30-year-old,
6   and I said to him, I said, Well, you have one
7   already, joking, and he really got a little bent out
8   of shape, and said, Watch your mouth, I'll get you,
9   and at that point that's when he stopped speaking to
10  me, we really didn't speak anymore after that.
11      Q. Is that all he said, Watch your mouth, I'll
12  get you?
13      A. Yeah.
14      Q. And that was when?
15      A. That was shortly after I saw him kiss Irene;
16  what month or year that was, I don't recall.
17      Q. You might have told me this already, but do
18  you remember what department you were in when that
19  happened?
20      A. I was in the art department.
21      Q. And that's basically the last interaction
22  you ever had with Brian Caswell?
23      A. Yes.
24      Q. Anything else discriminatory at all that you

Page 112

1   can think of that you haven't already told me?
2       A. Not that I can remember, that's it.
3       Q. And do you feel that WearGuard discriminated
4   against you when it fired you?
5       A. When they fired me, yes.
6       Q. Why do you feel that that was
7   discriminatory?
8       A. Because I felt I was fired for no
9   justifiable reason.
10      Q. What makes you feel that?
11      A. I've done nothing wrong, I violated no
12  rules.
13      Q. Do you understand what at-will employment
14  is?
15      A. Yes.
16      Q. What's your understanding of at-will
17  employment?
18      A. That they can let you go at their will.
19      Q. And did you understand that you were an
20  at-will employee?
21      A. Yes.
22      Q. You weren't in a union, right?
23      A. Correct.
24      Q. There is no union there. So assuming that

Page 113

1   they are not illegally discriminating against you,
2   it was your understanding that WearGuard could
3   terminate anybody for whatever reason they wanted,
4   good or bad?
5       A. Correct.
6       Q. And was it your understanding that if
7   WearGuard believed that you were doing drugs,
8   regardless of whether that was true, that they could
9   fire you because of that?
10          MR CALLANAN: Object to the form.
11      A. Yes.
12      Q. And is it your belief that WearGuard did not
13  actually think you were doing drugs?
14      A. Repeat your question.
15      Q. Do you feel that WearGuard said they were
16  firing you for drugs, but they didn't actually
17  believe you were doing drugs?
18          MR. CALLANAN: Object to the form.
19      A. I don't know
20      Q Did anybody at WearGuard ever say to you, We
21  don't really think you were doing drugs?
22      A. No.
23      Q. And did you ever tell anybody at WearGuard
24  that I don't think they really believe I was doing

29 (Pages 110 to 113)

Eric Beasley

Page 118

1   identification.)
2      Q.  Mr. Beasley, I'm showing you what's been
3   marked as Exhibit 10, do you recognize that
4   document?
5      A.  Yes.
6      Q.  What is Exhibit No. 10?
7      A.  Commonwealth of Massachusetts Commission
8   Against Discrimination.
9      Q.  And is Exhibit 10 the charge of
10  discrimination that you submitted to the MCAD in
11  this case?
12     A.  Yes.
13     Q.  And if you look at the second to last page
14  of this document, is that your signature down at the
15  bottom?
16     A.  Yes.
17     Q.  And did you understand that you were
18  swearing to the contents of this document when you
19  signed it?
20     A.  Yes.
21     Q.  And is this a complete statement of your
22  claims of discrimination against WearGuard and
23  Mr. Hess?
24     A.  Yes.

Page 119

1      Q.  And these are basically the same allegations
2   you set forth in your court complaint, is that
3   right?
4      A.  Correct.
5      Q.  Before your meetings in November of 2003
6   about the drug investigation, did you have any
7   knowledge that an investigation was going on?
8      A.  I did not.
9      Q.  Did you have any suspicions that it was
10  going on?
11     A.  I did not.
12     Q.  Did you have any discussions with anybody
13  else at WearGuard about whether an investigation was
14  going on?
15     A.  I did not.
16     Q.  So November of 2003 was the first time you
17  heard about any of this?
18     A.  Yes
19     Q.  This being the investigation?
20     A.  Yes
21     Q.  And the first time that you heard about any
22  of this was when you got called into a meeting in
23  November, on November 5, 2003, is that correct?
24     A.  Correct.

Page 120

1      Q.  How did you learn about this meeting?
2      A.  I was in my department working, it was
3   shortly after -- no, it was actually at night, and
4   Tom, which was the tailor shop supervisor, came into
5   my department and said, They are asking to speak
6   with you in the conference room. I said, Okay. I
7   go to the conference room, Jay Hess, John Cummings
8   and another gentleman was present in the conference
9   room when I arrived. Once I arrived, John Cummings
10  and the other gentleman left the room. Jay Hess
11  asked me to have a seat and proceeded to have a
12  discussion with me about the investigation.
13     Q.  Do you know who the other person was that
14  left the room?
15     A.  I do not.
16     Q.  Did you ever see him again?
17     A.  No.
18     Q.  So when you walked in the room, this is a
19  conference room?
20     A   Yes
21     Q.  You walk in the room, there is three people
22  there, Hess, Cummings and this other person?
23     A   Yes.
24     Q.  And Hess you have never seen before?

Page 121

1      A.  Correct.
2      Q.  Did he introduce himself?
3      A.  Yes.
4      Q.  What did he introduce himself as?
5      A.  Jay Hess from Philadelphia, head of all
6   Aramark security.
7      Q.  And Cummings, you knew who he was?
8      A.  Yes.
9      Q.  And did he say anything?
10     A.  No.
11     Q.  So you walk in the room, there are these
12  three guys, are they talking to each other when you
13  come in?
14     A   I believe they are having some dialogue.
15     Q.  And do they continue that dialogue after you
16  enter the room?
17     A.  They do not.
18     Q.  So the two guys left, and it's just you and
19  Hess?
20     A.  Yes.
21     Q.  Tell me as best you can remember everything
22  the two of you said to each other?
23     A.  Hess asked me to come into the room. I do
24  so. He said, Have a seat. I then do so. He sits

31 (Pages 118 to 121)

Eric Beasley

Page 122

1  across from me, he then indicates if I knew anything
2  that was going on, I said, No. He then said, Well,
3  I'm here because there was a theft, and that during
4  an investigation of the theft, drugs was discovered
5  being sold here, your name was brought up, what can
6  you tell me, I say, I can't tell you anything, I
7  don't know anything. He said, Oh, come on, your
8  kind loves to sell drugs. I then proceeded to tell
9  him I didn't know what he was talking about. He
10  then said that if he could search my car. I told
11  him, If you want to search my car, he would have to
12  do that at the body shop because it's at the body
13  shop. He was like, No, your car is outside, we have
14  the dogs out, there they are barking, the police
15  have your car surrounded, there you are going to talk to
16  the police officers? I said, No. He then passed me
17  a business card and told me if there is anything
18  that I want to talk to him about, give him a call.
19    Q. And that was it?
20    A. That pretty much was it.
21    Q. And then you left the room?
22    A. He told me to go back to work.
23    Q. And is that what you did?
24    A. And that's what I did.

Page 123

1    Q. How long did the meeting last?
2    A. About 15 minutes.
3    Q. And what was his reaction when you told him
4  that your car was in the shop?
5    A. He told me, No, it was outside. Then he
6  proceeded to tell me what kind of car I owned, then
7  he also told me that they followed me back and forth
8  from Rockland.
9    Q. They who?
10    A. Meaning, I assume, the police.
11    Q. And was it at that point that he asked you
12  if you wanted to talk to the police?
13    A. Yes.
14    Q. And you said no?
15    A. Right.
16    Q. Why did you say no?
17    A. Talk to them for what?
18    Q. I'm just asking why you said no?
19    A. I didn't feel I had a reason to talk to
20  them.
21    Q. Well, if, according to Mr. Hess, the police
22  thought they had your car surrounded, and that the
23  drug dogs were going crazy around your car, wouldn't
24  you have wanted to talk to the police and say, Hey,

Page 124

1  that's not my car?
2      MR. CALLANAN: Object to form.
3    A. No.
4    Q. Why not?
5    A. Because I knew it wasn't my car.
6    Q. And if Mr. Hess said that the police had
7  been following you, you wouldn't want to talk to
8  them about that?
9    A. No.
10    Q. Were you worried you would get arrested?
11    A. No.
12    Q. You just didn't want to talk to them?
13    A. Right.
14    Q. And have you now told me everything that
15  there is to tell me that happened in this first
16  meeting with Mr. Hess?
17    A. Yes.
18      MR. CALLANAN: Can we take a short
19  break?
20      MR. LAMKIN: Sure.
21      (Off the record.)
22    Q. Mr. Beasley, you can answer this yes or no,
23  during the break did you speak with your attorney?
24    A. Yes.

Page 125

1    Q. Did you speak with your attorney about any
2  of the facts of your case?
3    A. Yes.
4    Q. Which facts?
5    A. The facts were when I indicated that they
6  followed me from Brockton to WearGuard, he actually
7  indicated that they followed me from home, he
8  indicated that I lived in Brockton, from home in
9  Brockton to WearGuard in Norwell. And also I
10  indicated that he sat across from me, we actually
11  sat side by side to me, Jay Hess, in the conference
12  room.
13    Q. Any other facts of your case as you
14  discussed with your attorney during the break?
15    A. And that the night of the incident when he
16  asked to search my car, there was no car of mine
17  present in the parking lot at all that evening.
18    Q. How did you get to work that day?
19    A. I was dropped off.
20    Q. By whom?
21    A. My wife.
22    Q. What kind of car was she driving?
23    A. The rental car that we had.
24    Q. What -- at that time, was she working the

32 (Pages 122 to 125)

Eric Beasley

Page 126

1   State Street job?
2        A.  Yes.
3        Q.  Was that a 9 to 5 office kind of job?
4        A.  Correct.
5        Q.  So she, you were -- she typically would not
6   -- strike that
7            Your work shifts didn't completely
8   overlap, you were working a long time after she
9   would get home generally?
10       A.  Yes.
11       Q.  And your shift started at 2 o'clock in the
12  afternoon?
13       A.  Correct.
14       Q.  Was she working the day that she dropped you
15  off?
16       A.  Yes.
17       Q.  And was her normal, was 2 o'clock part of
18  her normal work day?
19       A.  Correct.
20       Q.  Did she take time off of work to drop you
21  off?
22       A.  Yes.
23       Q.  Any other facts you discussed with your
24  attorney during the break?

Page 127

1        A.  No.
2        Q   Anything --
3        A.  Oh, yes, one other fact, one other fact.
4        Q.  Yes.
5        A   In the conference room, Jay Hess also
6   mentioned that I should resign before they get me
7   because they will get me.
8        Q.  That was your first meeting with him or the
9   second one?
10       A.  The first one.
11       Q.  So that was on November 5 of 2003?
12       A.  Correct.
13       Q.  Anything else?
14       A.  That's it.
15       Q.  So have you now exhausted your memory about
16  who said what to whom during your November 5th
17  meeting?
18       A.  Yes.
19       Q.  And have you told me all of the facts of
20  your case that you and your attorney talked about
21  during the break?
22       A.  Yes.
23       Q.  After the November -- after you got out of
24  that meeting, did you go back to work?

Page 128

1        A.  Yes.
2        Q.  Did you talk to anybody at WearGuard about
3   the meeting?
4        A.  Yes.
5        Q.  Who did you talk to?
6        A.  Paul Keating.
7        Q.  Who is Paul Keating?
8        A.  He was the, my trainer, basically, in the
9   art department.
10       Q.  Did you talk to him that evening?
11       A.  Yes.
12       Q.  How long after you got out of the meeting
13  did you talk to Paul Keating?
14       A.  Immediately.
15       Q.  Where did you have this conversation?
16       A.  In the art department.
17       Q.  Was anybody else around?
18       A.  I'm not sure, Jeff Loback could have been
19  around because there was only us three in the
20  department at night.
21       Q.  But you don't remember if he was there or
22  not?
23       A.  I do not remember.
24       Q.  And if you would, tell me everything that

Page 129

1   you and Paul Keating said to each other in this
2   discussion?
3        A   Well, when I got back, Paul said, What did
4   they want?  I said to him, They are accusing me of
5   getting involved with the drug theft transaction
6   that was going on around here, and he said, I can't
7   believe this, I can't believe this, I can't believe
8   they are accusing you   I was like, Yeah, I can't
9   either, Paul, I can't either; and Paul had a
10  mutual -- well, not a mutual friend -- Paul had a
11  friend by the name of Johnny Brinkman, which is an
12  attorney, and I said, I'm going to need Johnny
13  Brinkman's number because I want some representation
14  for this situation, and he gave it to me, and that
15  was the extent of our conversation that night.  I
16  was bothered by the whole ordeal, so I pretty much,
17  after me and Paul had the few words, I pretty much
18  kept quiet until the end of my shift.
19       Q.  And so you didn't talk to anybody else at
20  WearGuard that day about your meeting with Mr. Hess?
21       A.  No.
22       Q.  Did you call this Johnny Brinkman?
23       A.  Yes, I did.
24       Q   When did you call him?

JONES REPORTING COMPANY
617-451-8900

Eric Beasley

Page 134

1    A. I did.
2    Q. What happened the next day?
3    A. Approaching the entryway of the building, I
4  was approached by John Cummings, and he said that I
5  needed to meet with him and Kathy Gillis in the
6  conference room. At that point, I proceeded to go
7  to the conference room, and John Cummings and Kathy
8  Gillis was sitting across the table from me. They
9  proceeded to tell me that there was an investigation
10 going on and I will be suspended without pay until
11 further notice.
12    Q. So this was roughly 2 o'clock in the
13 afternoon on November 6th?
14    A. Yes.
15    Q. And did you do any work that day before you
16 got called into the meeting?
17    A. I did not.
18    Q. And the meeting was Mr. Cummings and
19 Ms. Gillis?
20    A. Correct.
21    Q. And nobody else?
22    A. Correct.
23    Q. And is there anything that was said by
24 either of them or by you in that meeting that you

Page 135

1  haven't already told me?
2    A. No, I've told you that in that meeting Kathy
3  Gillis indicated that she didn't believe what I was
4  saying, and I mentioned to her after they did their
5  investigation how embarrassing it will be or
6  humiliating it will be for me to come back, and she
7  indicated, You don't have to worry about that
8  because you probably wouldn't be back.
9    Q. And that's everything you can remember her
10 saying at the meeting, the November 6th meeting?
11    A. And I was to leave the building immediately.
12    Q. Anything else?
13    A. And that I would not be escorted out, they
14 will have me leave on my own recognizance.
15    Q. Anything else that she said?
16    A. That's it.
17    Q. How about Mr. Cummings, did he say anything?
18    A. He asked for my work ID, and that was it.
19    Q. Did you say anything in the meeting other
20 than what you've already told me?
21    A. Not that I can remember.
22    Q. Did you ask Kathy Gillis why she didn't
23 believe you?
24    A. I did not.

Page 136

1    Q. Did you ask her where she was getting her
2  information?
3    A. I did not.
4    Q. And I might have asked you this, but in the
5  November 5th meeting, did you ask Jay Hess where he
6  got his information?
7    A. I did not.
8    Q. And did either Mr. Cummings or Ms. Gillis at
9  the November 6th meeting tell you what was going to
10 happen next?
11    A. No, they just told me there was an
12 investigation going on and that I was suspended
13 until further notice.
14    Q. With or without pay?
15    A. Without pay.
16    Q. And how long did this meeting last?
17    A. Seven minutes.
18    Q. What did you do after you left the meeting?
19    A. Went home.
20    Q. Did you speak with anyone before you went
21 home?
22    A. I did not.
23    Q. I'm sorry?
24    A. I did not.

Page 137

1    Q. Did anybody ask you that day what happened?
2    A. No.
3    Q. So you just left the plant, went to your car
4  and went home?
5    A. Correct.
6    Q. Did you have the car by then?
7    A. Yes.
8    Q. It was back from the shop?
9    A. No.
10    Q. You had the rental car?
11    A. Yes.
12    Q. And was your wife working that day?
13    A. Yes.
14    Q. How did she get to work?
15    A. I got up that morning and took her there.
16    Q. And where was her office?
17    A. She has changed so many locations, it was
18 with State Street still, I'm not sure if it was the
19 Quincy branch or the Adam Street branch.
20    Q. Has she ever worked in Boston for State
21 Street?
22    A. No, no.
23    Q. And other than your wife or an attorney, did
24 you talk to anybody else that day, did you talk to

35 (Pages 134 to 137)

Eric Beasley

Page 138

1 anybody that day about what happened at
2 WearGuard -- on that day I mean?
3    A. That day, not that I can remember.
4    Q. And did you ever go back to the WearGuard
5 facility after November 6th?
6    A. No.
7    Q. And what day was it that you were fired?
8    A. November 17th.
9    Q. And what were you doing during those 11
10 days?
11    A. Being home, trying to figure out what just
12 happened.
13    Q. And other than your wife or an attorney,
14 during that 11-day period did you discuss what had
15 happened with anybody?
16    A. Not that I remember.
17    Q. And during that 11-day period, did you
18 discuss what had happened with your wife at any time
19 when anyone other than the two of you was present?
20    A. Repeat your question.
21    Q. Sure. If you had conversations, just you
22 and your wife, with nobody else around about what
23 happened at WearGuard, I don't want to know about
24 those -- well, I want to know about them, but I

Page 139

1 probably can't -- but were there any times when you,
2 your wife and a third person, either in the room or
3 on the telephone, were having a discussion about
4 what happened at WearGuard?
5    A. The day of the 17th when I got the phone
6 call that I was terminated.
7    Q. Okay, tell me about that?
8    A. I received a phone call, my wife answered
9 the phone, and it was a young lady by the name of
10 Gail O'Connell, I believe it is, and she called, my
11 wife said, There is a Gail O'Connell on the phone
12 for you. I go to the kitchen or bedroom, I forget
13 which room of the house we was in, and Gail said,
14 Eric, Kathy Gillis asked me to give you a call and
15 to notify you that you have been terminated
16 immediately and you no longer need to return to
17 WearGuard, your property that's in your desk will be
18 mailed to you, and I then asked her, What was my
19 reasons for being terminated? She indicated that
20 she couldn't tell me, and I said, Who do I speak to
21 to find out my reasons for termination? She said,
22 You will receive a paper in the mail. That was the
23 end of the conversation, and my wife was present for
24 the conversation.

Page 140

1    Q. And nothing else that you said to Gail
2 O'Connell or that she said to you during this
3 discussion?
4    A. None other than I'm asking her what was my
5 reasons for being terminated, and she indicated she
6 couldn't tell me.
7    Q. And other than this phone call with Gail
8 O'Connell where your wife was around, were there
9 times when you discussed this with your wife in the
10 presence of a third person?
11    A. Not that I can recall.
12    Q. Any times that you discussed what happened
13 at WearGuard with an attorney when somebody other
14 than your wife was also there?
15    A. Yes, the private investigator for WearGuard,
16 I don't recall his first name, Sjoberg, he was at my
17 attorney Thomas Benner's office, and he came to ask
18 me questions about the investigation.
19    Q. When was that?
20    A. I believe it was between the November 6th
21 and the November 17th.
22    Q. So some time while you were out on
23 suspension?
24    A. Yes.

Page 141

1    Q. And that was at Attorney Benner's office?
2    A. Yes.
3    Q. How did you find out that you needed to go
4 to Attorney Benner's office?
5    A. The investigator called me requesting to
6 speak with me about these questions he wanted to ask
7 me.
8    Q. And how long after November 6th was that, if
9 you remember?
10    A. I don't.
11    Q. But it was some time between -- it was some
12 time during the period you were suspended?
13    A. Correct.
14    Q. And did he tell you what it was that he
15 wanted to ask you specifically?
16    A. No.
17    Q. He just said, I want to ask you some
18 questions about the investigation?
19    A. Correct.
20    Q. And what did you say?
21    A. You have to speak to my attorney about that.
22    Q. And did you give him your attorney's name
23 and phone number?
24    A. Correct.

36 (Pages 138 to 141)

Eric Beasley

Page 166

1    Q. What is this?
2    A. Plaintiff's Answers to Defendant's First Set
3  of Interrogatories.
4    Q. And if look at the third page from the back,
5  is that your signature where it says "Eric Beasley"?
6    A. Yes.
7    Q. And do you understand that you were signing
8  these answers under the penalties of perjury?
9    A. Yes.
10   Q. And are these answers true and correct?
11   A. Yes.
12   Q. If you turn to interrogatory No. 3, that
13  indicates that since May 7, 2004, you have been
14  working for Cintas, is that right?
15   A. Correct.
16   Q. And what were you, what were you earning at
17  WearGuard as of the time you were fired?
18   A. I believe I was earning $13.75 an hour.
19   Q. Do you know what that worked out to roughly
20  in a year?
21   A. I want to say maybe like $28,000.
22   Q. So you are getting paid more at Cintas than
23  you were at WearGuard?
24   A. Correct.

Page 167

1    Q. And I understand you are on your wife's
2  health insurance, but are there any benefits that
3  you do get that you participate in at Cintas?
4    A. Like a 401K?
5    Q. Yeah, 401K, life insurance, disability,
6  dental?
7    A. Life insurance and health -- not health,
8  life insurance.
9    Q. How about a 401K?
10   A. We have it, I'm not signed up as of yet.
11   Q. Okay. Did you have life insurance at
12  WearGuard?
13   A. I'm not sure, I don't recall.
14   Q. Do you remember if that was something that
15  was available to you as a WearGuard employee?
16   A. I don't recall the benefits for WearGuard.
17   Q. Do you remember if you had a 401K at
18  WearGuard?
19   A. Yes, I did have a 401K.
20   Q. Is that still there or did you roll it over
21  into the Cintas 401K?
22   A. No, I actually withdrew from it.
23   Q. Okay. Is there any of it left?
24   A. No.

Page 168

1    Q. And how much was that?
2    A. $5,000.
3    Q. If you look at interrogatory No. 4, it says,
4  "Identify by source and amount all wages or other
5  compensation, including compensation for
6  self-employment that you have received since your
7  employment with Aramark ended." The response is,
8  "None." I'm assuming that's inaccurate, because the
9  question was asking how much have you earned since
10  you were fired, and obviously you have earned
11  income, right?
12   A. Right.
13   Q. So was that just a misunderstanding of the
14  question?
15   A. Yes.
16   Q. And I take it you agree with me that you
17  have in fact earned money since then?
18   A. Yes.
19   Q. And are actually earning more money now than
20  you did when you worked at WearGuard, correct?
21   A. Correct.
22   Q. What, if anything, were you doing to try and
23  get a new job for the six months or so that you were
24  unemployed after WearGuard?

Page 169

1    A. I put my application on monster.com, I put
2  applications in at various establishments, I looked
3  at the newspaper daily. Being on unemployment, it
4  was mandatory for you to fill out a form that made
5  you apply for "X" amount of jobs per week for you to
6  be currently on unemployment.
7    Q. Do you remember in that time period
8  approximately how many jobs you applied for?
9    A. I do not.
10   Q. Was it more than ten?
11   A. Yes.
12   Q. More than 50?
13   A. No.
14   Q. So somewhere between ten and 50?
15   A. Yes.
16   Q. Do you remember any places you applied?
17   A. Yes.
18   Q. Tell me some of them?
19   A. The Reebok Outlet, the Reebok Store Outlet
20  in Avon, 'N Gear in Quincy, the New Balance
21  Factory in Stoughton, that's all I can remember at
22  the time.
23   Q. But you think there were more?
24   A. Yes, there were.

43 (Pages 166 to 169)

# EXHIBIT B

FILE COPY

**Page 1**

1    Volume: I
     Pages: 150
2    Exhibits: 5
3    UNITED STATES DISTRICT COURT
4    DISTRICT OF MASSACHUSETTS
5
6
     ERIC BEASLEY,
7         Plaintiff
                              Docket No.
8    vs.                    05-10496-NMG
9    ARAMARK UNIFORM and CAREER
     APPAREL, INC., and JAY HESS, JR.,
10        Defendants
11
12
13        DEPOSITION of JAY M. HESS, JR., a
     witness called by and on behalf of the Plaintiff, taken
14   pursuant to the Federal Rules of Civil Procedure,
     before Cynthia F. Stutz, Certified Shorthand Reporter
15   and Notary Public in and for the Commonwealth of
     Massachusetts, at the offices of Edwards, Angell,
16   Palmer & Dodge, 101 Federal Street, Boston,
     Massachusetts, on Friday, December 2, 2005, commencing
17   at 10:20 a.m.
18
19
20
21
22
23
24

**Page 2**

1    APPEARANCES:
2    KEVIN B. CALLANAN, ESQ.
     Law Office of Kevin B. Callanan
3    17 Accord Park Drive, Suite 101
     Norwell, Massachusetts 02061
4         on behalf of the Plaintiff
5    BRIAN H. LAMKIN, ESQ.
     Edwards, Angell, Palmer & Dodge
6    101 Federal Street
     Boston, Massachusetts 02110
7         on behalf of the Defendants
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**Page 3**

1              INDEX
2
     WITNESS:    DIRECT CROSS REDIRECT RECROSS
3
4    Jay Hess        4
5
     EXHIBITS:    DESCRIPTION        PAGE
6
7    1   Request Nos. 12, 17        80
8    2   Request Nos. 14, 8         85
9    3   Defendant's Response to Plaintiff's   88
         First Request for Production
10
11   4   Ortiz Statement            92
11
12   5   Hess Notes                148
13
14
15
16
17
18
19
20
21
22
23
24   *ALL EXHIBITS RETAINED BY ATTORNEY CALLANAN *

**Page 4**

1              PROCEEDINGS
2         MR. LAMKIN:  Usual stipulations, I
3    assume?
4         MR. CALLANAN:  Yeah.  Let me just put
5    them on the record so we can get started.  I would
6    propose that we stipulate that all objections except as
7    to the form of the question, as well as all motions to
8    strike be reserved until the time of trial.  Is that
9    agreeable?
10        MR. LAMKIN:  That's fine.
11        MR. CALLANAN:  And I propose that the
12   deponent have 30 days to read and sign the transcript
13   of his deposition before a Notary Public.
14        MR. LAMKIN:  We can do a Notary if you
15   want.  We're happy to waive it.
16        MR. CALLANAN:  Yeah, I prefer the Notary
17   Public.  Is that agreeable?
18        MR. LAMKIN:  That's fine.
19   Whereupon:
20        JAY M. HESS, JR.,
21   having been satisfactorily identified and duly sworn by
22   the Notary Public, was examined and testified as
23   follows:
24   *0*      DIRECT EXAMINATION

1 (Pages 1 to 4)

9811a46a-322b-4217-9bd1-7f560174bd70

Page 21

1  WearGuard Norwell in August of '03?
2      A.  A telephone call from John Cummings.
3      Q.  And what do you remember about that call?
4      A.  He called and he stated that they had
5  information that has been developing over a period of
6  time that they have individuals that are violating the
7  Aramark drug and alcohol policy.  And he said that they
8  initially attempted to go for the voluntary compliance,
9  where he met and reiterated with the employees
10  Aramark's policy on drug and alcohol.  It seemed that
11  it had some positive effect for a short period of time,
12  but now the feedback that they are getting up there is
13  that they still have a drug and alcohol problem and was
14  asking, looking for us as a resource of what they might
15  do to look into it.
16      Q.  Why did he call you rather than somebody else?
17          MR. LAMKIN:  Objection.  You may answer.
18      A.  In my position as manager of corporate
19  security, I'm the resource person to go to for any
20  lines of businesses that would be doing business in the
21  United States and in some cases two ports of Canada.
22      Q.  Had you met John Cummings before that phone
23  call?
24      A.  No, I had not.  Met as in person?

Page 22

1      Q.  Yes.
2      A.  No.
3      Q.  Had you met him other than in person?
4      A.  Yes, spoke to him on the phone on a couple of
5  occasions, answering questions in one form or another.
6      Q.  Okay.  So as a result of that telephone
7  conversation, what happened next involving you with
8  WearGuard Norwell?
9      A.  I had made the suggestion that one of the
10  things we might consider doing is putting an undercover
11  operative into the work force to be our eyes and ears
12  to try to identify what the problem was and who the
13  individuals who might be involved that are violating
14  the policies.
15      Q.  Did Mr. Cummings describe to you what section
16  or portion of WearGuard Norwell was involved in this
17  problem?
18      A.  To a limited degree.  He said that the
19  information that he has developed concentrates mostly
20  on the second shift.
21      Q.  Second shift being, what, 2:00 to 3:00 o'clock
22  to 11:00 or 12:00, midnight?
23      A.  He didn't say that, but I took it to be some
24  kind of an evening shift, yes.

Page 23

1      Q.  Okay.  How many shifts were running at
2  WearGuard Norwell in August of '03?
3      A.  I'm not sure.
4      Q.  Do you know if they had the so-called night or
5  graveyard shift?
6      A.  Do not know.
7      Q.  Do you know how many employees worked in the
8  Norwell facility when you first focused on them in
9  August of '03?
10      A.  No, I do not.
11      Q.  And as a result of the suggestion you made to
12  Mr. Cummings, what happened next?
13      A.  Two things happened.  The first thing is is
14  that he floated the idea past his people up to and
15  including Mr. Gold and he also looked at possibly
16  obtaining the resources from somebody in the area to do
17  that.
18      Q.  By that, you mean to be the undercover
19  operative?
20      A.  No.  I believe what he did is reached out to
21  Sjoberg and see if he could, if he had anybody under
22  his employ that was available to him to act in that
23  capacity.  I don't believe he made any attempt to
24  procure an undercover operative himself.

Page 24

1      Q.  Had you had previous contact of any kind with
2  Sjoberg before August of '03?
3      A.  No.
4      Q.  Did Mr. Cummings explain to you why he was
5  considering Sjoberg for this particular need?
6      A.  Yes.
7      Q.  What did he tell you?
8      A.  They've had a working relationship on other
9  issues where they required an outside investigator.  He
10  was a known vendor.
11      Q.  Okay.  Did you have any contact at this point
12  in August of '03 with David Gold?
13      A.  No.
14      Q.  With Susan Magrini?
15      A.  At the first conversation with John Cummings,
16  is that your question?
17      Q.  No.  Any contact with Susan Magrini in August
18  of '03 when this problem began to come to your
19  attention.
20      A.  Yes, I did.
21      Q.  What kind of contact was that?
22      A.  When I learned that this is something that we
23  would consider, that they would consider doing, I
24  traveled up there, which is customary for me, to take a

6 (Pages 21 to 24)

9811a46a-322b-4217-9bd1-7f560174bd70

Page 25

1  look at a facility and do some other things that I
2  would normally do for this kind of things. And at that
3  time I met Cathy Gillis, Susan and John Cummings.
4      Q  When you say this kind of a thing, what are
5  you referring to?
6      A  Undercover operation, including an operative.
7      Q  And when was that trip to WearGuard Norwell,
8  that first trip?
9      A  I believe it was --
10     Q  Roughly.
11     A  I believe it was the 21st. If I can look at
12  my travel plans I can tell you for sure, but I believe
13  it was the 21st.
14     Q  Of August?
15     A  Yes.
16     Q  And how long did you stay in the facility or
17  how many days?
18     A  Went there one day and returned the following
19  day.
20     Q  And you just indicated you met with Cathy
21  Gillis, Susan Magrini and John Cummings?
22     A  Yes.
23     Q  Do you remember what Cathy Gillis' position
24  was at WearGuard Norwell?

Page 26

1      A  Something with HR. Whether it was director or
2  manager, I really don't know.
3      Q  And where is she working now?
4      A  She works for Aramark in its uniform services
5  division.
6      Q  Do you know where she's located?
7      A  No, I do not.
8      Q  Is she still in Norwell, if you know?
9      A  I don't know.
10     Q  Do you know if she works in the Philadelphia
11  area?
12     A  She does work there periodically, but, no.
13  Her, I believe her residence is still in the northeast,
14  but her job requires extensive travel. I don't know
15  where she considers her home office at.
16     Q  Do you know where she lives in the northeast?
17     A  No, I do not.
18     Q  I take it you met with these three individuals
19  in late August of '03 at the facility in Norwell?
20     A  Correct.
21     Q  And what did you learn from your visit on that
22  particular occasion?
23     A  That managers and supervisors in part has come
24  to them saying that they do believe they do have a drug

Page 27

1  problem, that the information they are developing is
2  that it seems to be on second shift. There was really
3  a lack of specificity on exactly what was doing what
4  where, but the sources, the sources of information were
5  multiple and they certainly deemed that there could be
6  some credibility to it.
7      Q  What were the sources?
8      A  I do not know. I did not drill down that far.
9      Q  You say drug problem on the second shift. Did
10  you discuss the subject in any more detail with these
11  three individuals when you met with them?
12     A  Yes.
13     Q  Did they describe it in more detail than just
14  drug problem, second shift?
15     A  No, they -- Yes, to some degree. They said in
16  part that the information is that there is some drug
17  dealing on company property, there is some drug
18  possession and drug usage, but they could not identify
19  any individual times, locations or events, which is
20  what they're doing with us, how they're going to
21  identify what's going on.
22     Q  Did they mention Eric Beasley to you on that
23  first trip?
24     A  Yes.

Page 28

1      Q  What was that?
2      A  That that was one name that had surfaced that
3  was a person that was dealing drugs.
4      Q  Who told you that?
5      A  At one point or another both Susan and John
6  Cummings had.
7      Q  When you learned this from Susan and/or John
8  Cummings with respect to Mr. Beasley, did you ask if
9  anyone had, anyone in management had spoken with Mr
10  Beasley?
11     A  No, I did not.
12     Q  Do you know whether anybody had at that point
13  in time?
14     A  No, I'm not sure. I was led to believe that
15  the only conversations were, the direct conversations
16  with all the employee groups reiterating our drug and
17  alcohol policy, but the answer is no, I do not.
18     Q  So the policy was reiterated in group
19  meetings, is that your understanding?
20     A  Yes.
21     Q  Did you have any sense during this visit as to
22  how long the problem had been recognized or had been
23  suspected in Norwell?
24     A  Only to the extent that it happened over the

7 (Pages 25 to 28)

Page 41

1  do their own background check on this person, meet with
2  this person and satisfy themselves that this is an
3  appropriate person to use in this capacity
4      Q.  Do you know if that did happen?
5      A.  Yes, it did.
6      Q.  And where physically did that happen, if you
7  know?
8      A.  Norwell Police Department.
9      Q.  After your conversation with Mr. Larkin did
10  you ask that he develop an undercover operative?
11     A.  Yes.
12     Q.  And I take it he did so?
13     A.  Yes.
14     Q.  And how soon after August did that happen or
15  maybe in August of '03?
16     A.  My conversation with him was returned the same
17  day, saying yes, scheduling will permit us to use --
18     Q.  Did you tell Mr. Larkin what you knew about
19  Eric Beasley?
20     A.  No.
21     Q.  Did you mention Eric Beasley at all to Mr
22  Larkin?
23     A.  No
24     Q.  Why not?

Page 42

1      A.  The purpose of us putting somebody in is to
2  tell us what was going on  And I didn't want to taint
3  them or focus them.  I want him to be eyes and ears and
4  accurately report.  For all I knew, we had management
5  or supervisory people who could be involved in some
6  wrongdoing.  So the sole purpose of putting somebody in
7  was to tell us work rule violations, not just limited
8  to narcotics.
9      Q.  When did you first learn who the undercover
10  operative would be?
11     A.  That same phone call.
12     Q.  So the same phone call in which you requested
13  that there be one?
14     A.  Yes.
15     Q.  He was able to identify one?
16     A.  Yes
17     Q.  And I take it that we're referring to someone
18  who's identified in the case as Miss Alexander?
19     A.  Yes.
20     Q.  And her first name is what?
21     A.  Shawna
22     Q.  Shawna?  And did Mr. Larkin identify her by
23  name to you during the first conversation?
24     A.  Yes.

Page 43

1      Q.  Had she been an undercover operative before
2  this particular occasion?
3      A.  Yes.
4      Q.  And had she done so under the auspices of Mr.
5  Larkin's organization?
6      A.  Yes.
7      Q.  Do you know how many times?
8      A.  No, only several
9      Q.  Were you involved in any cases in which she
10  was an undercover operative within the Aramark system?
11     A.  Yes.
12     Q.  Where were those locations?
13     A.  Two that I remember are Turner Field, Brave
14  Stadium and the other one the Pennsylvania Convention
15  Center.  I'm not sure there's any more than that, but
16  those two come to my mind
17     Q.  And you're talking the Turner Center in
18  Atlanta, Georgia?
19     A.  Correct.
20     Q.  So you had met her before?
21     A.  Yes.
22     Q.  Did you suggest her when you had the
23  conversation with Mr. Larkin?
24     A.  Her name came up  I'm not too sure who

Page 44

1  brought it up first.
2      Q.  And she is a black woman, correct?
3      A.  Correct.
4      Q.  About how old is she?
5      A.  32, maybe
6      Q.  When did you first meet her?
7      A.  Turner Field the preceding year.
8      Q.  2002?
9      A.  Yes
10     Q.  How long was she undercover at Turner Field?
11     A.  I'm not sure
12     Q.  More than two days?
13     A.  Over several weeks, at least.  Probably closer
14  to two months.
15     Q.  What part of the country does she reside in,
16  if you know?
17     A.  Atlanta, Georgia
18     Q.  Atlanta.  Do you know if she's a regular
19  employee of Mr. Larkin's company?
20     A.  Yes, she is and -- Yes, I do and yes, she is.
21     Q.  What was the problem at Brave's Field, Turner
22  Field, excuse me, that she was undercover looking for?
23     A.  There were several issues, but the primary one
24  was theft

9811a46a-322b-4217-9bd1-7f560174bd70

Page 77

1    Q.  Susan Magrini was there?
2    A.  I'm not sure if it was her or Cathy.
3    Q.  What about Mr. Gold?
4    A.  Mr. who?
5    Q.  Gold.
6    A.  He was not there.
7    Q   And he was the chief executive officer of the
8    Norwell property?
9    A.  I never heard that title. I know he was
10   president of that line of business.
11   Q   Was he the Number One manager of that
12   property?
13   A.  Yes.
14   Q   Where was he that night?
15         MR. LAMKIN:  Objection.
16   A.  A business-related trip, but I forget where.
17   Q.  Presumably out of town, right?
18   A   Out of town, that's correct.
19   Q.  That night or that day, November 5, 2003, did
20   you interview any employees other than Eric Beasley?
21   A.  Yes.
22   Q   Who did you interview other than Eric Beasley?
23   A   I think it was Carlos Towres
24   Q.  Anybody else?

Page 78

1    A.  No. Well --
2    Q   We have a Jason Towres that's listed here
3    A.  Maybe it was Jason. It was --
4    Q.  Towres?
5    A   It was the individual I took the statement
6    from.
7    Q   Towres, T-o-w-r-e-s?
8    A.  Yeah.
9    Q.  It was not Carlos Ortiz?
10   A   I'd have to refresh my memory from the
11   statement that he gave me
12   Q.  Was Jason Towres one of the ones arrested and
13   taken to the Norwell Police Department?
14   A.  I'm not sure
15   Q.  So you interviewed him before any arrests
16   might have happened?
17   A.  No. I'm trying to think. My memory is
18   failing me on whether -- Maybe it was Carlo -- There
19   was one individual when I arrived at Norwell Police
20   Department, a police officer said that one of the
21   individuals we have in custody wants to talk to a
22   company representative and I said, Fine. And they took
23   me to a holding area and that's where this individual
24   was.

Page 79

1    Q.  And that's where you interviewed him?
2    A.  That's correct.
3    Q   So the only employee that you interviewed on
4    November 5 at the Norwell WearGuard facility was Eric
5    Beasley?
6    A.  Yes. I did have conversations with our
7    security officer, but it really wasn't an interview,
8    per se
9    Q.  And when you interviewed Mr. Towres at the
10   police station, was there anyone else present?
11   A.  No.
12   Q.  During that interview?
13   A.  No.
14   Q.  And when you interviewed Mr. Beasley at the
15   Norwell facility was anyone else present?
16   A.  No.
17   Q   Had you met Mr. Beasley before the interview?
18   A   No
19   Q.  Describe him to us.
20   A.  African American male. My memory is he's
21   taller than I was   At that point he was, I think, more
22   heavier set than I was. I'm not sure now. That's
23   about all I can remember.
24   Q.  What would you estimate to be his height?

Page 80

1    A.  Probably close to 5-11
2    Q   And his weight?
3    A.  Probably closer to 200, maybe
4    Q.  Anything unusual about his appearance?
5    A.  Not that I recall.
6    Q.  Any facial jewelry?
7    A.  Not that I recall.
8    Q.  Do you know if or did you know at the time on
9    November 5 whether there were any other employees at
10   the Norwell facility whose first name was Eric?
11   A.  Not that I recall.
12         MR. CALLANAN:  I'd like to have these
13   documents marked as an exhibit. Brian, I just have one
14   extra copy, but these are the documents that you have
15   produced in discovery
16         MR. LAMKIN:  Okay
17         (Hess Exhibit No  1 marked for
18         identification.)
19   Q.  Let me show you what's been marked as
20   Exhibit 1 and these, as I've just indicated, were
21   documents produced in response to the plaintiff's
22   document request and this group of documents which is
23   extensive is identified as Request Numbers 12 and 17,
24   meaning the response from Aramark to those particular

20 (Pages 77 to 80)

9811a46a-322b-4217-9bd1-7f560174bd70

Page 89

1  asked for, but let me just ask you with regard to
2  Request Number 1, did you take any notes during your
3  interview of Eric Beasley on November 5?
4     A.  No, I do not.
5     Q.  And was there any audio or video record of
6  that interview on November 5 with Mr. Beasley?
7     A.  No, there was not.
8     Q.  And did you prepare any written report or
9  reports following that November 5 interview?
10    A.  No, I did not.
11    Q.  And in Request 4 I asked for reports you might
12 have received from Corporate Risk Solutions. I take it
13 those are the reports that we have with us today?
14    A.  That is correct.
15         MR. LAMKIN: One caveat to that, Kevin?
16         MR. CALLANAN: Yes.
17         MR. LAMKIN: There are another set which
18 as far as I can tell are just another complete set of
19 the same thing.
20         MR. CALLANAN: Okay.
21         MR. LAMKIN: Which I didn't bother
22 copying. I have not gone through it page by page. So
23 if you want, we may have them floating around, if you
24 want to flip through them yourself after we're done or

Page 90

1  before we're done, that's fine.
2         MR. CALLANAN: Well, let's see where we
3  are when we finish. I'm not sure.
4     Q.  I take it, Mr. Hess, you didn't receive any
5  written reports in any other form than the ones that we
6  have with us today?
7     A.  From Corporate Risk?
8     Q.  From Corporate Risk.
9     A.  That's correct, I did not. And the bills
10 which I just produced today, I had to get them out of
11 accounts payable, but they're not reports in my mind.
12    Q.  No. Again, my sense of reports are, has to do
13 with the information coming from the Corporate Risk
14 Solutions about the investigation.
15    A.  That is complete set.
16    Q.  Okay. And then the written reports from Mr.
17 Sjoberg's office, which I believe are Exhibit 2, does
18 that appear to you to be the complete reports that you
19 received from his office?
20    A.  I have never received reports from his office.
21    Q.  I'm sorry. Those are the ones addressed to
22 Mr. Cummings?
23    A.  Yeah.
24    Q.  Let me ask you about your interview with Mr.

Page 91

1  Beasley. November 5, 2003, as I understand it up to
2  that point in time you had not interviewed any
3  employees of WearGuard Norwell prior to that time, is
4  that correct?
5     A.  Correct.
6     Q.  And that after you spoke with Mr. Beasley, you
7  interviewed Mr. Ortiz at the police station?
8     A.  Yes, and I'd like to correct that. Jason
9  Towres, I think, was the security officer. My memory
10 is now refreshed and it should be -- It is not Jason,
11 it was Ortiz, Carlos Ortiz.
12    Q.  Okay. So the only two WearGuard employees
13 that you interviewed at any time were the plaintiff,
14 Eric Beasley and Mr. Carlos Ortiz?
15    A.  Correct.
16    Q.  Ortiz was done at the Norwell police station
17 at his request?
18    A.  Correct.
19    Q.  Mr. Beasley was interviewed prior to Mr. Ortiz
20 on the same night, but at the workplace at WearGuard in
21 Norwell?
22    A.  Correct.
23    Q.  You mentioned that at the Norwell police
24 department Mr. Ortiz gave a statement, or?

Page 92

1     A.  Correct.
2     Q.  Let me show you what comes in responses to
3  Request Number 3 or which I should have it marked
4  before I show it to you.
5         (Hess Exhibit No. 4 marked for
6          identification.)
7         (Document handed to the witness.)
8     Q.  Do you recognize what's marked as Exhibit 4,
9  Mr. Hess?
10    A.  Yes, I do.
11    Q.  What is it?
12    A.  Statements submitted by Carlos Ortiz.
13    Q.  And do you recognize the signatures at the
14 bottom of the page?
15    A.  Yes, I do.
16    Q.  Whose signatures are they?
17    A.  Mine on the left and Carlos Ortiz on the
18 right.
19    Q.  The time is kind of pinched. Can you make out
20 the time there on this copy that I have is pinched?
21    A.  I have that information. My memory is it's
22 around 11:20 or 11:40, but if you want me to refresh my
23 memory, I can tell you.
24    Q.  No.

Page 125

1  it was by car.
2    Q.  Is it possible that someone could have dropped
3  him off at work, isn't that a possibility?
4    A.  It's possible.  I didn't take it from the
5  conversation, his responses, that was what had
6  happened.
7    Q.  But he did tell you that his car was in the
8  shop?
9    A.  Yes.
10   Q.  And that his car was not at WearGuard at that
11 time?
12   A.  Correct.
13   Q.  Did you mention to Mr. Beasley during the
14 interview that he been followed every day from
15 Brockton to work and that we know that you are the go-
16 to guy?
17   A.  No.
18   Q.  Did you know when you spoke to Mr. Beasley
19 where he lived?
20   A.  No.
21   Q.  So I take it that you didn't know that he
22 lives in Weymouth?
23   A.  No.
24       Let me correct that.  I was given his

Page 126

1  address early on and that information was on there, but
2  it never registered.  I don't even know where these
3  towns were.
4    Q.  And you never suggested to Mr. Beasley during
5  that interview that he resign?
6    A.  No.
7    Q.  And you didn't ask him any questions about
8  Brockton?
9    A.  Not that I recall.
10   Q.  And you didn't tell Mr. Beasley -- Let me ask
11 you.  Did you ever tell Mr. Beasley that we are going
12 to get you or that we will get you?
13   A.  No.
14   Q.  And how did the interview -- Well, was there
15 anything else of substance before the interview ended?
16   A.  Yes.
17   Q.  That we haven't covered yet?  Tell me about
18 it.
19   A.  Told him that, I only know that your name came
20 up as somebody that was involved in violating company
21 policies for drug and alcohol.  I don't know if it's
22 true or not.  I'm very interested in knowing if it is,
23 but I'm just as interested in knowing if you know
24 something about other individuals involved in any other

Page 127

1  company violations, whether it be theft, drugs, time
2  abuse.  I think I rattled off a whole series of things.
3    Q.  Did you tell him how his name had come up?
4    A.  No.  I said at that, point you know, here's my
5  business card.  And I think I might even have put my
6  cell phone number on the back of it, I'm not sure.  If
7  later on you want to call me about anything that I
8  might be interested in knowing, please give me a call.
9  And that was, he made one more statement.  He says, Are
10 you telling me I can't leave?  I said, No, that's
11 between you and your supervisors.  Talk to your
12 supervisors about whether you're permitted to leave
13 early and he walked out.
14   Q.  And where did he go?
15   A.  Don't know.
16   Q.  And he wasn't arrested that night, was he?
17   A.  No.
18   Q.  And the police did not ask to speak to him
19 that night, did they?
20   A.  No.
21   Q.  And when you asked him if he wanted to speak
22 to the police, he said no?
23   A.  Correct.
24   Q.  And why did you ask him if he wanted to speak

Page 128

1  to the police?
2    A.  He asked me, Am I going to get arrested?  And
3  my response to that question, This is a police
4  investigation on the narcotics end.  Do you want to
5  talk to the police, because they would know that
6  answer.  And he said no.
7    Q.  But you knew at that point that he had not
8  approached the truck with regard to taking any
9  merchandise, correct?
10   A.  Correct.
11   Q.  And based on what we've discussed today, there
12 wasn't any direct evidence of his involvement, at least
13 that night, with regard to either drug dealing or drug
14 use, correct?
15   A.  Correct.
16   Q.  I take it he didn't call you, even though you
17 invited him to do so?
18   A.  No, he did not.
19   Q.  And after the interview how long would you say
20 the interview lasted?
21   A.  Not very long.  Definitely not 15 minutes.  8
22 to 12 minutes, maybe.  Not long at all.
23   Q.  Did you think to ask him if he wanted to make
24 a written statement?

32 (Pages 125 to 128)

9811a46a-322b-4217-9bd1-7f560174bd70

Page 129

1    A.   No.
2    Q.   Why not?
3    A.   Because he told me he didn't know anything,
4    didn't know anybody that was violating company rules
5    and that he wasn't doing it, so there's nothing to ask
6    for a written statement about.
7    Q.   Do you know whether he was a supervisor?
8    A.   I believe he was.  I don't know in what
9    capacity.
10   Q.   If I told you he was a digitizer in the art
11   department, would that mean anything to you?
12   A.   No.
13   Q.   Was he identified to you by others at
14   WearGuard as a supervisor?
15   A.   I had thought so.  Or lead, the word might
16   have been a lead, which is another word that I think
17   they use sometimes for some type of supervisor
18   capacity, but I don't know.
19   Q.   Maybe a lead specialist?
20   A.   Could be.  I don't know.
21   Q.   Did you ever speak with Mr. Cummings or Susan
22   Magrini or anyone at WearGuard in management about the
23   fact that there was more than one Eric employed in this
24   part of WearGuard?

Page 130

1    A.   No.
2    Q.   And did you ever learn that there was another
3    Eric in WearGuard who happened to be a black man?
4    A.   No.
5    Q.   Are you hearing that for the first time today?
6    A.   Yes.
7    Q.   Do you know what happened to Mr. Beasley in
8    terms of his employment at WearGuard?
9    A.   Yes.
10   Q.   What happened?
11   A.   He was terminated.
12   Q.   Was he suspended?
13   A.   I believe he was, yes.
14   Q.   And then terminated?
15   A.   Correct.
16   Q.   Do you know why?
17   A.   Violation of company policy.
18   Q.   Do you know which policy?
19   A.   I believe it was the drug and alcohol in part,
20   but I don't know all the particulars or specifics.
21   That was handled locally.
22   Q.   Were you consulted about that decision?
23   A.   I was involved in one or more and maybe as
24   many as two conference calls where there was

Page 131

1    discussions about what they were doing with multiple
2    individuals, but no, I was not consulted on this.  I
3    just was in on the conference call.
4    Q.   One of those individuals was Eric Beasley,
5    though?
6    A.   Yes.
7    Q.   That you discussed?
8    A.   Correct.
9    Q.   And those conference calls were between you
10   and Susan Magrini?
11   A.   No, the conference calls were between a whole
12   bunch of people, I think Cathy Gillis was on the line
13   Susan was on the line, John was on the line, at least
14   one of the calls Steve Freedman, the corporate attorney
15   was on the line.  There was not just myself and
16   somebody else.  I think one of the calls my boss was in
17   the room with me on speaker phone and we had a
18   conversation.
19   Q.   What was the general subject, what to do with
20   these individuals, including Mr. Beasley?
21   A.   Correct.
22   Q.   In terms of their employment?
23   A.   Correct.
24   Q.   And these were individuals who were not

Page 132

1    arrested that night for any wrongdoing, correct?
2    A.   Probably so.
3    Q.   And how soon after you left was this
4    conference call?  Was it one call or several?
5    A.   There were several calls.  My memory is that I
6    only was able to participate in two of them because of
7    other, of travel arrangements.  I was peripherally
8    involved so that the conference call could go on
9    without me, but I believe there might have been two of
10   them that I remember.
11   Q.   Did anyone in the conference call ask you for
12   your opinion on these matters?
13   A.   No.
14   Q.   No?
15   A.   No.  What matters?  Who to discharge and who
16   not to discharge?
17   Q.   Well, the issue of these employees, who
18   included Mr. Beasley who were not arrested on the night
19   of the sting?
20   A.   They did not ask my -- They did not ask for my
21   input on whether it was or not and that's not uncommon.
22   Q.   Why were you even involved in the conference
23   calls?
24   A.   Conference -- First, I was involved in a

33 (Pages 129 to 132)

9811a46a-322b-4217-9bd1-7f560174bd70

Page 133

1  portion of the operation, the undercover, that was my
2  sole responsibility or whole involvement. The other is
3  that some of these calls also took in discussions about
4  going forward, what we might want to do to go forward
5  and some of the things we might do as a company
6     Q   When you finished your interview with Mr.
7  Beasley on the night of November 5, did you speak to
8  anybody at WearGuard about that interview?
9     A.  Uh-hum.
10    Q.  Who did you speak to?
11    A.  John Cummings and I think at one point Cathy
12  Gillis.
13    Q   About Susan Magrini?
14    A.  I don't think she was there that night
15    Q   I think you said earlier she was there for
16  part of that night, unless I misunderstood your
17  testimony.
18    A.  She was there earlier, but I don't -- She was
19  there earlier, but I don't think she was there during
20  this time. But I could be mistaken.
21    Q.  Did you speak to anybody other than Gillis and
22  John Cummings about the interview?
23    A   No.
24    Q   Did you speak to them together or separately?

Page 134

1     A.  Separately.
2     Q   Who did you speak to first?
3     A   John Cummings
4     Q   What did you tell him?
5     A   He didn't have any information and nothing,
6  nothing relevant.
7     Q   Did you tell him that he denied the
8  accusations or the suggestions of wrongdoing?
9     A.  No, but he certainly could imply that from
10  what I said
11    Q   And then you later spoke to Cathy Gillis?
12    A   I think it was Cathy. It was either her or
13  Susan in the hallway and same conversation.
14    Q.  And Susan Gillis worked for -- I'm sorry
15  Cathy Gillis worked for Susan Magrini at that point in
16  time?
17    A   Correct.
18    Q   And what did you tell either one of those when
19  you talked to them?
20    A.  Same thing. Nothing of relevance out of that
21  interview.
22    Q.  Did you tell them that he denied doing any
23  wrongdoing?
24    A.  It could be implied, but I don't believe I

Page 135

1  said that. I said nothing of relevance came out of
2  that interview
3     Q.  Don't you consider it relevant or important
4  that the individual denies the wrongdoing that was
5  suggested by you?
6     A.  I think that's implied  You know, it was a
7  very short conversation pertaining to Mr. Beasley. The
8  bigger conversations were, you know, going forward, you
9  know, what has to be done, you know, those kind of
10  things.
11    Q.  Had anyone asked you to obtain Beasley's
12  consent to search his car?
13    A   No.
14    Q   Did the police suggest that to you?
15    A.  No
16    Q.  Or Mr. Cummings?
17    A.  No.
18    Q.  That was your idea, that perhaps searching his
19  car would be helpful for the investigation?
20    A.  Yes, and in part to prove his innocence
21  There's nothing there. Do you mind if we have a dog
22  run past it? He said no.
23    Q.  His innocence was in doubt, in your mind?
24    A   Yes

Page 136

1     Q.  In fact, from the very first conference call
2  back in August, he was identified as the drug dealer?
3     A.  As a drug dealer.
4     Q   Yes
5     A.  The only name that was initially given
6     Q   That was the first name that you heard?
7     A.  Uh-hum  (Witness nodding head up and down.)
8     Q   And that was the only employee that you
9  interviewed, Beasley? And Ortiz, excuse me
10    A.  That's correct
11    Q.  And Ortiz?
12    A.  That's correct
13    Q.  Now, I'd like to direct your attention to
14  Exhibit 2, Mr Hess, Page 251, please.
15    A   Okay
16    Q   This is a portion of Mr Sjoberg's reports to
17  Mr. Cummings  And you received copies of these
18  sometime after you left Norwell?
19    A   No.
20    Q   On November 5?
21    A   No.
22    Q   No?
23    A   The first time I saw them was this week.
24    Q   This week? Okay

34 (Pages 133 to 136)

9811a46a-322b-4217-9bd1-7f560174bd70

Page 137

1    A   Uh-hum.  (Witness nodding head up and down.)
2    Q   You have had a chance to peruse them, I
3  assume?
4    A   Yes, very quickly, because it really has very
5  little relevance to me, but I scanned it.
6    Q   Do you know if these reports were available
7  when you participated in the conference calls after
8  November 5 with Magrini, Gillis and Cummings about what
9  to do with certain people?
10    A   Do not know.
11    Q   Was it your understanding that the group of
12  employees that were the subject of the conference calls
13  after November 5 were all on suspension?
14    A   I'm not sure.  I'm not sure.
15    Q   Do you know that Mr. Beasley was suspended the
16  day after you spoke to him?
17    A   I've come to know that.  I didn't know that
18  that day.  That happened after I was in the air.
19    Q   Do you know who actually suspended him or told
20  him that he was going to be suspended?
21    A   I did read that somewhere, but I forget.  I
22  think it might have been Cathy Gillis, but I'm not
23  sure
24    Q   Looking at Page 251 of Exhibit 2, this is a

Page 138

1  portion of Mr. Sjoberg's report that's under the
2  caption of Interview With Carlos Ortiz.
3    A   Okay.
4    Q   And if I can just read the preamble, it says,
5  The investigators met with Carlos Ortiz, who also
6  brought his 5-year old son on Monday, November 10, 2003
7  at 11:45 a.m. at a park along Route 37 in Holbrook,
8  Massachusetts.  Carlos Ortiz made the following
9  statements
10        And would you read the one that's at the
11  very bottom of the page, please?
12    A   Carlos Ortiz stated I only wrote down at the
13  police station about Eric (Beasley) so I could get
14  bailed.  It's not true.
15    Q   And then the first statement at the top of
16  Page 252, could you read that for me, please?
17    A   Carlos Ortiz stated I don't even know Eric
18  (Beasley) except to say hi  I didn't even know if he
19  (Eric Beasley) sold or smoked weed
20    Q   Now, do you know whether Mr. Ortiz was bailed
21  that night from the Norwell Police Department?
22    A   No, I do not
23    Q   He was still there when you left?
24    A   Yes, he was.

Page 139

1    Q   Do you know what the plan was in talking with
2  the police?
3    A   Not the final plan  I do know that because of
4  the lateness of the hour, there was some discussions
5  about finding a judge or maybe using a summons, but I
6  do not know what the final thing was.
7    Q   Was Ortiz the only WearGuard employee that was
8  at the police station when you left?
9    A   No, no.
10    Q   There were several others?
11    A   Yes
12    Q   Was Mr. Towres one of them?
13    A   I believe he was, yes.
14    Q   And do you know whether any of those
15  individuals were released on bail that night?
16    A   I do not know.
17    Q   Or even released on bail at some later time?
18    A   I certainly suspect at some point they were
19  all released, but I don't know what the timing was
20    Q   I'm just asking for your knowledge.
21    A   No, I don't know.
22    Q   Would you agree with me that the sentence that
23  you just read at the bottom of Page 251 calls into
24  question the validity, or the truthfulness perhaps is a

Page 140

1  better word, of Exhibit 4, which is the handwritten
2  statement that you signed alongside of Mr. Ortiz's
3  signature?
4    A   I'd say contradicts, but no, I would not say
5  it challenges the validity or truthfulness.
6    Q   But they do appear to be contradictory?
7    A   Absolutely.
8    Q   So he's being untruthful in either the
9  statement that you witnessed and signed or in his
10  interview with Mr. Sjoberg or Mr. Sjoberg's
11  representative that is mentioned on Page 251?
12    A   Correct.
13    Q   And looking at Page 251 again, if you would,
14  please  I was asking you to look again at Page 251
15  this time at the top of the page which indicates,
16  according to Mr. Sjoberg, who has produced this report,
17  that on Monday, November 10, the investigator and Mr
18  Cummings also spoke with the following employees  And
19  the last name there is Anthony Sketchy Sousa, do you
20  see that name?
21    A   Yes.
22    Q   Is that similar to the Sketch used by Mr.
23  Carlos Ortiz in Exhibit 4, which is his statement?
24    A   I could would suspect so

35 (Pages 137 to 140)

# EXHIBIT C



# $\mathcal{NSA}$, Inc.

## Needham, Sjoberg & Associates

INVESTIGATIVE CONSULTANTS

*Corporate Fraud*
*Pre-Employment Profiles*

*Attorney Services*
*Video Surveillance*

August 5, 2003

**PERSONAL AND CONFIDENTIAL**

**WearGuard-CREST**
141 Longwater Drive
Norwell, MA 02061

| | |
|---|---|
| **Attention:** | **Mr. John Cummings**<br>**Asst. V.P., Facilities, Engineering & Security** |
| **Re:** | **Background Investigation** |
| **Subject:** | **ERIC E. BEASLEY**<br>**SS# 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** |

Dear Mr. Cummings,

Pursuant to your request, we have conducted a background investigation on the above-named subject . This report will supplement our verbal update and detail our findings.

### SOCIAL SECURITY VERIFICATION

Through Trans Union Credit Bureau, we surfaced a Social Security Trace Report in the subject's name.. The subject's Social Security Number of 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, as well as, Date of Birth of October 11, 2007, were confirmed respectively.

### ADDRESS VERIFICATION

The following addresses were confirmed relative to this subject on the following corresponding dates:

| Residential Address | Date Reported | |
|---|---|---|
| 28 Charles Street, #21, Weymouth, MA 02189 | 08/94 To Present | CONFIDENTIAL |
| 9 Park Street, #1, Hyde Park, MA 02136 | 04/96 To 05/98 | |
| 5 Wellesley Park, #1, Boston, MA 02124 | 12/94 | |

ARA 0285

*101 Federal Street • Suite 1900 • Boston, Massachusetts 02110 • Telephone (617) 342-3616 • Facsimile (781) 337-3935*

WearGuard-CREST
Eric Beasley Background Investigation
August 5, 2003
Page 2

## DRIVER RECORD HISTORY

Research determined the applicant possesses an *Active*, Class D, Driver's License which is due
to expire on October 11, 2007. The applicant's Driver's License Number of S98955195 within
the Commonwealth Of Massachusetts lists a residential address 28 Charles Street, #21, Weymouth,
MA 02189.

A search of the applicant's Driver Record History found an extensive record of violations issued
to this license holder. **A copy of the subject's Driver Record History is attached for your
review.**

## CRIMINAL HISTORY

### Criminal History Research, Massachusetts

To the extent allowed by state law, criminal records were searched at appropriate jurisdictions
with the following criminal record found for this subject:

| Type Of Offense | Date | Court Location |
|---|---|---|
| **Illegal Possession Of Controlled Substance, Class D – Marijuana** (Docket #0256CR003008) | 05-18-02 | Quincy District, MA |

**Disposition:**     **Dismissed Upon Payment Of $200.00 Court Costs;**

**Police Report & Criminal Docket Attached**

| | | |
|---|---|---|
| **State Highway By-Law Violation (Civil Motor Vehicle Infraction)** (Docket #0256CR003008) | 05-18-02 | Quincy District, MA |

**Disposition:**     **Found Responsible, $50.00 Fine;**

**Police Report & Criminal Docket Attached**

CONFIDENTIAL

ARA 0286

WearGuard-CREST
Eric Beasley Background Investigation
August 5, 2003
Page 3

| Type Of Offense | Date | Court Location |
| --- | --- | --- |
| Operate Motor Vehicle With Suspended License (Docket #9306CR6479) | 08-25-93 | West Roxbury District, MA |

**Disposition:**    Dismissed On $150.00 Court Costs, $50.00 Victim / Witness Fees;

Defaulted On Payments - Various Warrants Issued / Recalled

## SUMMARY

We have completed our investigation on this subject and have provided you with a verbal update of our findings. Should you have any questions or comments, please feel free to contact our office at any time.

Sincerely,

*Richard A. Sjoberg*

Richard A. Sjoberg
President

CONFIDENTIAL

ARA 0287

# Milton Police Department

40 Highland Street
Milton, Ma 02186
617-696-5068
Custody Report
MIT

Booking Number: 2002000000201
File Number:

| | | | |
|---|---|---|---|
| Booking Code: | Arrest | Custody Type: | Taken into Custody |
| Cell Number: | 3/LO | Court: | N/A |
| Master Name: | BEASLEY, ERIC E | DOB: | 10/11/70 |
| Master Card No: | 2002000001656 | OBTN: | TMIT02000201 |
| Location of Custody: | ADAMS STREET / RANDOLPH AVENUE, MILTON MA, 02186 | | |
| Booking Name: | BEASLEY, ERIC E | | |
| Address: | 28 CHARLES STREET, Apt. 21, WEYMOUTH MA, 02189 | | |
| Booking Number: | 2002000000201 | File No: | |
| Booking Date: | 5/18/02  2:27:00AM | Custody Date: | 5/18/02  2:27:00AM |

5/18/02  2:44:56AM     5/18/02  2:45:24AM

CR Number:
RA Number:

## Personal Information

| | | | | | |
|---|---|---|---|---|---|
| Sex: | Male | Height: | 6' 3" | Occupation: | COMPUTERIZED DIGITI |
| Race: | Black | Weight: | 255 | Employer/School: | WEAR GUARD |
| DOB: | 10/11/70 | Age: | 31 | Emp/School Address: | NORWELL, MA |
| Place of Birth: | BIRMINGHAM, AL | Build: | Large | Social Security No: | 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 |
| Mother's Name: | N/A | Eye Color: | Brown | Opr's License # & St: | S98955195 | MA |
| Father's Name: | N/A | Hair Color: | Black | Marital Status: | Single |
| Legal Spouse: | N/A | Skin Tone: | Dark | Maiden Name: | N/A |
| Mother: | MARY BEASLEY | Ethnicity: | Not Hispanic | Home Telephone: | (781) 340-6493 |
| Father: | N/A | | | | |
| Spouse: | N/A | | | | |

Scars / Marks / Tattoos: N/A

## Associated Incidents

| Incident Number | Incident File Number | Incident Date | Description |
|---|---|---|---|
| 2002000004188 | | 5/18/02  1:55:00AM | Warrant Service |

## Booking Process

| | | | | | |
|---|---|---|---|---|---|
| Was Phone Used: | N/A | Examined at Hospital: | N/A | Breathalizer Administered: | No |
| Tel. No. Called: | N/A | | | | |
| Personal Property: | MARIJUANA, WALLET, WATCH, 2 RINGS, CHAIN, EARING, HAT | | | | |
| Refused Fingerprints: | No | Refused Photograph: | No | Refused Breath Test: | N/A | Refused Blood Test: | N/A |

CONFIDENTIAL

ARA 0293

# EXHIBIT D

# LIST OF EMPLOYEES

A-1    Jerry    Caucasian male, 5'8" tall, approximately 45-50 years of age, 180 lbs, balding.

A-2    Mike    Caucasian male, approximately 45 years of age, dark brown hair, 5'8" tall, 165 lbs, wears glasses.

A-3    Carlos    Latino male, approximately 20 years of age, 5'5" tall, 145 lbs, tattoo on left arm.

A-4    Jason    Hispanic male, approximately 24 years of age, 5'11"tall, 200 lbs, wears glasses.

A-5    John    African American male, approximately 22-24 years of age, 5'9" tall, 150 lbs, bushy long hair kept in a ponytail, drives a white Acura (Tag 26V 604)

A-6    Eric    African American male, approximately 30 years of age, 6'0" tall, 200 lbs, eye pierced.

A-7    Unknown    Caucasian male, approximately 25-30 years of age, dark hair, 5'9" tall, 160 lbs, always wearing a dark jacket and baseball cap, drives the navy SUV tag (4856 WX).

A-8    Bill    African American male, dark complexion, approximately 40 years of age, 5'10" tall, 160 lbs.

A-9    Cindy    Caucasian female, approximately 40 years of age, curly blonde short hair, 5'5", 140 lbs.

A-10    Rich    Caucasian male, approximately 40-45 years of age, 6'0" tall, 200 lbs, wears glasses, works as a Chef in cafeteria.

A-11    Unknown    Caucasian male, approximately 28-30 years of age, brown hair and beard, 5'10" tall, 160 lbs, many tattoos, walks hunched over, drives black Celebrity (tag 7284 ZB)

A-12    John    Caucasian male, approximately 20-24 years of age, 5'10" tall, 150 lbs, reddish blonde wavy hair, beard and

CONFIDENTIAL

ARA 0192

mustache, drives the white Corsica (tag 87F 957).

A-13    Brian      Caucasian male, approximately 30-35 years of age,  165
                   lbs. Embroidery area supervisor

A-14    George     Hispanic male, approximately 35-40 years of age, 5'5" tall,
                   140 lbs.

A-15    Paul       Caucasian male, approximately 25-30 years of age, 5'8"
                   tall, 140 lbs,  reddish beard color, always wears a baseball
                   cap.

A-16    Kendra     Caucasian female, approximately 25-30 years of age,
                   blonde hair, 5'6" tall, 135 lbs.

**CONFIDENTIAL**

**ARA 0193**

## LIST OF EMPLOYEES

A-1    Jerry    Caucasian male, 5'8" tall, approximately 45-50 years of age, 180 lbs, balding.

A-2    Mike    Caucasian male, approximately 45 years of age, dark brown hair, 5'8" tall, 165 lbs, wears glasses.

A-3    Carlos    Latino male, approximately 20 years of age, 5'5" tall, 145 lbs, tattoo on left arm.

A-4    Jason    Hispanic male, approximately 24 years of age, 5'11"tall, 200 lbs, wears glasses.

A-5    John    African American male, approximately 22-24 years of age, 5'9" tall, 150 lbs, bushy long hair kept in a ponytail, drives a white Acura (Tag 26V 604)

A-6    Eric    African American male, approximately 30 years of age, 6'0" tall, 200 lbs, eye pierced.

A-7    Unknown    Caucasian male, approximately 25-30 years of age, dark hair, 5'9" tall, 160 lbs, always wearing a dark jacket and baseball cap, drives the navy SUV tag (4856 WX).

A-8    Bill    African American male, dark complexion, approximately 40 years of age, 5'10" tall, 160 lbs.

A-9    Cindy    Caucasian female, approximately 40 years of age, curly blonde short hair, 5'5", 140 lbs.

A-10    Rich    Caucasian male, approximately 40-45 years of age, 6'0" tall, 200 lbs, wears glasses, works as a Chef in cafeteria.

A-11    Unknown    Caucasian male, approximately 28-30 years of age, brown hair and beard, 5'10" tall, 160 lbs, many tattoos, walks hunched over, drives black Celebrity (tag 7284 ZB)

A-12    John    Caucasian male, approximately 20-24 years of age, 5'10" tall, 150 lbs, reddish blonde wavy hair, beard and mustache, drives the white Corsica (tag 87F 957).

A-13    Brian    Caucasian male, approximately 30-35 years of age, 165 lbs. Embroidery area supervisor

CONFIDENTIAL

ARA 0202

A-14   George    Hispanic male, approximately 35-40 years of age, 5'5" tall, 140 lbs.

A-15   Paul      Caucasian male, approximately 25-30 years of age, 5'8" tall, 140 lbs, reddish beard color, always wears a baseball cap.

A-16   Kendra    Caucasian female, approximately 25-30 years of age, blonde hair, 5'6" tall, 135 lbs.

A-17   Victor

A-18   Robin     Caucasian female, approximately 25 years of age, semi long dark hair, 5'2" tall, 115 lbs.

CONFIDENTIAL

## LIST OF EMPLOYEES

| | | |
|---|---|---|
| A-1 | Jerry | Caucasian male, 5'8" tall, approximately 45-50 years of age, 180 lbs, balding. |
| A-2 | Mike | Caucasian male, approximately 45 years of age, dark brown hair, 5'8" tall, 165 lbs, wears glasses. |
| A-3 | Carlos | Latino male, approximately 20 years of age, 5'5" tall, 145 lbs, tattoo on left arm. |
| A-4 | Jason | Hispanic male, approximately 24 years of age, 5'11"tall, 200 lbs, wears glasses. |
| A-5 | John | African American male, approximately 22-24 years of age, 5'9" tall, 150 lbs, bushy long hair kept in a ponytail, drives a white Acura (Tag 26V 604) |
| A-6 | Eric | African American male, approximately 30 years of age, 6'0" tall, 200 lbs, eye pierced. |
| A-7 | Unknown | Caucasian male, approximately 25-30 years of age, dark hair, 5'9" tall, 160 lbs, always wearing a dark jacket and baseball cap, drives the navy SUV tag (4856 WX). |
| A-8 | Bill | African American male, dark complexion, approximately 40 years of age, 5'10" tall, 160 lbs. |
| A-9 | Cindy | Caucasian female, approximately 40 years of age, curly blonde short hair, 5'5", 140 lbs. |
| A-10 | Rich | Caucasian male, approximately 40-45 years of age, 6'0" tall, 200 lbs, wears glasses, works as a Chef in cafeteria. |
| A-11 | Unknown | Caucasian male, approximately 28-30 years of age, brown hair and beard, 5'10" tall, 160 lbs, many tattoos, walks hunched over, drives black Celebrity (tag 7284 ZB) |
| A-12 | John | Caucasian male, approximately 20-24 years of age, 5'10" tall, 150 lbs, reddish blonde wavy hair, beard and mustache, drives the white Corsica (tag 87F 957). |

CONFIDENTIAL

ARA 0214

| A-13 | Brian | Caucasian male, approximately 30-35 years of age, 165 lbs. Embroidery area supervisor |
|------|-------|-------------------------------------------------------------------------------------|
| A-14 | George | Hispanic male, approximately 35-40 years of age, 5'5" tall, 140 lbs. |
| A-15 | Paul | Caucasian male, approximately 25-30 years of age, 5'8" tall, 140 lbs, reddish beard color, always wears a baseball cap. |
| A-16 | Kendra | Caucasian female, approximately 25-30 years of age, blonde hair, 5'6" tall, 135 lbs. |
| A-17 | Victor | African American male, approximately 28-32 years of age, 5'8" tall, 145lbs. |
| A-18 | Robin | Caucasian female, approximately 25 years of age, semi long dark hair, 5'2" tall, 115 lbs. |
| A-19 | Unknown | Caucasian male, approximately 30 years of age, 6'2" tall, 160 lbs, long dark hair pulled into a pony tail, drives a small taupe colored van. |
| A-20 | Unknown | Latino male, approximately 26 years of age, 5'3" tall, 140 lbs, known as the brother of Carlos. |
| A-21 | Carlos | African American male, approximately 30 years of age, 6'0" tall, 200lbs. |

**CONFIDENTIAL**

ARA 0215

## LIST OF EMPLOYEES

A-1     Jerry       Caucasian male, 5'8" tall, approximately 45-50 years of age, 180 lbs, balding.

A-2     Mike        Caucasian male, approximately 45 years of age, dark brown hair, 5'8" tall, 165 lbs, wears glasses.

A-3     Carlos      Latino male, approximately 20 years of age, 5'5" tall, 145 lbs, tattoo on left arm.

A-4     Jason       Hispanic male, approximately 24 years of age, 5'11"tall, 200 lbs, wears glasses.

A-5     John        African American male, approximately 22-24 years of age, 5'9" tall, 150 lbs, bushy long hair kept in a ponytail, drives a white Acura (Tag 26V 604)

A-6     Eric        African American male, approximately 30 years of age, 6'0" tall, 200 lbs, eye pierced.

A-7     Unknown     Caucasian male, approximately 25-30 years of age, dark hair, 5'9" tall, 160 lbs, always wearing a dark jacket and baseball cap, drives the navy SUV tag (4856 WX).

A-8     Bill        African American male, dark complexion, approximately 40 years of age, 5'10" tall, 160 lbs.

A-9     Cindy       Caucasian female, approximately 40 years of age, curly blonde short hair, 5'5", 140 lbs.

A-10    Rich        Caucasian male, approximately 40-45 years of age, 6'0" tall, 200 lbs, wears glasses, works as a Chef in cafeteria.

A-11    "Sketch"    Caucasian male, approximately 28-30 years of age, brown hair and beard, 5'10" tall, 160 lbs, many tattoos, walks hunched over, drives black Celebrity (tag 7284 ZB)

A-12    John        Caucasian male, approximately 20-24 years of age, 5'10" tall, 150 lbs, reddish blonde wavy hair, beard and mustache, drives the white Corsica (tag 87F 957).

**CONFIDENTIAL**

ARA 0225

A-13  Brian    Caucasian male, approximately 30-35 years of age,  165
                lbs. Embroidery area supervisor

A-14  George   Hispanic male, approximately 35-40 years of age, 5'5" tall,
                140 lbs.

A-15  Paul     Caucasian male, approximately 25-30 years of age, 5'8"
                tall, 140 lbs,  reddish beard color, always wears a baseball
                cap.

A-16  Kendra   Caucasian female, approximately 25-30 years of age,
                blonde hair, 5'6" tall, 135 lbs.

A-17  Victor   African American male, approximately 28-32 years of age,
                5'8" tall, 145lbs.

A-18  Robin    Caucasian female, approximately 25 years of age, semi
                long dark hair, 5'2" tall, 115 lbs.

A-19  Unknown  Caucasian male. approximately 30 years of age, 6'2" tall,
                160 lbs, long dark hair pulled into a pony tail, drives a
                small taupe colored van.

A-20  Jesus    Latino male, approximately 26 years of age, 5'3" tall, 140
                lbs, known as the brother of Carlos.

A-21  Carlos   African American male, approximately 30 years of age,
                6'0" tall, 200lbs.

**CONFIDENTIAL**

## LIST OF EMPLOYEES

| | | |
|---|---|---|
| A-1 | Jerry | Caucasian male, 5'8" tall, approximately 45-50 years of age, 180 lbs, balding. |
| A-2 | Mike | Caucasian male, approximately 45 years of age, dark brown hair, 5'8" tall, 165 lbs, wears glasses. |
| A-3 | Carlos | Latino male, approximately 20 years of age, 5'5" tall, 145 lbs, tattoo on left arm. |
| A-4 | Jason | Hispanic male, approximately 24 years of age, 5'11"tall, 200 lbs, wears glasses. |
| A-5 | John | African American male, approximately 22-24 years of age, 5'9" tall, 150 lbs, bushy long hair kept in a ponytail, drives a white Acura (Tag 26V 604) |
| A-6 | Eric | African American male, approximately 30 years of age, 6'0" tall, 200 lbs, eye pierced. |
| A-7 | Unknown | Caucasian male, approximately 25-30 years of age, dark hair, 5'9" tall, 160 lbs, always wearing a dark jacket and baseball cap, drives the navy SUV tag (4856 WX). |
| A-8 | Bill | African American male, dark complexion, approximately 40 years of age, 5'10" tall, 160 lbs. |
| A-9 | Cindy | Caucasian female, approximately 40 years of age, curly blonde short hair, 5'5", 140 lbs. |
| A-10 | Rich | Caucasian male, approximately 40-45 years of age, 6'0" tall, 200 lbs, wears glasses, works as a Chef in cafeteria. |
| A-11 | "Sketch" | Caucasian male, approximately 28-30 years of age, brown hair and beard, 5'10" tall, 160 lbs, many tattoos, walks hunched over, drives black Celebrity (tag 7284 ZB) |
| A-12 | John | Caucasian male, approximately 20-24 years of age, 5'10" tall, 150 lbs, reddish blonde wavy hair, beard and mustache, drives the white Corsica (tag 87F 957). |

**CONFIDENTIAL**

A-13   Brian     Caucasian male, approximately 30-35 years of age,  165 lbs. Embroidery area supervisor

A-14   George    Hispanic male, approximately 35-40 years of age, 5'5" tall, 140 lbs.

A-15   Paul      Caucasian male, approximately 25-30 years of age, 5'8" tall, 140 lbs,  reddish beard color, always wears a baseball cap.

A-16   Kendra    Caucasian female, approximately 25-30 years of age, blonde hair, 5'6" tall, 135 lbs.

A-17   Victor    African American male, approximately 28-32 years of age, 5'8" tall, 145lbs.

A-18   Robin     Caucasian female, approximately 25 years of age, semi long dark hair, 5'2" tall, 115 lbs.

A-19   Unknown   Caucasian male. approximately 30 years of age, 6'2" tall, 160 lbs, long dark hair pulled into a pony tail, drives a small taupe colored van.

A-20   Jesus     Latino male, approximately 26 years of age, 5'3" tall, 140 lbs, known as the brother of Carlos.

A-21   Carlos    African American male, approximately 30 years of age, 6'0" tall, 200lbs.

CONFIDENTIAL

ARA 0235

# EXHIBIT E

 CORPORATE RISK SOLUTIONS

1439 Alpharetta Highway
Suite I
Alpharetta, Georgia 30004
770-664-0911    770-753-0911 fax
blarkin@corporaterisksolutions.com

November 4, 2003

Mr. Jay Hess
Manager - Corporate Security
Aramark Corporation
1101 Market Street
Philadelphia, PA. 19107

## UNDERCOVER OPERATION RECAP - WEARGUARD

**RE**: Operative # 1543

**PERIOD**:  September 9, 2003 to October 31, 2003

The following report outlines the observations of Operative 1543 where employee dishonesty, drug activity, and procedural deficiencies have been noted on a consistent basis at the Wearguard facility located in Norwell, Massachusetts. The outline will assist with identifying issues by employee that are either illegal or in violation of Wearguard policy.

The Operative has been successful in identifying the following employees currently involved in merchandise theft, drug use and drug sales:                    )

The Operative befriends a male employee by the name of *Carlos Ortiz* who she learns on her first day of working in the building is selling marijuana to the other employees. During the assignment, the Operative has observed much interaction between Carlos and another employee by the name of Eric Beasley.

The following dates are documented by the Operative involving observations and conversations of drug use, drug distribution and theft by Carlos.

CONFIDENTIAL

| | |
|---|---|
| September 10, 2003 | Carlos brags to the Operative that he makes "Mad money" on Thursdays selling marijuana because this is payday for the building employees. Carlos also states that he can provide any amount of marijuana that she is interested in purchasing. |
| September 15, 2003 | Carlos approaches the Operative at 4:07 pm to ask her if she is interested in making a purchase of marijuana. |
| September 16, 2003 | The Operative observes Carlos walking from one vehicle to the other in the parking lot making quick exchanges from hand to hand with the occupants of each vehicle. |
| September 18, 2003 | The Operative observes Carlos walking through the parking area making three different quick hand to hand exchanges with different employees. |
| September 26, 2003 | Carlos approaches the Operative and again attempts to persuade her to make a purchase of marijuana from him. |
| October 6, 2003 | Carlos approaches the Operative and invites her to smoke marijuana with him one evening after work. |
| October 7, 2003 | Carlos and several other employees sit inside of the Operative's van during a break. They are smoking cigars and cigarettes that they state contain marijuana. The smell is consistent with that of marijuana. |
| October 9, 2003 | Carlos approaches the Operative at the meal break and invites her to ride with him off premises to smoke marijuana. |
| | Carlos tells the Operative to start taking her evening break at 9:30 and he will give her a sample of some marijuana to smoke on the break. |
| October 10, 2003 | Carlos invites the Operative to meet with him and several other employees after work to smoke marijuana. Carlos also asks the Operative if she has any "Blunts" to smoke later that evening. The Operative has a conversation with another employee (Paul) who tells the Operative that Carlos sells flavored marijuana and has many employees who buy from him on a regular basis. Paul also states that Carlos leaves the premises on most of the breaks to smoke marijuana with other employees. |
| October 15, 2003 | The Operative observes Carlos leave for a break and return drinking a beer, which he discards in the back of his trunk. |

CONFIDENTIAL

ARA 0630

Carlos invites the Operative to go out and smoke marijuana with him Friday evening after work.

| October 17, 2003 | The Operative observes Carlos sell marijuana to Paul in the parking area during one of the breaks. The marijuana is sealed into a small plastic bag. |

After the shift ends, Paul gives the Operative a "Blunt" and states that it is a gift from Carlos for her to smoke this evening.

| October 20, 2003 | The Operative observes Carlos make a quick hand exchange with John (A-5) in the parking area. Carlos walks to the Operative's vehicle and observes that Carlos has a roll of cash still in his hand. |

Carlos approaches the Operative and requests that she steal some leather jackets for him from the building in exchange for ¾ ounce of marijuana.

During the evening break the Operative observes Carlos make a quick hand-to-hand exchange with an unidentified white male employee in the parking area.

| October 21, 2003 | The Operative conceals three jackets and places them in her vehicle. The Operative displays the jackets to Carlos at the evening break and also gives him $60 in cash to secure the deal for ¾ ounce of marijuana. They agree to meet at 1:30 AM to exchange the jackets for the marijuana. |

| October 22, 2003 | The Operative follows Carlos to his residence at 1:30am to collect the marijuana. Once they arrive at the residence, Carlos produces the marijuana, sealed in a plastic sandwich bag and hands it to the Operative. Carlos then collects the three leather jackets and another $140 in cash from the Operative for another ounce of marijuana, which he promises to produce the following day in exchange for three more leather jackets. |

CONFIDENTIAL

At 3:37 pm, at the building, Carlos approaches the Operative and requests that she get him a black leather jacket in an extra large size in addition to 10 blue jean jackets. Carlos promises the Operative another ounce of marijuana in exchange for the jackets.

At 6:10pm, the Operative meets with Carlos at her vehicle and produces three more leather jackets to Carlos. Carlos

ARA 0631

hands the Operative another bag of marijuana.

At 7:25pm, Carlos approaches the Operative and informs her that he has two more ounces of marijuana that he wants to sell if she is interested. The Operative tells Carlos that she will need to wait for "payday."

| | |
|---|---|
| October 23, 2003 | Carlos approaches the Operative and insists that she produce the ten blue jean jackets by the end of the evening. The Operative attempts to explain to Carlos that it is difficult to move that many jackets at one time. They agree to meet the next evening at 6:00pm in a back parking area to exchange the jackets for another ounce of marijuana. Carlos states that he is not working tomorrow but will come in to meet her. |
| October 24, 2003 | The Operative removes one leather jacket and one blue jean jacket from the building and places them in her vehicle to give to Carlos at 6:00pm. At 5:10pm, Carlos' brother approaches the Operative and she relays to him that she only has two jackets at this time. Carlos does not show up at the scheduled 6:00pm meeting place. |
| October 27, 2003 | The Operative has a conversation with Carlos in the Custom Embroidery area about the purchase of two ounces of marijuana. Carlos makes arrangements with the Operative to follow him to his residence that evening. The Operative gives Carlos $300 in cash. Later, the same evening, Carlos tells the Operative that he has decided to bring the marijuana to her at work the following day. At the evening break, the Operative meets with Carlos to give him the two jackets that she removed from the building the previous week. Carlos pushes the Operative for additional jackets and a pair of Timberland boots. |
| October 28, 2003 | At the evening break, Carlos informs the Operative that he was caught in a roadblock and had to toss the two ounces of marijuana from his vehicle. He agrees to bring the marijuana to the Operative at work the following day. Carlos has a conversation with the Operative about being involved with organized crime in Brockton, Massachusetts. In addition, Carlos tells the Operative, "Eric smokes more marijuana that you and I put together." |
| October 29, 2003 | At 6:25pm, the Operative meets with Carlos at her vehicle and he hands her two ounces of marijuana sealed inside of two sandwich bags. Carlos tells the Operative "I will have some |

better shit next week."

The Operative learns that Carlos is very close friends and spends a lot of time with another employee by the name of *John* an African American male, who has long hair pulled into a ponytail. The Operative has determined that John also smokes marijuana with Carlos. The Operative observes that John and Carlos leave the premises several times each day during breaks to presumably smoke marijuana. The Operative also notes that John is observed on several occasions driving an Audi registered to Eric Beasley.

**The following activities are documented by the Operative involving John:**

| | |
|---|---|
| September 10, 2003 | The Operative listens to John ask Carlos "You have any Fire on you?" which the Operative notes is a slang term for marijuana. The Operative then observes Carlos produce a cigar that he tells John has the marijuana inside and they begin to smoke. At this time, John is sitting in the Audi. |
| September 18, 2003 | The Operative observes John and Carlos leave the building together during the meal break. When Carlos and John return their eyes are red and glassy. |
| September 22, 2003 | The Operative again observes John sitting alone inside of the Audi. |
| | At the meal break, the Operative observes John and Carlos exit the parking area driving the Audi. The Operative walks to the vehicle when they return and notes that it smells strongly of marijuana. |
| September 24, 2003 | The Operative observes John and Carlos inside of the Audi. John slides down in the seat as a police vehicle cruises through the parking area. John drives the Audi quickly out of the parking area after the police leave the area. |
| October 9, 2003 | The Operative is approached by Carlos and John who try to persuade her to leave the premises with them to smoke marijuana on one of the breaks. |
| October 10, 2003 | The Operative makes plans to meet after work with Carlos, John and Paul. The Operative learns that Carlos and John drive to Brockton to obtain marijuana before meeting her and Paul at the TKO bar. During the evening, John calls Paul several times on his cell phone to relay their location. |
| October 14, 2003 | During a break, the Operative observes, Carlos and John drinking beer or liquor from a bottle concealed in a brown paper bag |

CONFIDENTIAL

October 20, 2003    The Operative observes John retrieving an item from the Audi. John then leaves the property with another employee in a small sports vehicle. When John returns, the Operative observes Carlos hand John a small plastic bag and John then hands Carlos a roll of cash. Carlos then walks over to the Operative and tells her that John and the other employees in the sports vehicle are smoking "a blunt."

October 22, 2003    Again, during a break the Operative observes John and Carlos make a quick hand-to-hand exchange in the parking area. The Operative notes that Carlos hands John a small plastic bag that contain "a blunt" and John hands Carlos a roll of cash.

The Operative determines that another employee, *Paul*, is actively involved with Carlos in drug usage. The Operative learns that Paul has a lot of knowledge regarding drug sales by Carlos to other employees in the building. Paul is also able to provide the Operative with details on the type of drugs and regular buyers that Carlos is involved with.

**The following dates outline the conversations and drug usage witnessed by the Operative involving Paul:**

October 10, 2003    The Operative has a conversation with Paul at the TKO bar while they are waiting for Carlos and John to arrive. The Operative learns from Paul that Carlos and John have gone to Brockton to purchase marijuana. Paul gives the Operative details regarding flavors of marijuana that Carlos has for sale. In addition, Paul tells the Operative that Carlos has many "regular customers" at the building and mentions a female employee, *Kendra* that makes purchases almost daily from Carlos.

October 15, 2003    The Operative has a conversation with Paul regarding a security employee, Jason. Paul tells the Operative that he suspects Jason is a "snitch." Later the same evening, Paul asks the Operative if she will "go in with him" on purchasing a bag of marijuana.

October 17, 2003    Paul comments to the Operative "We are going to get high as the sky tonight." At 4:00 PM, in the parking area of the building, the Operative observes Carlos hand Paul a plastic bag containing marijuana. Paul then hands Carlos a roll of cash. After work, the Operative agrees to meet Paul again at the TKO bar for dinner and drinks. Paul tells the Operative

CONFIDENTIAL    ARA 0634

that    he purchased marijuana from Carlos earlier during the day. Paul also tells the Operative that Carlos gave him an extra "blunt" for them to smoke together this evening. At the end of the evening Paul gives the "blunt" to the Operative to "take home and smoke."

October 27, 2003    Paul asks the Operative "Hey, you got some fire?" meaning marijuana. Paul then relays that he needs to purchase some marijuana because he does not have any.

The Operative learns that Carlos has a brother who begins working at the building by the name of *Jesus*. The Operative determines that Jesus is actively involved with Carlos in the distribution of drugs in exchange for cash or merchandise.

**The following dates are outlined by the Operative involving Jesus' involvement in illegal activity:**

October 20, 2003    Carlos introduces the Operative to his brother Jesus and then asks the Operative while Jesus is present to "move some leather jackets" from the building in exchange for an ounce of marijuana.

October 22, 2003    The Operative follows Carlos and Jesus to their residence    to exchange three leather jackets and $60 in cash for an ounce of marijuana.

October 24, 2003    Jesus approaches the Operative and asks "Did you get our jackets?" Jesus becomes angry with the Operative after she informs him that she only has two jackets instead of the ten that he and Carlos requested.

October 27, 2003    Jesus and Carlos meet the Operative at her vehicle in the parking area to obtain the two jackets that she removed from the building the previous week.

October 28, 2003    Jesus and Carlos meet with the Operative during a break and relay that they drove to a roadblock and threw out the two ounces of marijuana they were delivering to her.

Jesus and Carlos also relay some family history to the Operative regarding drug sales and being connected to organized crime. During this same conversation, the Operative makes arrangements with Jesus and Carlos to obtain two ounces of marijuana from them.

CONFIDENTIAL

ARA 0635

The Operative identifies another employee in the building, *Matt* who approaches the Operative regarding his interest in purchasing marijuana.

**The following date outlines a conversation that the Operative has with Matt involving drugs in the building:**

October 3, 2003      Matt approaches the Operative and complains of having a toothache and needing "some weed." Matt tells the Operative that he normally purchases his weed from "guys in the building." Matt relays that one employee was caught selling marijuana and now it is difficult to purchase marijuana from anyone at the building.

The Operative ascertains by many observations and direct conversations that another employee by the name of *Jason* violates company policies and procedures. Jason is employed as a Security representative for the company. The Operative notes that Jason has knowledge of information that is of confidential nature and he does not hesitate to share the information with other employees in the building.

**The following dates are outlined by the Operative as having conversations with Jason that exhibit racial discrimination:**

October 1, 2003      The Operative listens to Jason tell Bill "...stop being a fucking bitch....what are you afraid of... John Cummings? He is just another white man."

October 24, 2003      The Operative listens to Jason have a conversation with another employee about John Cummings. Jason continues to talk about John Cummings to the Operative stating "....he is racist...but he is hiring more and more blacks...that is the only reason you were hired...because you're black...that's all black people are good for."

                         Jason continues "Rich, you're lucky cause your ass is white." Rich then tells Jason that he is Indian and Hungarian decent.

                         Jason continues the conversation by stating "The white man will only hire a black for cleaning." Jason then tells the Operative "Get down on your hands and knees where you belong."

CONFIDENTIAL

A R A   0 6 3 6

**The following dates are outlined by the Operative as having conversations and observing behavior from Jason, which exhibit sexual discrimination;**

September 12, 2003    The Operative has a conversation at the Security desk with Jason who tells the Operative that he enjoys having lots of sex and then Jason asks the Operative "Do you like having sex?"

September 17, 2003    The Operative listens to a conversation between two female employees who are complaining about Jason "always talking about women's body part and sex."

September 22, 2003    The Operative listens to a conversation between two employees, Bill and Cindy who complain about Jason talking "sexy" to female employees.

September 25, 2003    The Operative observes a female employee at the Security desk with Jason. The Operative then hears Jason say "...so how big are your tits anyway?"

October 3, 2003    Jason requests that the Operative remain in the building with him overnight. The Operative refuses and Jason comments "...Are you afraid to stay because I might talk you into giving me a piece of that ass."

October 22, 2003    Jason approaches the Operative and states "So...you finally going to get some tonight." The Operative asks Jason what he means and Jason responds, "Some fucking dick...Ho...you've been here a month and I haven't heard you talk about dick."

October 30, 2003    Jason says "Cummings made a big mistake by hiring that lady guard because he is just wasting the company's time and money. Where the fuck did they get her from? The only thing they probably looked at was she was in the military and she probably ain't good at that." The Operative comments that he is angry because she is a female. Jason flips up his middle finger at the Operative and replies "Fuck you "

**The following dates are outlined by the Operative as observations, which involve Jason violating company policies and procedures;**

September 12, 2003    Jason attempts to persuade the Operative to "hang out" with him at the Security desk instead of working in her assigned area.

At 10:45pm, Jason asks the Operative to "cover" the Security desk for him while he takes a break.    CONFIDENTIAL

The Operative observes that Jason does not inspect any bags, which are being carried out by the employees.

September 18, 2003    The Operative observes an employee exit the building carrying two large duffle bags. The Operative notes that Jason does not challenge the employee nor does he appear to even be monitoring the cameras. Jason is engaged in conversation with another employee.

September 19, 2003    The Operative observes Jason has a female guest behind the Security desk with him. The female has a large duffle bag and sits with Jason as the employees are leaving for the evening. The Operative also listens to a conversation that Jason has with another employee, George. The Operative suspects that George reveals to Jason his plans to steal merchandise from the building. At the end of the conversation Jason gives George a thumbs up sign and states "Oh, we cool."

September 22, 2003    The Operative listens to a conversation between two other employees that are complaining about Jason moving cameras.

September 23, 2003    Jason curses at the Operative after she approaches the Security desk to obtain the cleaning keys.

Jason tells the Operative that Mike has requested for him to watch her on camera and log her activity and break times.

September 25, 2003    The Operative observes that Rich, who is the chef, is manning the Security desk while Jason takes a break.

September 26, 2003    Jason calls the Operative to the Security desk to show her photos of criminal trespass suspects.

October 2, 2003    The Operative listens to Jason telling another employee "...Cummings got a $17,000 raise...he makes over $200,000 to do shit."

October 3, 2003    Jason tells the Operative that he printed over 1000 pages from the Internet. In addition, Jason confides to the Operative that he is going to sleep after all the employees have exited the building.

October 7, 2003    Jason confides to the Operative that he was an hour late for work.

CONFIDENTIAL

ARA 0638

Jason asks the Operative to remain at the Security desk
while he "takes a piss."

October 14, 2003

Jason confirms to the Operative that his girlfriend stayed
in the building with him overnight.

October 16, 2003

Jason confides to the Operative that while he works this evening he
plans on "surfing the net, working out, and going to sleep."

October 31, 2003

The Operative listens to Jason tell Rich that he is going to sleep in
the Nurses station after the other employees have departed
the building.

**The following dates are outlined by the Operative as conversations with
Jason involving drug use:**

September 29, 2003

Jason confides to the Operative that he has a female friend that can
supply marijuana through her brother. Jason tells the
Operative that he can supply her with marijuana if she is
interested in making a purchase.

September 30, 2003

Jason approaches the Operative and informs her that he can supply
her with marijuana for $125 to $300 depending on the
quality of marijuana she is interested in purchasing.

October 1, 2003

The Operative negotiates a sale of marijuana with Jason. Jason tells
the Operative that his "Girl" must drive to get the marijuana
and that he will bring it to the Operative at work. Jason
approaches the Operative and attempts to persuade her to
purchase an ounce of marijuana versus the ½ ounce that the
Operative requested. After the Operative refuses, Jason
instructs the Operative to bring $300 in cash to work the
following day and he will have the marijuana.

October 2, 2003

Jason tells the Operative that he will not be able to deliver
the marijuana to her until the following day.

October 3, 2003

Jason informs the Operative "I didn't feel like driving to pick up the
stuff" referring to the marijuana. The Operative suspects
that Jason is unable to produce the marijuana.

CONFIDENTIAL

The Operative discovers that a cleaner, *George,* is taking merchandise from the
building. George persuades the Operative on several occasions to assist him with the theft
of merchandise. George offers to fraudulently clock the Operative in/out allowing her to

ARA 0639

gain wages for hours that she actually does not work.

The Operative outlines the following dates, which involve George and the Operative removing merchandise from the building in exchange for fraudulent clocking;

September 19, 2003    George approaches the Operative and requests that she place merchandise into a trash bag for him to remove from the building. George offers to allow the Operative to leave early and he will clock her out when he departs the building several hours later.

September 23, 2003    George again attempts to persuade the Operative to place some merchandise into a trash bag. George asks the Operative to place the bag under the stairs for him.

September 24, 2003    At 9:40pm, the Operative removes a red jacket from a small gray bin located in the rear left side of the Embroidery area. The jacket has a SKU #1438RB2XL. The Operative places the jacket in a trash bag containing dry paper.

At 11:30pm, the Operative catches a quick glimpse of George exiting the building with what appears to be the trash bag containing the red jacket.

September 25, 2003    George confirms to the Operative that he removed the red jacket from the building the previous evening. George requests that the Operative place more merchandise under the stairs for him. The Operative tells George that she wants to leave at 10:30 pm however wants to be clocked out at 11:30pm. George tells the Operative to find him before she leaves to give him her badge.

The Operative removes a green and blue jacket and paperwork from inside of a box located in the Embroidery area. The sku numbers on the paperwork are 1308 bl-m, 130810 fx1, and 1308 bl-l. The color is listed as 2335 for all the jackets in the box. The names on the paperwork are Momeganna, Tigigiluk, and Aviuk. Each jacket is priced at $139.99. Again, the Operative conceals the jacket inside of a trash bag and places it under the stairs.

The Operative departs the building at 10:30 pm and George clocks her out at 11:30pm.

CONFIDENTIAL

September 26, 2003    George asks the Operative to "Get some more jackets." The Operative removes two navy blue jackets (sku number

ARA 0640

414NC M) both size medium. The Operative places them in the same place under the stairs for George.

The Operative meets with George by the trash compactor and George asks her what she was able to conceal for him. The Operative hands George the trash bag that contains the jackets and George removes them from the bag. The Operative notes that George seems unaware that a camera is in place above the trash compactor.

The Operative departs the building at 10:30 pm and George clocks her out at 11:30pm.

September 30, 2003    George approaches the Operative and requests that she remove an entire box of jackets from the embroidery area. The Operative tells George that she will think about it and let him know.

This concludes the Operative's findings to the current date.

CONFIDENTIAL

ARA 0641

# EXHIBIT F

I'm willing to testify to these
(one of the bags was for shemp) statments
Two or three weeks ago I met
Erric at my machine & bought 2
bags of weed with was dimes
I bought weed off of him on
more than one accation. always on
wear guard propertie. about a dozen time.
it went from dimes to 8th s with
was 45 dollars.

John Shemp also selse weed &
usely has it on wed or thurs.
& also the bag the police officer
found on me came from John shemp

I Also Know somebody that
selse weed at wearguard & he
werks on the team that is
located on the same side of the
floor as the UCE. He is short
with a gold "T" & chubby.
I also baut wed from the kid on
the first time & twice.



gold T on his
chin long light
brown hair &
carries a bork
back.

**CONFIDENTIAL**

**ARA 0071**

I smoked with sketch on
many accations on wearguard
property.

EXHIBIT H

1

VOLUME:   I
PAGES:    1-150
EXHIBITS: See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CIVIL ACTION NO  05-10496-NMG

```
                                    x
ERIC BEASLEY                        x
            Plaintiff               x
                                    x
        vs                          x
                                    x
ARAMARK UNIFORM and CAREER APPAREL  x
INC  AND JAY HESS, JR               x
            Defendants              x
                                    x
```

DEPOSITION of SUSAN MAGRINI, taken
pursuant to the applicable provisions of the
Federal Rules of Civil Procedure, before
Jill Kourafas, Certified Shorthand Reporter
and Notary Public in and for the Commonwealth
of Massachusetts held at the Law Office of
Kevin B. Callanan, 17 Accord Park Drive
Norwell  Massachusetts, on Thursday,
January 12, 2006, commencing at 10:00 a.m

REPORTERS, INC.
GENERAL & TECHNICAL COURT REPORTING
23 HERRYMOUNT ROAD, QUINCY, MA 02169
617 786 7783/FACSIMILE 617 786 7723

---

2

APPEARANCES OF COUNSEL:

For the Plaintiff:
   LAW OFFICE OF KEVIN B. CALLANAN
   (BY:  KEVIN B. CALLANAN, ESQ.)
   17 Accord Park Drive, Suite 101
   Norwell  Massachusetts 02061

For the Defendants:
   EDWARDS, ANGELL, PALMER & DODGE
   (BY:  TIMOTHY P. VAN DYCK  ESQ.)
   101 Federal Street
   Boston  Massachusetts 02110

---

3

*INDEX*

| Testimony of: | Page |
|---|---|
| **Susan Magrini** | |
| Examination by Mr  Callanan | 5/142 |
| Examination by Mr  Van Dyck | 137 |

*INDEX OF EXHIBITS*

| Nos. | Description | Page |
|---|---|---|
| 1 | Defendant Aramark s Response to Plaintiff s First Set of Interrogatories | 51 |
| 2 | Three-page letter dated 8/5/03 to John Cummings from Richard Sjoberg | 59 |
| 3 | Memo dated 11/6/03 to Human Resources from John Cummings, Subject:  Suspended Employees with attached photographs of several individuals | 64 |
| 4 | Memo from John Cummings addressed to Security dated 11/17/03 with series of photographs attached | 72 |
| 5 | Status Change Form consisting of one page | 79 |
| 6 | One-page handwritten document | 81 |
| 7 | One-page letter dated 11/17/03 | 84 |
| 8 | Letter dated 11/25/03 to John Cummings from Richard Sjoberg consisting of 24 pages | 87 |

---

4

*INDEX OF EXHIBITS*
*(Continued)*

| Nos. | Description | Page |
|---|---|---|
| 9 | Multi-page letter, dated 3/2/04 to Sunila Thomas-George from Timothy Van Dyck, with attachments: Statement of WearGuard-Crest policies, handwritten statement signed by Carlos Ortiz Incident Report from the Milton Police Department | 112 |
| 10 | One-page copy of a photograph with bates-number ARA 0769 | 125 |

1 Q. Again, one of the rules is you need to say
2    "yes" or "no," if that's your answer, rather
3    than nodding, or giving some other indication,
4    because our skillful reporter needs to record
5    your answer
6         Do you know if Mr Hess interviewed
7    any other employees of WearGuard on the night
8    of the sting?
9 A. I believe he did.
10 Q. Do you know who they were?
11 A. I can't say. I don't remember.
12 Q. Why do you believe he interviewed other
13    employees other than Mr. Beasley?
14 A. Because what I do remember was him saying he
15    wanted to talk to employees that night to
16    follow up.
17 Q. And he mentioned that to you?
18 A. Yes.
19 Q. What was your response?
20 A. I don't remember.
21 Q. I believe the record shows that the sting was
22    on the night of November 5 and 6 of 2003.
23         When, in terms of time, did you make
24    the decision to suspend Mr. Beasley?

34

1         I realize others were suspended as
2    well, but I'm focusing on Mr. Beasley.
3 A. That next morning, I believe.
4 Q. And how did it come to your attention that
5    that decision was to be made by you?
6 A. Well, because he was involved in some of the
7    information that surfaced, and relative to
8    why we hired the undercover agent, we
9    decided -- I believe he was interviewed that
10    morning by, I believe, John Cummings, and
11    asked to be suspended based on the pending of
12    the investigation.
13 Q. Who asked?
14 A. John -- who asked?
15 Q. You said "asked to be suspended."
16 A. Oh. We decided to suspend him that morning.
17 Q. "We" meaning who?
18 A. Myself probably, John Cummings and Jay Hess.
19 Q. Is it fair to say that you made that decision
20    based on the information that you received
21    from Mr Cummings and Mr. Hess?
22 A. Right.
23 Q. Again, we are focusing on the night of the
24    sting --

1 A. Right.
2 Q. -- where you, as you say, primarily stayed in
3    your office
4 A. Right.
5 Q. So, is it fair to say that you depended for
6    your decision on information presented to you
7    by others?
8 A. Yes.
9 Q. And, in particular, by Mr. Hess and
10    Mr. Cummings?
11 A. Yes.
12 Q. Do you recall whether Mr. Hess told you that
13    he had interviewed Mr. Beasley before you
14    made your suspension decision or after?
15 A. I don't remember.
16 Q. Did you see any documents relative to
17    Mr Beasley before you suspended him on the
18    day of the sting? Just focusing on the day
19    of the sting?
20 A. I don't remember.
21 Q. You said you met with Hess and Cummings with
22    regard to the suspension decisions?
23 A. Yes.
24 Q. Mr. Beasley was not the only employee that

36

1    you had to make a decision about, right?
2 A. Yes.
3 Q. How long was the meeting?
4 A. I don't remember.
5 Q. Was it in your office or someplace else?
6 A. I'm sorry, I don't remember.
7 Q. Why was it you that made the decision about
8    suspension rather than someone else at
9    Aramark?
10 A. Because I was the Vice President of Human
11    Resources, and any decision like that should
12    be someone from that leadership team.
13 Q. But I'm focusing particularly on you.
14    Mr Gold could've made that decision,
15    couldn't he?
16 A. I guess.
17 Q. I don't want you to guess.
18         He was your boss, right?
19 A. Right.
20         MR VAN DYCK: I would instruct the
21    witness not to guess.
22         THE WITNESS: Okay
23 A. Then I --
24 Q. My question is simple: Why you, rather than

| | | | | |
|---|---|---|---|---|
| 1 | | bound by it? | 1 | | the sting was -- yes. |

1   bound by it?
2        THE WITNESS: Yes, I agree
3        MR. VAN DYCK: I think we can move
4   on.
5   Q.  Ms. Magrini, I call to your attention to
6        Exhibit No. 1, and I think I'd asked you
7        if you'd seen this before. Did you?
8   A.  No.
9   Q.  You have not?
10  A.  No.
11  Q   Do you know who Jason Callaway is who signed
12       this?
13  A.  No.
14  Q.  He identifies himself as Vice President of
15       Human Resources at Aramark, but did you know
16       that, that he was vice president at the
17       present time or at that time of this
18       document?
19  A.  No.
20  Q.  And just I want to briefly direct your
21       attention to Page 18.
22            At the bottom of Page 18 it shows
23       Interrogatory No. 20.
24            Do you see that?

---

54

1   A.  Yes.
2   Q.  And the interrogatory asks, just to summarize
3        it, to identify each employee who was
4        suspended from employment following the sting
5        operation at WearGuard-Norwell in November of
6        2003
7   A.  Uh-huh.
8   Q.  And drawing your attention to the answer,
9        which appears below it, the last sentence of
10       the answer reads: "The suspension decisions
11       were made by Susan Magrini."
12            Do you see that?
13  A.  Yes.
14  Q.  Do you degree with that statement?
15  A.  Yes.
16  Q.  And prior to that particular sentence, it
17       indicates that the suspensions were effective
18       November 6, 2003 without pay.
19            Do you agree with that statement?
20  A.  Yes.
21  Q.  And my question to you is: When, in terms of
22       time, did you make the decision to suspend
23       these individuals?
24  A.  Between the day after the sting and I believe

---

1        the sting was -- yes.
2   Q.  Was the sting on the night of November 5
3        and 6?
4   A.  Yes.
5   Q.  Were these decisions made in one session or
6        one meeting by you?
7   A.  I don't recall.
8   Q.  Now, the same answer at the bottom of Page 18
9        identifies the Plaintiff, Eric Beasley, as
10       well as a number of other employees who were
11       suspended at that time
12            Would you agree?
13  A.  Yes.
14  Q.  And it identifies them by race. Can you see
15       that as part of this answer?
16  A.  Yes.
17  Q.  This is a claim, among other things, of race
18       discrimination
19            At the time you made the decision
20       with respect to Mr. Beasley, did you know
21       that he was black?
22  A.  No.
23  Q.  Looking at these names, the other names are
24       Paul George, Richard Marsters, Carlos Ortiz,

---

56

1        Jesus Ortiz, John Schempp, S-C-H-E-M-P-P, and
2        Jason Torres, do you have any knowledge as to
3        the reasons why those individuals were
4        suspended?
5   A   Yes.
6   Q.  What do you know about them?
7   A.  It was based on the information from the
8        undercover agent in terms of drug issues,
9        drug dealing or drug use.
10  Q.  And that information came to you from what
11       source?
12  A.  Both through the undercover information that
13       came through to my attention and then the
14       sting operation.
15  Q.  And how did the undercover information come
16       to your attention?
17  A.  As information through talking with Jay Hess
18       and John Cummings.
19  Q.  Anybody else?
20  A.  The police officers from Norwell.
21  Q.  When did you speak to the police officers
22       about the sting?
23  A.  The day of the -- we met at the Radisson,
24       which was the first time I met the police

65

| | | |
|---|---|---|
| 1 | Q. | It appears to have been originated by |
| 2 | | Mr. Cummings? |
| 3 | A | Uh-huh. |
| 4 | Q | Is that a "yes"? |
| 5 | A | Yes. |
| 6 | Q | Yet, you were the one who made the decision |
| 7 | | to suspend these individuals, correct? |
| 8 | A. | Yes. |
| 9 | Q | Is there some reason why Mr. Cummings would |
| 10 | | originate this document rather than you? |
| 11 | A. | Because he manages security. |
| 12 | Q | And how did Mr. Cummings know what names to |
| 13 | | put in this group of suspended employees? |
| 14 | A | Based on decisions that were made, based on |
| 15 | | decisions between myself and reasons |
| 16 | | mentioned. |
| 17 | Q | Is it fair to say that you provided him with |
| 18 | | these names? |
| 19 | A | I believe the names came through the |
| 20 | | investigation and then through the sting |
| 21 | | operation. |
| 22 | Q | We just heard you tell us that you made the |
| 23 | | decision to suspend employees? |
| 24 | A. | Yes. |

66

| | | |
|---|---|---|
| 1 | Q. | At some point, did you communicate that |
| 2 | | decision to Mr. Cummings? |
| 3 | A. | Yes. |
| 4 | Q | Or perhaps he was present when you made the |
| 5 | | decision? |
| 6 | A. | Right. I would say he probably was present |
| 7 | | when we made the decision. |
| 8 | Q. | Anybody else present? |
| 9 | A | Probably Kathy Gillis. |
| 10 | Q. | And was Jay Hess there at the time? |
| 11 | A. | I don't remember that. |
| 12 | Q. | Mr. Hess's office is in Philadelphia? |
| 13 | A. | That's correct. |
| 14 | Q. | Or was at the time? |
| 15 | A. | Correct. |
| 16 | Q. | Going back for a moment to Exhibit No. 1, |
| 17 | | where we looked at the answer of Mr. Callaway |
| 18 | | about the employees suspended -- |
| 19 | A | What page? |
| 20 | Q. | Page 18 |
| 21 | A. | Thank you. |
| 22 | Q | -- and comparing the employees' names in |
| 23 | | Exhibit No. 1 who decided would be |
| 24 | | suspended, with the list of names in Exhibit |

67

| | | |
|---|---|---|
| 1 | | No. 3, they appear to be the same, except for |
| 2 | | the first name on Exhibit No. 3 |
| 3 | | Do you see the point I'm making? |
| 4 | A. | Let me just -- |
| 5 | Q. | Take your time |
| 6 | A | (Witness compares documents.) |
| 7 | | Yes. |
| 8 | Q. | So, the new name that appears, if you will, |
| 9 | | on Exhibit No. 3 is Nechanta Alexander, would |
| 10 | | you agree? |
| 11 | A | Yes. |
| 12 | Q. | And who is she? |
| 13 | A. | The undercover operative. |
| 14 | Q. | And isn't it fair to say she wasn't really |
| 15 | | suspended in this particular transaction? |
| 16 | A. | If I remember now, my memory tells me that in |
| 17 | | order to protect her undercover identity that |
| 18 | | she was identified as a terminated or a |
| 19 | | suspended employee from the other employees. |
| 20 | Q. | But, in fact, she was on her way back to |
| 21 | | Atlanta, Georgia when this document was |
| 22 | | prepared; is that true? |
| 23 | A. | That, I don't know. |
| 24 | Q. | Did you ever see her again after the sting? |

68

| | | |
|---|---|---|
| 1 | A. | I never saw her at all. |
| 2 | Q. | She was never pointed out to you? |
| 3 | A. | No. |
| 4 | Q. | Are you aware today that she's a black woman, |
| 5 | | Nechanta Alexander? |
| 6 | A. | No. |
| 7 | Q. | And do you know what position Mr. Torres held |
| 8 | | before he was suspended? |
| 9 | A. | Based on this document, the security guard. |
| 10 | Q. | You're looking at Exhibit No. 1? |
| 11 | A. | Yes. |
| 12 | Q. | And do you have knowledge as to why you |
| 13 | | decided to suspend him? |
| 14 | A. | Implications for drug involvement, drug use. |
| 15 | A. | I'm sorry, I missed your first word |
| 16 | A. | Implications for drug involvement, drug use. |
| 17 | Q. | That information came to you by what means? |
| 18 | A. | Through the undercover agent information and |
| 19 | | then the sting. |
| 20 | Q | But I mean, did you read it? Did someone |
| 21 | | speak to you about it? Did you receive a |
| 22 | | phone call, or how was it transmitted to you? |
| 23 | A. | Discussion. |
| 24 | Q. | With? |

71

1  A.  The directory of Security, John Cummings, the
2      Norwell Police and Jay Hess.
3  Q.  Exhibit No. 3 refers to Ralph Anderson, who
4      is he?
5  A.  Ralph was a security guard at Norwell. He
6      manned the front desk.
7  Q.  You've testified that you have not seen this
8      document before, do you have any
9      understanding of why Exhibit No. 3 was
10     addressed to Human Resources?
11 A.  No.
12 Q.  It appears to be a memo from John Cummings,
13     to Human Resources, but you didn't see it?
14 A.  I did not.
15 Q.  These photographs that are attached, what is
16     your understanding of the origin of these
17     photographs, if you have any knowledge?
18 A.  No. 3, Exhibit No. 3?
19 Q.  Exhibit No 3, yes, please.
20 A.  They may be from their WearGuard Aramark
21     ID tags.
22 Q.  Was there a procedure for photographing
23     employees --
24 A.  Yes.

1  these individuals would be informed of your
2  decision?
3  A   I don't remember.
4  Q.  Do you have any memory as to how they were
5      informed?
6  A.  They may have been informed by the director
7      of Human Resources, Kathy Gillis, with John
8      Cummings.
9  Q.  Did you inform any of these people that they
10     were suspended?
11 A.  No.
12 Q.  Do you recall any discussion having made the
13     decision to suspend these people, as to how
14     the decision would be promulgated?
15 A.  I'm not sure I understand the question.
16 Q.  Well, you made the decision to suspend these
17     people, I believe you said that Mr. Cummings
18     and, perhaps, Kathy Gillis were present when
19     those decisions were made?
20 A.  Uh-huh.
21 Q.  Do you remember any discussion about how that
22     information, i e., the decisions would be
23     published?
24 A.  No, I don't remember this or published in

70

1  Q.  -- when you were there?
2  A.  Yes.
3  Q.  What was it?
4  A.  You received an ID on the day you went -- on
5      the day you were hired, brought into the
6      company for your orientation.
7  Q.  Did that include a photo?
8  A.  Yes.
9  Q.  So, employees had photo IDs --
10 A.  Yes.
11 Q.  -- that they would wear on their uniform?
12 A.  Yes.
13 Q.  I realize you haven't seen this document
14     before, do you have any knowledge as to why
15     the photographs of these individuals would be
16     attached to this particular memo by
17     Mr. Cummings?
18 A.  No.
19 Q.  Where would Mr. Cummings access these
20     photographs?
21 A.  Security housed the IDs and the process.
22 Q.  When you made the decision to suspend these
23     individuals that are identified on Exhibit
24     No. 3, did you give any direction as to how

72

1  that regard.
2  Q.  What I'm trying to get at is, you made the
3      decision to suspend them. Obviously, the
4      people who were being suspended have to be
5      informed of your decision?
6  A.  Uh-huh.
7  Q.  I'm trying to see if you remember whether
8      there was any discussion that you were
9      present at as to how your decisions would be
10     communicated to the affected employees?
11 A.  I can't remember.
12 Q.  You didn't communicate it to anybody on this
13     list, Exhibit No. 3?
14 A.  No.
15         (Exhibit No. 4, Memo from John
16         Cummings addressed to Security
17         dated 11/17/03 with series of
18         photographs attached, marked.)
19 Q.  Ms. Magrini, I show you what has been marked
20     as Exhibit No 4. It's a memo from John
21     Cummings addressed to Security dated 11/17/03
22     with a series of photographs attached.
23         Take a look at that and tell me if
24     you've seen this before.

79

1  Q.  Just if you would help me with this  This,
2      which is page --
3          MR. VAN DYCK:  It's a better
4      photocopy of what is ARA 0304.
5          MR. CALLANAN:  Okay.  All right
6  Q.  Do you recognize that picture?  It is on a
7      page which has Mr. Beasley's name on it.
8          Do you recognize that?
9  A.  No.
10 Q.  Can you tell whether Mr. Beasley is black or
11     some other race from this picture?
12 A.  Black.
13 Q.  And the next page is an individual whose name
14     is --
15         MR. VAN DYCK:  This is Joseph Lee,
16     and, again, it's a better photocopy of
17     ARA 0305.
18 Q.  Just looking at this picture, would you tell
19     me what the race of this individual is?
20 A.  I don't know.
21 Q.  Does he appear to be black?
22 A.  I don't know.
23         MR. VAN DYCK:  The next one is --
24     the name at the bottom is John Qualter, and

78

1      it's document ARA 0306.
2  Q.  Same question for this individual:  Can you
3      tell me from just this picture what his race
4      is?
5  A.  I cannot.
6          MR. VAN DYCK:  The next one is
7      Anthony Souza, document ARA 0307.
8  Q.  Same question for this photograph:  Can you
9      tell me what his race is?
10 A.  I'm unable to.
11         MR. VAN DYCK:  The next one is
12     Carlos Ortiz, ARA 0308
13 Q.  Same question:  Can you tell from the
14     photograph what his race is?
15 A.  No.
16         MR. VAN DYCK:  The next one is Jason
17     Torres, ARA 0309
18 Q.  Same question for this photograph:  Can you
19     tell the race?
20 A.  No.
21         MR. VAN DYCK:  The next one is --
22     the name at the bottom is John Schempp,
23     ARA 0310
24 A.  Don't know.

80

1  Q.  You can't identify his race by the
2      photograph?
3  A.  No.
4          MR. VAN DYCK:  The next one is
5      Richard Marsters, ARA 0311
6  Q.  Can you tell the race of this gentleman?
7  A.  No.
8          MR. VAN DYCK:  The next one is
9      John Gomes, ARA 0312.
10 Q.  Can you tell from that photograph what the
11     race of that individual is?
12 A.  No.
13         MR. VAN DYCK:  The next one, the
14     name is Jesus Ortiz, ARA 0313.
15 Q.  Can you tell the race of that individual from
16     the photograph?
17 A.  No.
18         MR. VAN DYCK:  And the last one is
19     Paul George, ARA 0314
20 A.  No.
21         (Exhibit No. 5, Status Change Form
22          consisting of one page, marked.)
23 Q.  Ms. Magrini, I show you Exhibit No 5 in your
24     deposition.  It's a single-page Status Change

1      Form WearGuard-Crest, and it has to do
2      apparently with Eric Beasley
3          Are you familiar with this form?
4  A.  Yes.
5  Q.  In terms of your employment at WearGuard --
6  A.  Yes.
7  Q.  -- what does this form tell us?
8  A.  It tells us the employee's name is Eric
9      Beasley and tells us the date, November 17,
10     '03, the person was separated, the last day
11     of work was November 6, '03, that he was an
12     hourly employee, he's not eligible for
13     rehire, and it was an involuntary
14     termination based on violation of policy.
15     The comment says "Violation of company drug
16     policy."
17 Q.  Do you recognize the names at the bottom of
18     the form?
19 A.  R. Turner was an administrative person who
20     puts information into the system, 11/17, and
21     the HR person's name -- person's name there
22     is Gail O'Connell, 11/17, she was an HR
23     manager.
24 Q.  She reported to you?

125

1    is after Eric?

2  A.  Aloud or to myself?

3  Q.  Aloud.

4  A.  "African American male approximately 30 years

5      of age, six-foot tall, 200 pounds, eye

6      pierced."

7  Q.  And I suggest to you that throughout this

8      document, there are other pages that are

9      similar that there is a reference to Eric

10     with the eye pierced.

11         Were you aware there was an Eric

12     with the eye piercing in this report before

13     you made your decision to terminate

14     Mr Beasley?

15 A.  Not that I remember.

16         (Exhibit No. 10, One-page copy of a

17         photograph with bates-number.

18         ARA 0759, marked.)

19 Q   I show you what has been marked as

20     Exhibit No 10, and I have only one copy of a

21     better representation of it

22         I'd just ask you if that is a

23     photograph with the name "Eric O'Connor"

24     under it, do you have any knowledge of who

126

1      Eric O'Connor is or was?

2  A   No.

3  Q.  Would you agree with me that that photograph

4      does indicate an eye piercing or eye jewelry?

5  A.  Yes.

6  Q   Okay. So, going back to Exhibit No. 9, if we

7      could, Page 4, the reference here in this

8      paragraph to "Eric" followed by "Beasley" in

9      parentheses, do you recall at the time that

10     you signed this document as being a truthful

11     document having any knowledge of anyone else

12     named Eric in this context?

13 A.  I don't recall.

14 Q   Now, just dropping down to Paragraph D1 on

15     the same page.

16 A   Yes.

17 Q.  D1 is a paragraph that relates to Exhibit B,

18     which is attached  If you'd take a look at

19     Exhibit B, which is attached to

20     Exhibit No 9, that's a document we've

21     already have seen. I think it's already been

22     marked  That's the statement signed by in

23     Ortiz?

24 A.  That's correct.

127

1  Q.  And the quoted portion of the written

2      statement that appears in Exhibit No 9 --

3      I'll read it quickly -- it says "Two or three

4      weeks ago I met Eric at my machine and

5      brought two bags of weed, which was dimes. I

6      bought weed off of him on more than one

7      occasion always on WearGuard property about a

8      dozen times.  It went from dimes to eights"

9      -- E-I-G-H-T-S -- "which was $45 "

10         And if you'd look at the document in

11     the back, it appears to be a recitation of

12     the first paragraph beginning with "Two or

13     three weeks"; do you see that of the

14     handwritten document?

15 A   I don't see the "Two to three."

16 Q.  That appears to be a quotation from

17     Mr. Ortiz's letter?

18 A.  Yes.

19 Q   And you had seen Mr Ortiz's letter before

20     you decided to discharge Mr. Beasley?

21 A.  Yes.

22 Q.  And you saw the reference to the word "Eric"

23     in Mr Ortiz's letter?

24 A.  Yeah, I don't remember.

128

1  Q.  But at that time you had no knowledge that

2      there was another Eric employed at WearGuard

3      at the time?

4  A.  No.

5  Q.  Let me ask you this:  Going back to

6      Paragraph 2 on the same page, the first

7      sentence of Paragraph 2 says, "Mr. Beasley

8      was interviewed on two separate occasions by

9      WearGuard management.  On both occasions

10     Mr. Beasley refused to cooperate "

11         Do you see that?

12 A.  Yes.

13 Q.  Realizing that you've sworn that this is a

14     truthful statement, tell me what your

15     understanding of what Mr. Beasley's refusal

16     to cooperate was?

17 A.  I don't remember at this point in time.

18 Q.  You were aware that he denied involvement in

19     the drug activity, you testified to that

20     today, correct?

21 A.  Yes.

22 Q.  Page 6 of this Exhibit No. 9, the bottom of

23     the page, where is says "The Results of the

24     Sting Operation."

# EXHIBIT I

1

VOLUME:    I
PAGES:     1 to 163
EXHIBITS:  See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                        x
ERIC BEASLEY                            x
                                        x
         Plaintiff                      x
                                        x
      vs                                x
                                        x
ARAMARK UNIFORM AND CAREER              x
APPAREL  INC. and JAY HESS  JR          x
         Defendants                     x
                                        x
```

DEPOSITION of JOHN J CUMMINGS, taken
pursuant to the applicable provisions of the
Federal Rules of Civil Procedure, before Jill
Kourafas, Certified Shorthand Reporter and
Notary Public in and for the Commonwealth of
Massachusetts held at the Law Offices of
Kevin B. Callanan, 17 Accord Park Drive
Norwell, Massachusetts, on Tuesday,
December 13, 2005  commencing at 10:00 a m

—————————————
REPORTERS, INC.
GENERAL & TECHNICAL COURT REPORTING
23 MERRYMOUNT ROAD, QUINCY, MA 02169
617 786 7783/FACSIMILE 617 786 7723

---

2

APPEARANCES OF COUNSEL.

For the Plaintiff:
EDWARDS, ANGELL, PALMER & DODGE
(BY:  BRIAN H. LAMKIN  ESQ )
101 Federal Street
Boston, Massachusetts 02110

For the Defendants:
LAW OFFICES OF KEVIN B. CALLANAN
(BY:  KEVIN B. CALLANAN, ESQ.)
17 Accord Park Drive, Suite 101
Norwell  Massachusetts 02061

---

3

*INDEX*

| Testimony of | Page |
|---|---|
| JOHN J. CUMMINGS | |
| Examination by Mr  Callanan | 5 |

*INDEX OF EXHIBITS*

| Nos. | Description | Page |
|---|---|---|
| 1 | Letter to John Cummings from Richard Sjoberg, dated 8/5/03, bates-stamped ARA 0285 through ARA 0287 | 23 |
| 2 | Two-page document, bates-stamped ARA 0368 through ARA 0369 | 26 |
| 3 | One-page handwritten document bates-stamped ARA 0324 | 30 |
| 4 | One-page handwritten document bates-stamped ARA 0353 | 34 |
| 5 | One-page handwritten document bates-stamped ARA 0385 | 38 |
| 6 | Two-page handwritten document, bates-stamped ARA 0338 through ARA 0339 | 42 |
| 7 | One-page handwritten statement of Carlos Ortiz  bates-stamped ARA 0071 | 47 |

---

4

*INDEX OF EXHIBITS*
(Continued)

| Nos. | Description | Page |
|---|---|---|
| 8 | Multi-page memo dated 11/6/03, bates-stamped ARA 0315 through ARA 0323 | 54 |
| 9 | One-page memo  bates-stamped ARA 0388 | 59 |
| 10 | Multi-page Undercover Operative Report dated 9/14/03, bates-stamped ARA 0549 through ARA 0650 | 78 |
| 11 | One-page handwritten notes bates-stamped ARA 0406 | 94 |
| 12 | One-page handwritten notes bates-stamped ARA 0404 | 103 |
| 13 | One-page memo  bates-stamped ARA 0393 | 106 |
| 14 | One-page handwritten notes bates-stamped ARA 0380 | 119 |
| 15 | One-page handwritten notes bates-stamped ARA 0378 | 116 |
| 16 | One-page letter dated 11/17/03 bates-stamped ARA 0409 | 120 |
| 17 | Memo dated 11/17/03 without bates stamps | 123 |
| 18 | One-page letter dated 11/25/03 bates-stamped ARA 0237 | 128 |
| 19 | Report dated 11/25/03, bates-stamped ARA 0238 through ARA 0265 | 129 |

21

1       closely with the local police and authorities
2       in regards to things like this.
3   Q.  Was anybody else's name mentioned at this
4       stage other than Eric Beasley?
5   A.  I can't remember.
6   Q.  Is it fair to say that Eric Beasley was a
7       suspect from the very beginning, a suspect in
8       terms of use or distribution of drugs on the
9       company property?
10  A.  A suspect of mine?
11  Q.  In your mind.
12  A.  No.
13  Q.  But you can't think of anyone else's name who
14      was brought up at that early stage in the
15      investigation?
16  A.  No.
17  Q.  Did you take any steps -- I'm talking now
18      about August of '03, in that time frame -- to
19      investigate Eric Beasley?
20  A.  I think we had a background check done on
21      him.
22  Q.  And whose idea was that?
23  A.  I would say that would be Barbara Casagrande
24      or Kathy McNeeley or Kathy Gillis, one of

22

1       those three.
2   Q.  Did you have a background check done at that
3       time on anyone else?
4   A.  Not that I recall.
5   Q.  You had known Eric Beasley prior to this
6       particular point in time, had you not,
7       August of '03?  Did you know him as an
8       employee?
9   A.  No, not really, no.
10  Q.  You didn't?
11  A.  No.
12  Q.  Do you know whether at that time in August of
13      '03 there were any other employees at
14      WearGuard named Eric?
15  A.  At that time, no.
16  Q.  Does the name Eric O'Connor mean anything to
17      you?
18  A.  It does now, yes.
19  Q.  He's presently employed at WearGuard, is he
20      not?
21  A.  Yes.
22  Q.  He's a black male, is he not?
23  A.  Yes.
24  Q.  Eric Beasley is a black male, correct?

23

1   A.  Yes.
2   Q.  Do you have any knowledge as to whether Eric
3       O'Connor was employed at the Norwell facility
4       in August of 2003?
5   A.  I believe he was.
6   Q.  And works in the Custom Embroidery
7       Department, does he not?
8   A.  Now?
9   Q.  Let's start with now, yes.
10  A.  He works there now, yes.
11  Q.  Did he work there in 2003?
12  A.  I really don't know, no.
13  Q.  I show you some documents, Mr Cummings.
14          MR CALLANAN:  I'd like to have this
15      marked as Exhibit No. 1, please
16          (Exhibit No. 1, Letter to John
17          Cummings from Richard Sjoberg,
18          dated 8/5/03, bates-stamped ARA
19          0285 through ARA 0287, marked.)
20  Q.  I'd ask you to look at what's been marked as
21      Exhibit No. 1, and ask you if you recognize
22      this document?
23  A.  (Witness reviews document.)
24          Yes.

24

1   Q.  Is this the background investigation report
2       that you just testified about?
3   A.  Yes.
4   Q.  This was addressed to you, correct?
5   A.  Yes.
6   Q.  This particular letter?
7   A.  Yes.
8   Q.  It's a letter dated August 5 addressed to you
9       from Richard Sjoberg who is an investigator
10      with a group called NSA, Inc., is that
11      correct?
12  A.  Yes.
13  Q.  And it's your testimony that at this time in
14      August of '03, this was the only employee
15      who you requested a background investigation
16      on?
17  A.  The only one that I can recall at this time,
18      yes.
19  Q.  And what, if anything, did you do when you
20      received this report?
21  A.  I read it and can't tell you exactly what I
22      did with it.
23  Q.  Did it cause you to take any action with
24      respect to Eric Beasley?

45

1   A    Not that I know of, no.

2   Q    The statement "Carlos is the seller," is that

3        your statement, or is that someone else's

4        statement, if you can remember?

5   A    I can't remember.

6   Q    When you wrote down "Eric is probably

7        supplying Carlos," who said that, if anyone?

8   A    I can't remember.

9   Q    On Page 2 of Exhibit 6 you just read the

10       statement that says that "she had also

11       purchased an ounce from Carlos," do you see

12       that part of your notes?

13  A    (Pause.)

14  Q    Just below the 10/22/03.

15  A    Yes.

16  Q    Would it be fair to say that that reflects

17       what Jay has told you?

18  A    Yes.

19  Q    Was Carlos Ortiz an employee of WearGuard at

20       the time?

21  A    Yes.

22  Q    Did you think to take any action at that time

23       with respect to Mr. Ortiz?

24  A    No.

46

1   Q    It would appear that he had violated the

2        business practice policy, or the drug policy

3        at WearGuard as a result of what you just

4        learned here on October 22nd, right?

5   A    Yes.

6   Q    Who was actually in overall control of this

7        investigation?

8   A    I think this would be Susan Magrini.

9   Q    What's the basis for you making that

10       statement?

11  A    Well, she was the most senior person that was

12       aware of the undercover work. Jay was more

13       of a consultant.

14  Q    Did you keep Susan Magrini informed of the

15       process of the investigation?

16  A    I believe I did.

17  Q    During this conference call, which is

18       reflected in Exhibit No. 6, you don't know

19       who made the statement that you wrote down

20       that reads: "Eric is probably supplying

21       Carlos"?

22  A    No, I don't.

23  Q    And I take it that you don't know what the

24       basis of that statement is either?

47

1   A    No, I don't.

2             (Exhibit No. 7, One-page handwritten

3             statement of Carlos Ortiz,

4             bates-stamped ARA 0071, marked.)

5   Q    I show you Exhibit No. 7, Mr. Cummings

6        Have you seen this one-page document

7        before?

8   A    (Witness reviews document.)

9             Yes.

10  Q    I suggest to you it's a statement written by

11       Carlos Ortiz, which also has the signature of

12       Jay Hess at the bottom followed by the date

13       11/6/03, would you agree?

14  A    Yes.

15  Q    When did you first see this statement?

16  A    I believe I saw this at the police station.

17  Q    Was Mr. Hess with you at the time?

18  A    Yes.

19  Q    This was on the night of November 5,

20       November 6, the late evening of November 5

21       and early hours of November 6, 2003?

22  A    I believe so.

23  Q    And the so-called sting where the Norwell

24       police officers arrested employees at

48

1        WearGuard was on the evening of November 5,

2        correct?

3   A    I believe so.

4   Q    And this statement is dated November 6th,

5        suggesting it was done after midnight at that

6        particular time?

7   A    I think so.

8   Q    Did you speak to Mr. Ortiz about this

9        statement at the Norwell Police Department?

10  A    No.

11  Q    Now, in this statement he mentions one of the

12       bags was from Schempp, do you see that?

13  A    Yes.

14  Q    One of the WearGuard employees was

15       John Schempp, correct?

16  A    Yes.

17  Q    He also mentions in the fourth line, or third

18       line down, someone name Erric, correct?

19  A    Yes.

20  Q    Do you see that?

21  A    Yes.

22  Q    Spelled E-R-R-I-C in this particular

23       document, correct?

24  A    Yes.

77

1  Q.  At the time Kathy Gillis was director of
2      Human Resources; is that correct?
3  A.  Yes.
4  Q.  Worked for Susan Magrini who was vice
5      president of Human Resources?
6  A.  Yes.
7  Q.  Was Mr. Beasley asked to surrender his photo
8      ID card at that time?
9  A.  I believe so. I probably asked him for it,
10     yes. If not, Kathy would've asked him.
11 Q.  Did you hear Mr. Beasley say that it was
12     going to be difficult for him to return to
13     work after being suspended, that he would be
14     embarrassed?
15 A.  Yes.
16 Q.  Do you remember Kathy Gillis's statement when
17     he made that remark?
18 A.  All I remember her saying was that "If
19     there's no wrongdoing, you can come back to
20     work," that's all I remember.
21 Q.  Do you remember her saying "You don't have to
22     worry about that, you probably won't be
23     back"?
24 A.  No, I don't.

78

1  Q.  Did you and Kathy Gillis meet with any other
2      individuals that day for purposes of
3      informing them of their suspension?
4  A.  That day, I can't remember, no.
5  Q.  You said you've worked for WearGuard, did you
6      say 19 years?
7  A.  I started in 1986, yes.
8  Q.  And do you remember a case brought against
9      Aramark by someone named James Blue?
10 A.  No, I don't.
11 Q.  Bear with me for a second here
12 A.  Sure.
13 Q.  (Pause.)
14         Do you know who a Mr. Eighmey is,
15     E-I-G-H-M-E-Y, identified as a floor
16     supervisor?
17 A.  No, I don't.
18 Q.  Now, I want to show you this.
19         (Exhibit No. 10, Multi-page
20         Undercover Operative Report dated
21         9/14/03, bates-stamped ARA 0549
22         through ARA 0650, marked.)
23 Q.  I show you what has been marked as Exhibit
24     No. 10. It is a lengthy document beginning

79

1      with -- I'll use the ARA documentation
2      numbers that are in the lower right-hand
3      bottom corner -- ARA 0549 through ARA 0650;
4      is that the way yours is put together, your
5      Exhibit No. 10?
6  A.  Yes.
7  Q.  Would you agree these are a series of reports
8      from Computer Risk Solutions addressed to Jay
9      Hess providing reports of information from
10     the undercover operative who was working at
11     WearGuard at the time?
12 A.  Yes.
13         MR. LAMKIN: Corporate Risk
14 Solutions?
15         MR. CALLANAN: Yes.
16         MR. LAMKIN: I think you said
17 "Computer."
18         MR. CALLANAN: Thank you. Corporate
19 Risk Solutions.
20 Q.  These reports were addressed to Mr. Hess, at
21     least the first one, dated September 14th; is
22     that correct?
23 A.  Yes.
24 Q.  And did you see these reports at any time

80

1      during the period September to November of
2      '03?
3  A.  Yes. Jay would forward them to me.
4  Q.  On the first page of Exhibit No. 10, there's
5      handwriting, is that your handwriting?
6  A.  Yes.
7  Q.  Would you read that to us?
8  A.  "Gave copies of field reports to Rich Sjoberg
9      - NSA, Kathy Gillis HR, Susan Magrini HR" --
10     crossed those out -- "11/11/03."
11 Q.  The word "field reports," is that what you
12     said?
13 A.  Yes.
14 Q.  What do you mean by "field reports"? Do you
15     mean this document?
16 A.  Yes.
17 Q.  This entire document?
18 A.  The entire undercover, yes.
19 Q.  Did you give a copy to Kathy Gillis?
20 A.  I don't believe I did. I don't know why I
21     would cross it out if I did.
22 Q.  What about Susan Magrini?
23 A.  I don't think I gave them to her either at
24     this time.

133

1   Q.   He's no longer employed at WearGuard, is he?
2   A.   I don't think he is, no.
3   Q.   Was he terminated at some point after this
4        investigation, if you know?
5   A.   I don't know.
6   Q.   But as far as you know, these five
7        supervisors, from Casagrande, Hogan,
8        Phillips, Caswell and Lowder, as far as you
9        know, the investigation didn't find them
10       responsible for any wrongdoing or any failure
11       of supervision, as far as you know?
12  A.   I don't know.
13  Q.   You don't?
14  A.   No.
15  Q.   Do you have any understanding as to why
16       Mr. Sjoberg was asked to interview those five
17       supervisors?
18  A.   Other than these are the people that worked
19       in the departments that the majority of the
20       these people came from. Like, Barbara
21       Casagrande, she was the initial one that came
22       to me. The rest of them worked in CE or the
23       Art Department.
24  Q.   Page 243 of Mr. Sjoberg's report, which is

134

1        Exhibit 19, the bottom of the page there's a
2        statement that Mr. Sjoberg writes, it says,
3        "Brian Caswell stated he knows for sure that
4        Eric sold drugs at WearGuard at that time."
5             Do you see that statement?
6   A.   I see that.
7   Q.   And did you inquire of Mr. Sjoberg what the
8        basis of that statement was?
9   A.   Did I what?
10  Q.   Did you inquire from Mr. Sjoberg, he's
11       reporting this to you, what the basis of that
12       statement was?
13  A.   In the way Richard Sjoberg -- these are just
14       statements that come from -- these are
15       actually statements. That's how he writes
16       his reports. I didn't know. I didn't --
17  Q.   Did you ask Mr. Caswell what the basis of his
18       statement about --
19  A.   I don't remember. I don't remember.
20  Q.   Do you know if Mr Casagrande (sic) was asked
21       to give a written statement as to what he
22       knew about Eric?
23  A.   I don't know.
24  Q.   On Page 251 of Mr. Sjoberg's report, it

135

1        indicates "On Monday, November 10, 2003, the
2        investigator and Mr. Cummings also spoke with
3        the following employees noted within the
4        scope of the ongoing investigation." Do you
5        see that part of the report, Page 14 of the
6        report itself?
7   A.   Yes.
8   Q.   And there are six names there beginning with
9        Carlos Ortiz?
10  A.   Yes.
11  Q.   And do you agree that you were present when
12       Mr. Sjoberg interviewed those six employees
13       on November 10?
14  A.   The only one I remember being present with
15       was Carlos Ortiz.
16  Q.   This is the same November 10 that we've just
17       seen back on Page 234 of the report, the same
18       day that he interviewed the five supervisors,
19       correct?
20            I'm looking at Page 0239  It says
21       "On this day" --
22  A.   Yeah, it does say that. I don't know if
23       that's the actual day he talked to him or
24       investigated it.

136

1   Q.   His reports states on November 10, he
2        interviewed the five supervisors, and over
3        here on Page 251 of the same report, he says
4        on the same day that he and you spoke to six
5        individuals beginning with Carlos Ortiz and
6        ending with Anthony Sketchy Sousa, correct?
7        The report says that? I'm just --
8   A.   Yes.
9   Q.   This is the report he submitted to you?
10  A.   Yes.
11  Q.   And so that's 11 interviews on November 10th
12       of 2003, according to the report, anyway?
13  A.   Yes.
14  Q.   And you were present during the Ortiz
15       interview?
16  A.   I remember meeting Ortiz in Holbrook, yes.
17  Q.   How did it happen that you met Ortiz in
18       Holbrook?
19  A.   I think he requested that it be at his house
20       and we met him in the baseball field.
21  Q.   He was suspended at the time?
22  A.   I believe so.
23  Q.   You accompanied Richard Sjoberg to Holbrook?
24  A.   Yes.

137

1 Q. And the report indicates on Page 0251 under
2 the section "Interview With Carlos Ortiz,"
3 that the meeting took place "on Monday at
4 11:45 a.m.; at a park along Route 37 in
5 Holbrook"?
6 A. Yes.
7 Q. How was that location determined?
8 A. I think Carlos requested it.
9 Q. Was he alone? I think it says he had his son
10 with him?
11 A. Yeah, he did have his son with him.
12 Q. And you and Mr Sjoberg were present?
13 A. Yes.
14 Q. And was the interview done in somebody's car
15 or standing or sitting?
16 A. Sitting.
17 Q. Sitting where?
18 A. On a park bench.
19 Q. At the bottom of that page, Page 0251, would
20 you read that last entry?
21 A "Carlos Ortiz stated; 'I only wrote down at
22 the police station about Eric Beasley so I
23 could get bailed. It's not true.'"
24 Q. Were you present when Mr. Ortiz said that?

138

1 A I believe so, yes.
2 Q. Now, it's in Mr. Sjoberg's report and it's in
3 quotation marks, but the word "Beasley" is in
4 parentheses, do you see that?
5 A. Yes.
6 Q. Did Mr. Ortiz actually say that it was Eric
7 Beasley that he was referring to or did he
8 just say Eric, if you know?
9 A. I don't know.
10 Q. Did you understand that Mr Ortiz's statement
11 when you were present when he made it, was in
12 reference to his written statement that we've
13 earlier seen in this deposition?
14 A. I believe so.
15 Q. The statement that he gave at the Norwell
16 Police Station?
17 A. I believe so.
18 Q. And that would've been about five days
19 earlier on November 5th or early on the
20 morning of November 6th, right?
21 A. Yes.
22 Q. Was there any follow-up after he made that
23 statement? Did you inquire, or did
24 Mr. Sjoberg, your investigator, inquire any

139

1 further about that?
2 A. I can't remember.
3 Q. The next statement from Sjoberg's report,
4 which is at the top of Page 0252, would you
5 read that to us, please?
6 A. "Carlos Ortiz stated; 'I don't even know Eric
7 Beasley except to say Hi. I didn't even know
8 that he, Eric Beasley, smoked weed.'"
9 Q. And, again, part of that sentence is in
10 quotation marks although the word "Beasley"
11 is in parentheses, and in the second line the
12 words "Eric Beasley" are in parentheses.
13 Did Mr. Ortiz use the word "Beasley"
14 when he made that statement when you were
15 present?   -
16 A. I can't remember.
17 Q. Carlos Ortiz worked in the Custom Embroidery
18 Department, did he not?
19 A. Yes.
20 Q. And Mr. Beasley worked in the Art Department?
21 A. Yes.
22 Q. At the time?
23 A. Yes.
24 Q. And Mr. Eric O'Connor worked in the Custom

140

1 Embroidery Department at the time?
2 A. I really don't know.
3 Q. Now, at the bottom of this page, 0252,
4 there's an entry that says "Carlos Ortiz
5 subsequently contacted the investigator by
6 telephone"; I take it that means that after
7 you had the meeting in Holbrook, there was
8 some subsequent telephone contact. That's
9 the way I read it, would you agree?
10 A. Yes.
11 Q. How long did the meeting in Holbrook last?
12 A. 20 minutes, half an hour.
13 Q. What was the purpose of the meeting, as you
14 understand it?
15 A. Again, it was to interview everybody that was
16 involved, you know.
17 Q. Find out what they knew?
18 A. Yeah.
19 Q. And was the meeting with Ortiz recorded in
20 any way, notes taken?
21 A. I can't remember.
22 Q. Or audio tape?
23 A No, no.
24 Q. Do you know anything about the subsequent

153

1    Q.    Excuse me, other than the interview or
2          conversation with Kathy Gillis?
3    A.    Yes.
4    Q.    When he was informed that he was suspended?
5    A.    Yes.
6    Q.    And he didn't admit any wrongdoing during
7          that conversation, did he?
8    A.    No.
9    Q.    In fact, he denied wrongdoing in your
10         presence at that time?
11   A.    Yes.
12   Q.    You testified that Eric O'Connor is presently
13         employed at WearGuard, correct?
14   A.    Yes.
15   Q.    You would have a photo ID of Eric O'Connor in
16         your office?
17   A.    Yes.
18   Q.    Do you know whether Eric O'Connor wears an
19         eye piece?
20   A.    Yes.
21   Q.    He does wear an eye piece?
22   A.    Yes.
23   Q.    Has he worn it for some time?
24   A.    I don't know.

154

1    Q.    Was he wearing it in 2003 when these events
2          happened?
3    A.    I really don't know.  I would have to look at
4          the ID picture.
5    Q.    Is the ID picture usually taken upon hire?
6    A.    Yes, unless they lose their ID and we take
7          another one.
8    Q.    But, normally, the original is taken at the
9          time of hire and that is used throughout
10         employment?
11   A.    Yes.
12   Q.    Would you agree with me that according to the
13         undercover operative, she appears to be
14         describing an Eric who wears an eye piece in
15         her reports?
16   A.    Yes.
17   Q    Why is Susan Magrini no longer employed with
18         WearGuard?
19   A    I really don't know.
20   Q.    When did she leave?
21   A.    I really don't know.  A year ago.  I really
22         don't know.
23   Q.    Who is Jason Callaway?
24   A.    The HR VP now.

155

1    Q.    He succeeded Susan Magrini?
2    A.    They went quite awhile without a VP of HR.
3          There was a director in place and they didn't
4          replace him -- her right away.
5    Q.    You have no knowledge as to why Susan Magrini
6          left employment with WearGuard?
7    A.    No.
8    Q.    Or with Aramark?
9    A.    No.
10   Q.    Did they have sort of a farewell gathering
11         when she left?
12   A.    I can't remember.
13   Q.    Have you had any contact with Susan Magrini
14         since she left employment with WearGuard?
15   A.    No.
16   Q.    Have you tried to have contact with her, made
17         any attempts to contact her?
18   A.    There was a situation with her company car
19         that -- I can't remember who asked me.
20         Something -- I don't know.  No, I have not
21         had any contact with regards to this.  I
22         can't even remember talking to her once she
23         left.
24   Q.    Your counsel has provided me with a post

156

1          office box in East Sandwich, Massachusetts as
2          the address for Susan Magrini, do you know if
3          she lives on the Cape?
4    A.    She does live on the Cape, yeah.
5    Q.    Do you know where she lives, what community?
6    A.    Sandwich.
7    Q.    In Sandwich?
8    A.    Yes.
9    Q.    Do you know her address?
10   A.    No.
11   Q.    Or her telephone number?
12   A.    No.
13   Q.    Or her email address?
14   A.    No, wish I could help you.  The only reason I
15         know is I used to go down the Cape quite a
16         bit and I'd mention that I would go down that
17         Route 6 and she said, "Oh, I live right off
18         of Route 6."  That's all I know.
19   Q.    That narrows it down a bit.
20   A.    I know where the street is, but I don't know
21         the name of it, though.
22   Q.    Do you know whether Susan Magrini is now
23         employed or not?
24   A.    I really don't know.

# EXHIBIT J



O'Connor, Eric

ARA 0769